IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CASE NO.:  3:18-cv-1342-J-20PDB


DEPUY SYNTHES PRODUCTS, INC.,          Jacksonville, Florida
& DEPUY SYNTHES SALES, INC.,
                                       May 7, 2019
          Plaintiffs,
                                       2:03 p.m. - 3:49 p.m.
          -vs-
                                       Courtroom:  5B
VETERINARY ORTHOPEDIC
IMPLANTS, INC.,

          Defendant.
_____

**DIGITALLY RECORDED MOTION HEARING**
BEFORE THE HONORABLE PATRICIA BARKSDALE
UNITED STATES MAGISTRATE JUDGE


OFFICIAL COURT REPORTER:

Cindy Packevicz Jarriel, RPR, FCRR
221 N. Hogan Street, #128
Jacksonville, FL  32202
e-mail:  cindyrprfcrr@gmail.com

     (Proceedings recorded by electronic sound recording;
transcript produced by computer.)

```
 1
 2                    A P P E A R A N C E S
 3   For Plaintiffs:
 4   JASON G. SHEASBY, ESQ.
     Irell & Manella, LLP
 5   Suite 900
     1800 Avenue of the Stars
 6   Los Angeles, CA 90067-4271
 7   EDWARD MATHIAS, ESQ.
     Axinn, Veltrop & Harkrider, LLP
 8   90 State House Square
     Hartford, CT 06103
 9
     ROBERT TROY SMITH, ESQ. (via speakerphone)
10   GrayRobinson PA
     50 N Laura St Ste 1100
11   Jacksonville, FL 32202-3611
12   STEPHEN GREGORY ANDERSON, ESQ.
     GrayRobinson, PA
13   301 E. Pine Street
     Suite 1400
14   Orlando, FL 32801
15
16   For Defendant:
17   AUSTEN C. ENDERSBY, ESQ.
     Fox Rothschild LLP
18   Suite 380 East
     1030 15th Street N.W.
19   Washington, DC 20005
20   MEGAN ANNE MCNAMARA, ESQ.
     Fox Rothschild, LLP
21   Suite 1700 West Tower
     777 S. Flagler Drive
22   West Palm Beach, FL 33401-6148
23                            -   -   -
24
25
```

PROCEEDINGS

1

2    May 7, 2019                                          2:03 p.m.

3                          -  -  -

4        (Court called to order.)

5            THE COURT:  We're on the record in *DePuy/DePuy* -- how

6    do we pronounce it?

7            MR. SHEASBY:  DePuy, Your Honor.

8            THE COURT:  DePuy, thank you.

9            *Synthes Products* --

10           MR. SHEASBY:  Like Pepé LePew.

11           THE COURT:  What's that?

12           MR. SHEASBY:  The character.

13           THE COURT:  Okay.  That will help me remember.  Thank

14   you.

15           *Versus Veterinary Orthopedic Implants*, 3:18-cv-1342.

16           I'll ask counsel to state their names for the record,

17   starting with plaintiffs' counsel, shifting to defense counsel,

18   and we'll turn to the counsel on telephone.

19           MR. ANDERSON:  Stephen Anderson with GrayRobinson on

20   behalf of plaintiffs, Your Honor.

21           THE COURT:  All right.  Good afternoon.

22           MR. MATHIAS:  Edward Mathias from the law firm of

23   Axinn, Veltrop & Harkrider on behalf of the DePuy plaintiffs,

24   Your Honor.

25           THE COURT:  All right.  Good afternoon.

1          MR. SHEASBY:  Good afternoon, Your Honor.  Jason

2   Sheasby for the DePuy plaintiffs.  And with us is in-house

3   counsel for the parent company, Denise DeFranco.

4          THE COURT:  Ms. DeFranco, okay.  Your name sounds

5   familiar.

6          All right.  Thank you.

7          And for the defense?

8          MR. ENDERSBY:  Good afternoon, Your Honor.  Austen

9   Endersby of the law firm of Fox Rothschild for defendant,

10  Veterinary Orthopedic Implants, Inc.  And we'll be referring to

11  them as VOI today.

12         THE COURT:  Okay.

13         MS. MCNAMARA:  Megan McNamara for VOI.

14         MR. ENDERSBY:  And, Your Honor, we have a claim

15  representative from VOI here today.

16         THE COURT:  Okay.

17         MR. ENDERSBY:  This is Rebecca Ballou-Gendreau, the

18  VP of Operations.

19         THE COURT:  Okay.  Good afternoon.

20         And on the telephone?

21         MR. SMITH:  Good afternoon, Your Honor.  This is Troy

22  Smith of GrayRobinson for the plaintiffs.

23         THE COURT:  All right.  Good afternoon, Mr. Smith.

24         MR. SMITH:  Thank you for allowing me to appear by

25  phone.

THE COURT:  You're welcome.

And anyone else on the telephone?

(No response.)

THE COURT:  That's it?  Just Mr. Smith.

All right.  A few housekeeping matters before we turn to the pending motions.

Yeah, these are just housekeeping matters.

There was a motion to bring electronics into the courtroom.  Note that the order -- administrative order that the Court issued a while back permits lawyers to bring electronics into the courtroom without a separate order.  So all you have to do is show either your bar card or your pro hac vice order, so any kind of motion like that is unnecessary.

Second, the motion to appear by telephone was unnecessary in this proceeding because the order specified counsel can appear in person or by telephone.

I only bring that up because, for both of those motions, the judges on the case, Judge Schlesinger and I, had to turn to the motions, consider them, draft an order, enter the order.  And so if it's unnecessary to do that -- do that kind of thing, we'd rather not have to do it.  So please read the orders carefully so that we can avoid unnecessary motion practice.

Another housekeeping matter.  This is, again, a small one.  Rule 5(d) was amended in December.  It doesn't require

certificate of service to be placed on anything anymore when
you file it with ECF.

This is really hard for lawyers, especially lawyers
who have been around for a long time, to get used to.

I think everybody continues to include a certificate
of service on everything that's filed because it's so hard to
get used to that rule.

But know, if you want to save some paper, and
certainly in a case that might be document heavy and filing
heavy, that it's not required anymore.

I apologize for the delay in getting to the motion
concerning Ms. Defranco.  I thought I'd get to it earlier but I
was tied up with other matters that took priority to get
something out about Ms. Defranco this week, and we can talk
about her presence here in just a few minutes considering the
most recent motion filed concerning confidential documents.

On those recently filed motions, I will note that --
it might be moot, because the only person in the courtroom
that's not associated with the Court or counsel is -- well,
there isn't anyone, really.  There's one possible stranger in
the back, at least a stranger to the parties, but that's
Ms. Lasry.  She's Judge Schlesinger's law clerk.

And so, with that, I don't see a need to close the
courtroom.  If anyone walks in, we can reconsider that.

I also don't see a need to preclude mention of

1    confidential documents at this time.  Counsel says they're

2    pertinent to arguments.  I would like to hear about them.

3              So any issue with that from either side?

4              MR. SHEASBY:  No, Your Honor.

5              THE COURT:  All right.  From the defense?

6              MR. ENDERSBY:  And, Your Honor, we will address those

7    documents in turn when it comes time to discuss Interrogatory

8    No. 12, which I believe opposing counsel said these documents

9    all relate to that part of their argument.

10             THE COURT:  All right.  Does that take care of that

11   motion?

12             MR. ENDERSBY:  I believe it does for now, but we will

13   just see what they say at that time, and I'll reserve my right

14   to discuss the relevance or irrelevance of those documents

15   during that part of the argument.

16             THE COURT:  Sure.  I'm not making any kind of rule

17   about their relevancy.  I'm just trying to protect confidences.

18             MR. ENDERSBY:  Understood, Your Honor.

19             THE COURT:  Okay.  All right.  What we're here to

20   discuss is Document 36.  That's the defendant's motion to

21   compel the plaintiffs to provide full and timely supplemental

22   answers to interrogatories.

23             We have Document 41, which is the plaintiff's

24   response.

25             Document 37, which is the defendant's motion to

1  compel the plaintiffs to timely produce documents responsive --

2  responsive to the RFP. We've got the defendant's response to

3  that.

4        And then the motion that I just referenced, the

5  defendant's motion to exclude the presentation of confidential

6  information or close the courtroom, and that's denied as moot.

7        I'm not going to exclude the presentation if it's

8  relevant. I want to hear it. If it's part of their argument,

9  I want to hear it, and there's no need to close the courtroom.

10        I did review Document 59, which was the parties'

11  notice of filing an amended proposed case management report.

12  And I'm not sure how much we can get done today before Judge

13  Schlesinger sets the case management and scheduling order.

14        He said something about setting the trial for July,

15  and that would make a difference in a discovery practice here

16  today.

17        So what I'll do is hear argument from both sides on

18  whatever discovery issues were made, and then I'll await Judge

19  Schlesinger's decision on the case management and scheduling

20  order before entering anything on those motions.

21        All right. So they're the defendant's motion.

22        Who will be speaking for the defendant?

23        MR. ENDERSBY: I will, Your Honor --

24        THE COURT: All right.

25        MR. ENDERSBY: -- Austen Endersby.

1        Thank you.

2        THE COURT:  You're welcome.

3        MR. ENDERSBY:  Good afternoon, Your Honor.

4        THE COURT:  Good afternoon.

5        MR. ENDERSBY:  May it please the Court.  I'd first

6   like to begin by discussing VOI's motion to compel supplemental

7   interrogatory responses.

8        THE COURT:  Okay.

9        MR. ENDERSBY:  And I'd like to note at the outset

10  that DePuy supplemented a number of interrogatory responses

11  since briefing closed, so I think it makes the most sense to

12  just discuss the supplemental responses that were submitted

13  under seal to Your Honor the other day.

14       THE COURT:  Okay.

15       MR. ENDERSBY:  And some of those supplements occurred

16  last week on May 1st and May 3rd, but unfortunately -- go

17  ahead, Your Honor.

18       THE COURT:  So which ones are still at issue?

19       MR. ENDERSBY:  So interrogatories 1 through 7, 9

20  through 12, and 15 are still at issue.

21       THE COURT:  Okay.

22       MR. ENDERSBY:  And Nos. 8 regarding facial

23  information supporting the request for a permanent injunction,

24  and No. 13 regarding any disagreements by DePuy to VOI's

25  affirmative defenses, we are not presenting argument on those

1   at this time, but we would reserve our right to revisit those

2   later in discovery should we find that, based on the factual

3   record at the time, those responses have not been seasonably

4   supplemented in light of the evidence in the record at that

5   time.

6          THE COURT:  Okay.  And Interrogatory 1 wasn't

7   resolved through the parties' submission to Judge Schlesinger,

8   the amended case management report, setting a May 15th

9   deadline?

10         MR. ENDERSBY:  I don't believe so, Your Honor.

11  Because we did set a May 15th deadline for supplementing that

12  response, but we did receive a supplemental response on May 1st

13  to that interrogatory.

14         And we're not sure whether that means that that's

15  going to be what we would have received by May 15th, or whether

16  we're getting another supplemental response on May 15th.

17         THE COURT:  Mr. Sheasby, what's happening with 1?

18         MR. SHEASBY:  Your Honor, we've been rolling our

19  supplementations as we find documents.  It is possible that we

20  will find more documents --

21         THE COURT:  Okay.

22         MR. SHEASBY:  -- between now and May 15th.  We made a

23  production on April 30th, and so we are still working.

24         I think, though, that what VOI is concerned about is

25  that the way the interrogatory response reads now is we give

1  dates based on the documents we've found to date as to when

2  inventions were conceived and reduced to practice.

3       And I think what they're complaining about is that

4  we're not giving definitive dates yet because it is

5  theoretically possible that we may find additional documents

6  later on.

7       THE COURT:  Okay.  All right.  Thank you.

8       MR. ENDERSBY:  That is actually exactly right, Your

9  Honor.

10       Our issue with the current supplemental response is

11  that the way it's phrased is that the current evidence

12  establishes a conception date by June 21st, 2005, and a

13  reduction and practice date by July 11th, 2005.

14       And it's problematic to say that these events

15  occurred by a certain date, because that necessarily means that

16  it's possible that those events could have taken place before

17  those dates.

18       And from a prior art standpoint, that's very

19  problematic for a defendant, because it essentially means we

20  don't know what is and what is not prior art, because something

21  can only be prior art to a patent if it preexisted the date of

22  invention, conception or reduction to practice.

23       So that's why it's essential that we have a firm date

24  on what conception and reduction to practice is so that we

25  avoid a shifting sands or a moving target approach to

1  litigation.

2        THE COURT:  And it sounds like they're still looking

3  for documents or poring over documents to try to give you more

4  definitive dates earlier than then.

5        What's your response to that?

6        MR. ENDERSBY:  Well, I understand that that's their

7  position, Your Honor, but we would say that this information is

8  squarely within their knowledge, possession, custody, and

9  control and has been for the past 14 years, if they're saying

10  that this was invented in 2005.

11        And this litigation began six months ago, and these

12  are pieces of information that every patentee knows that it has

13  to produce in patent cases, in all patent cases.

14        So we would submit that this is information that they

15  probably should have known before they even filed suit.

16        THE COURT:  And if they just tell me they just need

17  more time and will supplement it as they do more discovery, is

18  that unreasonable to give them more time?

19        You say it is, because they've had plenty of time,

20  years and years, in fact.

21        MR. ENDERSBY:  Well, that is our position.

22        THE COURT:  Okay.

23        MR. ENDERSBY:  And I would also add that while we

24  realize that Judge Schlesinger has ruled that he will not be

25  adopting any patent local rules from other jurisdictions that

1   have such rules in this case, we would still point to such

2   patent local rules as at least a persuasive guide into

3   understanding the importance of upfront and early and fairly

4   concrete disclosure of those dates.

5           Under most patent local rules, patentees are required

6   to provide those dates early, and they're not permitted to

7   adjust those dates later in the case unless they can show good

8   cause.  And that's a fairly stringent standard.

9           THE COURT:  But you don't know what they're going to

10   say on May 15th; right?

11           I mean, they haven't supplemented it completely

12   possibly yet.

13           MR. ENDERSBY:  That is true.

14           THE COURT:  So May 15th is the proposed deadline, if

15   Judge Schlesinger adopts that.  You don't even know what

16   they're going to say on May 15th; right?

17           MR. ENDERSBY:  That is true.  We do certainly remain

18   hopeful that we will get definitive dates --

19           THE COURT:  Okay.

20           MR. ENDERSBY:  -- on May 15th.

21           So with that said, Your Honor, we would actually ask

22   for an order requiring them to provide actual dates on

23   May 15th.

24           THE COURT:  All right.  Interrogatory 2 -- unless you

25   have something more on 1.

1          MR. ENDERSBY:  I think that covers 1 fairly well,

2     Honor, thank you.

3          Interrogatory No. 2 generally asks about DePuy's

4     efforts to mark its products with the '921 patent number.

5          And the current supplemental response was received on

6     April 2nd, and that response provided very little additional

7     information.

8          The response, for example, does not provide the date

9     that the patent marking began, does not explain whether there

10    are any other products in addition to the 12 that are listed in

11    the response that were ever marked at any point in time.  It

12    doesn't --

13         THE COURT:  But we know from, I guess, your informal

14    correspondence, there are just 12?

15         MR. ENDERSBY:  I -- I understand from informal

16    correspondence, but --

17         THE COURT:  Okay.

18         MR. ENDERSBY:  -- that's not a verified interrogatory

19    response.

20         THE COURT:  All right.

21         MR. ENDERSBY:  So it's just a communication from

22    counsel, as opposed to something that's a more formal discovery

23    supplementation that has to be verified under penalty of

24    perjury.

25         Also, the current response does not explain whether

1  there are any time periods during which any of those products

2  were not marked, and the reasons, if any, why they weren't

3  marked during any such time periods.

4        But I will note that on May 3rd, we received an

5  e-mail from DePuy's counsel indicating that they intend to

6  supplement with some additional information, but that

7  supplementation has not yet occurred yet, and the information

8  in that e-mail did not cover all of the information that we're

9  seeking in the interrogatory.

10        THE COURT:  And they had talked about -- this is the

11  one where they say they're using a virtual marking website that

12  it's time-consuming, that they'll commit to providing all the

13  information you need by September?

14        MR. ENDERSBY:  That is the -- this is the

15  interrogatory, yes.

16        THE COURT:  Okay.  So what is unreasonable about that

17  response?

18        MR. ENDERSBY:  Well, I think September 20th is such a

19  long ways off.  And it's -- it's a bit perplexing to us as to

20  why should a large company like Depuy Synthes needs essentially

21  eight months from the date that we served our interrogatory

22  response to track down information on how it marks its products

23  with a patent number.

24        THE COURT:  They did say it was time-consuming.

25        MR. ENDERSBY:  Yes, Your Honor, but they didn't

explain --

THE COURT:  You don't think it is?

MR. ENDERSBY:  Well, I guess we don't know, absent any sort of declaration or explanation as to what goes into the process.

THE COURT:  And if Judge Schlesinger adopts the case management report dates that the parties agreed to, is September still unreasonable for that information?

MR. ENDERSBY:  I think it is, Your Honor, because -- I mean, certainly under the federal rules, we're entitled to the information within 30 days.

THE COURT:  All right.  Well, that's true.  That's true.  The federal rules do -- they say 30 days.

Now, it's in the mine run of cases you can get the information in 30 days.

What we often see, especially in complex litigation -- I would count this as complex relative to other federal cases.  We see a give-and-take between counsel agreeing and understanding that 30 days would be insufficient, and so there's not really what there has been in this case, this press:  Immediately, 30 days, time's up, give it to us.

Is that how it went?  Not really?

MR. ENDERSBY:  I mean, we at least wanted some commitment on reasonable supplementation date.  So that's why we wanted to meet and confer and understand what goes into

1  answering these interrogatories, and understand what we'll be

2  getting and when, and expecting reasonable times.  And we --

3            THE COURT:  And they provide us with a timeline that

4  they believe is reasonable based on an assessment of their --

5  you know, looking at what their clients can produce and

6  provide.  They've given you a timeframe at this point.  And

7  that -- you think that's still unreasonable, I understand?

8            MR. ENDERSBY:  I do think it stretches it out quite a

9  bit longer than one would expect.  And absent an explanation as

10 to why it will take that long and why it's burdensome -- and as

11 some of the cases we cited in our motion state, there has to be

12 some explanation as to what -- what the burden is and why it

13 would take so long.

14            THE COURT:  And counsel's representation is not

15 enough?

16            MR. ENDERSBY:  Well, we just don't have enough

17 information to -- to really understand it.

18            And based on some of the meet-and-confers, we just

19 don't have enough information to assess the reasonableness of

20 that.

21            THE COURT:  Okay.

22            MR. ENDERSBY:  And -- and I'm sure Mr. Sheasby will

23 explain when he gets up here why September 20th is the absolute

24 earliest that they can finish providing information in response

25 to this.  And, you know, we'll certainly be able to assess that

1  explanation at that time.

2              THE COURT:  Okay.  Anything else on 2?

3              MR. ENDERSBY:  I don't believe so, Your Honor.

4              THE COURT:  All right.  3?

5              MR. ENDERSBY:  Okay.  Three requests information on

6  DePuy's sales.

7              And we did receive a supplemental response on May 1st

8  that cited to a sales spreadsheet that contained certain sales

9  data.

10             When we reviewed it, it was not apparent to us that

11 it contained all of the information that we were seeking.

12             For example, it did not appear to contain gross and

13 net profit data.  So we sent an e-mail to DePuy the next day

14 just asking basically that question.

15             And we did receive a response this morning, Your

16 Honor, that said -- and I'll just read it here:  We have

17 provided the information that is within our possession,

18 custody, and control.  We are producing additional cost

19 category information shortly.

20             So we certainly appreciate that response.  It's just

21 unclear whether that communication means that DePuy has

22 exhausted providing everything that they have in their

23 possession that's responsive to this particular interrogatory.

24 So I'm sure Mr. Sheasby will say yea or nay when he's up here

25 as to that.

1      So 3 may be resolved and may not be.  I'm just not

2  sure yet.

3      THE COURT:  Well, this is sales of their products;

4  right?

5      MR. ENDERSBY:  Correct, Your Honor.

6      THE COURT:  And it pertains to damages; right?

7      MR. ENDERSBY:  That's right.

8      THE COURT:  I mean, it's really pretty early for a

9  definitive answer right now on that; right?

10      No, you don't think so?

11      They should have it for you.  I understand your

12  position.  But isn't it their risk -- it's their risk; right?

13      If they don't provide you the information on a timely

14  basis, information that they have in their possession, custody,

15  and control, and they don't have a reason for timely providing

16  it, aren't they risking inability to introduce it as evidence?

17      MR. ENDERSBY:  That is true, Your Honor.

18      THE COURT:  And if they say:  We've given everything

19  in our custody, control, possession -- that's what they told

20  you -- then what's the problem for you?

21      MR. ENDERSBY:  That very well could end the inquiry,

22  Your Honor.  I think that's what I understand from the e-mail

23  we received this morning.

24      And if that's how I read the e-mail, then that should

25  settle Interrogatory 3.

```
 1              THE COURT:  Okay.  All right.
 2              MR. ENDERSBY:  Moving on to No. 4.
 3              THE COURT:  Theories and calculations?
 4              MR. ENDERSBY:  Yes.  Damages calculations and facts
 5     that DePuy is relying on to support its theories.
 6              We did receive a supplement to this interrogatory on
 7     May 1st, but from our perspective it remains incomplete.  For
 8     starters, it does not contain a damages calculation.
 9              And we would note that DePuy's initial response and
10     its first supplemental response explain that they could not
11     provide a damages calculation, in part, because it had not yet
12     received sales data from VOI.  But it has since received sales
13     data from VOI.  We produced that on March 25th.
14              THE COURT:  Okay.
15              MR. ENDERSBY:  So at least that rationale for not
16     being able to provide that calculation no longer applies.
17              There's also additional factual detail relevant to
18     damages that we do not see in their supplemental response.  For
19     example, they've indicated that they intend to rely on a theory
20     of lost profits in the patented product.
21              And in order to prove that, they need to be able to
22     show an absence of acceptable non-infringing alternatives,
23     manufacturing and marketing capability to exploit the demand of
24     the patented product, among other things.  And there are
25     certainly facts within their possession that go to those
```

1   factors that we have not seen in the response yet.

2           THE COURT:  Okay.  So it would take a long time to go

3   through each interrogatory and request for production, but

4   having gone through these four, I'm sort of getting the gist

5   and the flavor of things, which I got through the written

6   documents, too, which is they say they need more time; you say

7   they don't know need more time.  Let's get it together.

8           Is that -- can I sum it all up like that, or are

9   there substantive, meaty issues to present?

10          MR. ENDERSBY:  I think that's generally a good lens

11  to view this through.

12          THE COURT:  Okay.

13          MR. ENDERSBY:  I would say there are a number of

14  substantive, meaty issues.

15          THE COURT:  Okay.  So beyond the arguments about

16  time:  We've done this.  We've asked for this, they haven't

17  produced it.  They say they will but they haven't given a

18  definitive time; or they've given a set date, but that's too

19  long.  It's unreasonable.  I understand your complaint there.

20          But what I'm going to do is turn to them and ask:

21  How long do you need?  What's a reasonable time period to

22  produce that?

23          Let's set some deadlines.

24          I'm going to have to wait for Judge Schlesinger to do

25  that; right?

1          But what I can work on right now and we can stick to,

2    since we won't have -- I mean, we can't stay here all night, is

3    the really substantive disagreements on discovery.

4          So if you can turn to those, beyond just when they're

5    going to produce something.

6          MR. ENDERSBY:  Yes, Your Honor.

7          THE COURT:  Okay.

8          MR. ENDERSBY:  Interrogatory No. 5 is a good example

9    of what we should talk about in this regard.

10          THE COURT:  Okay.

11          MR. ENDERSBY:  This one requests the date of first

12    sale, first offer for sale, first public use of products

13    embodying the patent and the circumstances involved in those

14    activities.

15          THE COURT:  Okay.

16          MR. ENDERSBY:  And the current supplemental response

17    includes information on the first sale dates of the 12 products

18    that -- that DePuy says are covered by the patent.

19          THE COURT:  Okay.

20          MR. ENDERSBY:  Does not contain information on the

21    first public use, first offer for sale, or the circumstances

22    surrounding those activities.  And certainly all of those

23    activities are relevant to patentability and invalidity.

24          So not having actually heard any -- anything from

25    DePuy as to whether they're going to provide first offers for

1  sale -- I understand in their -- at least in their opposition,

2  if not their response to the interrogatory, they did say that

3  they were looking into first public uses and that they would do

4  so by May 31st, I believe.

5         So if we get that information on May 31st, that will

6  satisfy that aspect of this interrogatory, but we just haven't

7  heard from them yet as to whether they're going to produce

8  anything regarding the first offers for sale, which is equally

9  as important as the other two aspects.

10        THE COURT:  So that's sort of premature as well.

11        If we take away the time issue, they say they'll

12  provide everything -- they'll provide a response on May 31st.

13        We don't even know what they're going to say yet;

14  right?

15        MR. ENDERSBY:  They did say that they would provide

16  information on first public use.

17        THE COURT:  Okay.

18        MR. ENDERSBY:  But they were silent as to whether

19  they're going to provide information on first offers for sale.

20  And that's an important part of this --

21        THE COURT:  But we just don't -- we just don't know

22  what they're going to produce.

23        MR. ENDERSBY:  That's true, Your Honor.  But I can

24  only judge what I think they're going to do based on the words

25  that they've used.  And they've said specifically first public

1    use, but haven't said anything about offers for sale, so

2    that's --

3              THE COURT:  And remind me of the objections to this

4    one, No. 5, the specific objection.

5              MR. ENDERSBY:  Let me just turn to that, Your Honor.

6              Looks like they objected on the basis that it could

7    call for legal conclusions, attorney-client privilege, overly

8    broad, unduly burdensome, not limited to only the first use,

9    offer for sale, or sale, and therefore exceeding the scope of

10   permissible discovery.

11             THE COURT:  So the substantive issue is whether they

12   have to provide anything beyond public use?

13             MR. ENDERSBY:  I believe so, Your Honor, although I

14   have not seen anything from them indicating a flat-out refusal

15   to provide that.

16             THE COURT:  Mr. Sheasby, do you plan on producing

17   that information by -- it looks like the CMR for those is

18   May 15th.

19             MR. SHEASBY:  Yes, Your Honor.  We actually

20   supplemented this interrogatory on 5-1-19.

21             And what we've given them is all the data that we

22   collected on the -- we know when the first sale is, because

23   that's in our databases.

24             As to first offers for sale, that information would

25   be invoices or in catalogs, which we produced to them.  We

1    produced 40,000 invoices.

2           And the third issue is, in terms of first use, we've

3    produced to them all our research and development documents

4    that would relate to folks who would be using these documents.

5           So this is an example in which we actually asked to

6    meet and confer with counsel last week.  And after we had done

7    the next run of supplementation, I -- we're not refusing to

8    produce first offer of sale, first -- no, I mean, there's no

9    dispute here.

10          THE COURT:  Okay.

11          MR. SHEASBY:  And we actually think we've probably

12   gotten them most, if not all, of the documents on this subject.

13   And we supplemented it per 32(d) in our interrogatories.

14          THE COURT:  All right.

15          Let's go to 6.

16          MR. ENDERSBY:  If I could just say one last thing

17   about that, Your Honor.

18          THE COURT:  Sure.

19          MR. ENDERSBY:  The supplemental response on May 1st,

20   on page 27 says:  Although not a public use, first offer for

21   sale, and/or first sale in the United States, Depuy Synthes

22   notes that during the research and development program,

23   experimental testing of various prototypes by collaborators

24   occurred, and then they cite the documents -- presumably the

25   ones that Mr. Sheasby is talking about now.

1  So, yes, they did supplement, but they explicitly say

2  that it's not a public use or a first offer for sale.

3  THE COURT:  All right.  But they're saying they're

4  not objecting to that.  They're going to provide you the

5  information that's requested; right?

6  I might have gotten that wrong.

7  MR. ENDERSBY:  I am not sure.  It sounded like he

8  said that they've already provided it.  And I'm just taking

9  issue with the language in the supplement that says:  This is

10  not a public sale for an offer for sale.

11  MR. SHEASBY:  Your Honor, if I may be clear, we don't

12  have an obligation -- public sale, public use, offer to sale

13  are legal concepts under the patent law.

14  We have an obligation to provide them with

15  information, not to provide a legal conclusion to them.

16  So what we've given them is all invoices, the date in

17  our records for first sale that we have in our preexisting

18  records, and all the data about people using our products

19  before the data for sale.  That's been given.

20  So I really don't know -- I don't -- I don't even

21  understand what the fight is here.

22  THE COURT:  Okay.  Okay.  Thank you.

23  I understand 5.

24  Number 6?

25  MR. ENDERSBY:  Number 6 asks for an identification of

1   the people who worked with the named inventors during the

2   development of the claimed subject matter, including each

3   person's role, the dates they collaborated with the named

4   inventors, and the locations where the assistants and

5   collaboration took place.

6          And we did receive a supplement on March 25th.  And

7   that supplement identified two individuals and their titles,

8   but the response does not provide the rest of the information

9   that we're seeking, like the details regarding what role they

10  actually played in the development, what dates they were

11  working or collaborating with the named inventors, and where

12  they were doing this.

13         And we believe that a complete response to this

14  interrogatory is important in order to establish a clear

15  timeline of events leading up to the development and conception

16  or introduction to practice.  And also to establish the --

17  essentially inventorship on the patent.

18         You know, were all the proper inventors named in the

19  patent; are there other people out there who perhaps should

20  have been named but weren't?

21         And that's all clearly discoverable and relevant to

22  issues of validity and we just have not received a proper

23  supplement.

24         And this is also information that we believe should

25  be readily available to them.

1          THE COURT:  Okay.  7?

2          MR. ENDERSBY:  7 and 12, I'd like to take up

3    together, because both of these relate to our key defense of

4    equitable estoppel.

5          Number 7 asks for basic information about the

6    circumstances in which DePuy first became aware of the

7    accused's products, and this response has not yet been

8    supplemented.

9          THE COURT:  And they said they disclosed -- or it

10   will be disclosed in documents that will be produced?

11         MR. ENDERSBY:  They did say that they are committed

12   to supplementing by July 1st, but we don't know what that

13   supplement's going to look like until we get it, of course,

14   Your Honor.

15         But, you know, this is another one that is in the

16   same vein of we're not getting information fast enough.  But

17   this one and 12 matter for a slightly different reason, Your

18   Honor, because we are going to be seeking expedited proceedings

19   with Judge Schlesinger on our affirmative defense of equitable

20   estoppel.

21         We first proposed that to DePuy's counsel as part of

22   our supplemental scheduling order that we submitted on

23   April 26th, and they rejected that idea, so we took it out of

24   the joint filing.  But we're still fully intending on asking

25   Judge Schlesinger for expedited proceedings on that.

1    And under our plan, we would propose a trial, a bench

2  trial, with the judge by either September or October 2019.  And

3  we would hope that fact discovery would close on this issue by

4  late June, at the latest.

5    So providing supplemental responses to this on July

6  1st would come too late for that time frame, in the event Judge

7  Schlesinger agrees that -- that we should have such a fast

8  proceeding for this issue.

9    And I realize that this dovetails with what we're

10  going to be doing tomorrow with Judge Schlesinger and any

11  motion that we may or may not be required to file on this issue

12  with him.

13    THE COURT:  Yes -- yeah, that would probably be in

14  his camp for now.

15    Is there a substantive issue with this?

16    MR. ENDERSBY:  Well, apart from missing information

17  that we haven't been provided in 7, No. 12, which we just

18  received a supplement to on May 3rd, does not actually explain

19  the reasons why DePuy did not file suit sooner than November of

20  2018.

21    Upon review of the supplemental response, it provides

22  certain information, but nowhere do they actually explain why

23  it is they did not file suit sooner.

24    So we consider it --

25    THE COURT:  And they'll explain that in their

1   response to your motion for summary judgment on that equitable

2   defense; right?

3           MR. ENDERSBY:  Perhaps they will.

4           THE COURT:  It's a defense -- I mean, it's sort of

5   intertwined with their legal argument; right?

6           MR. ENDERSBY:  I would agree that --

7           THE COURT:  There's some facts there; there's some

8   law there; it's all mixed in?

9           MR. ENDERSBY:  Well, the problem with the response is

10  it doesn't give us any facts as to why they waited.

11          They just provide information.  And it's not clear

12  what -- how that information actually relates to the

13  interrogatory as posed.

14          THE COURT:  And depositions, tell me about those.  Or

15  you're going to just ask that question in a deposition and get

16  your answer, or you're waiting to get it first through an

17  interrogatory?

18          MR. ENDERSBY:  Well, we think this is appropriate

19  information to ask in the form of an interrogatory.

20          THE COURT:  Okay.

21          MR. ENDERSBY:  And --

22          THE COURT:  What is the status, since I'm on that, of

23  depositions?  What's happening with those?

24          MR. ENDERSBY:  None have been scheduled at this

25  point, Your Honor.

```
 1              THE COURT:  Okay.
 2              MR. ENDERSBY:  But certainly if we do get an
 3    expedited procedure for equitable estoppel, we'll be seeking
 4    depositions related to that issue in very short order.
 5              THE COURT:  Okay.  Is that it?
 6              Skip 8.
 7              MR. ENDERSBY:  That's right, we're skipping 8.
 8              THE COURT:  And 9?
 9              MR. ENDERSBY:  Nine relates to secondary
10    considerations of non-obviousness and factual information to
11    support -- to support that.
12              We did get a supplement on April 2nd.
13              THE COURT:  Okay.
14              MR. ENDERSBY:  But, again, it's missing a whole host
15    of factual information that we would expect them to be able to
16    provide.
17              THE COURT:  Do I have that supplement on the record?
18              MR. ENDERSBY:  I believe so, Your Honor.
19              THE COURT:  Which one --
20              MR. ENDERSBY:  The supplemental responses that were
21    filed yesterday contain each and every supplemental response --
22              THE COURT:  Okay.
23              MR. ENDERSBY:  -- throughout the course of the case.
24              THE COURT:  Okay.  In the original response, they
25    committed to supplement by August 1st.
```

1    Was that changed?

2    MR. ENDERSBY:  It's unclear, Your Honor, because at

3 the time that they said that they would supplement by

4 August 1st, the scheduling order before Judge Schlesinger had

5 invalidity contentions occurring sometime in July.

6    So I believe it was DePuy's position that they should

7 respond to this interrogatory after our invalidity contentions.

8    THE COURT:  Okay.

9    MR. ENDERSBY:  Now the parties have agreed that VOI

10 can provide invalidity contentions by September 12th.

11    THE COURT:  Okay.

12    MR. ENDERSBY:  So I'm not sure what that does to the

13 calculus of when they propose to supplement this.

14    THE COURT:  Okay.  So the substantive issue there is

15 they haven't yet provided all the information requested, so we

16 don't quite know what they plan to provide.

17    MR. ENDERSBY:  That's -- that's essentially it, Your

18 Honor.  And this is very similar to many other interrogatories

19 where it should be basic factual information that they know

20 about, and they should be able to provide factual information

21 to support the assertions that they have in their response, but

22 we just haven't seen it.

23    And we need to have information so that we can

24 conduct fact depositions in a reasonable manner and in a timely

25 fashion.

1    THE COURT:  Okay.  This is -- I'm just kind of
2  mulling over what would be the most efficient process here,
3  rather than going through each and every interrogatory with
4  you, each and every RFP with you, and then turning to the
5  defense, and then possibly giving you a chance to reply.
6    MR. ENDERSBY:  Sure, Your Honor.  Well, I can be
7  extremely brief --
8    THE COURT:  All right.
9    MR. ENDERSBY:  -- on the rest of it.
10    THE COURT:  Okay.  Go ahead.
11    MR. ENDERSBY:  I think I can short-circuit this.
12  There's not much left to go over.
13    And I can cut to the chase on Interrogatory No. 10.
14    THE COURT:  Uh-huh.
15    MR. ENDERSBY:  I think the main problem with our
16  response -- the response we've received so far is that we don't
17  have an identification of all of the DePuy products that they
18  believe are covered by the '921 patent.
19    The only statement we have is that they --
20    THE COURT:  This is the 12 again?
21    MR. ENDERSBY:  I'm sorry, this is No. 10.
22    THE COURT:  No, I mean, they said 12 products?
23    MR. ENDERSBY:  Correct, yes, it's the 12 products.
24    THE COURT:  This is the same issue?
25    MR. ENDERSBY:  Well, the issue here is that they

1  stated in their first set of objections and responses that

2  whether or not there are other products out there beyond this

3  12 that are covered by the patent --

4           THE COURT:  I understand.  But we're repeating it,

5  though.

6           They said informally, there's only 12.  You want that

7  in writing, under oath, in an answer?

8           MR. ENDERSBY:  It is actually slightly different with

9  respect to --

10          THE COURT:  Okay.

11          MR. ENDERSBY:  -- this interrogatory.

12          THE COURT:  Okay.  How is it different here?

13          MR. ENDERSBY:  I'll accept, you know, once they

14 supplement their interrogatory that there's only 12 that they

15 mark, but to the extent there are other products that they make

16 and sell that they believe are covered by the patent but are

17 not marked, it's important that we know what those are as well

18 because it relates to all kinds of other issues in the case,

19 like whether those products, beyond just the 12 listed in

20 interrogatory 5 and 2, may have been sold or offered for sale

21 at some critical date before either the application of the

22 patent or the date of invention, which is important for on sale

23 bar defense, prior public use defense.

24          We just don't know whether there are other products

25 of theirs that they consider to be covered by the patent beyond

1   just these 12 that are listed in this interrogatory and others

2   that may be covered.

3          And it's also critical to understand for purposes of

4   how they read their own patent claims on their own products,

5   that informs broader issues in the case like claim

6   construction --

7          THE COURT:  Well, it's also -- it's sort of incumbent

8   on that if they come, and six months out we have product 13, we

9   never disclosed it, but we're going to bring that one up as

10  well.  They face the danger, not you; right?

11         Right now you know of 12.  You're doing discovery on

12  12.  We're working with those 12.  They've got to provide you

13  when they have the information with other -- they can't

14  surprise you with products 15, 16, 17.

15         So it's really a risk they face, not you face; right?

16         MR. ENDERSBY:  I think they do face the bigger risk.

17  I would agree with that, Your Honor.

18         THE COURT:  Okay.  All right.  I understand 10.

19         11?

20         MR. ENDERSBY:  Eleven is --

21         THE COURT:  Prior art?

22         MR. ENDERSBY:  -- prior art.

23         The issue that we have with this current response is

24  that there's a vague reference to non-privileged documents that

25  Depuy Synthes may produce in this litigation, and that's an

1    improper reference to Rule 33(d) right after that statement.

2    And -- and it's improper because they don't actually cite any

3    documents, they just say that they may produce documents.  And

4    it's just unclear to us whether this statement means that DePuy

5    is aware of other documents that are responsive to this, other

6    prior art that they were aware of at the time of prosecution

7    but have not yet decided whether or not to produce it.

8         It's just a vague statement that we frankly don't

9    understand.  And this is information that we think is clearly

10   within their immediate knowledge and possession, or their

11   patent attorneys, and can be provided very quickly.

12         THE COURT:  Okay.  We've done No. 12.  We can skip

13   that; right?

14         MR. ENDERSBY:  That's correct.

15         THE COURT:  We can skip 13?

16         MR. ENDERSBY:  We can skip 13.

17         THE COURT:  Okay.  Number 14?

18         MR. ENDERSBY:  Fourteen was not at issue in the

19   motion.

20         And 15 is essentially our infringement contentions,

21   and an element-by-element claim chart, and this is one that the

22   parties have agreed will be supplemented by June 14th.

23         And so, of course, I have nothing to say with regard

24   to the sufficiency of the answer because we haven't seen it

25   yet.  I simply just want to reiterate that we would like to

1    have the chance to revisit the response to this interrogatory

2    if and when we get something on the 14th that we deem to be

3    insufficient.  And we think that DePuy should be ordered to

4    provide a complete response to this interrogatory by June 14th.

5         We just don't know what we're going to see, and it

6    should be within all of the parameters we put forth in our

7    interrogatory.

8         THE COURT:  All right.  Why don't we let Mr. Sheasby

9    have a chance to talk and then we'll go to the RFP.

10        MR. ENDERSBY:  Thank you, Your Honor.

11        THE COURT:  Thank you.

12        MR. SHEASBY:  Good afternoon, Your Honor.

13        THE COURT:  Good afternoon.

14        MR. SHEASBY:  I have a set of demonstratives, if I

15   may approach, Your Honor.

16        THE COURT:  Okay.  Thank you.

17        So, Mr. Sheasby, if you were the judge

18   confronted with -- yes?

19        MR. ENDERSBY:  Your Honor, if I may, we only just

20   received a copy of these demonstratives.  I believe we just got

21   an e-mail from opposing counsel right as the hearing began with

22   these demonstratives.

23        We have not had an opportunity to review them, so I

24   would note an objection to these on the record.

25        THE COURT:  Objection to what, me looking at them?

1    MR. ENDERSBY:  Not to you looking at them, but just
2  to our ability to assess them.

3          We have not ever reviewed them.  We just think that
4  this is an example of trial by ambush, Your Honor, and we just
5  have not had the chance to review these prior to one minute
6  before the hearing.

7          THE COURT:  All right.  Well, to the extent they're
8  helpful, I'll go ahead and look at them, but I understand your
9  objection.

10         So, Mr. Sheasby, if you are the judge confronted with
11 this motion to compel and then the zillion documents attached
12 to it, and then supplements, and then this hearing, what would
13 you do?  If you're the judge.

14         MR. SHEASBY:  I would deny the motion.

15         THE COURT:  I thought you would say that.  But why?
16 Tell me --

17         MR. SHEASBY:  And I would do something else, though.

18         I would order that meet-and-confer occur with either
19 a tape-recording or a court reporter.

20         And the reason why I say this is because I actually
21 believe that the reason why this motion exists is because there
22 is just ships passing in the night when it comes to the concept
23 of a serious meet-and-confer.

24         And let me show you, if I may put up a slide on that,
25 Your Honor.

1          MR. ENDERSBY:  Please turn on the --

2          MR. SHEASBY:  It's Slide 20 in the presentation, if

3     that's easier, Your Honor.

4          THE COURT:  Okay.

5          MR. SHEASBY:  So I think it's important to level set

6     on what happened in this case.

7          So basically a couple days after the case management

8     initial discovery conference, they served 63 RFPs and 15

9     interrogatories.

10         And these RFPs were basically:  Give us every

11    document on VOI in your possession.

12         Give us every document on your TPLO in your

13    possession.

14         Present to us your full damages calculation.

15         Present to us all your bases for all your responses

16    to affirmative defenses.

17         And what this has done -- what this did is

18    essentially we've asked for everything.

19         And when you ask for everything, as a defendant or a

20    plaintiff, it takes time to get that information.

21         And so, in my mind, the truest test of what is going

22    on here is on Slide 20.

23         So we served our responses on a Friday evening.

24         On a Monday, they -- which was a national holiday,

25    they wrote us a letter.

1          On Tuesday, they wrote us another letter.

2          And then on Tuesday, when we said to them:  Listen,

3   we obviously have some major disputes here.  We're not going to

4   search for every document that references VOI in our

5   production, and we're not going to be able to give you a full

6   damages calculation before we even have your documents, we said

7   to them, we're going to write you a letter, we're going to see

8   where there's common ground, and we're going to try to resolve

9   this.

10          And the response we got from them was, quote:  It is

11  unacceptable to draw out this meet-and-confer for another week

12  while you prepare an irrelevant letter.  You failed miserably.

13          This is the language and position that's been taken

14  by VOI in this case.  It's positions of extreme.  It's

15  positions of:  30 days, we want all your documents.

16          And it's not just that we're going to move to compel,

17  we're going to sanction you.

18          It's positions of extremes in which -- let me give

19  you another example.  If you go to slide --

20          THE COURT:  You said failed -- you failed miserably

21  was in that e-mail that was attached to the response?

22          MR. SHEASBY:  Yes, Your Honor.

23          THE COURT:  And who said that?

24          MR. SHEASBY:  It was counsel for VOI, Your Honor.

25          THE COURT:  Which counsel?

1    MR. SHEASBY:  It was lead counsel, Your Honor.

2    THE COURT:  All right.  Who is?

3    MR. SHEASBY:  Mr. Schwartz, Your Honor.

4    THE COURT:  Mr. Schwartz is lead counsel.  Okay.

5    MR. SHEASBY:  And let me give you another example.

6    On Slide 8.  This is one of the slides they objected

7    to, I think, me showing Your Honor today.

8    So they're asking for us, in Interrogatory No. 7, to

9    give them the list.

10    THE COURT:  I'm going old-fashioned.  I'm just

11    looking at this.

12    MR. SHEASBY:  I have another copy.

13    THE COURT:  That's fine.  It's on the screen also.

14    MR. SHEASBY:  So this is another example of a slide

15    they don't want you to see.

16    So in Interrogatory 7 and Interrogatory No. 12,

17    they're asking for all the times that we encountered VOI's

18    accused products and our list of what the VOI's accused

19    products are.

20    But this is an e-mail from their CEO to one of their

21    purchasing people.  And he's asking them:  Are all items in the

22    catalog, VOI's catalog, available for online direct purchase?

23    And he responds:  Not the Synthes TPLO plates.

24    Everything else, yes.

25    Now I'm going to tell you something that's probably

1    obvious is VOI is not a distributor.

2           What he's referring to as, quote, "the Synthes TPLO

3    plates," are the plates that we're trying to get information on

4    in this case.

5           And so one of the big challenges we face in this case

6    is they say, for example, in Rog 7, on Rog 12:  Just give us

7    the listing of all products that are accused.  You've known

8    about this for years.  The patent has issued since 2014.

9           But the practical reality is, is that we don't have

10   the list because there were affirmative decisions to hide the

11   information.

12          Now, this is not for the purpose of prejudging this

13   case, but it does prepoint to something unique about this case.

14   This letter about we've been sitting around since 2014, this

15   rhetoric of you should already have the information, doesn't --

16   is inconsistent with the documents that indicate attempts to

17   hide the information.

18          So why do they want the list of accused products now?

19   Why do they want them yesterday?  They want them yesterday

20   because they don't want us to figure out, I believe, Your

21   Honor, the scope of what the full discovery is.

22          So that's one area of uniqueness is the secrecy

23   associated with VOI's conduct.

24          There's a second area of secrecy, which is discovery

25   period in this case -- and I'm on Slide 9, Your Honor -- is the

1  parties have agreed that discovery in this case is long.  It's

2  going to close on January 24th, 2020.

3          THE COURT:  Not if trial is July.

4          MR. SHEASBY:  Your Honor, I know that Judge

5  Schlesinger indicated a July trial date.  And to be honest, at

6  this point, that may be the best thing in this situation.

7          I would say the following is, is -- what you have is

8  you have a situation in which there's a lot of complexity here.

9  And at least when the parties had agreed to a January 2020

10 date, the idea that we would be making our supplementations

11 throughout June and were giving a drop-dead date of September

12 is not unreasonable.

13         You know, there's something that I think is a valid

14 question.  We're not entitled to special treatment because

15 we're a big company.  And, in fact, in some ways, maybe your

16 expectations for us should be higher.

17         But the flip side of it is, is that when you're a big

18 company, it does take time to pull documents.

19         So let me give you an example.

20         Having to pull out forensically a database to

21 determine when something was marked -- which, by the way, we

22 gave that them information on Monday, when the virtual marking

23 started -- takes time.

24         And so what we've always tried to do is approach it

25 in a situation in which -- let me give you an example.

1          So when we first served our request for production,

2     we served a request -- it was nine requests for production.

3     And the reason why we only served nine is because there were

4     documents and information we really, really wanted.

5          Now, ironically, we actually still don't have it.

6     It's not going to get to us until May 15th, but that's for

7     another day.

8          We said:  Give us this.  This is the most important

9     thing.

10          Well, they did the exact opposite.

11          They didn't say:  Give us this.  We absolutely need

12     this.

13          What they said was:  Give us everything right now.

14          And when someone says:  Give us everything right

15     now -- Slide 14 is an example -- all documents concerning the

16     advertising or marketing, all documents concerning all of our

17     customers who use these products, all documents concerning

18     communications with VOI, all documents recording or refuting

19     any of the allegations, when you ask for everything and you

20     don't give people guideposts, that's -- there's consequence to

21     that.

22          In other words, we set a schedule to get them their

23     demand for everything.

24          Now, the flip side of it is, if they would have said

25     x document was incredibly important, we could have prioritized

X document.

So if you look on Slide 15, we gave them a detailed schedule for supplementation and production of documents in writing. In writing.

And one of the most remarkable things about this motion practice is last night I read the section on their motion in which they're supposed to explain what's the prejudice to them of this schedule. Why is this an unreasonable schedule?

There's not one concrete explanation as to why one of these dates is unreasonable. It doesn't exist.

There's not even anything for me to engage.

THE COURT: Well, I mean, I kind of drew the same conclusion from looking at everything. It seemed -- when I was talking about the 30 days, that seemed like the mine run of cases, but this is not that type of case.

When you see -- when this happens -- and it doesn't happen in that many cases -- one party saying: We need more time; the other party saying: No, we want it now. You've had enough time. You sat on this for years. Give us the information ASAP. You're the one who brought the lawsuit. Give it to us now.

Is that kind of sum and substance?

MR. SHEASBY: Right.

THE COURT: Okay. So one of the things you could

1  have done would be to meet and confer, which you tried to do,

2  and then if they were still unreasonably asking for the

3  information in an unreasonable timeframe, just come to the

4  Court.  You could have come to the Court as well, right,

5  instead of just saying:  We'll produce them at some time in the

6  future.

7          That would be a problem on your side; right?

8          Not saying, Your Honor, look, we -- they've asked for

9  all these documents -- they're asking for everything under the

10 sun, the moon, and the stars at the get-go.  We don't have a

11 problem producing it, but it's going to take a lot of time.

12 We're a big company.  It takes a lot of time.

13         They won't give us the time.  They're insisting on it

14 yesterday.  Can we have time, a reasonable amount of time?  And

15 then it's sort of resolved; right?  If the Court says:  Yeah,

16 of course, that sounds reasonable.

17         Instead we get what we have now, which is this kind

18 of massive motion to compel, massive motion to compel, massive

19 responses to the motion to compel, extra motions concerning

20 this hearing.

21         So is there a reason why you didn't go that route?

22         MR. SHEASBY:  Well -- so, Your Honor, I'm not

23 supposed to disagree with courts, but I'm going to disagree

24 with you on this one.

25         THE COURT:  Uh-huh.

1          MR. SHEASBY:  We did.  In other words, on Slide 15,

2    we gave them this in writing during the meet-and-confer

3    process.

4          THE COURT:  Well, right.  What I'm saying is you

5    didn't come to the Court.

6          MR. SHEASBY:  Oh, but that was my next point --

7          THE COURT:  Okay.

8          MR. SHEASBY:  -- because we actually did.

9          We asked Judge Schlesinger to set a date for the

10   substantial completion of discovery in September.

11         THE COURT:  Uh-huh.

12         MR. SHEASBY:  In other words, we actually lodged this

13   exact issue in front of Judge Schlesinger.

14         We said --

15         THE COURT:  At the -- at the hearing that you had

16   before him?

17         MR. SHEASBY:  No, in the submissions.  In the CMC

18   submissions, we actually said:  Set a substantial completion

19   date of September.  And that's one of the issues.

20         If you go to slide -- one of the -- one of the things

21   that I don't understand about this, if you go to Slide 10 --

22         THE COURT:  Okay.

23         MR. SHEASBY:  And this is just -- it -- it -- I've

24   never seen this, which is VOI, in its case management

25   conference, proposed to Judge Schlesinger that our response to

1    Interrogatory No. 15 would be due on March 28, 2019.

2           After making that submission to Judge Schlesinger,

3    they then filed a motion to compel on March 12th before their

4    even proposed due date requiring us to answer the interrogatory

5    in full or seek preclusive sanctions.

6           Well, first off, that's not even a remedy available

7    under the federal rules.  Federal Rule 26(e) sets the standard

8    for supplementation.

9           Second of all, I don't even understand how it was

10   possible to have filed two submissions before two sitting

11   judges on the same case, asking for exactly contradictory

12   relief.

13          At least I didn't understand it until I did today,

14   which is that this request that their response to Interrogatory

15   No. 15 be fully responded to by June 15th.

16          Well, I got to tell you, this is another example in

17   which it's just working at cross-purposes with what Judge

18   Schlesinger is trying to do.

19          So if you go to Slide 29, this is what they agreed to

20   in their submission to Judge Schlesinger.

21          By June 14th, we're going to identify all accused

22   products based on the design documents provided by defendants,

23   and where each element of each asserted claim is located in

24   each accused product.

25          Now, I can tell you, and I hope you'll take my

1  representation, is they had a line in there that said:  And

2  these responses must be complete and cannot be adjusted.

3          And we wrote back to them and said:  No, rog

4  responses are governed by Rule 26(d).

5          So they took that out of their submission to Judge

6  Schlesinger.

7          So this is what they showed Judge Schlesinger.  And

8  then today, they're telling you:  Oh, and we want the complete

9  response that will never change.

10          Well, if they provide more documents, how could it

11  not change?

12          And so one of the big challenges that I'm facing

13  is -- I once had a judge in Texas tell me:  Sometimes when

14  grenades explode, everyone gets injured.

15          And this is a situation in which I get it.  The

16  Court's not happy with anyone that it has to hear -- that it

17  has to sit and hear this.

18          But for the life of me --

19          THE COURT:  It's not that I'm unhappy.  That's -- you

20  know, I get paid to do this job, and we hear discovery

21  disputes.  It's rare that we see discovery disputes like this.

22          MR. SHEASBY:  Right.

23          THE COURT:  There's usually some meat to them.  So I

24  really -- Middle District of Florida, Jacksonville Division, is

25  a friendly place.

1              MR. SHEASBY:  Right.

2              THE COURT:  So it's kinder, gentler here, and we see

3      counsel working together, really well.

4              Local counsel will agree with this; correct?

5              UNIDENTIFIED SPEAKER:  Yes, Your Honor.

6              THE COURT:  Especially on time considerations.  And

7      so what we -- when we do see discovery disputes, and we do have

8      them from time to time, they're usually pretty meaty.

9              The one you had in this case regarding Ms. Defranco,

10     that's a legitimate discovery dispute.  Reasonable judges could

11     disagree on that result.  We see that from the cases both sides

12     have cited.  That's the kind of discovery dispute we typically

13     see.

14             We don't typically see this, what's happened here.

15     And it's kind of a -- I hope it doesn't predict what's going to

16     happen in the future of this case, because it will be really

17     problematic given that we're still sort of in the infancy of

18     the case.  There's no case management and scheduling order yet

19     and we've already had all of this.

20             MR. SHEASBY:  I agree.

21             THE COURT:  All right.  So that --

22             MR. SHEASBY:  I'm sorry.

23             THE COURT:  Are you done with your presentation or do

24     you have some more?  Go ahead.

25             MR. SHEASBY:  I was going to go through each of the

interrogatories, if you would like, Your Honor.

THE COURT:  Well, finish your sentence, when I asked you that question if you were the judge, what would you do.

You said you'd deny the motion.  How would your order read?

You said you would direct the parties to do a meet-and-confer with a court reporter?

MR. SHEASBY:  With a court reporter.

THE COURT:  Really?

MR. SHEASBY:  Yes, Your Honor.

THE COURT:  I have never heard that request before in my life.

MR. SHEASBY:  Yes, Your Honor.  That's what I would request.

THE COURT:  I've never heard it in practice or as a judge.

Have you made that request before?

MR. SHEASBY:  I've never made that request before, in my entire career.

THE COURT:  Have you ever seen it granted?

MR. SHEASBY:  I've never seen it granted, Your Honor. And that's the seriousness with which I think -- what is going on here.

In other words, I have to tell you --

THE COURT:  That's a sad situation; right?

1    MR. SHEASBY:  I agree with you, Your Honor.

2    THE COURT:  If lawyers who are barred in various

3  courts and given permission to proceed here pro hac vice and

4  are professional lawyers -- I know all of you guys are really

5  good lawyers; we know your backgrounds, that you have to have

6  everything in writing with a court reporter or you said

7  audio-taped?

8    MR. SHEASBY:  Your Honor -- audio-taped.  The reason

9  I say that is I just don't know what else to do.

10   When we get communications from opposing counsel the

11 day after a national holiday telling we're going to tell you

12 that we refused to meet and confer with them because we haven't

13 responded to a date, when they write us and tell us our

14 discovery communications with them are irrelevant, when they

15 write and tell us that we failed miserably -- and this is not

16 the only language that we've been exposed to, if you read the

17 correspondence.

18   At some level, I don't know what to do because I

19 can't get them the documents tomorrow.  It's physically

20 impossible.

21   I can prioritize.  I can supplement -- we

22 supplemented our interrogatories five times.  And if you look

23 at our last supplementation, we've given them pages of

24 information.

25   Let me give you an example.

So we have a fight on the lack of our damages
calculations. And they're telling us: We want you to
calculate the damages via the invoices now.

A damages calculation in a case of this complexity
requires -- absolutely requires the role of an expert.

THE COURT: Sure.

MR. SHEASBY: We gave them multiple pages explaining
in detail our theories and our facts.

And after giving them that multiple pages, we now
have to come before Your Honor and their answer to you is:
Order them to compel them to give a damages calculation in this
case.

That's not even what the federal rules require. They
require us to use reasonable effort based on the information
reasonably available to you.

Let me give you an another example.

We don't even have their list of accused products
completely yet. We don't have that set yet because we don't
even have their data on accused products yet.

And so how can we be having a fight about calculating
damages?

And why are we having a fight about giving them a
damages calculation number before a case management conference
has even been entered?

I wish I had tools for dealing with this. In other

1    words, maybe it's something that I've done, and I freely

2    acknowledge that maybe I'm not handling this right, but I don't

3    know -- I don't know how to approach this in a way that stops

4    this sort of language and attacks and stops us having to be in

5    front of you each time about stuff that doesn't -- doesn't

6    really make sense.

7              Let me give you another example.

8              So we had a motion -- they just spent time with you

9    arguing about Interrogatory No. 6, where we listed the people

10   who are involved in our products.

11             And if you go to Slide 39 -- sorry, Slide 40, they

12   said:  Well, what do the people who are involved in the

13   research program do?

14             And they spent time with Your Honor dealing with

15   that.

16             But on Slide 40, in our response to two separate

17   interrogatories, we listed the development documents for them

18   so that they know what everyone who was involved in the program

19   did.

20             And I don't understand what else we can do.  If they

21   want a narrative in which we talk about the narrative of people

22   who were involved, that's not appropriate for interrogatory.

23             And why are we in front of this Court when they

24   literally have data in the interrogatory below them or the

25   interrogatory above them?

1           Let me give you another example.

2           So they want to talk about the information, because

3   they have this -- this important defense that is so crucial

4   that apparently they're now going to tell Judge Schlesinger

5   after we propose a schedule that is chock-a-block through

6   trial, that they now want to throw that out and have an earlier

7   trial on something.

8           Well, let me give you an example of the frustration

9   we have with that, which is that if you turn to Slide 43, they

10  want us to list every time anyone at the company ever

11  interacted with a VOI accused product.

12          Well, there's two issues with that.  One, they say

13  it's about our delay.  Our delay is not even a relevant factual

14  predicate in this case because the United States Supreme Court,

15  a few years ago, has rejected laches as a doctrine.

16          And so we have a situation where they're telling us:

17  Go to every single employee at your company, find out any time

18  they are aware of a VOI accused product, tell us about it, and

19  if you don't, we're going to seek sanctions against you in

20  front of Your Honor, when that -- their explanation for that

21  doesn't even exist here.

22          Let me give you another example, if you turn Slide

23  44.

24          The surreal aspect of this is that we don't even know

25  how to name the -- all the accused products yet.  Because this

1  is, once again, an e-mail between Patrick Gendreau, who's the

2  COO of the company, and Tim VanHorssen.

3      This is from 2006.  A work in progress.  Working on a

4  new TPLO product --

5      MR. ENDERSBY:  Your Honor, I would just caution that

6  this may implicate VOI highly confidential information and that

7  Ms. Defranco is in the room.

8      THE COURT:  Does it -- is it designated as highly

9  confidential?  It looks like it's designated as confidential.

10     MR. SHEASBY:  It's AEO confidential, Your Honor.

11  It's attorneys' eyes only confidential.

12     THE COURT:  Okay.  So Ms. DeFranco -- I haven't made

13  a decision on that.  I will soon.  But it looks like you don't

14  mind leaving the courtroom for just a second.  Thank you.

15     Why don't you just stay close.  Okay.

16     She might welcome the opportunity to leave for a

17  while.

18     MR. SHEASBY:  So let me give you an example of this.

19     So two observations.  One, they designate it as

20  outside attorneys' eyes only, highest confidentiality, a

21  document in which one of their researchers is telling their CEO

22  that they're making essentially the Synthes plate.

23     So two issues.  One is a profound overdesignation.

24  The idea that that is outside attorneys' eyes only strikes me

25  as, second, questionable.

          But there's a deeper issue here, which is that they
have this imagination which they're trying to pitch is that in
2014, there were these products, and that was it.

          But that's not exactly -- at all what's going on
here.  What's going on here is that there was design changes.
There was hiding of the products.

          And so for them to ask us:  Well, when did you find
out all about -- all the used products -- accused products,
which is what they're asking you to order us to do immediately,
if you turn to Slide 45, they said that we don't even have to
list -- they've agreed that we're going to list all the accused
products on June 14th.

          So we're in this surreal world in which we're in
front of Your Honor in which they're seeking sanctions because
we haven't listed when every member of our company has
encountered the accused products, and we don't even have to
provide the list of accused products until June 14th.

          Let me give you another example.

          Your Honor, I'm done talking about outside attorneys'
eyes only information.

          THE COURT:  Okay.  You can continue.

          MR. SHEASBY:  I'm sorry, Your Honor.  I thought you
wanted me to wait.

          THE COURT:  Okay.  No, that's okay.  If you want to
wait until she gets back, that's fine.  We can take a little

1  break.

2          MR. SHEASBY:  I'm sorry.  I'm sorry, Your Honor.

3          THE COURT:  But if you can keep -- if you don't mind.

4  It's your client, right, you can keep going if you -- if you'd

5  like.

6          MR. SHEASBY:  No, I'm happy to continue, Your Honor.

7          THE COURT:  All right.

8          MR. SHEASBY:  I thought for a second that you wanted

9  Judge Schlesinger's clerk to be in the room, but I apologize

10  for that.  I will definitely continue.

11          So let me give you another example.

12          So if you turn to Slide 31, we have a motion to

13  compel an interrogatory response on our sales information.

14          And one of the things that they complain to Your

15  Honor about is that -- there's no --

16          THE COURT:  Ms. DeFranco's back and Ms. Lasry is

17  back.  Thank you.

18          MR. SHEASBY:  One of the issues they complain about

19  is:  Well, there's no calculation of gross or net profits.  And

20  we need an order compelling the Court -- from the Court

21  compelling them to provide that information.

22          We don't even have to -- that's not even what Rule 34

23  requires.

24          Our response to them was in direct compliance with

25  Rule 34.  This is the *Naser* case from this district.

1          The Court does not require a product to create new

2     documents for production.

3          We've extracted from the database the information we

4     have on sales.  We've given them to it [verbatim].

5          We held multiple conversations with them.  The data

6     we've given them is so large that you can't even e-mail it.

7          It's thousands, upon thousands, upon thousands of

8     columns.

9          Let me give you another example.

10         If you go to Slide 46, they have filed a motion to

11    compel an interrogatory response in which we are obligated to

12    tell them, quote, prior art pertaining to the subject matter of

13    the '921 patent.

14         It's not our obligation to make conclusions about

15    what is or is not relevant to the '921 patent.

16         What we've done is we've searched our records, which

17    we've told them -- and we cited to the only source of

18    information that we have in our possession that is public and

19    lists the analysis of relevant -- that's the prosecution

20    history for the patent.

21         And so I keep coming back to this.  I had a feeling

22    you were going to ask me this question, Your Honor, which is

23    what do you do in this situation.

24         Because, in some sense, just denying a motion is

25    unsatisfactory because you just may hear it again.

1    The flip side is, is that the remedies that are being

2 asked for, novation of Rule 26(e) standards for

3 supplementation, the creation of a completely new rule for

4 supplementation in this district based on local patent rules

5 that Judge Schlesinger has said he's already not going to

6 apply.  This just strikes me as so extreme that I'm really at a

7 loss of what to do.

8    And so at the end of the day, I do believe this

9 motion should be denied.  It should be denied on what I think

10 are three very particular reasons.

11    One, I do not believe that there was appropriate

12 meet-and-confer done in this case.  Merely getting on the phone

13 with someone and listening to them is not a meet-and-confer.

14    Telling them:  Your letter's irrelevant.  You've --

15 you're a complete failure.  You're in bad faith by having --

16 trying to talk to us, that's not a meet-and-confer.  That's a

17 litigation tactic.

18    The second reason it should be denied is because we

19 have presented a reasonable schedule for supplementation.

20    And it's not -- let me be clear.  It's not like we're

21 saying:  Manana.  On September 20th, you'll get all the

22 information.

23    We are ongoing supplementing as we collect the

24 information in good faith.

25    And the third reason I think it should be denied is

1  because I do not believe it's appropriate to use two sitting

2  judges in the same courthouse to compete with each other on

3  remedies.

4          THE COURT:  Well, I'm not going to compete with Judge

5  Schlesinger.  He would always win.

6          I don't think they're asking me to do that.

7          MR. SHEASBY:  Well, you know, I -- I -- it's unclear

8  to me, Your Honor.  I would respectfully disagree.

9          I would say things like ordering a complete response

10  to Interrogatory 15 that can never be changed, where that is

11  not the issue we're having with Judge Schlesinger, a discussion

12  we're having withing Judge Schlesinger on 15, asking for them

13  to -- let me give you another example.

14          Conception and reduction of practice.

15          They are fixated on the fact that saying the data we

16  have now shows a conception date by blank, after a good-faith

17  search.

18          All the motion -- the schedule before Judge

19  Schlesinger asks us to do is to present -- do a good-faith

20  search.

21          It is possible that we will find additional documents

22  that show an earlier date.  And you know what, we will be

23  judged by the standard Rule 26(e) that is consistently and

24  appropriately applied in this district.

25          Were we reasonable?

1      Were we diligent?

2      Did we do a fair search?

3      And what's the explanation for why we found new

4  documents?

5      At some level, this district works.  We don't need

6  rules from other patent courts.  We need people to apply, I

7  think, good faith and rationality.

8      Thank you, Your Honor.

9      THE COURT:  All right.  Thank you.

10      Would you like to respond?

11      MR. ENDERSBY:  Yes, Your Honor.

12      THE COURT:  All right.  And the RFP, I mean, if

13  they're similar arguments, you can skip them.

14      If you have something really specific you'd like to

15  talk about that's not in your papers, then feel free to.

16      MR. ENDERSBY:  I would like to provide an update on

17  the RFPs, Your Honor.

18      THE COURT:  Okay.

19      MR. ENDERSBY:  But before I do, I don't want to

20  forget anything that I've written down to discuss what

21  Mr. Sheasby just said.

22      THE COURT:  Okay.

23      MR. ENDERSBY:  So with Your Honor's indulgence, I'll

24  just respond to some of the points.

25      THE COURT:  Please.

1          MR. ENDERSBY:  The first thing I'd like to say is

2    that this is not a motion to compel information from VOI.  And

3    Mr. Sheasby was clearly, at the beginning of his presentation,

4    trying to say that they have not received certain information

5    from us.

6          We have provided --

7          THE COURT:  I don't think he was asking me to compel

8    the information.  He was explaining --

9          MR. ENDERSBY:  Understood, Your Honor.

10         THE COURT:  It's fine.  You don't have to -- you

11    don't have to focus on that point.  I'm not compelling you to

12    do anything.

13         MR. ENDERSBY:  Understood, Your Honor.

14         THE COURT:  Okay.

15         MR. ENDERSBY:  And it's also not an argument about

16    whether or not we've properly or improperly designated anything

17    under the protective order, and I heard a comment about that.

18         I do want to say a couple words about the

19    meet-and-confer process.

20         Now, we did have two productive meet-and-confers on

21    February 28th and 26th with Mr. Mathias, that lasted for about

22    two hours for the first one and maybe an hour for the second

23    one.

24         And in our exhibits to our motion, we had a detailed

25    e-mail reciting what took place during that meet-and-confer,

1 and it was fairly lengthy, and a lot of issues were discussed.

2 Now, we did try to have two separate meet-and-confers

3 with DePuy's counsel very recently. We tried to have one on

4 April 26th, and it took quite a bit of back-and-forth to

5 actually set that up, and we chose a day that we knew

6 Mr. Sheasby would be available, because he had previously

7 advised that he would be available for this hearing on that

8 date, so we did pick that day.

9 And when we got on the phone that day, we began with

10 a discussion of interrogatory responses that we believed were

11 still deficient in light of current responses that occurred

12 after briefing had closed.

13 And immediately, before hearing anything that I had

14 to say, Mr. Sheasby shut me down and said: This is an improper

15 way to conduct a meet-and-confer. You should have provided us

16 with a letter outlining all of our deficiencies. We'd like to

17 share this information with our client, so if you can put it in

18 a letter.

19 And we disagreed with that, number one, because never

20 before the actual teleconference, which took about a week to

21 schedule, did they ever suggest that we should provide a letter

22 beforehand. Second of all, all of the information in the

23 written record, and certainly in our motions, provides a huge

24 roadmap to what we still found to be insufficient.

25 And we were fully prepared at that meet-and-confer to

1  discuss anything else that was still missing from responses

2  that had occurred after briefing had closed.

3         But, unfortunately, counsel didn't want to hear it.

4  And when the reasoning was:  We need a letter to take back to

5  our client, we said:  Well, that's fine.  Let's just go through

6  these one by one, and perhaps one of the four of the

7  two attorneys on the phone can take notes.  And that was

8  refused as well.

9         So then the next response was:  Okay.  When can you

10 be available the following week, which would have been last

11 week, for a meet-and-confer?

12        So our response was:  Well, number one, our lead

13 counsel, Mr. Schwartz, will be away for a preplanned overseas

14 trip, and everybody knew that, and that's why we couldn't have

15 this hearing during that week, but I knew that I was going to

16 be available.

17        So the question was when are you, Mr. Endersby,

18 available?

19        I said:  Well, when will we see a supplemental

20 interrogatory response?

21        And the answer was:  I don't know.

22        So at that time, we couldn't set a meet-and-confer

23 date.  We did get the supplemental response, the first -- the

24 fifth set on May 1st.

25        So I wrote a follow-up e-mail the next day, asking

1   for a meet-and-confer on Friday, May 3rd, and I gave

2   two separate three-hour time windows, for a total of six hours

3   on that day.

4           And the response that I received was:  When is lead

5   counsel available?

6           To which I responded:  Lead counsel is not available,

7   as you know.  But I'm available at these times.

8           And eventually, the next day, the response was:

9   We're disappointed that we cannot have a lead-to-lead counsel

10  meet-and-confer.

11          So from my perspective, I agree there's a problem

12  with the meet-and-confer process.  And this was a court-ordered

13  meet-and-confer that we absolutely wanted to have, and we were

14  making every effort to do it on both the 26th and May 3rd.  And

15  if the Court needs to see any of that correspondence, I have

16  it, but this is truly what happened and --

17          THE COURT:  I'll take your word for it.

18          MR. ENDERSBY:  Yeah.

19          And, you know, to Mr. Sheasby's point, if he doesn't

20  know what to do in this situation, neither do I.  Because we

21  really tried our best to have a meet-and-confer and I really

22  did want to go through everything with them and understand what

23  we could possibly do about responses we thought were still

24  deficient and when.

25          And, you know, we understand that they were

1   supplementing and continuing to supplement.

2              And I got an e-mail today about Interrogatory No. 3,

3   the sales data.  And it's great that we received that

4   information, but I just can't explain why Mr. Sheasby didn't

5   want to talk to me on Friday.

6              THE COURT:  You guys are listening to each other like

7   in the abstract as a mutual observer.  It's -- it seems kind of

8   crazy what you're -- both of you, I mean...

9              MR. SHEASBY:  I can actually answer this question.  I

10  was on a 14-hour flight from London to Los Angeles on that

11  Friday, and they gave me no notice about when the

12  meet-and-confer would occur.  By the time I got the e-mail, I

13  was already on the plane.

14             THE COURT:  All right.  Well, I mean, we could

15  probably go back and forth.  And he would say this happened,

16  and then you'd say:  Well, this is the reason.  You'd say:

17  Well, this is the reason.  Here's the reason.

18             Here's the reason that at some point I feel like a

19  baby-sitter in a way, and I shouldn't have to do that because

20  you're professionals and you're good lawyers who don't need

21  that kind of oversight.

22             MR. ENDERSBY:  But that was all I wanted to say about

23  the meet-and-confer point.

24             And just a couple of other quick things.

25             THE COURT:  All right.  Yeah, I mean, I don't know

1   even know what to say -- I don't even know what to say about

2   any of that.

3           MR. ENDERSBY:  And I did not know that Mr. Sheasby

4   was on a flight.  He --

5           THE COURT:  All right.  I mean, but at the end of the

6   day, you could have some very valid points on the substance of

7   the responses, but the overall position that you've taken is:

8   We want this stuff immediately.

9           The "failed miserably," I don't know what's up with

10  that.  That doesn't sound like something professionals would

11  say.

12          And the desire for immediate responses, we sent this

13  e-mail; we didn't get a response that day; we didn't get a

14  response the next day.

15          I mean, there's a point of reasonableness in

16  responding.  If they ignored you for a long time, that's a real

17  issue.  If they ignored you for a day or two days, not an

18  issue.  You know, there's no obligation to turn immediately to

19  an e-mail and respond that day.

20          Courtesy might dictate that, but we're all human.

21  Sometimes we just can't.

22          I mean, at the end of the day, is your position about

23  wanting the stuff by particular dates -- do you find that to be

24  reasonable?

25          MR. ENDERSBY:  I do, Your Honor.  And especially --

1        THE COURT:  Okay.  And if you go to the 30 days, you

2   can't use that as a template in every case, can you?

3        MR. ENDERSBY:  That's probably true, Your Honor,

4   particularly when some information needs to rely on information

5   that we have to provide.

6        THE COURT:  And is that where you got off on the

7   wrong foot, that you -- this sort of mismatch between

8   personalities or meet-and-confer issues, is that your side

9   wasn't giving an inch on time, and so they were responding in

10  that sort of way, and then it just got to be the mess that it

11  is now?

12       MR. ENDERSBY:  Well, it's not a personality issue,

13  Your Honor, it was that the written responses we received were,

14  in our estimation, woefully deficient under the rules, and also

15  under the Middle District of Florida guidelines, and we just

16  didn't understand why we received responses that were totally

17  noncompliant, so we wanted a quick meet-and-confer to

18  understand why the responses were like that.

19       I mean, the initial responses provided no

20  information, no factual information, and relied on 33(d)

21  without relying on any documents, and that's totally improper.

22       So we just wanted to meet and confer quickly to

23  resolve that issue and to understand when we would be receiving

24  factual information.  And --

25       THE COURT:  And when they have provided that

1   timeline, their best estimate on when they could get you the

2   information, and you did you not agree with those dates.

3           MR. ENDERSBY:  Well, from our perspective, those

4   dates were too far out, given their position as the plaintiff

5   in this case, given that we now know they have three law firms

6   at this point -- it was two at the time, but three now.  At

7   least ten attorneys have entered their appearances,

8   two discovery vendors, 15 attorneys working full time on

9   collecting and reviewing documents.  With that kind of an army

10  of attorneys devoted to discovery and --

11          THE COURT:  Sounds like a really strong effort to get

12  you what you want, doesn't it?

13          MR. ENDERSBY:  It sounds like that on paper, Your

14  Honor, but we're just, quite frankly, not seeing the results

15  and the fruits of that sort of labor.  So I don't know where we

16  go from here.

17          THE COURT:  All right.  You want to talk in

18  particular about any RFP?

19          MR. ENDERSBY:  Just very briefly, Your Honor.

20          I do want to say that our motion was certainly

21  prompted by a lack of documents.

22          THE COURT:  And since then you've gotten --

23          MR. ENDERSBY:  Since then, we have gotten a fair

24  amount of documents.  And on paper, it may look great; right?

25          I mean, I'm sure Mr. Sheasby will tell you exactly

how many documents they've produced.

By our count, it's 73,303 documents, which amounts to 190,337 pages -- although probably more than that, because some of those pages are slip sheets that say:  Document produced natively, and go to the native file and it's bigger than one page, so it could be around 200,000 pages.

So on the surface, that does look like a lot of documents.

When you drill down, though, about two-thirds of those, around 50,000, are automated, thank-you-for-your-order e-mails, sales invoices attached, and other automated e-mails that say something like:  Your order has now shipped from Synthesvet.com.

And I'm not complaining about that, per se, because they are probably somehow responsive to certain RFPs on, you know, documents relating to sales.  I fully acknowledge that.

But to the extent that they want to say that:  We're making huge efforts to produce large swaths of documents, well, you know, you need to look at what it is, and two-thirds of it is automated e-mails.

So, really, the thing that is top of mind here is that the rules require a date certain for when they're going to be finished with production, within a reasonable time.  And we still haven't gotten that, so we just don't know.

THE COURT:  Well, they say -- there's also this

1  notion of rolling production when they are found and reviewed
2  and produced.  It sounds like they want to proceed along that
3  route given the number of documents and the number of people
4  having to review them.

5          Is there something wrong with that in this case?
6          MR. ENDERSBY:  I would be a hypocrite if I said
7  there's something wrong with that, because VOI is doing the
8  exact same thing; we are doing a rolling production.

9          The difference is we did provide a date certain in
10 our discovery responses as to when our production would be
11 complete.

12         THE COURT:  And they said they really pinpointed the
13 most important things they needed, and that you asked for the
14 sun, the moon, and the stars, so you can't compare the two
15 responses.

16         Do you disagree with that?

17         MR. ENDERSBY:  I do.  Because if they are indeed
18 prioritizing the most important information -- and we -- we
19 certainly do have conception and reduction to practice
20 documents.  I'm not sure if it's complete, because it sounded
21 like they're still reviewing, but certainly the individual
22 thank-you-for-your-e-mail type of documents are not the most
23 important documents in the case.  So for what that's worth...

24         All -- all VOI is asking for at this point is for a
25 reasonable date certain for when we can expect a complete

1    production, which is what the obligation is under the rules.

2              THE COURT:  Well, complete production, but you also

3    have the ability to supplement.

4              MR. ENDERSBY:  That's correct.  But we think that --

5              THE COURT:  What date did you pick for yourselves?

6              MR. ENDERSBY:  May 15th, Your Honor.

7              THE COURT:  May 15th.

8              And have you produced those yet?

9              MR. ENDERSBY:  No.  We're still working towards that

10   date, but that date is next week and we are on target for that

11   date, Your Honor, and that's what we've represented in our

12   written responses that we'll be doing.

13             THE COURT:  Describe your company.

14             MR. ENDERSBY:  VOI?  VOI is a small company, about 50

15   employees, located in St. Augustine.

16             THE COURT:  Uh-huh.

17             MR. ENDERSBY:  And they make, as the name would

18   suggest, veterinary orthopedic implants.

19             THE COURT:  That's it?

20             They make them in St. Augustine?

21             MR. ENDERSBY:  I'm sorry?

22             THE COURT:  They make them in St. Augustine?

23             MR. ENDERSBY:  They are not manufactured in

24   St. Augustine.

25             THE COURT:  Okay.

1      MR. ENDERSBY:  They're manufactured by a supplier in

2  China.

3      THE COURT:  All 50 employees are in St. Augustine?

4      MR. ENDERSBY:  There are some that are not.

5      Mr. VanHorssen is in California.

6      THE COURT:  Okay.  Thank you.

7      MR. ENDERSBY:  Thank you, Your Honor.

8      MR. SHEASBY:  Your Honor, may I be heard just

9  briefly?

10      THE COURT:  Briefly, yes.

11      MR. SHEASBY:  So two issues.  One, Your Honor

12  shouldn't have to referee about meet-and-confers.

13      Mr. Smith was on the meet-and-confer with me, and I

14  can tell you that we acted in good faith on that

15  meet-and-confer.

16      I want to read into the record which is before Your

17  Honor some things we're dealing with -- some more, quote:  You

18  keep proceeding in bad faith, failing your obligations to VOI

19  and the Court, which we will point out in your motion.  Your

20  persistent failing to meet your discovery obligations...

21      Another example, when we said we wanted some time to

22  respond.  Quote:  There is no need or reason to delay other

23  than your continued attempts in bad faith to improperly drag

24  your feet in this litigation and obstruct legitimate discovery.

25      When grenades go off, everyone gets hurt, but there's

1 a problem here.  And I do not believe, with all due respect,

2 that this problem is with DePuy.

3          Now if you could go to Slide 18.

4          This is another example in which they're talking

5 about the request for production and what we've given them,

6 junk.

7          Well, on Slide 18, we've actually gone through and

8 cataloged exactly what we've given them at each point in time

9 on a rolling basis.

10         And so this idea, this abstract idea that:  We don't

11 have everything we need without any concrete explanation of why

12 our deadline of rolling productions through September 20th is

13 unreasonable, without any concrete explanation of prejudice,

14 with just an answer that because they're committed to providing

15 documents -- and I want to be very clear.  They're not

16 committing to provide every document that is due in this case

17 by May 15th.  They're committing to respond on a rolling basis

18 to the RFPs we previously served by May 15th.

19         This is an example in which you can stand up, you can

20 sound incredibly reasonable, but when you read the record, when

21 you read the language that is used against DePuy, when you read

22 the positions that we've taken in writing, and you contrast

23 this to why we're in front of Your Honor for a two-hour

24 hearing, when there is no concrete, substantive dispute, and

25 there's no explanation for prejudice or why our schedule is

1   unreasonable, I do respectfully believe that Your Honor should

2   deny these motions.

3           Thank you for your time.

4           THE COURT:  All right.  Thank you.

5           Let me -- I'm going to take a break just for about

6   five minutes.  If counsel can take a break as well off the

7   record.

8           I'm going to talk to Ms. Lasry and Mr. Kolenc for a

9   few minutes and then I'll come back on the record.

10          MR. SHEASBY:  Thank you, Your Honor.

11          MR. ENDERSBY:  Thank you, Your Honor.

12      (Recess taken.)

13          COURT SECURITY OFFICER:  All rise.  This Court is

14   once again in session.

15          You may be seated.

16          THE COURT:  All right.  I don't really have anything

17   more to say.

18          Counsel for either side have anything else to say?

19          MR. SHEASBY:  No, Your Honor.

20          THE COURT:  All right.

21          MR. ENDERSBY:  Your Honor, the only thing that I

22   would add, and I would be remiss if I didn't do it, is that we

23   came across two cases regarding the appropriateness of

24   contention interrogatories in certain instances in the Middle

25   District, and they were not cited in our brief, and I did

provide copies to opposing counsel before this argument.

THE COURT:  Okay.

MR. ENDERSBY:  So would Your Honor like to receive copies or just have me --

THE COURT:  I mean, if you already have the copies made, that's fine.

MR. ENDERSBY:  I do.

May I approach, Your Honor?

THE COURT:  Yeah, sure.

You know, every case -- I do appreciate cases from our court or other courts.  They can sometimes be very helpful.  Other times the cases are so fact-specific that they're really not that weighty for me, but I'll take a look at them and see.

For contention interrogatories this does come up quite a bit.  Interestingly it comes up most often in our patent cases, these contention interrogatories.

I mean, we have -- the federal rules address contention interrogatories, and so does our discovery handbook.  They specifically talk about the appropriateness, and our discovery handbook limits them a little bit more than the federal rules do.  It's less typically what I would rely on for contention interrogatories.

The handbook says -- and I think one or both sides really cited to the handbook to say interrogatories that generally require the responding party to state the basis of

particular claims, defenses, or contentions in pleading or other documents should be used sparingly.

So that's where I start. They should be used very sparingly. And if used, need to be designed to target claims, defenses, or contentions that the propounding attorney reasonably suspects may be proper subject of early dismissal or resolution.

So I do follow that guidepost. The *Middle District Discovery Handbook* is not binding, but that's a good guidepost to use.

It goes on to say: Or to identify, narrow the scope of unclear claims, defenses, or contentions. Interrogatories that purport to require a detailed narrative of the opposing party's case are generally improper because they are overbroad and oppressive.

And then the federal rule, of course, is 33(b)(4), so I'll take a look at the objections based on the contention nature of some of the discovery requests and decide what to do, and I'll take a look at the cases you provided.

I did get the sense from reading them that they bordered on improper contention requests, some of them, if not actual improper contention interrogatories, and so I'll just look closely at those. And if I need to make a decision right now on those, I will.

I have a feeling that a lot more has to happen before

1  I make substantive rulings, but I'm just going to reserve a

2  decision on all of that.

3          MR. ENDERSBY:  Understood, Your Honor.  And I do hope

4  the cases are helpful in that regard.

5          THE COURT:  All right.  Thank you.

6          For that motion on confidential documents,

7  Mr. Sheasby, do you plan on presenting or talking about any

8  confidential documents tomorrow before Judge Schlesinger?

9          MR. ENDERSBY:  Your Honor, it's my anticipation that

10 tomorrow they're going to bring up this request.

11         MR. SHEASBY:  Request for expedited trial on just

12 their defense.

13         THE COURT:  Okay.

14         MR. SHEASBY:  And I anticipate that if they do bring

15 up that defense, I will show some documents that are

16 confidential information of VOI or --

17         THE COURT:  Okay.  And so Ms. Lasry, Judge

18 Schlesinger's law clerk, was here listening intently to

19 everything.  She can give Judge Schlesinger a heads-up.

20         I was really deciding that motion with respect to

21 this hearing today, but it sounds like it might continue to be

22 an issue before Judge Schlesinger, and so I'll leave that to

23 Judge Schlesinger to decide what to do in his courtroom about

24 your mention of confidential documents.

25         MR. SHEASBY:  I understand, Your Honor.

1          THE COURT:  All right.  And I might be able to get an

2    order on Ms. DeFranco out between now and Judge Schlesinger's

3    hearing, possibly, so be on the lookout for that.

4          Anything else?

5          MR. SHEASBY:  No, Your Honor.  Thank you for your

6    time this afternoon.

7          THE COURT:  All right.  Enjoy your evening in

8    Jacksonville.

9          If you'd like a conference room to sit and confer and

10   talk about the case, just let Ms. Loeschen know.  She's our

11   courtroom deputy.  It's available for you today and also

12   tomorrow.  Just give her a heads-up and we can make a big room

13   available for you so you can get some stuff done while you're

14   waiting for Judge Schlesinger.

15         MR. ENDERSBY:  Thank you, Your Honor.

16         MR. SHEASBY:  Much appreciated, Your Honor.

17         COURT SECURITY OFFICER:  All rise.

18    (Proceedings concluded at 3:49 p.m.)

19                             -  -  -

20

21

22

23

24

25

1

2                    C E R T I F I C A T E

3

4  UNITED STATES DISTRICT COURT)

5

6  MIDDLE DISTRICT OF FLORIDA  )

7       I, court-approved transcriber, certify that the foregoing

8  is a correct transcript from the official electronic sound

9  recording of the proceedings in the above-entitled matter.

10

11      Dated this 23rd day of May 2019.

12

13

14

15                         /s/Cindy Packevicz Jarriel

16                         Cindy Packevicz Jarriel, RPR, FCRR

17

18

19

20

21

22

23

24

25