*Confidential*

*Execution Version*

# AMENDED AND RESTATED
# MEMBERSHIP INTEREST PURCHASE AND EXCHANGE AGREEMENT

by and among

**OSSIUM BIDCO, LLC**

as the Parent,

**OSSIUM NEWCO, LLC**

as the Buyer,

**VETERINARY ORTHOPEDIC IMPLANTS, INC.,**

**VOI HOLDINGS, LLC,**

and

**CLAUDE GENDREAU,**

**TIMOTHY VAN HORSSEN,**

**THE CLAUDE GENDREAU INVESTMENT TRUST,**

**PATRICK GENDREAU**

and

**BRIAN BEALE**

as the Sellers

Dated as of June 11, 2020

ny-1917489

PLAINTIFFS'
TRIAL EXHIBIT
**594**
3:18-CV-01342-HES-PDB

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0000994

PX0594.1

## TABLE OF CONTENTS

Page

ARTICLE 1 DEFINITIONS ................................................................................................ 2

ARTICLE 2 PURCHASE AND SALE; EXCHANGE ...................................................... 13

    Section 2.1    Purchase and Sale of the Purchased Units ......................................... 13

    Section 2.2    Buyer Reorganization ........................................................................ 13

    Section 2.3    Consideration. .................................................................................... 13

    Section 2.4    Closing .............................................................................................. 13

    Section 2.5    Locked Box ....................................................................................... 15

    Section 2.6    Withholding. ...................................................................................... 15

    Section 2.7    Purchase Price Allocation. ................................................................. 16

ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF THE SELLERS .................... 16

    Section 3.1    Organization and Qualification .......................................................... 16

    Section 3.2    Authority ........................................................................................... 16

    Section 3.3    No Conflict ........................................................................................ 17

    Section 3.4    Ownership ......................................................................................... 17

    Section 3.5    Capitalization. ................................................................................... 18

    Section 3.6    Financial Statements; No Undisclosed Liabilities ............................. 19

    Section 3.7    Locked Box ....................................................................................... 19

    Section 3.8    Compliance with Law; Permits .......................................................... 22

    Section 3.9    Legal Proceedings ............................................................................. 23

    Section 3.10    Employee Benefits Matters ................................................................ 24

    Section 3.11    Labor and Employment Matters ........................................................ 26

    Section 3.12    Title to and Condition of Assets ........................................................ 28

    Section 3.13    Real Property ..................................................................................... 29

    Section 3.14    Intellectual Property .......................................................................... 30

    Section 3.15    Information Technology. .................................................................... 32

    Section 3.16    Privacy and Security ......................................................................... 34

    Section 3.17    Taxes ................................................................................................. 34

    Section 3.18    Environmental Matters ...................................................................... 37

    Section 3.19    Material Contracts ............................................................................. 38

    Section 3.20    Related Person Interests and Transactions .......................................... 39

i

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0000995

PX0594.2

Section 3.21    Insurance ................................................................................................ 40

Section 3.22    Accounts Receivable ............................................................................... 40

Section 3.23    Inventory ................................................................................................. 40

Section 3.24    Product Liability ..................................................................................... 40

Section 3.25    Customers and Suppliers ........................................................................ 40

Section 3.26    Certain Payments .................................................................................... 41

Section 3.27    Brokers .................................................................................................... 41

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF THE PARENT AND
            THE BUYER ................................................................................................ 42

Section 4.1    Organization ............................................................................................ 42

Section 4.2    Authority .................................................................................................. 42

Section 4.3    No Conflict ............................................................................................... 42

Section 4.4    Financing .................................................................................................. 42

Section 4.5    Brokers ..................................................................................................... 43

Section 4.6    Investment Intent ..................................................................................... 43

Section 4.7    Solvency and Financial Capacity ............................................................ 43

Section 4.8    Buyer Information .................................................................................... 43

ARTICLE 5 COVENANTS ...................................................................................................... 43

Section 5.1    Conduct of Business ................................................................................ 43

Section 5.2    Access ...................................................................................................... 45

Section 5.3    Notification of Certain Matters ............................................................... 45

Section 5.4    Efforts and Consents ................................................................................ 45

Section 5.5    Patent Litigation ...................................................................................... 45

Section 5.6    Continuing Management and Employees ................................................ 46

Section 5.7    Public Announcements ............................................................................ 46

Section 5.8    Restrictive Covenants .............................................................................. 46

Section 5.9    Reorganization ......................................................................................... 48

Section 5.10   Further Assurances ................................................................................... 48

Section 5.11   Sellers' Representative ............................................................................. 48

Section 5.12   Purchase Option ....................................................................................... 49

Section 5.13   Termination of Side Letter ...................................................................... 49

ARTICLE 6 TAX MATTERS .................................................................................................. 50

Section 6.1    Apportionment ......................................................................................... 50

ii

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0000996

PX0594.3

|  |  |  |
|---|---|---|
| Section 6.2 | Pre-Closing and Straddle Period Tax | 50 |
| Section 6.3 | Tax Claims | 51 |
| Section 6.4 | Maintenance of Tax Books and Records | 51 |
| Section 6.5 | Transfer Taxes | 51 |
| Section 6.6 | Pre-Closing Tax Indemnity | 52 |
| Section 6.7 | Tax Refunds | 52 |
| **ARTICLE 7 CLOSING CONDITIONS** | | 52 |
| Section 7.1 | Condition to Obligation of the Parties | 52 |
| Section 7.2 | Additional Conditions to Obligation of the Parent and the Buyer | 52 |
| Section 7.3 | Additional Conditions to Obligation of the Sellers | 53 |
| **ARTICLE 8 INDEMNIFICATION** | | 54 |
| Section 8.1 | Survival | 54 |
| Section 8.2 | Indemnification | 54 |
| Section 8.3 | Limitations. | 55 |
| Section 8.4 | Procedure. | 56 |
| Section 8.5 | Third Party Claims. | 57 |
| Section 8.6 | Tax Matters | 58 |
| **ARTICLE 9 TERMINATION** | | 58 |
| Section 9.1 | Termination | 58 |
| Section 9.2 | Effect of Termination | 58 |
| **ARTICLE 10 GENERAL PROVISIONS** | | 59 |
| Section 10.1 | Fees and Expenses | 59 |
| Section 10.2 | Amendment and Modification | 59 |
| Section 10.3 | Waiver | 59 |
| Section 10.4 | Notices | 59 |
| Section 10.5 | Interpretation | 60 |
| Section 10.6 | Entire Agreement | 61 |
| Section 10.7 | No Third-Party Beneficiaries | 61 |
| Section 10.8 | Governing Law; Submission to Jurisdiction; Waiver of Jury Trial | 61 |
| Section 10.9 | Assignment; Successors | 62 |
| Section 10.10 | Enforcement | 62 |

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0000997

PX0594.4

Section 10.11   Severability ........................................................................ 62

Section 10.12   Counterparts ....................................................................... 62

Section 10.13   VOI HoldCo Guaranty. ...................................................... 63

ny-1917489

iv

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0000998

PX0594.5

## AMENDED AND RESTATED
## MEMBERSHIP INTEREST PURCHASE AND EXCHANGE AGREEMENT

This AMENDED AND RESTATED MEMBERSHIP INTEREST PURCHASE AND EXCHANGE AGREEMENT (this "Agreement") is dated as of June 11, 2020, by and among Ossium BidCo, LLC, a limited liability company organized under the laws of the State of Delaware (the "Parent"), Ossium NewCo, LLC, a limited liability company organized under the laws of the State of Delaware (the "Buyer"), Veterinary Orthopedic Implants, Inc., a corporation organized under the laws of the State of Florida ("VOI"), VOI Holdings, LLC, a Florida limited liability company ("VOI HoldCo"), and Claude Gendreau, Timothy Van Horssen, the Claude Gendreau Investment Trust u/a/d March 16, 2013, Patrick Gendreau and Brian Beale (each, a "Seller", and collectively, the "Sellers").  Each of the Parent, the Buyer, the Company, VOI HoldCo and the Sellers is referred to herein individually as a "Party" and collectively as the "Parties."  Undefined capitalized terms have the meanings set forth in Article 1.

### RECITALS

WHEREAS, the Parties have entered into the Membership Interest Purchase and Exchange Agreement, dated as of May 5, 2020 (the "Original MIPA");

WHEREAS, the Parties desire to amend and restate the Original MIPA as set forth in this Agreement, effective as of the date of the Original MIPA;

WHEREAS, references to "the date hereof", "the date of this Agreement" or similar references shall refer to the date of the Original MIPA;

WHEREAS, in connection with, and as an integral part of, the Transactions, prior to the Closing, the Sellers and VOI HoldCo will conduct a reorganization (the "Reorganization") as described on Exhibit 1 hereto;

WHEREAS, following the Reorganization, VOI HoldCo will be the record and beneficial owner of ninety-nine percent (99%) of the issued and outstanding units of limited liability company interest in the Company ("Units") and VOI Corporation, a Florida corporation taxable as a corporation for U.S federal income tax purposes pursuant to Code Section 7701(a)(3) and Treas. Reg. Section 301.7701-2(b)(1) and wholly owned subsidiary of VOI HoldCo ("Blocker"), will be the record and beneficial owner of one percent (1%) of the Units;

WHEREAS, upon the terms and subject to the conditions set forth in this Agreement, the Buyer will (a) issue to VOI HoldCo [Redacted - Other (Nonresponsive)] units of limited liability company interest in the Buyer and [Redacted - Other (Nonresponsive)] units of limited liability company interest in the Buyer (collectively, the "Buyer Units") in exchange for Units representing a 26.3% interest in VOI LLC (the "Rollover Units" and, such exchange, the "Rollover") and (b) purchase from VOI HoldCo all of VOI HoldCo's right, title and interest in and to (x) all of the issued and outstanding capital stock in Blocker (the "Blocker Shares") and (y) the Units other than the Rollover Units and the Units owned by Blocker, which together with the Units owned by Blocker represent a 73.7% interest in VOI LLC (together, the "Purchased Units");

1

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

WHEREAS, the Sellers will benefit from conducting the Reorganization and the other transactions contemplated by this Agreement;

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements herein contained, and intending to be legally bound hereby, the Parties agree as follows:

# ARTICLE 1

## DEFINITIONS

For purposes of this Agreement:

"Action" means any claim, action, demand, suit, inquiry, proceeding, audit, summons, subpoena, investigation, hearing, injunction, seizure or other proceeding by or before any Governmental Authority, or any arbitration, mediation or other similar proceeding.

"Affiliate" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such first Person.  For the avoidance of doubt, following the Reorganization, VOI HoldCo and Blocker shall be deemed Affiliates of each Seller and (prior to the Closing) VOI LLC.

"Agreement" has the meaning set forth in the preamble.

"Ancillary Agreements" means the Remaining Seller Note, the Contingent Closing Note, the Operating Agreement, and the Employment Agreements.

"Balance Sheet" has the meaning set forth in Section 3.6(a).

"Base Purchase Price" means [Redacted - Other (Nonresponsive)]

"Blocker" has the meaning set forth in the recitals.

"Blocker Shares" has the meaning set forth in the recitals.

"Business" means the development, design, assembly, manufacturing, marketing and sale by the Target Companies of the Products and services focused on the pet healthcare market for dogs and cats.

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in Sweden or the State of New York.

"Buyer" has the meaning set forth in the preamble.

"Buyer Indemnitees" has the meaning set forth in Section 8.2(a).

"Buyer Units" has the meaning set forth in the recitals.

2

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001000

PX0594.7

"Cap" has the meaning set forth in Section 8.3(a).

"CARES Act" has the meaning set forth in Section 3.7.

"CEBA" has the meaning set forth in Section 3.7.

"CEBA Loan" has the meaning set forth in Section 3.7.

"Closing" has the meaning set forth in Section 2.4.

"Closing Company Payment" means the amount, if any, by which Leakage (other than Permitted Leakage), including the Company Transaction Expenses, estimated in good faith by the Sellers and notified to the Buyer two Business Days prior to the Closing exceeds the amount of such Leakage used in determining the Base Purchase Price.

"Closing Date" has the meaning set forth in Section 2.4.

"Closing VOI HoldCo Payment" means an amount equal to the Base Purchase Price minus the Closing Company Payment, if any.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" means (i) prior to the Reorganization, VOI and (ii) following the Reorganization, VOI LLC.

"Company Intellectual Property" means all Company Intellectual Property Rights and all Technology owned or purported to be owned by the Target Companies.

"Company Intellectual Property Rights" means all Intellectual Property Rights owned or purported to be owned by the Target Companies.

"Company Registered IP" means Registered IP owned or purported to be owned by, or filed or registered in the name of, any of the Target Companies.

"Company Transaction Expenses" means any fees, expenses or other costs or liabilities paid or agreed to be paid or incurred or owing by the Target Companies in connection with the Transactions, including professional or advisory fees and any VAT or other Taxes payable in respect of the foregoing.

"Confidential Information" has the meaning as set forth in Section 5.8(d).

"Contingent Closing Note" means a contingent promissory note in the form attached hereto as Exhibit 2 in an initial principal amount equal to [Redacted - Other (Nonresponsive)]

"Continuing Employees" has the meaning set forth in Section 5.6.

"Contract" means any binding arrangement or understanding, including any contract, agreement, lease, sublease, license, sublicense, purchase order or commitment.

3

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001001

PX0594.8

"control," including the terms "controlled by" and "under common control with," means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, as trustee or executor, as general partner or managing member, by Contract or otherwise, including the ownership, directly or indirectly, of securities having the power to elect a majority of the board of directors or similar body governing the affairs of such Person.

"Customer Data" means any and all information (i) collected by the Target Companies about visitors to or users of any Target Company's Websites or services which either (A) identifies such customer or its unique visitors or users, (B) is unique to such customer or its unique visitors or users or (C) could provide insight into such users' or visitors' behavior if analyzed, aggregated or otherwise examined or (ii) held, retained or maintained by any Target Company for purposes of analyzing or comparing any interaction between third parties and such website(s) to the extent such data is received in accordance with applicable terms and conditions governing the use and sale of the Target Companies' Products and services.

"Damages" means any losses, liabilities, damages, awards, deficiencies, fines, fees, penalties, charges, Taxes, assessments, payments (including amounts paid in settlement), costs and expenses (including costs of investigation, preparation and defense, and the fees and disbursements of counsel), whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, together with interest with respect to any of the foregoing; *provided however*, damages shall be reduced by and to the extent that an Indemnitee actually receives cash proceeds under insurance policies, risk sharing pools, or similar arrangements specifically, including the R&W Insurance Policy, as a result of, and in compensation for, the subject matter of an indemnification claim by such Indemnitee.

"Disclosure Schedules" has the meaning set forth in Article 3.

"Employment Agreement" means an employment agreement, effective as of the Closing, entered into between VOI LLC and Patrick Gendreau to serve as the President and Chief Executive Officer of VOI LLC, a copy of which is attached hereto as Exhibit 3, VOI LLC and Timothy Van Horssen to serve as the Vice President of Business Development of VOI LLC, a copy of which is attached hereto as Exhibit 4; and VOI LLC and Rebecca Ballou to serve as Vice President of Operations of VOI LLC, a copy of which is attached hereto as Exhibit 5.

"Encumbrance" means any charge, claim, mortgage, lien, option, pledge, security interest, easement, encroachment, right of first refusal or other similar restriction, including any restriction on transfer or other assignment, as security or otherwise, of or relating to use, quiet enjoyment, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"Environmental Laws" means any Laws relating to (a) Releases or threatened Releases of Hazardous Substances or materials containing Hazardous Substances; (b) the manufacture, handling, transport, use, treatment, storage or disposal of Hazardous Substances or materials containing Hazardous Substances; or (c) pollution or protection of the environment or natural resources.

"ERISA" has the meaning set forth in Section 3.10(a).

4

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001002

PX0594.9

"ERISA Affiliate" means any trade or business, whether or not incorporated, under common control with any Target Company and that, together with the Company, is treated as a single employer within the meaning of Section 414(b), (c), (m) or (o) of the Code.

"FDA" means the Food and Drug Administration.

"FDCA" has the meaning set forth in Section 3.8(a).

"Financial Statements" has the meaning set forth in Section 3.6(a).

"Florida Lease" means that certain Industrial/Warehouse Lease, dated as of November 30, 2018, by and between Gendreau Holdings LLC, a Florida limited liability company, as landlord and VOI as tenant.

"FTC" means the Federal Trade Commission.

"Fundamental Representations" has the meaning set forth in Section 8.1(a).

"GAAP" means United States generally accepted accounting principles and practices as in effect on the date hereof.

"GDPR" has the meaning set forth in Section 3.16(a).

"Governmental Authority" means any United States or non-United States federal, national, supranational, state, provincial, local or similar government, governmental, regulatory or administrative authority, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations, or orders of such organization or authority have the force of law), or any court, tribunal or arbitral or judicial body.

"Hardware" means any computer or computer network equipment used by or for the benefit of any Target Company (or, where so specified, by or for the benefit of any other Person) at any time including parts of computer equipment such as firmware, screens, terminals, keyboards, disks and including cabling, routers, and other peripheral and associated electronic equipment, but excluding all Software.

"Hazardous Substances" means:  (a) those substances defined in or regulated under the Hazardous Materials Transportation Act, the Resource Conservation and Recovery Act, the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), the Clean Water Act, the Safe Drinking Water Act, the Atomic Energy Act, the Toxic Substances Control Act, the Federal Insecticide, Fungicide, and Rodenticide Act and the Clean Air Act, and their state counterparts, as each may be amended from time to time, and all regulations thereunder; (b) petroleum and petroleum products, including crude oil and any fractions thereof; (c) natural gas, synthetic gas and any mixtures thereof; (d) lead, polychlorinated biphenyls, asbestos and radon; and (e) any other pollutant or waste regulated by any Governmental Authority pursuant to any Environmental Law.

5

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001003

PX0594.10

"Indebtedness" with respect to a Person means, without duplication, the unpaid principal amount of, and accrued interest on, (a) all obligations for borrowed money, (b) all obligations evidenced by bonds, debentures, notes or similar instruments, (c) all obligations under conditional sale, repurchase or other title retention agreements, (d) all obligations in respect of the deferred purchase price of property or services, (e) all obligations, contingent or otherwise, to purchase, redeem, retire or otherwise acquire any equity interests of such Person or its Affiliates, (f) all obligations secured by an Encumbrance on such Person's consolidated assets, (g) all capital lease obligations, synthetic lease obligations or obligations arising out of financial hedging arrangements, (h) all obligations, contingent or otherwise, in respect of letters of credit, letters of guaranty, bankers' acceptances or similar instruments, (i) any item of Indebtedness of another Person that is directly or indirectly guaranteed by such Person, secured by an Encumbrance on such Person's assets or in respect of which such Person has otherwise assured a creditor against loss, and (j) all other obligations required to be capitalized in accordance with GAAP. Indebtedness specifically excludes any liabilities included in the calculation of the Base Purchase Price, including accounts payable.

"Indemnified Party" has the meaning set forth in Section 8.4(a).

"Indemnifying Party" has the meaning set forth in Section 8.4(a).

"Indemnity Dispute Notice" has the meaning set forth in Section 8.4(a).

"Intellectual Property Rights" means all (i) United States and foreign patents and patent applications and disclosures relating thereto (and any patents that issue as a result of those patent applications), and any renewals, reissues, reexaminations, extensions, continuations, continuations-in-part, divisions and substitutions relating to any of the patents and patent applications, as well as all related foreign patent and patent applications that are counterparts to such patents and patent applications, and any other national and multinational statutory invention registrations and disclosures relating thereto; (ii) United States and foreign trademarks, trade names, service marks, service names, trade dress, logos, slogans, 800 numbers and corporate names, whether registered or unregistered, and the goodwill associated therewith, together with any registrations and applications for registration thereof; (iii) rights in works of authorship including any United States and foreign copyrights and rights under copyrights, whether registered or unregistered, including moral rights, and any registrations and applications for registration thereof; (iv) United States and foreign mask work rights or equivalents, and registrations and applications for registration thereof; (v) rights in databases and data collections (including knowledge databases, customer lists and customer databases) under the laws of the United States or any other jurisdiction, whether registered or unregistered, and any applications for registration therefor; (vi) trade secrets and other rights in know-how and confidential or proprietary information (including any business plans, designs, technical data, Customer Data, financial information, pricing and cost information, bills of material, or other similar information); (vii) URL and domain name registrations; (viii) inventions (whether or not patentable) and improvements thereto, and all prior user rights; (ix) all claims and causes of action arising out of or related to infringement or misappropriation of any of the foregoing; and (x) other proprietary or intellectual property rights now known or hereafter recognized in any jurisdiction worldwide.

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001004

PX0594.11

"IRS" means the U.S. Internal Revenue Service.

"IT Systems" means all systems used by the Target Companies in the Business including the information and communications technology infrastructure and systems (including all Software, Hardware, firmware, networks and Company Websites), and any security and disaster recovery arrangements relating thereto.

"Knowledge" of any fact or matter means (a) with respect to the Sellers, the knowledge, after due and diligent inquiry, of the Sellers, Rebecca Ballou, Steve McQueen, Korrie D. Wilhelm, Kristine Thornton, Pierre D'Amours, Faye Koritko and Christopher L. Hamilton and (b) with respect to the Buyer, the knowledge, after due and diligent inquiry, of Gabriel Fitzgerald and Theodor Bonnier.

"Law" means any statute, law, ordinance, regulation, rule, code, executive order, injunction, judgment, decree, order, constitution, treaty, trade agreement, common law, directive, requirement or other pronouncement or interpretation having the effect of law that has been issued, established, or promulgated by any Governmental Authority.

"Leakage" means (a) the declaration, making or payment or agreement to the paying or making by any Target Company (whether in cash or in kind and whether deemed or actual) of any distribution in favor of or for the benefit of any Seller or any Related Person of any Seller; (b) any payments made (including bonuses, loan repayments, management fees, monitoring fees or directors' fees), accrued or assumed or agreed to be made by or on behalf of any Target Company to, in favor of or for the benefit of any Seller or Related Person of any Seller (including Company Transaction Expenses); (c) the sale, purchase, transfer or disposal of any right, benefit or asset by or on behalf of any Target Company to, in favor of or for the benefit of any Seller or Related Person of any Seller; (d) the assumption, indemnification, incurrence or increase, or agreement to assume, indemnify, incur or increase (including under any guarantee, indemnity or other Encumbrance) by or on behalf of any Target Company of any liabilities of or obligations of or for the benefit of any Seller or Related Person of any Seller; (e) the amount paid or agreed to be paid to any of the Sellers as a result of any membership interest of the Company having been issued, redeemed, returned, purchased or repaid or any other return of capital; (f) the forgiveness, release, writing off, compromise, discount, deferral or waiver of, or agreement to forgive, release, write off, compromise, discount, defer or waive, by or on behalf of any Target Company, any debt or claim outstanding, owed by any Seller or Related Person of any Target Company; (g) the entry into any transaction other than on arms' length terms for fair market value; (h) the making of any gift, charitable donation or other gratuitous payment; (i) the revision of the terms of remuneration of any employee; (j) the payment or incurrence of any fees, costs or expenses by any Target Company as a consequence of any of the matters referred to in (a) through (i) above; (k) the payment or incurrence of any Tax by any Target Company (or which would have been payable by any Target Company but for the use of a credit) as a consequence of any of the matters referred to in (a) through (i) above; or (l) any agreement or commitment (whether conditional or not) to do any of the things set out in (a) through (i) above.

"Leased Real Property" means all real property leased, subleased or licensed to any Target Company, together with all structures, facilities, fixtures, systems, improvements and

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001005

PX0594.12

items of property located thereon, or attached or appurtenant thereto, and all easements, rights and appurtenances relating to the foregoing.

"Licensed Intellectual Property" means all Intellectual Property Rights or Technology owned by a third party and licensed or sublicensed to any Target Company.

"Locked Box Date" means December 31, 2019.

"Locked Box Provisions" means Section 2.5 and Section 3.7.

"Material Adverse Effect" means any event, condition, circumstance, development, change or effect that, individually or in the aggregate, (i) would prevent, materially delay or materially impede the consummation of the Transactions or (ii) has had, or would reasonably be expected to have, a material adverse effect on the business, operations, properties, assets, liabilities, condition (financial or otherwise), prospects or results of operations of the Target Companies, taken as a whole.

"Material Contract" has the meaning set forth in Section 3.19(a).

"Material Customer" means each customer who has paid aggregate consideration to the Target Companies for services rendered or goods sold in an amount greater than or equal [Redacted - Other (Nonresponsive)] for any of the three (3) most recently completed fiscal years.

"Material Supplier" means each supplier to whom the Target Companies have paid consideration for goods or services rendered in an amount greater than or equal [Redacted - Other (Nonresponsive)] for any of the three (3) most recently completed fiscal years.

"Original MIPA" has the meaning set forth in the recitals.

"Operating Agreement" means the Amended and Restated Limited Liability Company Agreement of Buyer in the form attached hereto as Exhibit 6.

"Organizational Documents" means (i) in the case of a Person that is a corporation, its articles or certificate of incorporation and its by-laws, regulations or similar governing instruments required by the laws of its jurisdiction of formation or organization together with any applicable agreement among shareholders relating thereto; (ii) in the case of a Person that is a partnership, its articles or certificate of partnership, formation or association, and its partnership agreement (in each case, limited, limited liability, general or otherwise); (iii) in the case of a Person that is a limited liability company, its articles or certificate of formation or organization, and its limited liability company agreement or operating agreement; and (iv) in the case of a Person that is none of a corporation, partnership (limited, limited liability, general or otherwise), limited liability company or natural person, its governing instruments as required or contemplated by the laws of its jurisdiction of organization.

"Owned Real Property" has the meaning set forth in Section 3.13(a).

"Parent" has the meaning set forth in the preamble.

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001006

PX0594.13

"Party" has the meaning set forth in the preamble.

"Patent Litigation" means the patent litigation pending in the United States District Court for the Middle District of Florida under the caption *DePuy Synthes Products, Inc. et al. v. Veterinary Orthopedic Implants, Inc.*, 3:18-cv-01342-HES-PDB (M.D. Fla.), together with any appeals therefrom and any related or derivative Actions.

"Percentage Interest" means, with respect to each Seller, the percentage set forth opposite such Seller's name on Exhibit 7.

"Permits" has the meaning set forth it in Section 3.8(b).

"Permitted Encumbrances" has the meaning set forth in Section 3.12(a).

"Permitted Leakage" means (a) any payment made by any Target Company in respect of salaries, pension contributions, performance or other bonuses (other than as made or payable as a result of, or in connection with, the Transactions) or other reimbursements, benefits or expenses due to any Seller in such person's capacity as an employee and/or manager of any Target Company in the ordinary course consistent with past practice without the exercise of discretion by any Target Company; and (b) any of the payments set forth on Schedule 1.1.

"Person" means an individual, corporation, partnership, limited liability company, limited liability partnership, syndicate, person, trust, association, organization or other entity, including any Governmental Authority, and including any successor, by merger or otherwise, of any of the foregoing.

"Personal Information" means any information that relates to an identified or identifiable individual or device, including, but not limited to, name, address, telephone number, email address, username and password, photograph, government-issued identifier, or any other data used or intended to be used to identify, contact or precisely locate an individual.

"Plans" has the meaning set forth in Section 3.10(a).

"Pre-Closing Tax Period" means any taxable period ending on or before the Closing and, in the case of any Straddle Period, the portion of such Straddle Period ending on and including the Closing.

"Pre-Closing Taxes" means (a) any and all Taxes with respect to the income or assets of the Target Companies for any Pre-Closing Tax Period, including any Taxes imposed on any Target Company in connection with the Reorganization and (b) any Taxes of another Person imposed on any Target Company as a transferee or successor, by Contract or otherwise, which Taxes relate to an event or transaction occurring before the Closing.

"PPP Loan" has the meaning set forth in Section 3.7.

"Privacy Laws" has the meaning as set forth in Section 3.16(a).

9

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

"Product" means any product developed, designed, assembled, manufactured, marketed or sold by or on behalf of the Target Companies.

"Purchase Option" has the meaning set forth in Section 5.12.

"Purchase Price Allocation" has the meaning set forth in Section 2.7.

"Purchased Units" has the meaning set forth in the recitals.

"R&W Insurance Policy" means the buyer-side representation and warranty insurance policy obtained by the Buyer with respect to the representations and warranties of the Sellers in this Agreement.

"Registered IP" means all Intellectual Property Rights that are registered, filed or issued under the authority of any Governmental Authority, including all patents, registered copyrights, registered trademarks, and domain names and all applications for any of the foregoing.

"Release" has the meaning set forth in Section 101(22) of CERCLA (42 U.S.C. § 9601(22)), but not subject to the exception in Subsection (A) of 42 U.S.C. § 9601(22).

"Related Person" means, with respect to any Person, (a) the Affiliates of such Person, (b) the Family members of such Person and (c) any other Person in whom such Person or any Person described in clauses (a) or (b) holds a Material Interest.  For purposes of this definition, "Family" means, with respect to any Person, such Person, such Person's spouse and each of their parents, children, grandchildren and siblings, including adoptive relationships and relationships through marriage, or any other relative of such Person that resides with such Person; and "Material Interest" means beneficial ownership (as defined in Rule 13d-3 under the Exchange Act) of securities representing at least 20% of the voting power or equity interests in a Person.

"Remaining Seller Note" means a promissory note in the form attached hereto as Exhibit 8.

"Remediation" means:  (a) any remedial action, remedy, response or removal action as those terms are defined in 42 U.S.C. § 9601, (b) any corrective action as that term has been construed pursuant to 42 U.S.C. § 6924, and (c) any measures or actions required or undertaken to investigate, assess, evaluate, monitor, or otherwise delineate the presence or Release of any Hazardous Substances in or into the environment or to prevent, clean up or minimize a Release or threatened release of Hazardous Substances.

"Reorganization" has the meaning set forth in the recitals.

"Representatives" means, with respect to any Person, the officers, directors members, managers, employees, agents, counsel, auditors, advisors, bankers and other representatives of such Person.

"Restricted Period" has the meaning set forth in Section 5.8.

10

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001008

PX0594.15

"Rollover" has the meaning set forth in the recitals.

"Rollover Units" has the meaning set forth in the recitals.

 "Seller Indemnitees" has the meaning set forth in Section 8.2(b).

"Sellers" has the meaning set forth in the preamble.

"Sellers' Representative" has the meaning set forth in Section 5.11(a).

"Software" means any and all computer programs, software (in object and source code), firmware, middleware, applications, API's, web widgets, code and related algorithms, models and methodologies, files and documentation thereof.

"Straddle Period" means any taxable period that includes any portion of the Closing but does not end on the Closing.

"Subsidiary" means, with respect to any Person, any other Person controlled by such first Person, directly or indirectly, through one or more intermediaries, and specifically with respect to the Company, VOI Europe, SARL, a disregarded French entity organized April 5, 2017, VOI Japan, KK, a Japanese entity organized September 21, 2017 and Veterinary Orthopedic Implants Canada, ULC, a Canadian entity organized May 30, 2016, all of which are owned by VOI LLC at the Closing.

"Target Companies" means Blocker, the Company and its Subsidiaries.  Each of Blocker, the Company or a Subsidiary of the Company is referred to herein as a "Target Company".

"Tax Authority" means any Governmental Authority having or purporting to exercise jurisdiction with respect to any Tax.

"Tax Return" means any return, report or information statement or disclosure statement (including any amendments thereof) required to be filed with respect to Taxes and any accompanying schedules, exhibits, worksheets and the like filed with such return, report or statement.

"Tax Claim" has the meaning set forth in Section 3.17(d).

"Taxes" means (a) all federal, state, local, non-U.S. and other net income, gross income, gross receipts, sales, use, ad valorem, transfer, unclaimed property, franchise, profits, registration, license, lease, service, service use, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, windfall profits, unclaimed property or escheat, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever (including any amounts resulting from the failure to file any Tax Return), together with any interest and any penalties, additions to tax or additional amounts with respect thereto; (b) any liability for payment of amounts described in clause (a) whether as a result of transferee liability, of being a member of an affiliated, consolidated, combined or unitary group for any period or otherwise through operation of law; and (c) any liability for the payment of amounts described in

11

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001009

PX0594.16

clauses (a) or (b) as a result of any tax sharing, tax indemnity or tax allocation agreement or any other express or implied agreement to indemnify any other Person.

"Technology" means tangible embodiments of Intellectual Property Rights, whether in electronic, written or other media, including diagrams, inventions (whether or not patentable), invention disclosures, know-how, methods, network configurations and architectures, proprietary information, protocols, schematics, design information, bills of material, specifications, technical data, Software (in any form, including source code and executable or object code), build scripts, test scripts, algorithms, application program interfaces, subroutines, techniques, user interfaces, URLs, web site content, works of authorship, documentation (including instruction manuals, samples, studies and summaries), databases and data collections.

"Termination Fee" means    Redacted - Other (Nonresponsive)

"Third Party Claim" has the meaning set forth in Section 8.4(a).

"Transaction Documents" means this Agreement, the Ancillary Agreements, the Disclosure Schedules and any other agreements, certificates and instruments required to be delivered by the parties thereto.

"Transactions" means the transactions contemplated by the Transaction Documents.

"Transfer Taxes" has the meaning set forth in Section 6.5.

"Units" has the meaning set forth in the recitals.

"USDA" has the meaning set forth in Section 3.8.

"VOI" has the meaning set forth in the preamble.

"VOI HoldCo" has the meaning set forth in the preamble.

"VOI LLC" means Veterinary Orthopedic Implants, LLC, a Florida limited liability company.

"WARN Act" has the meaning set forth in Section 3.11(h).

"Websites" means all Internet websites, including content, text, graphics, images, audio, video, data, databases, Software and related items included on or used in the operation of and maintenance thereof, and all documentation, ASP, HTML, DHTML, SHTML and XML files, cgi and other scripts, subscriber data, archives, and server and traffic logs and all other tangible embodiments related to any of the foregoing.

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001010

PX0594.17

## ARTICLE 2

## PURCHASE AND SALE; EXCHANGE

Section 2.1    Purchase and Sale of the Purchased Units; Contribution of Rollover Units. Subject to the terms and conditions set forth in this Agreement, at the Closing, VOI HoldCo shall, and the Sellers shall cause VOI HoldCo to, (a) sell, transfer, assign, convey and deliver to the Buyer, and the Buyer shall purchase from VOI HoldCo, all of VOI HoldCo's right, title and interest in and to all of the Purchased Units and (b) contribute, transfer, assign, convey and deliver to the Buyer, and the Buyer shall purchase from VOI HoldCo, all of VOI HoldCo's right, title and interest in and to all of the Rollover Units (the Purchased Units and the Rollover Units together constituting all of the Units), free and clear of any Encumbrances as to the Units; *provided however*, the parties acknowledge and agree that the assets of the Company may be encumbered by Permitted Encumbrances at the Closing.  Each of the Sellers and VOI HoldCo hereby waives any right of first refusal or similar right that it may have pursuant to the provisions of the Organizational Documents of any Target Company or any other agreement to which they are a party in relation to the Transactions.

Section 2.2    Buyer Reorganization.  Subject to the terms and conditions of one or more contribution agreements by and between the Parent and/or one or more of its Affiliates, on the one hand, and the Buyer, on the other hand, immediately prior to the Closing, the Parent and/or such Affiliates shall sell, contribute, transfer, assign, convey and deliver to the Buyer, and the Buyer shall purchase, acquire and accept, certain assets including all of the share capital in Ossium HoldCo AB and all of the interests in BioMedtrix LLC such that, following such contribution, all of the assets, business and operations of BioMedtrix LLC, Kyon AG and Kyon Pharma Inc. will be owned directly or indirectly by the Buyer.

Section 2.3    Consideration.

(a)    The Buyer (i) as consideration for the Purchased Units, shall pay to VOI HoldCo an aggregate amount equal to (A) the Base Purchase Price plus (B) the aggregate principal amount of the Contingent Closing Note plus (C) the aggregate principal amount of the Remaining Seller Note, each in the amounts set forth on Schedule 2.3 hereof, and (ii) in exchange for the Rollover Units, shall issue and deliver to VOI HoldCo the Buyer Units, free and clear of all Encumbrances (other than Encumbrances pursuant to the Operating Agreement and applicable securities Laws).

(b)    At the Closing the Buyer shall (i) pay, or cause to be paid, by wire transfer of immediately available funds (A) to VOI HoldCo, the Closing VOI HoldCo Payment, to the account notified in writing by the Sellers' Representative to the Buyer at least two (2) Business Days prior to the Closing and (B) to the Company, the Closing Company Payment and (ii) issue to VOI HoldCo the Buyer Units.

Section 2.4    Closing.  The closing of the Transactions (the "Closing") shall take place remotely via the delivery and exchange of documents and signatures on the date thereof by electronic mail, courier, facsimile, and/or hand delivery (or by such other means or at such other location as shall be mutually agreed to by the Parties) effective as of 12:00:01 a.m. Eastern Time

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001011

PX0594.18

on the second Business Day following the satisfaction or waiver of the conditions set forth in Article 7 (other than those conditions that by their nature are to be satisfied at the Closing but subject to the satisfaction or waiver of such conditions) but in any event no earlier than June 16, 2020, or at such other time as the Parties may agree (the "Closing Date"). For avoidance of doubt, if the Buyer does not have the financial capacity to close the transactions contemplated herein but the conditions to the Buyer's obligation to close set forth in Article 7 (other than those conditions that by their nature are to be satisfied at the Closing but subject to the satisfaction or waiver of such conditions) have been satisfied (or waived by Buyer) and the conditions to the Sellers' and VOI HoldCo's obligation to close set forth in Article 7 (other than those conditions that by their nature are to be satisfied at the Closing but subject to the satisfaction or waiver of such conditions) have been satisfied (or waived by Sellers and VOI HoldCo), then the Closing shall be required to occur for purposes of Section 9.2(b) on the later of (x) the second Business Day following the satisfaction or waiver of such conditions or (y) June 16, 2020 (assuming the continued satisfaction or waiver of such conditions on such day). At the Closing:

(a)     The Buyer shall deliver, or cause to be delivered, to the appropriate Parties:

(i)     the Closing VOI HoldCo Payment;

(ii)    the Closing Company Payment;

(iii)   the Contingent Closing Note;

(iv)    the Remaining Seller Note;

(v)     duly executed counterparts to all Ancillary Agreements to which the Buyer or any of its Affiliates is a party, including the Operating Agreement which shall evidence the issuance of the Buyer Units to VOI HoldCo;

(vi)    payment to the insurance carrier for the R&W Insurance Policy;

(vii)   a copy of the R&W Insurance Policy binder;

(viii)  the Employment Agreements; and

(ix)    the other documents to be delivered pursuant to Section 7.3.

(b)     The Sellers shall deliver, or cause to be delivered, to the appropriate Parties:

(i)     duly executed counterparts to all Ancillary Agreements to which any Seller, VOI HoldCo or the Company is a party;

(ii)    evidence that the Reorganization has been completed;

(iii)   an assignment by VOI HoldCo acknowledging receipt of the Closing VOI HoldCo Payment and transferring to the Buyer title to the Purchased Units;

14

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001012

PX0594.19

(iv)    an assignment by VOI HoldCo acknowledging receipt of the Buyer Units and transferring to the Buyer title to the Rollover Units;

(v)    (A) a certificate of good standing for each of Blocker and VOI LLC, issued as of a recent date by the Secretary of State of the State of Florida, and (B) a certificate of good standing or similar certificate of each Subsidiary of the Company, issued as of a recent date by the Secretary of State or similar authority of the applicable jurisdiction in which such Subsidiary was formed;

(vi)    a duly executed Internal Revenue Service Form W-9 from VOI HoldCo;

(vii)    the Employment Agreements;

(viii)    ratification of all prior actions of the Company and the Company Subsidiaries by their respective directors or equivalent governing body; and

(ix)    the other documents to be delivered pursuant to Section 7.2.

Section 2.5    Locked Box.

(a)    Leakage. Each of the Sellers severally (in proportion to their Percentage Interests) but not jointly warrants and undertakes to the Parent and the Buyer that:

(i)    between the Locked Box Date and the Closing, neither the Sellers nor any of their Related Persons has received from any Target Company, or permitted, any amount of Leakage, other than Permitted Leakage; and

(ii)    the entry into of this Agreement and consummation of the Transactions (including the Reorganization) will not result in any Leakage from any Target Company, other than any Permitted Leakage.

(b)    Post-Closing Adjustment on Account of Leakage.  VOI HoldCo, and the Sellers severally (in proportion to their Percentage Interests) but not jointly, undertake to pay to the Buyer on demand, on a dollar for dollar basis, an amount equal to any Leakage (other than Permitted Leakage). VOI HoldCo and the Sellers shall not have any liability under this Section 2.5 unless a claim has been notified to the Sellers' Representative pursuant to this paragraph on or before the date which is 12 months from the Closing, and setting out such details of the claim as are available to the Buyer at the time and, if practicable, the Buyer's estimate of the amount and all relevant details of the Leakage, provided that failure to provide such details shall not invalidate such notice or prejudice the Buyer's right to claim under this clause.

Section 2.6    Withholding.  The Buyer shall be entitled to deduct and withhold from any amounts otherwise payable hereunder such amounts that the Buyer determines in good faith are required to be deducted or withheld with respect to the making of such payment under the Code or any other provision of applicable Law. Any amounts so deducted and withheld shall be treated for all purposes hereof as having been paid to the Person in respect of which such deduction and withholding was made.

15

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Section 2.7    Purchase Price Allocation.  On or before the 120th day following the Closing, the Buyer shall provide the Sellers' Representative an allocation of the Initial Consideration, as adjusted by the Post-Closing Adjustment, among the assets of the Target Companies in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (the "Purchase Price Allocation"). If the Buyer and the Sellers' Representative agree to the Purchase Price Allocation after good faith negotiations, the Buyer and the Sellers shall (and shall cause their respective Affiliates to) file all Tax Returns in accordance with the Purchase Price Allocation. None of the Parties shall take any position with respect to Taxes (whether on any Tax Returns, in any Tax Contest or otherwise) that is inconsistent with the Purchase Price Allocation except to the extent required by applicable Law or otherwise required pursuant to a "determination" within the meaning of Section 1313(a) of the Code (or any analogous provision of state, local or non-U.S. Law).

# ARTICLE 3

## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Except as set forth in the corresponding sections or subsections of the Disclosure Schedules attached hereto (collectively, the "Disclosure Schedules") (each of which shall qualify only the specifically identified Sections or subsections hereof to which such Disclosure Schedule relates and any other Sections or subsections hereof to which it is reasonably apparent on the face of such disclosure that such disclosure is applicable), VOI HoldCo and the Sellers hereby represent and warrant to the Parent and the Buyer, as of the date hereof and as of the Closing, as follows:

Section 3.1    Organization and Qualification.

(a)    Each Target Company is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has full corporate power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted and is duly qualified or licensed as a foreign corporation to do business, and is in good standing, in each jurisdiction where the character of the properties and assets occupied, owned, leased or operated by it or the nature of its business makes such qualification or licensing necessary.

(b)    The Sellers have furnished to the Buyer complete and correct copies of the Organizational Documents of each Target Company, in each case, as amended.  Such documents are in full force and effect.  No Target Company is in violation of any of the provisions of its Organizational Documents.

Section 3.2    Authority.  Each Seller, their Related Persons and the Company has, and following the Reorganization VOI HoldCo will have, full power and authority to execute and deliver this Agreement and each of the Ancillary Agreements to which it is a party, to perform its obligations hereunder and thereunder and to consummate the Transactions.  The execution, delivery and performance by each Seller, their Related Persons, the Company and VOI HoldCo of this Agreement and each of the Ancillary Agreements to which it is a party and the consummation by each Seller, their Related Persons, the Company and VOI HoldCo of the

16

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001014

PX0594.21

Transactions have been (or in the case of VOI HoldCo, following the Reorganization, will have been) duly and validly authorized by all necessary action.  This Agreement has been, and upon their execution and delivery each of the Ancillary Agreements to which each Seller, their Related Persons, the Company and VOI HoldCo are a party will have been, duly executed and delivered by each Seller, their Related Persons, the Company and VOI HoldCo and, assuming due execution and delivery by each of the other parties hereto and thereto, this Agreement constitutes, and each of the Ancillary Agreements to which each Seller, their Related Persons, the Company and VOI HoldCo are a party will constitute, the legal, valid and binding obligations of each Seller, their Related Persons, the Company and VOI HoldCo, enforceable against each Seller, their Related Persons, the Company and VOI HoldCo in accordance with their respective terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether considered in a proceeding in equity or at law).

Section 3.3    No Conflict.

(a)    The execution, delivery and performance of this Agreement and each of the Ancillary Agreements to which the Sellers, the Company and VOI HoldCo are a party, and the consummation of the Transactions, do not and will not (i) conflict with or violate the Organizational Documents of VOI HoldCo or any Target Company; (ii) conflict with or violate any Law applicable to the Sellers, VOI HoldCo or any Target Company or by which any property or asset of the Sellers, VOI HoldCo or any Target Company is bound or affected that would reasonably be expected to cause a Material Adverse Effect to the Target Companies; or (iii) result in any breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, require any consent of or notice to any Person pursuant to, give to others any right of termination, amendment, modification, acceleration or cancellation of, allow the imposition of any fees or penalties, require the offering or making of any payment or redemption, give rise to any increased, guaranteed, accelerated or additional rights or entitlements of any Person or otherwise adversely affect any rights of the Sellers, VOI HoldCo or any Target Company under, or result in the creation of any Encumbrance on any property, asset or right of the Sellers, VOI HoldCo or any Target Company pursuant to, any note, bond, mortgage, indenture, agreement, lease, license, permit, franchise, instrument, obligation or other Contract to which the Sellers, VOI HoldCo or any Target Company is a party or by which the Sellers, VOI HoldCo or any Target Company or any of their respective properties, assets or rights are bound or affected.

(b)    No holder of any Units will have or be entitled to assert dissenter's rights or any other rights of appraisal as a result of or in connection with this Agreement or any of the Transactions.

Section 3.4    Ownership.

(a)    Prior to the Reorganization, the Sellers are the record and beneficial owners of all of the capital stock of VOI, free and clear of any Encumbrances (other than transfer restrictions under applicable securities Laws and the Organizational Documents of the Company).  Following the Reorganization, VOI HoldCo will be the record and beneficial owner

17

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001015

PX0594.22

of ninety-nine percent (99%) of the Units and one hundred percent (100%) of the Blocker Shares, and Blocker will be the record and beneficial owner of one percent (1%) of the Units, in each case free and clear of any Encumbrances (other than transfer restrictions under applicable securities Laws and the Organizational Documents of the Company). Following the Reorganization, VOI HoldCo will have the right, authority and power to sell, assign and transfer to the Buyer the Blocker Shares and the Units owned by VOI HoldCo.

(b)     Immediately following the Closing, the Buyer will hold good, valid and marketable title to ninety-nine percent (99%) of the Units and one hundred percent (100%) of the Blocker Shares, and Blocker will hold good, valid and marketable title to one percent (1%) of the Units, in each case free and clear of any Encumbrances (other than transfer restrictions under applicable securities Laws and the Organizational Documents of the Company).

Section 3.5     Capitalization.

(a)     Section 3.5(a) of the Disclosure Schedules accurately and completely sets forth the capital structure of the Target Companies as of the date hereof, including the number of equity interests authorized, issued and outstanding of each such Person and the record and beneficial owners thereof.

(b)     The Units will constitute all of the issued and outstanding equity interests in the Company at the Closing.  The equity interests in the Company's Subsidiaries owned by the Company constitute all of the equity interests in such Subsidiaries.  The Units of the Company will not be, and the equity interests in the Company's Subsidiaries are not, and have never been, in certificated form.

(c)     The Units will be, and the equity interests in the Company's Subsidiaries were, issued in compliance with applicable Laws.  The Units will not be sold in violation of the Organizational Documents of the Company or any other agreement or arrangement to which the Company is a party.  The equity interests in the Company's Subsidiaries were not issued in violation of the Organizational Documents of the Subsidiaries or any other agreement or arrangement to which a Subsidiary is a party.

(d)     Except for the Units, at the Closing there will be no equity interests in the Company, or options, warrants or other securities convertible into, or exercisable or exchangeable for, equity interests in the Company.  Except for the equity interests in the Company's Subsidiaries owned by the Company, there are no equity interests in the Company's Subsidiaries, or options, warrants or other securities convertible into, or exercisable or exchangeable for, equity interests in the Company's Subsidiaries.

(e)     Other than the Company's Organizational Documents, there are no voting agreements, voting trusts, revocable or irrevocable proxies or other agreements or understandings in effect with respect to the voting or transfer of any of the Units.  Other than the Organizational Documents of the Company's Subsidiaries, there are no voting agreements, voting trusts, revocable or irrevocable proxies or other agreements or understandings in effect with respect to the voting or transfer of any of the equity interests in the Company's Subsidiaries.

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001016

PX0594.23

(f)     Except as set forth of Section 3.5(a) of the Disclosure Schedules, no Target Company has ever owned, nor does it currently own, directly or indirectly, any equity interests in any other Person.

(g)     VOI Japan KK, a Subsidiary of the Company, has engaged in no business activities and has no assets or liabilities.

(h)     Following the Reorganization, all of the Blocker Shares will be owned by VOI HoldCo, and there will be no other equity interests in Blocker, or options, warrants or other securities convertible into, or exercisable or exchangeable for, equity interests in Blocker. Following the Reorganization, the Blocker Shares will have been issued in compliance with applicable Laws. The Blocker Shares will not be sold in violation of the Organizational Documents of Blocker or any other agreement or arrangement to which Blocker is a party. Following the Reorganization, Blocker shall have engaged in no business activities and will have no assets, liabilities or obligations of any nature other than (i) one percent (1%) of the Units and (ii) those incident to its formation and pursuant to this Agreement and the consummation of the Transactions.

Section 3.6     Financial Statements; No Undisclosed Liabilities.

(a)     True and complete copies of the audited consolidated balance sheet of the Company as at the Locked Box Date (the "Balance Sheet"), and the related audited consolidated statements of income, retained earnings, members' equity and statements of cash flow of the Company, together with all related notes and schedules thereto (collectively referred to as the "Financial Statements"), are set forth in Section 3.6(a) of the Disclosure Schedules.  The Financial Statements (i) have been prepared from the books and records of the Target Companies in accordance with GAAP and (ii) fairly present, in all material respects, the consolidated assets, liabilities, financial position, results of operations and cash flows of the Company as at the respective dates thereof and for the respective periods indicated therein, except as otherwise noted therein.

(b)     **Redacted - Other (Nonresponsive)** and except as and to the extent adequately reflected or reserved against in the Financial Statements, no Target Company has any liability or obligation of any nature, whether accrued, absolute, contingent or otherwise, whether known or unknown and whether or not required by GAAP to be reflected in a consolidated balance sheet of the Company that is in excess of [Redacted - Other (Nonresponsive)] individually or [Redacted - Other (Nonresponsive)] in the aggregate.

(c)     The books of account and financial records of the Target Companies pertaining to the assets, properties, business, operations, accounts or financial condition thereof are true and correct in all material respects and have been maintained in accordance with GAAP.

Section 3.7     Locked Box.

(a)     Since the Locked Box Date through the Closing:  (i) the Target Companies have conducted the Business in all material respects only in the ordinary course consistent with past practice; and (ii) the Target Companies have not suffered any loss, damage, destruction or

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001017

PX0594.24

other casualty affecting any of their material properties or assets, whether or not covered by insurance.

(b)     Between the Locked Box Date and the Closing, other than in the ordinary course of business or pursuant to the Transaction Documents, including the Reorganization, there has not been, with respect to each Target Company, any:

(i)     amendment or restatement of the Organizational Documents of such Person;

(ii)     split, combination or reclassification of any Units or other equity interests;

(iii)     issuance, sale or other disposition of, or creation of any Encumbrance on, any Units or other equity interests, or grant of any options, warrants or other rights to purchase or obtain (including upon conversion, exchange or exercise) any Units or other equity interests;

(iv)     change in any method of financial reporting, accounting or accounting practice;

(v)     change in cash management practices and its policies, practices and procedures with respect to collection of accounts receivable, establishment of reserves for uncollectible accounts, accrual of accounts receivable, inventory control, prepayment of expenses, payment of trade accounts payable, accrual of other expenses, deferral of revenue or acceptance of clients deposits;

(vi)     entry into any Contract that would constitute a Material Contract;

(vii)     incurrence, assumption or guarantee of any Indebtedness except unsecured current obligations and liabilities incurred in the ordinary course of business and except for (A) that certain Payroll Protection Program loan in the principal amount of [Redacted - Other (Nonresponsive)] loaned to VOI on April 15, 2020 by Valley National Bank (the "PPP Loan") as part of Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (P.L. 116-136) (the "CARES Act") which debt the Sellers represent will be discharged and forgiven in accordance with the CARES Act and (B) that certain Canada Emergency Business Account (the "CEBA") loan (the "CEBA Loan") in the amount of [____] which debt the Sellers represent is interest free and matures on December 31, 2022 with a discharge and forgiveness of [____] if the remaining amount is repaid prior to such maturity date;

(viii)     transfer, assignment, sale or other disposition of any of the assets shown or reflected in the Financial Statements other than in the ordinary course of business;

(ix)     capital investment in, or any loan to, any other Person;

(x)     acceleration, termination, modification or cancellation of any Material Contract;

20

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

(xi)   capital expenditures in excess of [Redacted - Other (Nonresponsive)] individually or [Redacted - Other (Nonresponsive)] in the aggregate;

(xii)   imposition of any Encumbrance upon any properties (other than a Permitted Encumbrance), tangible or intangible assets (other than a Permitted Encumbrance), or Units;

(xiii)   grant of any bonuses, whether monetary or otherwise, or increase in any wages, salary, severance, pension or other compensation or benefits in respect of any current or former employees, officers, managers, independent contractors or consultants, other than as required by applicable Law, change in the terms of employment or status for any employee or any termination of any employee for whom the aggregate costs and expenses exceed [Redacted - Other (Nonresponsive)] or action to accelerate the vesting or payment of any compensation, benefit or Plan for any current or former employee, officer, independent contractor or consultant;

(xiv)   hiring or promoting any employee except in the ordinary course of business;

(xv)   adoption, modification or termination of any: (A) employment, severance, retention or other agreement with any current or former employee, officer, independent contractor or consultant, (B) Plan or (C) collective bargaining or other agreement with a union, in each case whether written or oral;

(xvi)   loan to (or forgiveness of any loan to), or entry into any other transaction with, any of the Sellers or any current or former managers, officers and employees;

(xvii)   entry into a new line of business or abandonment or discontinuance of existing lines of business;

(xviii)   adoption of any plan of merger, consolidation, reorganization, liquidation or dissolution or filing of a petition in bankruptcy under any provisions of federal, state or non-U.S. bankruptcy Law or consent to the filing of any bankruptcy petition against it under any similar law;

(xix)   acquisition by merger or consolidation with, or by purchase of substantially all of the assets or equity of, or by any other manner, any business or any Person or any division thereof;

(xx)   action by or on behalf of any Target Company to make, change or rescind any Tax election, amend, refile or otherwise revise any previously filed Tax Return, settle or compromise any claim, notice, audit report, assessment or other proceeding in respect of Taxes, consent to any extension or waiver of the statute of limitations period applicable to any Tax claim or assessment, make any change to (or make a request to any Tax Authority to change) any of its methods of Tax accounting, enter into or terminate any agreement with any Tax Authority, enter into a Tax allocation, sharing, indemnity or similar agreement (other than credit or other commercial agreements the primary purpose of which does not relate to Taxes), grant any power of attorney relating to Tax matters, or take any position on any Tax Return, take any action, omit to take any action or enter into any other transaction that would have the effect

21

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001019

PX0594.26

of increasing the Tax liability or reducing any Tax asset of any Target Company or the Buyer in respect of any post-Closing tax period;

(xxi)   commencement, settlement, or offer or proposal to commence or settle (A) any Action involving or against any Target Company or (B) any Action that relates to the Transactions;

(xxii)   any declaration or payment of distributions to any Person; or

(xxiii)   any Contract to do any of the foregoing, or any action or omission that would result in any of the foregoing.

Section 3.8    Compliance with Law; Permits.

(a)    Except as would not reasonably be expected to have a Material Adverse Effect, the Target Companies are and have been in compliance in all respects with all applicable Laws, including the Laws administered by the FDA (including the Federal Food, Drug and Cosmetic Act (the "FDCA") and its implementing regulations), by the United States Department of Agriculture (the "USDA"), and by state and local laws parallel to federal requirements, including those relating to kickbacks and rules of veterinary medical ethics.  The Target Companies have not (i) received any oral or written notice, order, complaint or other communication from any Governmental Authority that any Target Company is not in compliance in any material respect with any applicable Law or (ii) entered into or been subject to any governmental order or received any written request for information, notice, demand letter, inquiry, complaint or claim from any Governmental Authority with respect to the foregoing.  To the Sellers' Knowledge, none of the managers, members, officers, employees, consultants or agents of any Target Company, in their respective capacities as such, has been charged or has received written notice that he or she is or was under investigation by any Governmental Authority with respect to any violation of any applicable Law.

(b)    The Target Companies and their contract manufacturers are in possession of all permits, licenses, approvals, certifications, registrations or other authorizations of any Governmental Authority necessary for the Target Companies and their contract manufacturers to own, lease and operate its properties and to carry on its business in all material respects as currently conducted and in compliance with all applicable Laws (individually, a "Permit", and collectively, the "Permits") to the extent that the failure to possess such Permit would reasonably be expected to cause a Material Adverse Effect to the Target Companies.  The Products are distributed in accordance with all applicable Laws and pursuant to all necessary Permits.  All Permits are valid and in full force and effect.  Each of the Target Company and their contract manufacturers is and during the past four (4) years has been in compliance with all such Permits to the extent that such noncompliance would reasonably be expected to cause a Material Adverse Effect to the Target Companies.  No denial, suspension, cancellation, modification, revocation or nonrenewal of any Permit is pending or, to the Knowledge of the Sellers, threatened.

(c)    The Products are not adulterated or misbranded pursuant to or within the meaning of the FDCA or equivalent provisions of state Laws that are applicable to the Target Companies.

22

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001020

PX0594.27

(d)    The Target Companies have made reasonable efforts to confirm that the label, labeling, advertising, all structure/function claims, all express and implied product claims, and the expiration dates of each Product comply with all applicable Laws. The Target Companies have not, with respect to the FDA, the FTC or any other Governmental Authority or from any other Person, (i) received any warning letters or oral or written correspondence regarding the compliance of any Product label, labeling, advertising, structure/function claim, express or implied product claim, or expiration date; (ii) been investigated or is under investigation for any product claim; or (iii) received any oral or written notice that would restrict the ability to sell, market or distribute any Products as they are being sold, marketed or distributed currently or as they are intended to be in the future.

(e)    Each Target Company is in compliance with any settlements and consent judgments thereunder entered into by such Target Company.

(f)    The Products neither are, nor have been, the subject of any ban, suspension, recall, market withdrawal or replacement, inventory destruction, safety alert or other notice relating to an alleged lack of safety or regulatory compliance, whether voluntarily or as required by the FDA or any other Governmental Authority, or by any state. To the Knowledge of the Sellers, there are presently no facts or circumstances that exist that could reasonably be expected to result in any such actions.

(g)    The manufacture of the Products by, or on behalf of, the Target Companies has at all times been conducted in compliance with applicable Laws the violation of which would reasonably be expected to cause a Material Adverse Effect to the target Companies, including being manufactured pursuant to all applicable current good manufacturing practices and safety laws. The Target Companies' manufacturing processes are adequate to ensure that Products will conform to all component, packaging, and product specifications and the regulations established therefor and will be safe for their intended use. No Target Company has received any notice or correspondence from any Governmental Authority or from any other person relating to any claim or allegation that the manufacture of any Product is not in compliance with applicable Laws.

(h)    The Target Companies are neither being investigated nor, to the Sellers' Knowledge, are under threat of investigation by the FDA, the FTC or any other Governmental Authority, nor is the FDA, the FTC, or any other Governmental Authority currently investigating or to the Sellers' Knowledge threatening to investigate any claim that the manufacture of the Products by, or on behalf of, any Target Company is not in compliance with applicable Laws the violation of which would reasonably be expected to cause a Material Adverse Effect to the Target Companies.

Section 3.9    Legal Proceedings. Except as set forth on Section 3.9 of the Disclosure Schedules, there is no Action pending or, to the Knowledge of the Sellers, threatened against any Target Company, or any material property or asset of any Target Company, or, to the Knowledge of the Sellers, any of the members, managers, officers or employees of any Target Company in regards to their actions as such. There is no Action pending or, to the Sellers' Knowledge, threatened against the Sellers, VOI HoldCo or any Target Company which, if adversely determined, would reasonably be expected to have a Material Adverse Effect on the ability of the

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001021

PX0594.28

Sellers, VOI HoldCo or the Target Companies to perform their and its obligations under this Agreement and the Ancillary Agreements or to consummate the Transactions.  There is no outstanding material order, writ, judgment, injunction, decree, determination or award of, or pending or, to the Knowledge of the Sellers, threatened investigation by, any Governmental Authority relating to any Target Company or any of their properties or assets, or, to the Knowledge of the Sellers, any Target Company's members, managers, officers or employees in regards to their actions as such.  As of the date hereof, there is no Action by any Target Company pending, or which such Target Company has commenced preparations to initiate, against any other Person.

Section 3.10    Employee Benefits Matters.

(a)    Section 3.10(a) of the Disclosure Schedules sets forth a true and complete list of (i) all benefit plans (as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), whether or not subject to ERISA), (ii) all bonus, stock option, stock purchase, restricted stock, or other equity-based plan, incentive, deferred compensation, retiree medical or life insurance, supplemental retirement, severance or other benefit plans, arrangements, programs or policies of the Target Companies, and (iii) all retention, change in control, termination or severance agreements to which any Target Company is a party along with one or more persons that are providing or have provided services to the Target Companies, with respect to which any Target Company has or could reasonably be expected to have any obligation or liability (contingent or otherwise) or which are maintained, contributed to or sponsored by any Target Company for the benefit of any current or former employee, officer, member, manager or consultant of any Target Company (collectively, the "Plans").

(b)    The Sellers have furnished to the Buyer a true and complete copy of each Plan and all current amendments thereto and have delivered to the Buyer a true and complete copy of (or, to the extent no such copy exists, a description of): (i) each trust or other funding arrangement, (ii) each summary plan description and summary of material modifications, (iii) the two most recently filed IRS Form 5500 with attached schedules, (iv) the most recently received IRS determination letter for each such Plan and (v) the most recently prepared actuarial report and financial statement, if any, in connection with each such Plan.  No Target Company has any express or implied commitment (A) to create, incur liability with respect to, or cause to exist any employee benefit plan, program or arrangement that is not a Plan, (B) to enter into any Contract to provide compensation or benefits to any individual, or (C) to modify, change or terminate any Plan, other than with respect to a modification, change or termination required by ERISA or the Code.

(c)    No Target Company or any ERISA Affiliate has ever sponsored, maintained, contributed to or been required to contribute to or incurred any liability (contingent or otherwise) with respect to any:  (i) multiemployer plan within the meaning of Section 3(37) or 4001(a)(3) of ERISA, (ii) single employer pension plan within the meaning of Section 4001(a)(15) of ERISA for which any Target Company could incur liability under Section 4063 or 4064 of ERISA, (iii) "employee pension benefit plan" within the meaning of Section 3(2) of ERISA that is subject to Title IV of ERISA or Section 412 of the Code, or (iv) "funded welfare plan" within the meaning of Section 419 of the Code, in each case with respect to which any Target Company could reasonably be expected to have any material liability.

24

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001022

PX0594.29

(d)     The execution and delivery of this Agreement and the consummation of the Transactions will not, either alone or in combination with any other event, (i) entitle any current or former employee, officer, manager or independent contractor of any Target Company (or any Related Person) to any retention bonus, transaction bonus, severance pay or any other similar payment (whether payable by the Sellers or any of their Related Persons), (ii) accelerate the time of payment or vesting, or increase the amount of or otherwise enhance any compensation or benefit provided to any such employee, officer, manager or independent contractor (or any Related Person of any of the foregoing) by the Sellers or any of their Related Persons or (iii) entitle any current or former employee, officer, manager or independent contractor of any Target Company (or any Related Person of any of the foregoing) to any payment in respect of any vested or unvested equity (or phantom equity or derivative equity) interests in the Sellers or any of their Related Persons.

(e)     None of the Plans, or any employment or consulting agreements with any current or former employee, officer, manager or consultant of any Target Company, currently provides, or reflects or represents any liability to provide, post-termination or retiree welfare benefits to any person for any reason, except as may be required by Section 601, et seq. of ERISA and Section 4980B(b) of the Code or other applicable similar Laws regarding health care coverage continuation, and none of the Target Companies or any ERISA Affiliate has any liability to provide post-termination or retiree welfare benefits to any person or ever represented, promised or contracted to any employee or former employee, officer, manager or independent contractor of any Target Company (either individually or to the Target Company employees as a group) or any other person that such employee(s) or other person would be provided with post-termination or retiree welfare benefits, except to the extent required by statute.

(f)     Each Plan, and all employment or consulting agreements with any current or former employee, officer, manager or consultant of any Target Company, is now and always has been operated in accordance with its terms and the requirements of all applicable Laws, including ERISA and the Code, the violation of which would reasonably be expected to cause a Material Adverse Effect to the Target Companies.  Each Target Company has performed all obligations required to be performed by it to the extent that such non-performance of which would reasonably be expected to cause a Material Adverse Effect to such Target Company and is not in any  respect in default under or in violation under any Plan to the extent that such default or violation would reasonably be expected to cause a Material Adverse Effect to such Target Company, nor do the Sellers have any Knowledge of any such default or violation by any other party to any Plan.  No Action is pending or, to the Knowledge of the Sellers, threatened with respect to any Plan, other than claims for benefits in the ordinary course, and no fact or event exists that would give rise to any such Action.  There has not been any non-exempt prohibited transaction, within the meaning of Section 406 of ERISA or Section 4975 of the Code, with respect to any Plan.

(g)     Each Plan that is intended to be qualified under Section 401(a) of the Code or Section 401(k) of the Code has received a timely favorable determination letter from the IRS, or, with respect to a prototype plan, can rely on an opinion letter from the IRS to the prototype plan sponsor covering all of the provisions applicable to the Plan for which determination or opinion letters are currently available, that the Plan is so qualified.  To the Knowledge of the Sellers, no fact or event has occurred since the date of such determination or opinion letter or

25

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001023

PX0594.30

letters from the IRS that could adversely affect any Target Company's ability to rely on such letters or the qualified status of any such Plan.

(h)     All contributions, premiums or payments required to be made with respect to any Plan have been made on or before their due dates.  All such contributions have been fully deducted for income tax purposes.  No such deduction has been challenged or disallowed by any Governmental Authority and no fact or event exists that would give rise to any such challenge or disallowance.

(i)     No Plan or any related trust or other funding medium thereunder or any fiduciary thereof is, to the Knowledge of the Sellers, the subject of an audit, investigation or examination by any Governmental Authority.

(j)     The Target Companies and their ERISA Affiliates do not maintain any Plan which is a "group health plan," as such term is defined in Section 5000(b)(1) of the Code, that has not been administered and operated in all material respects in compliance with the applicable requirements of Section 601 of ERISA, Section 4980B(b) of the Code and the applicable provisions of the Health Insurance Portability and Accountability Act of 1986.  No Target Company is subject to any material liability, including additional contributions, fines, penalties or loss of tax deduction as a result of such administration and operation.

(k)     With respect to each Plan, or any employment or consulting agreements with any current or former employee, officer, manager or consultant of any Target Company, that is in whole or in part a "nonqualified deferred compensation plan" (as defined for purposes of Section 409A(d)(1) of the Code), (i) such plan or arrangement has been operated since January 1, 2005 in material compliance with Section 409A of the Code and all applicable IRS guidance promulgated thereunder to the extent such plan or arrangement is subject to Section 409A of the Code so as to avoid any tax, interest or penalty thereunder; (ii) the document or documents that evidence each such plan or arrangement have conformed to the provisions of Section 409A of the Code and the final regulations under Section 409A of the Code since December 31, 2008; and (iii) as to any such plan or arrangement in existence prior to January 1, 2005 and not subject to Section 409A of the Code, has not been "materially modified" (within the meaning of IRS Notice 2005-1) at any time after October 3, 2004.

Section 3.11   Labor and Employment Matters.

(a)     Section 3.11(a) of the Disclosure Schedules sets forth a true and complete list of all persons who are employees, independent contractors or consultants of any Target Company as of the date hereof, including any employee who is on a leave of absence of any nature, and sets forth for each individual the following by the relevant Target Company: (i) employee name; (ii) title or position (including whether full-time or part-time); (iii) hire date; and (iv) annual base compensation rate or contract fee and commission, bonus and other incentive-based compensation in effect immediately prior to the Locked Box Date.

(b)     No Target Company is a party to any labor or collective bargaining Contract that pertains to employees of any Target Company.  To Sellers' Knowledge, there are no, and there have been no, organizing activities or collective bargaining arrangements that could

26

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001024

PX0594.31

affect any Target Company, pending or under discussion with any labor organization or group of employees of any Target Company. There is no and there has been no, labor dispute, strike, controversy, slowdown, work stoppage or lockout pending or, to the Knowledge of the Sellers, threatened against or affecting any Target Company, nor is there any basis for any of the foregoing. There is no pending or, to the Knowledge of the Sellers, threatened union grievances or union representation questions involving employees of any Target Company.

(c)     To the Knowledge of the Sellers, all employees of the Target Companies, are or were during their employment authorized for employment by the Target Companies, as applicable, in the United States in accordance with the Immigration and Naturalization Act, as amended, and the regulations promulgated thereunder. No allegations of immigration-related unfair employment practices have been made, or to the Knowledge of the Sellers, threatened with the Equal Employment Opportunity Commission or the Special Counsel for Immigration-Related Unfair Employment Practices, or any other Governmental Authority. The Target Companies have completed and retained in accordance with the Department of Homeland Security regulations a Form I-9 for all employees working in the United States for the Target Companies.

(d)     Each Target Company is, and has been, in compliance in all respects with all applicable Laws respecting employment, including discrimination or harassment in employment, terms and conditions of employment, termination of employment, wages, overtime, classification as exempt and non-exempt, hours, occupational safety and health, employee whistle-blowing, immigration, employee privacy, disability and accommodations, pay equity, background checks, leaves of absence, paid sick leave and vacation, employment practices and classification of employees, consultants and independent contractors, to the extent that such noncompliance of which would reasonably be expected to cause a Material Adverse Effect to such Target Company. No Target Company is engaging in, or has engaged in, any unfair labor practice, as defined in the National Labor Relations Act or other applicable Laws. No unfair labor practice or labor charge or complaint is pending or, to the Knowledge of the Sellers, threatened with respect to any Target Company or any of its Subsidiaries before the National Labor Relations Board or any other Governmental Authority. Except as set forth on Section 3.11(d) of the Disclosure Schedules, there are no Actions against any Target Company pending, or to the Knowledge of the Sellers, threatened to be brought or filed in, by, or with any Governmental Authority in connection with the employment of any current or former applicant, employee, consultant, intern, or independent contractor of any Target Company.

(e)     Each Target Company has withheld and paid to the appropriate Governmental Authority or is holding for payment not yet due to such Governmental Authority all amounts required to be withheld from employees of such Target Company and is not liable for any arrears of wages, taxes, penalties or other sums for failure to comply with any applicable Laws relating to the employment of labor. Each Target Company has paid in full to all its employees or adequately accrued in accordance with GAAP for all wages, salaries, commissions, bonuses, benefits and other compensation due to or on behalf of such employees.

(f)     No Target Company is a party to, or otherwise bound by, any consent decree with, or citation by, any Governmental Authority relating to employees or employment practices. No Target Company nor any of its officers has received any notice of intent by any

27

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001025

PX0594.32

Governmental Authority responsible for the enforcement of labor or employment laws to conduct an investigation relating to any Target Company and, to the Knowledge of the Sellers, no such investigation is in progress.

(g)     To the Knowledge of the Sellers, no current employee or officer of any Target Company intends, or is expected, to terminate his or her employment relationship with such Target Company following the consummation of the Transactions. Except for the Transaction Documents and as set forth on Section 3.11(g) of the Disclosure Schedules, all employees of the Target Companies are employed on an at-will basis.

(h)     (i) The Target Companies have not effectuated a "plant closing" (as defined in the Worker Adjustment Retraining and Notification Act of 1988, as amended (the "WARN Act")) affecting any site of employment or one or more facilities or operating units within any site of employment or facility, (ii) there has not occurred a "mass layoff" (as defined in the WARN Act) in connection with any Target Company affecting any site of employment or one or more facilities or operating units within any site of employment or facility and (iii) the Target Companies have not been affected by any transaction or engaged in layoffs or employment terminations sufficient in number to trigger application of any similar state, local or foreign law.

(i)     No Target Company has incurred, or would reasonably be expected to incur, any liability under applicable Law with respect to any misclassification of any person as an independent contractor rather than as an employee, or as an exempt employee rather than a non-exempt employee that would reasonably be expected to cause a Material Adverse Effect to a Target Company.

(j)     To the Knowledge of the Sellers, there have been no allegations of sexual harassment or sexual misconduct involving any current or former manager, officer, or employee of any Target Company.  No Target Company has entered into any settlement agreements related to allegations of sexual harassment or sexual misconduct by any current or former manager, officer, or employee of any Target Company.

Section 3.12     Title to and Condition of Assets.

(a)     Each Target Company has good and valid title to or a valid leasehold interest in all of its assets, including all of the assets reflected on the Balance Sheet or acquired in the ordinary course of business since the date of the Balance Sheet, except those sold or otherwise disposed of for fair value since the date of the Balance Sheet in the ordinary course of business consistent with past practice and except as otherwise related to the Patent Litigation. Except as set forth on Section 3.12(a) of the Disclosure Schedules, none of the assets owned by any Target Company or the leasehold interest of a Target Company in any assets used in the Business is subject to any Encumbrance, other than (i) the liens referenced on Section 3.12(a) of the Disclosure Schedules, (ii) liens for Taxes not yet past due or being contested in good faith by appropriate procedures, (iii) mechanics', workmen's, repairmen's, warehousemen's, carriers' liens or other similar Encumbrances imposed by Law arising or incurred in the ordinary course of business of such Target Company consistent with past practice, (iv) any such matters of record, Encumbrances and other imperfections of title that do not, individually or in the

28

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001026

PX0594.33

aggregate, materially impair the continued ownership, use and operation of the assets to which they relate in the business of such Target Company as currently conducted and (v) Encumbrances that could result from the Patent Litigation (collectively, "Permitted Encumbrances").

(b)      All material tangible assets owned or leased by any Target Company have been maintained in all material respects in accordance with generally accepted industry practice, are in all material respects in good operating condition and repair, ordinary wear and tear excepted, and are adequate for the uses to which they are being put.

(c)      The assets (including Contracts, Permits and other rights) of the Target Companies immediately following the Reorganization (other than assets which may be distributed or paid by the Target Companies as Permitted Leakage) will constitute all of the assets (including Contracts, Permits and other rights) necessary to operate the Business in the same manner it was conducted immediately prior to the date hereof.

Section 3.13      Real Property.

(a)      Owned Real Property.  Section 3.13(a) of the Disclosure Schedules sets forth a complete and accurate list of each interest in real property owned by any Target Company (the "Owned Real Property"), including the location thereof and the current use of such real property.  The Target Companies have good and marketable title in fee simple to all of such properties, free and clear of all Encumbrances except for Permitted Encumbrances.  No event or condition exists that, with or without the passage of time or the giving of notice, or both, would constitute a breach or default by any Target Company of any covenants, conditions, restrictions or other Laws applicable to any Owned Real Property and no Target Company has received any written notice or allegation thereof.  None of the Owned Real Properties is subject to any material lease, sublease, license or similar agreement that grants to any other Person any right to acquire, lease, use or occupy such property or any part thereof.  No condemnation proceeding is pending or, to the Knowledge of the Sellers, threatened with respect to any such property.  To the Knowledge of the Sellers, all of the buildings and structures on any Owned Real Property are structurally sound with no defects that would reasonably be expected to cause a Material Adverse Effect to any Target Company, are in good operating condition and repair, and each has adequate rights of ingress and egress, utility connections and licenses.  Complete and accurate copies of all deeds, title reports and insurance policies, surveys, mortgages, certificates of occupancy, building permits and inspection certificates with respect to the Owned Real Properties have been delivered to the Buyer and no Target Company and, to the Knowledge of the Sellers, no other Person party thereto is, or has been alleged to be, in breach or default thereunder.

(b)      Leased Real Property.  Section 3.13(b) of the Disclosure Schedules sets forth a complete and accurate list of each interest in real property leased by any Target Company, including the location thereof, the lessor and the annual rent therefor.  Each such lease is valid, binding and in full force and effect and creates a valid leasehold estate in the real property and a valid right of occupancy or use of the real property subject thereto.  All rent and other sums and charges payable by any Target Company as tenant, sublessee or licensee thereunder have been paid or reserved for.  No event or condition exists that, with or without the

29

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

passage of time or the giving of notice, or both, would constitute a default or breach by any Target Company pursuant to any such lease or of any covenants, conditions, restrictions or other Laws applicable to such property and no Target Company has received any written notice or allegation thereof.  To the Knowledge of the Sellers, each landlord under each such lease agreement has complied with its material obligations thereunder.  No notice of termination or non-renewal has been given or, to the Sellers' Knowledge, threatened by either party to any such lease and, to the Knowledge of the Sellers, no landlord intends to terminate or not renew any such lease by virtue of the Transactions.  No condemnation proceeding is pending or, to the Knowledge of the Sellers, threatened with respect to any such property.  To the Knowledge of the Sellers, all of the buildings, structures, improvements and fixtures on the premises leased by any Target Company are structurally sound with no defects that would reasonably be expected to cause a Material Adverse Effect to any Target Company, are in good operating condition and repair, and each has adequate rights of ingress and egress and utility connections.

Section 3.14    Intellectual Property.

(a)    Registered IP. Section 3.14(a) of the Disclosure Schedules sets forth a true and complete list of (i) each item of Company Registered IP; (ii) the jurisdiction in which such item of Company Registered IP has been registered or filed and the applicable application, registration, or serial or other similar identification number; (iii) any other Person (including the Sellers) that has an ownership interest in such item of Company Registered IP and the nature of such ownership interest; (iv) all material unregistered trademarks used in connection with any Target Company's Products or services; and (v) all actions that are required to be taken by the Target Companies or the Sellers within one hundred and eighty (180) days of the Closing in order to avoid prejudice to, impairment or abandonment of such Company Registered IP (including all office actions, provisional conversions, annuity or maintenance fees or re-issuances).

(b)    Products and Services. Section 3.14(b) of the Disclosure Schedules accurately identifies and describes each Product and service developed, marketed, licensed, sold, performed, distributed or otherwise made available (i) by any Target Company as of the date hereof, including any product or service currently under development by any Target Company; or (ii) by the Sellers in conducting the Business prior to the date hereof.

(c)    Ownership. Except as otherwise related to the Patent Litigation or as set forth on Section 3.14(c) of the Disclosure Schedules, the Target Companies exclusively own all right, title and interest in and to the Company Intellectual Property free and clear of any Encumbrances. Each Person who is or was an employee, officer, director or contractor of a Target Company and who is or was involved in the creation or development of any Company Intellectual Property has signed an enforceable agreement containing an assignment to the Company of all Intellectual Property Rights in such Person's contribution to the Company Intellectual Property and a waiver (to the extent waivable under Applicable Law) of any rights that such Person may have in the Company Intellectual Property that cannot be assigned as a matter of law. The Sellers did not assign any of the foregoing Intellectual Property Rights to any Person and, as of the Closing, have transferred to the Target Companies all such Intellectual Property Rights. No current or former member (whether direct or indirect), officer, manager or

30

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001028

PX0594.35

employee of any Target Company has any claim, right (whether or not currently exercisable) or ownership interest in any Company Intellectual Property.

(d)     <u>Registration; Validity</u>. Except as otherwise related to the Patent Litigation or as set forth on Section 3.14(d) of the Disclosure Schedules, all Company Registered IP is valid, subsisting and enforceable. The Sellers and/or the Target Companies have made all filings and payments and taken all other actions required to be made or taken to maintain each item of Company Registered IP in full force and effect by the applicable deadline and otherwise in accordance with all Applicable Laws.  Each item of Company Registered IP is in compliance with all legal requirements and all filings, payments and other actions required to be made or taken to maintain such item of Company Registered IP in full force and effect have been made by the applicable deadline. No event or circumstance (including a failure to exercise adequate quality controls and an assignment in gross without the accompanying goodwill) has occurred or exists that has resulted in, or could reasonably be expected to result in, the abandonment of any material trademark (whether registered or unregistered) owned, used or applied for by any Target Company.

(e)     <u>Infringement of Company Intellectual Property Rights</u>. Redacted - Privilege (Common Interest)

# Redacted - Privilege (Common Interest)

(f)     <u>Effect of Transaction</u>. Neither the execution, delivery or performance of this Agreement nor the consummation of any of the transactions or agreements contemplated by this Agreement will, with or without notice or the lapse of time, result in or give any other Person the right or option to cause or declare (i) a loss of or Encumbrances on any Company Intellectual Property; (ii) the release, disclosure or delivery of any Company Intellectual Property by or to any escrow agent or other Person; or (iii) the grant, assignment or transfer to any other Person of any license or other right or interest under, to or in any Technology or Intellectual Property Right.

(g)     <u>Sufficiency</u>. **Redacted - Privilege (Common Interest)**

# Redacted - Privilege (Common Interest)

31

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001029

PX0594.36

(h)   <u>Non-Infringement</u>.



**Redacted - Privilege (Common Interest)**

(i)   <u>Development Obligations</u>.  No Target Company has any unfulfilled obligation under any Contract to develop any deliverables for the Sellers, their Related Persons or any third party.

(j)   <u>Funding Sources</u>. No funding, facilities or personnel of any Governmental Authority or any public or private university, college or other educational or research institution were used, directly or indirectly, to develop or create, in whole or in part, any Company Intellectual Property. To the Knowledge of the Sellers, no current or former employee, consultant or independent contractor of any Target Company or the Sellers who was involved in, or who contributed to, the creation or development of any Company Intellectual Property (i) has performed services for any Governmental Authority, university, college or other educational institution or research center during a period of time during which such employee, consultant or independent contractor was also performing services for any Target Company; or (ii) was or is operating under any grants from any Governmental Authority or private source or subject to any employment agreement, invention assignment or non-disclosure agreement or other obligations with any third party that could adversely affect any Target Company's rights in any Company Intellectual Property.

(k)   <u>Standards Bodies</u>. The Target Companies are not nor have ever been a member or promoter of, or a contributor to, any industry standards body or similar organization that could require or obligate any Target Company to grant or offer to any other Person any license or right to any Company Intellectual Property.

Section 3.15   <u>Information Technology</u>.

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001030

PX0594.37

(a)     All IT Systems used by the Target Companies in the Business are owned by, or licensed or leased to, the relevant Target Company.  Copies or details of all licenses and leases relating to the IT Systems that are or have been used in the Business that were purchased for an amount exceeding [redacted] or licensed for an annual fee exceeding [redacted] per year are listed in Section 3.15(a) of the Disclosure Schedules.  The Target Companies are the legal and beneficial owners of, or has a contractual right to use, the IT Systems free from Encumbrances and have not, in the twelve (12) months prior to the Closing, received written notice from a third party alleging that any Target Company is in default under licenses or leases relating to the IT Systems. All Contracts relating to the IT Systems are valid and binding and no Contract that relates to the IT Systems has been the subject of any breach by any Target Company, the Sellers or any other Person, and none of the Target Companies or the Sellers (i) has waived any breach thereof by any other Person; (ii) has received any notice of termination of any such Contract; or (iii) is aware of any circumstances that would give rise to a breach, suspension, variation, revocation or termination of any such Contract without the consent of the relevant Target Company (other than termination on notice in accordance with the terms of such Contract).

(b)     The IT Systems have been satisfactorily maintained and supported and the Target Companies have reasonable and appropriate maintenance and support agreements in respect of the IT Systems, and none of them will be terminable as a result of the execution of this Agreement or the consummation of the Transactions. The Target Companies are the sole legal and beneficial owners of the IT Systems and the IT Systems are used exclusively by the Target Companies or, as it relates to the Business, the Sellers. The IT Systems that are currently used in the Business constitute all the information and communications technology and other systems infrastructure reasonably necessary to carry on the Business, including having sufficient capacity and maintenance and support requirements to satisfy the requirements of the Business with regard to information and communications technology, data processing and communications. The IT Systems are in good working order and function in accordance with all applicable documentation and specifications.

(c)     The Target Companies have in effect industry standard disaster recovery plans, procedures and facilities for its business and have taken all reasonable steps to safeguard the security and the integrity of its IT Systems.  There have been no unauthorized intrusions or breaches of the security with respect to the IT Systems. The Target Companies have implemented any and all security patches or upgrades that are generally available for the IT Systems.

(d)     The Target Companies implement industry standard measures designed to prevent the introduction of malicious code into its IT Systems, including firewall protections and regular virus scans and for taking and storing on-site and off-site back-up copies of Software, Customer Data and Personal Information.

(e)     Neither the Target Companies nor, as it relates to the Business, the Sellers or their Related Persons have experienced, and to Sellers' Knowledge, no circumstances exist that are likely or expected to give rise to, any disruption in or to the operation of the Business as a result of: (i) any substandard performance or defect in any part of the IT Systems whether caused by any viruses, bugs, worms, software bombs or otherwise, lack of capacity or otherwise; or (ii) a breach of security in relation to any part of the IT Systems.

33

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001031

PX0594.38

Section 3.16    Privacy and Security.

(a)    The Target Companies comply and have complied with all applicable Laws (including U.S. federal and state Laws relating to privacy or data security, the General Data Protection Regulation ("GDPR"), and EC Directive 95/46 and its implementations in the EU Member States), and its own published, posted and internal agreements and policies (which are in conformance with reputable industry practice and applicable Laws) relating to the access, collection, use, transmission or disclosure or other processing of Personal Information, and all requirements related to privacy, data protection or data security of any Contract or codes of conduct to any Target Company is a party (all of the foregoing, collectively, "Privacy Laws").

(b)    The Target Companies have provided legally sufficient public disclosures with respect to their policies and practices relating to Personal Information on Websites operated by or on behalf of any Target Company and has provided all notices required by applicable Privacy Laws pursuant to which the failure to comply would reasonably be expected to cause a Material Adverse Effect to the Target Companies.

(c)    The Target Companies take and have taken commercially reasonable steps and have implemented and maintained commercially reasonable administrative, technical, organizational and physical safeguards and policies to protect the confidentiality, integrity and security of the Personal Information maintained by or on behalf of any Target Company against any unauthorized or improper use, access, transmittal, interruption, modification or corruption (including any malware, virus, worm, bomb, backdoor, clock, timer or other disabling device, code, design or routine), and there have been no material breaches, disruptions or corruption of same that have not been fully remediated.

Section 3.17    Taxes.

(a)    The Target Companies and the Sellers have duly and timely filed or caused to be timely filed with the appropriate Tax Authority (after giving effect to any extensions of time in which to make such filings) all Tax Returns required to be filed by, or with respect to, the Target Companies.  All such Tax Returns have been properly completed in all material respects in compliance with all applicable legal requirements and are true, complete and accurate in all material respects.  The Target Companies are not currently the beneficiary of any extension of time within which to file any Tax Return.

(b)    All Taxes due and owing by the Target Companies (whether or not shown on any Tax Return) have been timely paid and the Target Companies have adequately reserved in the Financial Statements in accordance with GAAP for all Taxes (whether or not shown on any Tax Return) that have accrued but are not yet due or payable as of the dates thereof.  Since the end of the most recent period covered by the Financial Statements, no Target Company has incurred any liability for any material Taxes outside the ordinary course of business or otherwise inconsistent with past custom and practice.

(c)    No claim has ever been made by a Tax Authority in a jurisdiction where the Target Companies do not file Tax Returns or pay Taxes that any Target Company is or may be subject to taxation by such jurisdiction.

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001032

PX0594.39

(d)     There are no pending or asserted audits, claims, demands, causes of action, suits, arbitrations, inquiries, hearings, investigations, requests for information or filings, examinations, disputes, proposed adjustments, assessments or other actions or proceedings (whether administrative, regulatory or otherwise) by any Tax Authority with respect to Taxes relating to any Target Company (a "Tax Claim").  All deficiencies claimed, proposed or asserted or assessments made against a Target Company by any Tax Authority have been fully paid, will be timely paid or are being contested in good faith by appropriate proceedings and adequate reserves have been made for such Taxes in the Financial Statements in accordance with GAAP.

(e)     Section 3.17(e) of the Disclosure Schedules sets forth all income Tax Returns filed or to be filed by or on behalf of any Target Company with any jurisdiction for the three most recently completed taxable years.  The Target Companies have previously delivered or made available to the Buyer complete and accurate copies of all material federal, state, local and non-U.S. Tax Returns of the Target Companies for the three most recently completed taxable years, including, promptly upon their availability, for the most recent taxable year, and complete and accurate copies of all audit or examination reports and statements of deficiencies assessed against or agreed to by any Target Company for all taxable years remaining open under the applicable statutes of limitations.  No Target Company has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to the assessment or collection of any Tax, nor has any request been made in writing for any such extension or waiver.  There are no powers of attorney in effect with respect to Taxes of any Target Company.

(f)     There are no material liens for Taxes upon any property or asset of any Target Company, other than statutory liens for Taxes not yet due and payable.

(g)     No Target Company has agreed, or is required, to make any adjustment under Sections 481(a) or 263A of the Code (or any comparable provision of state, local or non-U.S. Tax Law) by reason of a change in accounting method for a taxable period ending prior to the Closing.

(h)     No Target Company will be required to include any item of income in, or exclude any item of deduction from, taxable income for any period (or any portion thereof) ending after the Closing as a result of any prepaid amounts, installment sale or other transaction on or prior to the Closing, any accounting method change or agreement with any Tax Authority entered into on or prior to the Closing or any prepaid amount received on or prior to the Closing.

(i)     Other than Contracts or agreements entered into in the ordinary course of business not primarily related to Taxes which include indemnification provisions (including, for the avoidance of doubt, sale or acquisition Contracts), no Target Company is, or has ever been, a party to or bound by any Tax indemnity agreement, Tax sharing agreement, Tax allocation agreement or similar Contract, and no Target Company is, or has ever have been a party to or bound by any offer in compromise, closing agreement, gain recognition agreement or other agreement with any Tax Authority with respect to Taxes.  No Tax ruling has been applied for or received by any Target Company.

(j)     No Target Company has ever been a party to a transaction that is a "reportable transaction," as such term is defined in Treasury Regulation Section 1.6011-4(b)(1)

35

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

(or any other transaction requiring disclosure under analogous provisions of state, local or foreign Tax Law), or a transaction that constitutes a "listed transaction" as such term is defined in Treasury Regulation Section 1.6011-4(b)(2).

(k)     No Target Company (i) has ever been a member of an affiliated group filing a consolidated federal income Tax Return or any similar group for federal, state, local or foreign Tax purposes or (ii) has or will have any liability for the Taxes of any other Person under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or foreign Law), as a transferee or successor, by Contract, operation of Law or otherwise.

(l)     No Target Company has ever been a party to any transaction intended to qualify under Section 355 of the Code.

(m)     All material Taxes that the Target Companies have been required to withhold or to collect for payment have been duly withheld and collected, and, to the extent required, have been timely paid to the appropriate Tax Authority in compliance with all applicable legal requirements.  The Target Companies have properly requested, received and retained all necessary exemption certificates and other documentation supporting any claimed exemption or waiver of Taxes on material sales or other transaction as to which the Target Companies otherwise would have been obligated to collect or withhold Taxes.  Each Target Company has materially complied with all information reporting and record keeping requirements under all applicable Law, including retention and maintenance of required records with respect thereto.

(n)     The Target Companies are in compliance with all applicable transfer pricing Laws and regulations.

(o)     All references to any Target Company in this Section 3.17 shall include references to any Person (i) which merged with and into or liquidated into such Target Company or (ii) that was converted into such Target Company.

(p)     None of the assets of any Target Company is tax-exempt use property within the meaning of Section 168(h) of the Code, or directly or indirectly secures any debt the interest on which is exempt from tax under Section 103(a) of the Code.

(q)     No asset of any Target Company is, or after the consummation of the Transactions will be, subject to the anti-churning rules of Section 197(f)(9) of the Code and Treasury Regulations Section 1.197-2(h).

(r)     At all times from June 28, 1999 until the Reorganization, VOI was validly treated for U.S. federal and state income tax purposes as a "small business corporation" within the meaning of Section 1361(b) of the Code and has had in effect a valid election under Section 1362(a) of the Code or as a "qualified subchapter S subsidiary" of VOI HoldCo, within the meaning of Section 1361(b)(3)(B) of the Code. Effective as of the date of the Reorganization, and at all times thereafter prior to the Closing, VOI LLC has been treated as a disregarded entity of VOI HoldCo for U.S. federal income tax purposes. Each of VOI and VOI LLC has validly been treated in a manner similar to its respective treatment described in the preceding sentences of this Section 3.17(q) for purposes of the income Tax laws of all states and local jurisdictions in

36

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001034

PX0594.41

which it has been subject to taxation where such treatment is legally available. Neither VOI nor VOI LLC has ever been treated as a Subchapter C corporation for state or local income Tax purposes. Notwithstanding the foregoing, Veterinary Orthopedic Implants, Inc., an Illinois corporation (the "Illinois corporation"), and Veterinary Orthopedic Implants, Inc., a Vermont corporation (the "Vermont corporation"), merged with and into VOI on March 17, 2009 with VOI as the survivor of such merger. The Illinois corporation was created on June 28, 1993, and filed a Subchapter S corporation election effective as of June 28, 1999.

(s)     Each Subsidiary of VOI and VOI LLC is, and has been since its inception, treated as a disregarded entity for U.S. federal income tax purposes. Redacted - Other (Nonresponsive)

**Redacted - Other (Nonresponsive)**

(t)     No Target Company is a party to any joint venture, partnership, or other arrangement or Contract that is treated as a partnership for U.S. federal income tax purposes.  No non-U.S. Target Company is, or has been, a controlled foreign corporation (as defined in Code Section 957) or passive foreign investment company (as defined in Code Section 1297.

Section 3.18     Environmental Matters.

(a)     The Target Companies are and have been in compliance in all respects with all applicable Environmental Laws which noncompliance would reasonably be expected to cause a Material Adverse Effect on the Target Companies.  No Target Company nor any of the executive officers or managers of any Target Company has received any written notice, request for information, communication or complaint from a Governmental Authority or other Person alleging that any Target Company has any liability under any Environmental Law or is not in compliance with any Environmental Law.

(b)     There is and has been no Release or threatened Release of Hazardous Substances nor any Remediation or corrective action of any kind relating thereto, on, in, at or under any properties (including any buildings, structures, improvements, soils or subsurface strata, surface water bodies or drainage ways and groundwaters thereof) (i) owned, leased or operated by or for any Target Company; (ii) to which any Target Company has sent any Hazardous Substances; or (iii) with respect to which any Target Company is liable, the liability of which would reasonably be expected to cause a Material Adverse Effect to the Target Companies.  No underground improvement that would be reasonably likely to result in a Release, including any treatment or storage tank or water, gas or oil well, is or has been located on any property described in the foregoing sentence, the liability for which would reasonably be expected to cause a Material Adverse Effect to the Target Companies.  The Target Companies are not actually, contingently or allegedly liable for any Release of, threatened Release of or contamination by Hazardous Substances or otherwise under any Environmental Law the liability of which would reasonably be expected to cause a Material Adverse Effect to the Target Companies.

(c)     The Target Companies have provided to the Buyer all permits, audits and other reports available pertaining to compliance with Environmental Law.  The Target Companies have also provided to the Buyer all environmental reports in their possession,

37

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001035

PX0594.42

addressing every location owned, operated or leased by any Target Company or at which any Target Company actually or allegedly has material liability under any Environmental Law.

Section 3.19    Material Contracts.

(a)    Section 3.19(a) of the Disclosure Schedules contains a true, correct and complete list of the following Contracts to which any Target Company is a party or by which the assets or properties of any Target Company are bound (the Contracts as are required to be listed on Section 3.19(a) of the Disclosure Schedules being collectively, the "Material Contracts"):

(i)    any sales, distribution, broker, agency, licensing, private label, co-branding, marketing, advertising, manufacturing, co-packing, outsourcing, supply, customer, service, leasing or consulting Contract;

(ii)    any Contract involving payment by or to the Target Companies of aggregate consideration in excess of (i) [Redacted - Other (Nonresponsive)] year or (ii) [Redacted - Other (Nonresponsive)] over the life of the Contract;

(iii)    any Contract with a Material Customer or a Material Supplier (excluding any purchase orders that do not contain material terms that have not been superseded by the Contract to which such purchase order relates);

(iv)    any Contract relating to the Indebtedness of any Target Company or the granting of any Encumbrances on any material assets (tangible or intangible) or properties of any Target Company;

(v)    any Contract relating to any Company Intellectual Property, including any Licensed Intellectual Property (other than license agreements for commercially available, off-the-shelf Software used by any Target Company for an annual license fee of no more than [Redacted - Other (Nonresponsive)]

(vi)    except with respect to an offer from, and related agreements with, DW Healthcare Partners IV, L.P. with respect to a potential transaction with VOI and the Sellers that was not executed or effectuated and has been cancelled, any Contract (A) relating to the acquisition or disposition of any business, membership interest units or material assets of any Target Company or of any other Person (in each case, whether by merger, sale of membership interest units, sale of assets or otherwise) or (B) that materially limits the ability of any Target Company to own, operate, sell, transfer, pledge, or otherwise dispose of any material assets or property, in each case with respect to clauses (A) and (B), either (x) entered into within the last five (5) years or (y) under which any Target Company has any continuing obligations;

(vii)    any employment agreements and other Contracts with any employee, consultant or independent contractor providing for annual base salary or other fixed compensation in excess of [Redacted - Other (Nonresponsive)]

(viii)    any Contract with any Governmental Authority;

38

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001036

PX0594.43

(ix)      any Contract that limits or purports to limit the ability of any Target Company (or, after the Closing, would limit or purport to limit the ability of the Buyer or its Subsidiaries) to compete in any line of business or with any Person or in any geographic area or during any period of time, solicit or hire employees or consultants, do business with any Person, or that contain an exclusivity obligation, right of first refusal, right of first negotiation, minimum use, purchase or supply requirements, or most favored nation provision, and which, in all cases, cannot be cancelled by such Target Company, as applicable, without penalty and without more than thirty (30) days' notice;

(x)      any Contract under which any Target Company made or committed to make any advance, loan, guarantee, extension of credit or capital contribution to, or other investment in, any Person;

(xi)      any settlement, resolution, or similar Contract under which any Target Company has any continuing obligations, liabilities, or rights (in each case, contingent or otherwise), other than releases entered into with former employees or independent contractors in the ordinary course of business consistent with past practice;

(xii)      any Contract for capital expenditures or the acquisition or construction of fixed assets requiring the Target Companies to pay in excess of [Redacted - Other (Nonresponsive)] following the Closing;

(xiii)     any Contract with any Seller, a Related Person of any Seller, or any members, managers or officers of any Target Company (other than employment Contracts);

(xiv)     any Contract under which any Target Company is required to indemnify the obligations or liabilities of any Person, in excess of [Redacted - Other (Nonresponsive)] or otherwise uncapped by the terms of such Contract;

(xv)      any partnership, alliance, joint venture or similar Contract; and

(xvi)     any other Contract that is material to the business, operations, assets, financial condition, results of operations or prospects of the Target Companies, taken as a whole.

(b)      The Target Companies have made available to the Buyer true, correct and complete copies of all Material Contracts. Each of the Material Contracts is a legal, valid, binding and enforceable agreement and is in full force and effect and will continue to be in full force and effect on identical terms immediately following the Closing. None of the Target Companies or, to the Knowledge of the Sellers, any other party is in breach or violation of, or (with or without notice or lapse of time or both) default under, any Material Contract, nor has any Target Company received any claim of any such breach, violation or default.

Section 3.20    Related Person Interests and Transactions.

(a)      Except as set forth on Section 3.20(a) of the Disclosure Schedules, no Seller or Related Person of any of the Sellers (i) owns, directly or indirectly, any equity or other financial or voting interest in excess of 5% in any competitor, supplier, licensor, lessor,

39

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001037

PX0594.44

distributor, independent contractor or customer of any Target Company or its Business; (ii) owns, directly or indirectly, or has any interest in, any property (real or personal, tangible or intangible) with a value in excess of ⬚ that any Target Company uses; or (iii) has any material business dealings or a financial interest in any transaction with any Target Company or involving any assets or property of any Target Company.

(b)     Except for the Transaction Documents and as set forth on Section 3.20(b) of the Disclosure Schedules, there are no Contracts by and between any Target Company, on the one hand, and any Seller or Related Person of any of the Sellers, on the other hand.

(c)     Except with respect to the Subscription Receivable, there are no outstanding notes payable to, accounts receivable from or advances by any Target Company to, and the Target Companies are not otherwise a debtor or creditor of, or has any liability or other obligation of any nature to, any Seller or Related Person of any of the Sellers.

Section 3.21   Insurance.  Section 3.21 of the Disclosure Schedules sets forth a true and complete list of all material casualty, managers and officers liability, general liability, product liability and all other types of insurance policies maintained with respect to the Target Companies and identifying the applicable carrier, coverage amount and deductibles.  No Target Company has received written notice of, nor, to the Knowledge of the Sellers, is there threatened, any cancellation, termination, reduction of coverage or material premium increases with respect to any such policy.  All premiums due have been paid on such insurance policies.

Section 3.22   Accounts Receivable.  All accounts receivable reflected on the Balance Sheet (i) represent bona fide and valid obligations arising from sales of goods or performance of services by the Target Companies in the ordinary course of business and (ii) are valid and undisputed claims of the Target Companies, and, as of the date hereof, there is no valid basis for any claims of set-off or other defenses or counterclaims under any Contract, in each case subject to applicable reserves established in accordance with GAAP.

Section 3.23   Inventory.  The inventory of the Target Companies has not been consigned to, or held on consignment from, any third person.  Such inventory consists of items of a quality and quantity substantially all of which is usable or saleable in the ordinary course of business, except for reasonable provisions or adjustments for excess inventory or damaged or slow-moving inventory and inventory obsolescence.  The present quantities of all inventory are reasonable in the present circumstances of the Target Companies.

Section 3.24   Product Liability.  There are no pending, or, to the Knowledge of the Sellers, threatened product liability claims by any third party (whether based on contract or tort and whether relating to destruction or return of Product, personal injury, including death, property damage or economic loss) arising from the sale or distribution of Products by any Target Company or the manufacture of Products by or on behalf of any Target Company.

Section 3.25   Customers and Suppliers.

(a)     Section 3.25(a) of the Disclosure Schedules sets forth a true and complete list of (i) the names of each of the ten largest (in terms of dollar volume) customers of the Target Companies, taken as a whole, for the 12 months ended December 31, 2019, based on sales to

40

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001038

PX0594.45

such customers during such period, (ii) the amount for which each such customer was invoiced during such period and (iii) the percentage of the consolidated total sales of the Target Companies, taken as a whole, represented by sales to each such customer during such period.  As of the date of this Agreement, the Target Companies have not received any written notice from any such customer that such customer (x) has ceased or substantially reduced, or will cease or substantially reduce, use of Products or services of any Target Company or (y) has sought, or is seeking, to reduce the price it will pay for the Products or services of any Target Company.  No material volume of goods intended for a particular geographic market has been diverted to be sold in another geographic market.

(b)     Section 3.25(b) of the Disclosure Schedules sets forth a true and complete list of (i) the ten largest (in terms of dollar volume) suppliers of the Target Companies, taken as a whole, for the 12 months ended December 31, 2019, based on purchases from such supplier during such period, and (ii) the amount for which each such supplier invoiced the Target Companies, taken as a whole, during such period.  As of the date of this Agreement, the Target Companies have not received any written notice that there has been any material adverse change in the price of such supplies or services provided by any such supplier and used by any Target Company, or that any such supplier will not sell supplies or services to the Target Companies at any time after the Closing on terms and conditions substantially similar to those used in its current sales to the Target Companies, subject to general and customary price increases.

Section 3.26   <u>Certain Payments</u>.  None of the Sellers, their Related Persons, the Target Companies or any of their Representatives, distributors or other third parties acting on their behalf has, directly or indirectly, with respect to the Business, (a) used any corporate funds for any illegal contributions, gifts, entertainment or other unlawful expenses relating to political activity, (b) used or is using any corporate funds for any direct or indirect unlawful payments to any foreign or domestic government officials or employees or any employees of a foreign or domestic government-owned entity, (c) violated or is violating any provision of the Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010 or any other anticorruption Law applicable to any Target Company, (d) made, offered, authorized or promised any payment, rebate, payoff, influence payment, contribution, gift, bribe, rebate, kickback or any other thing of value to any government official or employee, political party or official, or candidate, regardless of form, to obtain favorable treatment in obtaining or retaining business or to pay for favorable treatment already secured, (e) established or maintained, or is maintaining, any fund of corporate monies or other properties for the purpose of supplying funds for any of the purposes described in the foregoing clause (d) or (f) made any bribe, unlawful rebate, payoff, influence payment, kickback or other similar payment of any nature.

Section 3.27   <u>Brokers</u>.  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the Transactions based upon arrangements made by or on behalf of the Sellers, their Related Persons or any Target Company.

41

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001039

PX0594.46

## ARTICLE 4

## REPRESENTATIONS AND WARRANTIES OF THE PARENT AND THE BUYER

The Parent and the Buyer hereby represent and warrant to the Sellers, as of the date hereof and as of the Closing, as follows:

Section 4.1    Organization.  Each of the Parent and the Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of Delaware and has full corporate power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted.

Section 4.2    Authority.  Each of the Parent and the Buyer has full power and authority to execute and deliver this Agreement and each of the Ancillary Agreements to which it is a party, to perform its obligations hereunder and thereunder and to consummate the Transactions. The execution, delivery and performance by each of the Parent and the Buyer of this Agreement and each of the Ancillary Agreements to which it is a party and the consummation by each of the Parent and the Buyer of the Transactions have been duly and validly authorized by all necessary action.  This Agreement has been, and upon their execution and delivery each of the Ancillary Agreements to which the Parent or the Buyer is a party will have been, duly executed and delivered by the Parent or the Buyer, as applicable and, assuming due execution and delivery by each of the other parties hereto and thereto, this Agreement constitutes, and each of the Ancillary Agreements to which the Parent or the Buyer is a party will constitute, the legal, valid and binding obligations of the Parent or the Buyer, as applicable, enforceable against the Parent or the Buyer, as applicable, in accordance with their respective terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether considered in a proceeding in equity or at law).

Section 4.3    No Conflict.  The execution, delivery and performance by each of the Parent and the Buyer of this Agreement and each of the Ancillary Agreements to which it is a party, and the consummation of the Transactions, do not and will not (a) conflict with or violate the Organizational Documents of the Parent or the Buyer; (b) conflict with or violate any Law applicable to the Parent or the Buyer; or (c) result in any breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under or require any consent of any Person pursuant to, any note, bond, mortgage, indenture, agreement, lease, license, permit, franchise, instrument, obligation or other Contract to which the Parent or the Buyer is a party, except for any such conflicts, violations, breaches, defaults or other occurrences that do not, individually or in the aggregate, materially impair the ability of the Parent or the Buyer to consummate, or prevent or materially delay, any of the Transactions or would reasonably be expected to do so.

Section 4.4    Financing.  At the Closing, the Buyer will have sufficient funds to permit the Buyer to consummate the Transactions.

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001040

PX0594.47

Section 4.5     Brokers.  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the Transactions based upon arrangements made by or on behalf of the Parent or the Buyer.

Section 4.6     Investment Intent.  The Parent and the Buyer are acquiring the Units for their own account for investment purposes only and not with a view to any public distribution thereof or with any intention of selling, distributing or otherwise disposing of the Units in a manner that would violate the registration requirements of the Securities Act of 1933, as amended.

Section 4.7     Solvency and Financial Capacity.  On the Closing Date, assuming (i) that the representations and warranties of the Sellers and VOI HoldCo contained in this Agreement are true and correct in all material respects, (ii) the performance in all material respects of all covenants and agreements required by this Agreement to be performed and complied with at or prior to the Closing by the Sellers, VOI HoldCo and the Company, and (iii) the Target Companies, taken as a whole, are Solvent immediately prior to the Closing, the Buyer and the Target Companies, taken as a whole, will be Solvent and the Buyer will have the financial capacity to close and consummate the transactions contemplated herein by the Buyer.

Section 4.8     Buyer Information.  Schedule 4.8 sets forth a list of certain information provided to the Sellers on behalf of the Buyer at the request of the Sellers. Such information is true and correct in all material respects.

## ARTICLE 5

## COVENANTS

Section 5.1     Conduct of Business.  From the date hereof until the Closing, except as expressly contemplated by the Transaction Documents, including without limitation, distribution of the Permitted Leakage as contemplated by Section 2.5 hereof, or as set forth in Section 5.1 of the Disclosure Schedules, the Sellers and, following the Reorganization, VOI HoldCo shall cause the Target Companies to (i) maintain their organizational existence, (ii) operate their respective businesses in the ordinary course and in compliance with all applicable Laws, (iii) maintain their rights, facilities and assets in all material respects in at least the same condition as they are in on the date hereof, (iv) use commercially reasonable efforts to preserve intact their business, relations and goodwill with their suppliers, vendors, customers, employees and other Persons having a business relationship with any of them, and (v) use commercially reasonable efforts to maintain in full force and effect all Material Contracts and all material Permits as of the date hereof.  Without limiting the generality of the foregoing, from the date hereof until the Closing, except as expressly contemplated by the Transaction Documents or as set forth in Section 5.1 of the Disclosure Schedules, without the prior written consent of the Buyer, the Sellers and, following the Reorganization, VOI HoldCo shall cause each Target Company not to:

(a)     amend any of its Organizational Documents;

43

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001041

PX0594.48

(b)     issue, grant, sell, transfer, or authorize the issuance, granting, sale or transfer of, any equity interests or any securities convertible into, or exercisable or exchangeable for equity interests;

(c)     reclassify, combine, split, subdivide or redeem, purchase or otherwise acquire, directly or indirectly, any of its equity interests or other securities;

(d)     acquire (including by merger, consolidation, tender offer, acquisition of stock (or other equity interests) or assets, or any other business combination) any Person or assets or business thereof (including by forming a partnership or joint venture therewith), other than (i) the acquisition of inventory in the ordinary course of business, and (ii) capital expenditures not exceeding [Redacted - Other (Nonresponsive)] individually or [Redacted - Other (Nonresponsive)] in the aggregate for all Target Companies;

(e)     sell, assign, transfer, convey, lease, license or otherwise dispose of any material asset or property, other than the disposition of inventory in the ordinary course of business;

(f)     make any loan, advance, capital contribution to, or any investment in, any Person,

(g)     create or permit any Encumbrance other than Permitted Encumbrances on any asset or property except Encumbrances for trade payables incurred in the ordinary course of business;

(h)     incur, assume or otherwise become liable for any Indebtedness;

(i)     (A) modify the compensation payable or to become payable or the benefits provided to its managers, officers, consultants, contractors or employees, except for changes required by the terms of a Contract or Plan in effect on the date hereof, (B) grant or modify any severance or termination pay to, or enter into or modify any vesting, employment, bonus, consulting, change of control or severance arrangement with any current or former manager, officer, consultant, contractor or employee, or (C) establish, adopt, enter into, modify or terminate any Plan;

(j)     announce, implement or effect any material reduction in labor force, lay-off, early retirement program, severance program or other program or effort concerning the termination of employment of employees of any Target Company;

(k)     enter into, amend, waive or terminate any Material Contract (or Contract that, if in effect on the date hereof, would be a Material Contract) other than customer Contracts entered into after the date hereof in the ordinary course of business;

(l)     make or rescind any material tax election or settle or compromise any material Tax liability;

(m)     satisfy or settle any material liabilities or claims against them, or amend, compromise or waive any claims against another Person or other material rights;

44

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001042

PX0594.49

(n)　　materially change their business or operations or the manner of conducting the same; or

(o)　　authorize, commit or agree to take any of the foregoing actions.

Section 5.2　　Access.  From the date hereof to the Closing, the Sellers and, following the Reorganization, VOI HoldCo shall give the Buyer and its Representatives reasonable access to all of the personnel, records, offices and other facilities and properties of the Target Companies during normal business hours and upon reasonable prior notice.

Section 5.3　　Notification of Certain Matters.  From the date hereof until the Closing, each Party shall give prompt notice in writing to the other Parties of the occurrence or failure to occur, or the impending, alleged or threatened occurrence or failure to occur, of any event or circumstance which occurrence or failure to occur would reasonably be expected to cause any of such Party's representations or warranties in this Agreement to be untrue or inaccurate in any material respect; provided, that the delivery of any such notice will not limit or otherwise affect the representations and warranties of the notifying Party or the remedies available to the recipient hereunder in respect of the matters notified.

Section 5.4　　Efforts and Consents.  Each Party hereby covenants and agrees to use its commercially reasonable efforts to (i) obtain those approvals and consents from third parties set forth on Section 7.2(e) of the Disclosure Schedules and (ii) if any such approval or consent is not obtained as of the Closing and the Buyer wants to enter into a new, direct Contract with such third party, assist and cooperate with the Buyer in obtaining such new, direct Contract.  The Parties' obligations contained in this Section 5.4 shall not require any Party to make any material payments to, or initiate any Action against, any Person.

Section 5.5　　Patent Litigation.

(a)　　Prior to the Closing, the Company shall (i) promptly inform the Buyer of any communications, correspondence, filings or other documents received by the Company in connection with the Patent Litigation and promptly provide copies thereof to the Buyer, (ii) consult with the Buyer in advance of any material meetings, telephone calls, conferences, communications or filings in connection with the Patent Litigation, (iii) consider in good faith any reasonable requests by the Buyer in connection with the Patent Litigation, and (iv) not settle or offer to settle the Patent Litigation without the prior written consent of the Buyer, unless such settlement does not include a statement or admission of fault by the Company and does not impose any material obligations on the Company other than [Redacted - Privilege (Common Interest)] [Redacted - Privilege (Common Interest)] If the Company does settle the Patent Litigation prior to Closing, then notwithstanding any other provisions of this Agreement (x) the Buyer shall not deliver a Contingent Closing Note to VOI HoldCo at Closing and (y) the Base Purchase Price shall be (1) increased by [Redacted - Other (Nonresponsive)] and (2) decreased by the aggregate amount of Damages to the Company resulting from the Patent Litigation (including the Company's expenses and amounts paid in settlement).

(b)　　Following the Closing, the Sellers' Representative shall (i) control the defense of the Patent Litigation and any settlement negotiations relating thereto on behalf of the

45

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001043

PX0594.50

Company, (ii) promptly inform the Buyer of any communications, correspondence, filings or other documents received by the Company in connection with the Patent Litigation and promptly provide copies thereof to the Buyer, (iii) consult with the Buyer in advance of any material meetings, telephone calls, conferences, communications or filings in connection with the Patent Litigation, (iv) consider in good faith any reasonable requests by the Buyer in connection with the Patent Litigation, and (v) not settle or offer to settle the Patent Litigation without the prior written consent of the Buyer, unless (x) the aggregate amount of Damages to the Company resulting from the Patent Litigation (including the Company's expenses and amounts paid in settlement) do not exceed the then-applicable principal amount of the Contingent Closing Note and (y) such settlement does not include a statement or admission of fault by the Company and does not impose any material obligations on the Company other than Redacted - Privilege (Common Interest)

Redacted - Privilege (Common Interest)

(c)    **Redacted - Privilege (Common Interest)**

# Redacted - Privilege (Common Interest)

Section 5.6    Continuing Management and Employees.  Except as provided in the Employment Agreements, for the six (6) month period immediately following the Closing, the Target Companies shall continue to provide to the employees of the Target Companies ("Continuing Employees") rates of compensation and Plans which are no less favorable in the aggregate to those provided to the Continuing Employees by the Company as of immediately prior to the Closing. The Continuing Employees will remain employed by the Target Companies on an at-will basis.

Section 5.7    Public Announcements.  The Parties shall consult with each other before issuing any press release or otherwise making any public statements with respect to this Agreement or the Transactions, and neither party shall issue any press release or make any public statement prior to obtaining the other party's written approval, which approval shall not be unreasonably withheld or delayed, except that no such approval shall be necessary to the extent disclosure may be required, upon advice of counsel, by applicable Law.

Section 5.8    Restrictive Covenants.

(a)    Provided that the Closing occurs as set forth in Section 2.4 hereof, for a period of four (4) years commencing on the Closing Date (the "Restricted Period"), each Seller shall not, and shall not permit any of their respective Related Persons to, directly or indirectly, (i) engage in or assist others in engaging in any business which competes with the Business within Europe or North America; (ii) have an interest in any Person that engages directly or indirectly in the Business within Europe or North America in any capacity, including as a partner, shareholder, member, lender, investor, employee, director, manager, principal, agent, trustee or consultant; or (iii) interfere in any material respect with the business relationships (whether

46

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

formed prior to or after the date of this Agreement) between any Target Company, on the one hand, and the customers, suppliers or other business relationships of any Target Company, on the other hand.

(b)     During the Restricted Period, each Seller shall not, and shall not permit any of their respective Related Persons to, directly or indirectly, hire or solicit any employee of any Target Company or encourage any such employee to leave or terminate such employment or hire any such employee who has left or terminated such employment.

(c)     During the Restricted Period, the Sellers shall not, and shall not permit any of their respective Related Persons to, directly or indirectly, solicit or entice, or attempt to solicit or entice any present or potential customer, distributor, vendor, supplier, advisor or any other Person who has a business relationship with any Target Company for purposes of diverting their business or services to any other Person, from any Target Company, or terminating or materially decreasing their business or services from any Target Company.

(d)     During the Restricted Period, the Sellers shall not, and shall cause their Related Persons and the respective Representatives of the Sellers and their Related Persons not to, use for its or their own benefit or disclose to any third party, any Confidential Information. Notwithstanding the foregoing, the Sellers or their Related Persons may (i) use or disclose Confidential Information in connection with participation in the assertion of or defense against any Action arising out of this Agreement or any Ancillary Agreement; or (ii) disclose such portion (and only such portion) of the Confidential Information as the Sellers or such Related Persons reasonably determines, based on advice of counsel, it is legally obligated to disclose if (A) the Sellers receive a request to disclose all or any part of the Confidential Information under the terms of a subpoena, civil investigative demand or order issued by a Governmental Authority or required by applicable Law; (B) to the extent permitted by such request and applicable Law, it notifies the Buyer of the existence, terms and circumstances surrounding such request; and (C) upon the request and at the expense of the Buyer, the Sellers exercise their commercially reasonable efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to the disclosed Confidential Information.  For purposes of the foregoing, "Confidential Information" means competitively sensitive, proprietary and all other information and data relating to any Target Company or the Transactions (other than data or information that is or becomes available to the public other than as a result of a breach of this Section 5.8(d)).

(e)     The Sellers acknowledge that a breach or threatened breach of this Section would give rise to irreparable harm to the Parent, the Buyer and the Company, for which monetary damages would not be an adequate remedy, and hereby agree that in the event of a breach or a threatened breach of any such obligations, the Parent, the Buyer and the Company shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to seek equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

(f)     The Sellers acknowledge that the restrictions contained in this Section 5.8 are reasonable and necessary to protect the legitimate interests of the Parent, the Buyer and the Company and constitute a material inducement to the Parent and the Buyer to enter into this

47

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001045

PX0594.52

Agreement and consummate the Transactions.  In the event that any covenant contained in this Section 5.8 should ever be adjudicated to exceed the time, geographic, product or service, or other limitations permitted by Applicable Law in any jurisdiction, then any court is expressly empowered to reform such covenant, and such covenant shall be deemed reformed, in such jurisdiction to the maximum time, geographic, product or service, or other limitations permitted by Applicable Law.  The covenants contained in this Section 5.8 and each provision hereof are severable and distinct covenants and provisions; *provided however*, if Buyer materially breaches any payment obligation owed to VOI HoldCo set forth herein or set forth in the Operating Agreement, which material breach remains uncured, and such breach occurs prior to any breach of this Agreement or the Operating Agreement by VOI HoldCo or such Seller, then the noncompete provision set forth in Section 5.8(a) shall be null and void *ab initio* as to such Seller. The invalidity or unenforceability of any such covenant or provision as written shall not invalidate or render unenforceable the remaining covenants or provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such covenant or provision in any other jurisdiction.

(g)     For the avoidance of doubt, none of the restrictions set forth in this Section 5.8 or the Operating Agreement shall prevent Brian Beale from engaging in activities that involve (i) 3-D printing/additive manufacturing (to the extent such manufacturing does not involve products that are competitive with the Company's products as of the date hereof), (ii) selling educational materials, (iii) opening and teaching wet lab courses, (iv) owning and developing an educational center and (v) engaging in any speaking engagements; in each case, in a manner consistent with similar activities undertaken by him prior to the date hereof.

(h)     As used in this Section 5.8, the term Family as incorporated into the definition of Related Person shall be limited to a Person's spouse and minor children.

Section 5.9     Reorganization. Prior to the Closing, the Sellers shall conduct the Reorganization.

Section 5.10     Further Assurances. Each Party shall, without further consideration (unless otherwise provided for herein), take such further action (including the execution and delivery of such further documents and instruments) as any other Party reasonably requests in order to carry out the purposes of and give effect to the Transactions.

Section 5.11     Sellers' Representative.

(a)     Each Seller and VOI HoldCo hereby irrevocably designates and appoints Patrick Gendreau (the "Sellers' Representative") to act as its exclusive agent and attorney in fact under this Agreement.  The Sellers' Representative shall have the full power and authority on behalf of each Seller and VOI HoldCo to take any and all actions and make any and all determinations in respect of this Agreement and the Transactions.  Without limiting the generality of the foregoing, the Sellers' Representative is authorized, in its sole discretion, to (i) negotiate, execute and deliver all amendments, modifications and waivers to this Agreement or any other Transaction Document, (ii) take all actions on behalf of the Sellers and VOI HoldCo in connection with any claims or disputes with respect to this Agreement or the Transactions, to initiate, prosecute, defend and/or settle such claims and disputes, (iii) deliver wire instructions to

48

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001046

PX0594.53

the Buyer in connection with the Transactions, (iv) accept notices on behalf of the Sellers and VOI HoldCo, (v) execute and deliver, in the Sellers' Representative's capacity, any and all notices, documents or certificates on behalf of the Sellers and VOI HoldCo in connection with this Agreement and the other Transaction Documents, (vi) grant any consent or approval on behalf of the Sellers and VOI HoldCo under this Agreement and (vii) take all actions necessary or appropriate in the judgment of the Sellers' Representative for the accomplishment of the foregoing.

(b)     The Sellers and VOI HoldCo shall be bound by all actions taken and documents executed by the Sellers' Representative in connection with this Agreement and the other Transaction Documents, and all defenses which may be available to any Seller or VOI HoldCo to contest, negate or disaffirm the action of the Sellers' Representative taken in good faith are hereby waived.  The Parent and the Buyer shall be entitled to rely on any action or decision of the Sellers' Representative.  A decision, act, consent, or instruction of the Sellers' Representative in connection with the Transactions shall constitute a decision of all the Sellers and VOI HoldCo and shall be final, binding, and conclusive upon each Seller, VOI HoldCo, and their successors as if expressly confirmed and ratified in writing by such Seller and VOI HoldCo, and each of the Parent, the Buyer and, after the Closing, the Company may rely upon any such decision, act, consent, or instruction of the Sellers' Representative as being the decision, act, consent, or instruction of each Seller and VOI HoldCo.

Section 5.12   Purchase Option  Conditioned and effective upon the Closing, Gendreau Holdings LLC hereby grants to the Buyer and its Affiliates an option (the "Purchase Option") during the Option Period (as defined below) to purchase the real property defined as the "Premises" in the Florida Lease from Gendreau Holdings LLC free and clear of all Encumbrances pursuant to a standard contract for the sale and purchase of real estate between Gendreau Holdings LLC and the Buyer or an Affiliate thereof. The price for the purchase of such real property (the "Purchase Price") shall be an amount equal Redacted - Other (Nonresponsive)

Redacted - Other (Nonresponsive)
Redacted - Other (Nonresponsive) compounded annually, from and including the Closing Date to and including the day prior to the date on which the Buyer or an Affiliate of the Buyer completes the sale pursuant to the Purchase Option and pays such Purchase Price in full. At the closing of the Purchase Option, the purchaser shall pay the Purchase Price to Gendreau Holdings LLC. The Buyer and its Affiliates shall have the right to exercise the Purchase Option at any time from the Closing Date to the earlier of the termination of the Florida Lease or December 31, 2023 (the "Option Period") and shall exercise the Purchase Option by providing written notice to Gendreau Holdings LLC.

Section 5.13   Termination of Side Letter.  Effective as of the execution and delivery of this Agreement, the letter agreement, dated as of May 5, 2020, among the Parent, the Buyer, VOI, VOI HoldCo and the Sellers, is hereby terminated without any further action on the part of any of the Parties.

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001047

PX0594.54

# ARTICLE 6

# TAX MATTERS

Section 6.1    Apportionment.  For the sole purpose of appropriately apportioning any Taxes relating to a Straddle Period, the portion of such Tax that is attributable to any Target Company for the part of such Tax period that ends on the Closing shall be (a) in the case of a Tax that is not based on or measured by income, receipts, payroll, sales or similar items and that is not otherwise transaction-based, the total amount of such Tax for the full Tax period that includes the Closing multiplied by a fraction, the numerator of which is the number of days from the beginning of such Tax period to and including the day immediately prior the Closing and the denominator of which is the total number of days in such full Tax period, and (b) in the case of any Tax that is based on or measured by income, receipts, payroll, sales or similar items or that is otherwise transaction-based, the Tax that would be due with respect to such partial period, if such partial period were a full Tax period, apportioning income, gain, expenses, loss, depreciation, deductions, credits and state and local apportionment factors equitably based on an interim closing of the books at the close of business on the day immediately preceding the Closing.

Section 6.2    Pre-Closing and Straddle Period Tax.  The Buyer will prepare or cause to be prepared (a) all Tax Returns of the Target Companies that are required to be filed after the Closing for any Straddle Period, and (b) all non-income Tax Returns of VOI or VOI LLC required to be filed after the Closing Date for any taxable period ending on or before the Closing and (c) all other Tax Returns of Target Companies that are required to be filed after the Closing (together, the "Buyer Prepared Returns").  The costs and expenses of preparing any Buyer Prepared Returns shall be apportioned between the Buyer and the Sellers in the same ratio that the Taxes reflected on that Tax Return are apportioned between the Buyer and the Sellers (as determined pursuant to Section 6.1).  The costs and expenses of preparing any Tax Returns for a taxable period ending on or before the Closing shall be borne solely by the Sellers.  Any Tax Return filed with respect to the Target Companies relating to any Pre-Closing Tax Period (including any Straddle Period) shall be prepared in accordance with past practices of the Target Companies, as the case may be, unless otherwise required by applicable Law.  No later than 20 days prior to filing (or, in the case of a Tax Return for a Straddle Period that is due within 40 days of the Closing, as soon as reasonably practicable), the Buyer will deliver to the Sellers' Representative such Tax Return for a Pre-Closing Tax Period or Straddle Period for review and comment and shall consider all written comments of the Sellers' Representative in good faith. The Sellers will be responsible for paying (i) any Taxes shown as due on any Tax Return for a taxable period ending on or before the Closing and (ii) the pre-Closing portion of any Taxes shown as due on any such Tax Return for a Straddle Period (determined in accordance with Section 6.1).  Any payments required to be made by the Sellers pursuant to this Section 6.2 shall be paid promptly by the Sellers to the Target Companies within the later of (x) 10 days of notice or (y) five days prior to the date such Taxes are due.  For the avoidance of doubt, nothing contained in Article 6 shall in any way limit this Section 6.2.  Except for any filings made pursuant to Section 6.2, neither the Buyer nor any of its Affiliates shall amend, refile or otherwise modify any Tax Return relating in whole or in part to the Target Companies with respect to any Pre-Closing Tax Period without first notifying the Sellers' Representative in writing.

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001048

PX0594.55

Section 6.3    Tax Claims.  The Buyer and the Sellers' Representative shall promptly notify each other in writing upon receipt of any notice of any pending or threatened Tax Claim which may affect any Tax liability for which the other party is liable pursuant to this Article 6 or pursuant to Article 8.  The Sellers' Representative shall have the right to (i) represent the interests of the Target Companies in any Tax Claim with regard to Taxes for any Pre-Closing Tax Period or Taxes for which the Sellers may be required to indemnify the Buyer (other than with regard to any Straddle Period) and (ii) employ counsel of its choice (at its sole cost and expense) in connection therewith; provided, however that the Buyer shall have the right (at its sole cost and expense), directly or through its designated Representatives, to review in advance and comment upon all submissions made in the course of such Tax Claim and otherwise reasonably participate in such Tax Claim and the Sellers' Representative shall not settle or otherwise dispose of any such Tax Claim without obtaining the prior written consent of the Buyer, which shall not be unreasonably withheld, conditioned or delayed.  The Buyer shall control any other Tax Claim; provided, however, that to the extent the Sellers could reasonably be expected to be required to indemnify the Buyer as a result of any Tax Claim with respect to any Straddle Period, the Buyer shall promptly notify the Sellers' Representative of such Tax Claim, and the Sellers' Representative shall have the right (at its sole cost and expense), directly or through its designated Representatives, to review in advance and comment upon all submissions made in the course of such Tax Claim and otherwise reasonably participate in such Tax Claim, and the Buyer shall not settle or otherwise dispose of any such Tax Claim without obtaining the prior written consent of the Sellers' Representative, which shall not be unreasonably withheld, conditioned or delayed.  To the extent that Article 8 conflicts with this Section 6.3, this Section 6.3 shall control.

Section 6.4    Maintenance of Tax Books and Records.  The Buyer and the Company, on the one hand, and VOI HoldCo and the Sellers, on the other hand, shall cooperate fully, as and to the extent reasonably requested by the other Parties, in connection with the preparation and filing of all Tax Returns and any Tax Claim or other proceeding with respect to Taxes, including the resolution of any claims involving Taxes pursuant to this Agreement.  Such cooperation shall include the retention and (upon the other Parties' request) the provision of records and information that are reasonably relevant to any such matter, making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder and furnishing the other Parties and their Representatives reasonable assistance (at such other Party's expense).  The Buyer and the Company agree to retain all books and records with respect to Tax matters pertinent to the Target Companies relating to any taxable period beginning before the Closing until the expiration of the statute of limitations of the relevant taxable periods (and any extension thereof), and to abide by all record retention agreements entered into with any Governmental Authority.

Section 6.5    Transfer Taxes.  All transfer, documentary, sales, use, stamp, recording, property, registration and similar Taxes, and all conveyance fees, recording charges and other charges and fees (including any penalties and interest) incurred in connection with consummation of the Transactions (other than the Reorganization) ("Transfer Taxes") shall be borne 50% by the Buyer and 50% by VOI HoldCo and the Sellers (and, for the avoidance of doubt, the Sellers shall be severally (in proportion to their Percentage Interests) but not jointly responsible for the portion of the Transfer Taxes allocable to the Sellers).  The Buyer shall prepare and file all necessary Tax Returns and other documentation with respect to all such

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001049

PX0594.56

Transfer Taxes.  All Transfer Taxes incurred in connection with the Reorganization shall be borne by VOI HoldCo and the Sellers and VOI HoldCo and the Sellers shall prepare and file all necessary Tax Returns and other documentation with respect to all such Transfer Taxes related to the Reorganization.

Section 6.6     Pre-Closing Tax Indemnity.  Notwithstanding anything to the contrary stated elsewhere in this Agreement, VOI HoldCo shall be liable, and the Sellers shall be severally (in proportion to their Percentage Interests) but not jointly liable, for and shall pay, and agree to indemnify and hold the Buyer and its Affiliates (including the Target Companies) harmless from and against all Pre-Closing Taxes, and any Damages associated with either of the foregoing.  Payment by the Sellers of any amount due under this Section 6.6 shall be made within 15 days following written notice from the Buyer to the Sellers' Representative.

Section 6.7     Tax Refunds.  VOI HoldCo and the Sellers shall be entitled to all refunds of Taxes of the Target Companies with respect to any Pre-Closing Tax Period; provided, that such amounts shall be net of any reasonable out-of-pocket costs incurred in obtaining such refund of Taxes; provided further, that any refund of Taxes related to a Straddle Period shall be prorated based on the method employed in Section 6.1.  At the Sellers' Representative's request, upon VOI HoldCo or a Seller paying the reasonable out-of-pocket costs associated therewith, the Buyer shall, and shall cause the Target Companies to, apply for any refund of Taxes available for any Pre-Closing Tax Period.  In the event that the Buyer or its Affiliates or the Target Companies receives a Tax refund with respect to any Pre-Closing Tax Period to which the Sellers are entitled pursuant to this Section 6.7, then such refund, plus all related interest received or credited, less the reasonable out-of-pocket costs incurred in obtaining such refund, shall be paid by the Buyer within 15 days after receipt thereof to an account designated by the Sellers' Representative.

# ARTICLE 7

## CLOSING CONDITIONS

Section 7.1     Condition to Obligation of the Parties.  The obligation of each of the Parties to consummate the Transactions is subject to the satisfaction or waiver of the condition that no Law that would prevent or render unlawful the consummation of the Transactions shall be in effect.

Section 7.2     Additional Conditions to Obligation of the Parent and the Buyer.  The obligations of the Parent and the Buyer to consummate the Transactions are subject to the satisfaction or waiver of each of the following conditions:

(a)     Performance.  Each of the Sellers, VOI HoldCo and the Company shall have performed or complied in all material respects with all of the covenants and agreements required to be performed or complied with by them before or at the Closing.

(b)     Representations and Warranties.  Each of (i) the Fundamental Representations and any representations of the Sellers that are qualified by materiality or

52

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001050

PX0594.57

Material Adverse Effect shall be true and correct in all respects and (ii) the other representations of the Sellers shall be true and correct in all material respects.

(c)     No Material Adverse Effect.  Since the Locked Box Date, there shall not have occurred and be continuing any change, effect, event or condition that has had, or would reasonably be expected to have, a Material Adverse Effect; *provided however,* that the parties specifically agree that any affect upon the Target Companies or the Buyer or any of their Affiliates caused by COVID-19, or any governmental order, rule or directive or any change in consumer or customer behavior or any sickness, death or health impact to any individual caused by or related to COVID-19, shall not constitute a Material Adverse Effect; *provided further*, however, that the death of Patrick Gendreau (for any reason, including COVID-19) shall constitute a Material Adverse Effect.

(d)     Certificate.  The Buyer shall have received a certificate, dated as of the Closing Date and signed by the Sellers' Representative, as to the satisfaction of the conditions set forth in Sections 7.2(a), (b) and (c).

(e)     Consents.  Each of the consents set forth on Section 7.2(e) of the Disclosure Schedules (the "Specified Consents") shall have been obtained and copies thereof shall have been delivered to the Buyer.

(f)     Closing Deliveries.  The Sellers shall have caused each of the documents and other items required by Section 2.4(b) to have been delivered.

Section 7.3     Additional Conditions to Obligation of the Sellers and VOI HoldCo.  The obligation of the Sellers and VOI HoldCo to consummate the Transactions is subject to the satisfaction or waiver of each of the following conditions:

(a)     Performance.  Each of the Parent and the Buyer shall have performed or complied in all material respects with all of the covenants and agreements required to be performed or complied with by it before or at the Closing.

(b)     Representations and Warranties.  Each of (i) the representations set forth in Sections 4.1, 4.2 and 4.3 and any representations of the Parent or the Buyer that are qualified by materiality shall be true and correct in all respects and (ii) the other representations of the Parent and the Buyer shall be true and correct in all material respects.

(c)     Certificate.  The Sellers shall have received a certificate, dated as of the Closing Date and signed by an officer of the Parent and an officer of the Buyer, as to the satisfaction of the conditions set forth in Sections 7.3(a) and (b).

(d)     Closing Deliveries.  The Buyer shall have caused each of the documents and other items required by Section 2.4(a) to have been delivered.

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001051

PX0594.58

## ARTICLE 8

## INDEMNIFICATION

Section 8.1    Survival.

(a)    The representations and warranties of the Parties contained in this Agreement and the Ancillary Agreements and any schedule, certificate or other document delivered pursuant hereto or thereto or in connection with the Transactions shall survive the Closing until the 18-month anniversary of the Closing; provided, however, that the representations and warranties set forth in Section 3.1 through Section 3.5, Section 3.20 and Section 3.27 (collectively, the "Fundamental Representations"), and Section 3.17 and any representation in the case of fraud, intentional misrepresentation or intentional breach, shall survive until the close of business on the 30th day following the expiration of the applicable statute of limitations (giving effect to any waiver, mitigation or extension thereof).

(b)    The respective covenants and agreements of the Parties contained in this Agreement shall survive the Closing until fully performed in accordance with their respective terms.

Section 8.2    Indemnification.

(a)    Indemnification by VOI HoldCo and the Sellers.  Subject to the terms of this Article 8 (including Section 8.3(d)), from and after the Closing, VOI HoldCo, and the Sellers shall severally (in proportion to their Percentage Interests) but not jointly indemnify, defend and hold harmless the Buyer, its Affiliates (including the Parent and the Company) and their respective employees, officers and members and managers (the "Buyer Indemnitees") from and against any and all Damages arising out of or relating to (i) a breach of any representation or warranty made by the Sellers herein other than the Locked Box Provisions (disregarding any qualification or exception with respect to materiality or Material Adverse Effect contained therein for purposes of determining both whether there has been a breach and the amount of Damages from any breach), (ii) a breach of any representation or warranty made by the Sellers in the Locked Box Provisions or a breach of any covenant or agreement of any Seller, VOI HoldCo or the Company in this Agreement or (iii) any Damages suffered by the Company as a result of, or in connection with, the Patent Litigation, any amount of the PPP Loan that is not discharged and forgiven in accordance with the representation in Section 3.7(b)(vii), or the $10,000 portion of the CEBA Loan is not discharged and forgiven in accordance with the representation in Section 3.7(b)(vii).

(b)    Indemnification by the Parent and the Buyer.  Subject to the terms of this Article 8, from and after the Closing, the Parent and the Buyer shall indemnify, defend and hold harmless the Sellers, their Affiliates and their respective employees, officers, members and managers (the "Seller Indemnitees") from and against any and all Damages arising out of or relating to (i) a breach of any representation or warranty made by the Parent or the Buyer herein (disregarding any qualification or exception with respect to materiality or material adverse effect contained therein for purposes of determining both whether there has been a breach and the

54

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001052

PX0594.59

amount of Damages from any breach) or (ii) a breach of any covenant or agreement of the Parent or the Buyer in this Agreement.

      (c)    Availability; Non-Reliance.  A Party's right to indemnification hereunder shall not be affected by any investigation conducted, or any Knowledge acquired (or capable of being acquired) by or on behalf of such Party at any time, whether before or after the execution and delivery of this Agreement or the Closing.  In entering into this Agreement, each Party has relied solely upon the representations and warranties of each other Party set forth in this Agreement and agrees that each other Party has made no other representation or warranty, either express or implied.

      Section 8.3    Limitations.

      (a)    Retention, Cap.  With respect to the Parties' obligation to indemnify pursuant to clause (i) of Section 8.2(a) or Section 8.2(b), as applicable, the Indemnifying Party shall only be required to indemnify for 50% of the Damages suffered by the Buyer Indemnitees or Seller Indemnitees, as applicable, up to the amount of the retention under the R&W Insurance Policy.  No Party shall have any obligation to indemnify pursuant to clause (i) of Section 8.2(a) or Section 8.2(b), as applicable, to the extent the aggregate amount of indemnifiable Damages suffered by the Buyer Indemnitees or the Seller Indemnitees, as applicable, under such clause would exceed [Redacted - Other (Nonresponsive)] the "Cap"); provided, that the Cap shall not apply to any claim for indemnification based on fraud, intentional misrepresentation, a breach of a Fundamental Representation or a Locked Box Provision, or the expenses of the Indemnified Party in enforcing its rights under this Article 8, nor shall indemnification payments in respect thereof count toward the Cap. No Party shall have any indemnification obligation under this Agreement to the extent the aggregate amount of indemnifiable Damages would exceed the aggregate consideration paid by the Buyer for the Units; provided, that the foregoing limitation shall not apply to any claim for indemnification based on fraud, intentional misrepresentation, a knowing and willful breach of covenant or the expenses of the Indemnified Party in enforcing its rights under this Article 8, nor shall indemnification payments in respect thereof count toward such limitation.

      (b)    Termination; Exclusions.  No Party shall have any obligation to indemnify pursuant to this Article 8 unless a Claim Notice is delivered as set forth in Section 8.4 prior to the applicable survival date; provided, that any obligation to indemnify with respect to a Claim Notice that is so delivered prior to the applicable survival date shall survive and shall not terminate until finally resolved as provided herein. No Party shall have any obligation to indemnify pursuant to this Article 8 to the extent of any Damages reflected as liabilities (including specifically identified reserves) in the Financial Statements; provided, that Damages in excess of the amounts thereof shall be indemnifiable.

      (c)    Sole Remedy.  Except in the case of fraud, intentional misrepresentation or a knowing and willful breach of covenant, from and after the Closing, the indemnification provided in this Article 8 shall be the sole and exclusive remedy for any Damages under this Agreement.

      (d)    R&W Insurance Policy.  With respect to all Damages in excess of the retention under the R&W Insurance Policy, the Buyer shall use commercially reasonable efforts

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001053

PX0594.60

to recover any indemnifiable Damages from the insurer under the R&W Insurance Policy in the first instance.  Notwithstanding the foregoing, if the Buyer recovers under the R&W Insurance Policy with respect to Damages for which the Sellers have previously indemnified the Buyer Indemnitees, the Buyer shall promptly pay over to the Sellers the amount so recovered under the R&W Insurance Policy up to the amount of such Damages indemnified by the Sellers.

(e)     Right of Set-Off.  In addition to any other remedies provided for in this Agreement, the Buyer may set off any finally-determined Damages for which it is entitled to indemnification under Section 8.2(a) and any amounts owing by the Sellers pursuant to the Locked Box Provisions, on a dollar-for-dollar basis, from time to time against any unpaid principal or interest under the Contingent Closing Note.  During the pendency of any claim for indemnification under Section 8.2(a), the Buyer may suspend any payments due under the Contingent Closing Note until such claim or dispute is finally resolved.

Section 8.4     Procedure.

(a)     Inter-Party Claims.  In order for a Party to validly assert a claim for indemnification under this Article 8, such Party shall deliver written notice (a "Claim Notice") to the Sellers' Representative (in the case of a Buyer Indemnitee) or to the Parent (in the case of a Seller Indemnitee) no later than twenty (20) Business Days after the Indemnified Party acquires knowledge of such claim (or potential claim, in the case of a Third Party Claim), specifying (to the extent known) the facts constituting the basis therefor and the amount thereof.  Failure to deliver a Claim Notice in a timely manner as specified in the preceding sentence shall not be deemed a waiver of the right of the Buyer Indemnitees or Seller Indemnitees, as applicable (collectively, the "Indemnified Party"), to indemnification in connection therewith except to the extent the recipient of such Claim Notice (the "Indemnifying Party") is actually and materially prejudiced as a result of such failure, in which case the amount of indemnification to which the Indemnified Party is entitled shall be reduced by the amount, if any, by which the Indemnified Party's Damages would have been lower had such Claim Notice been timely delivered.  The Indemnified Party shall deliver to the Indemnifying Party, promptly following the Indemnified Party's receipt thereof, copies of all notices and documents (including court papers) relating to any actual or potential Action or claim made by another Person against the Indemnified Party that, if successful, would be indemnifiable hereunder (a "Third Party Claim") that are received by the Indemnified Party from another Person.  If the Indemnifying Party does not notify the Indemnified Party in writing within fifteen (15) Business Days from its receipt of the Claim Notice that the Indemnifying Party disputes such claim (an "Indemnity Dispute Notice"), the Indemnifying Party shall be deemed to have agreed with and accepted such claim.

(b)     Payment.  The Indemnifying Party shall pay the Indemnified Party for any portion of the claim set forth in the Claim Notice which is not disputed in the Indemnity Dispute Notice, on or before the fifth Business Day following the acceptance or deemed acceptance thereof.  If the Indemnifying Party delivers an Indemnity Dispute Notice disputing all or any portion of the claim (including any Third Party Claim) set forth in the Claim Notice, the Indemnifying Party and the Indemnified Party shall proceed in good faith to negotiate a resolution to such dispute for twenty (20) Business Days.  The Indemnifying Party shall pay the Indemnified Party for any disputed claims which are resolved in favor of the Indemnified Party in accordance with the dispute resolution procedures hereof, on or before the fifth Business Day

56

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001054

PX0594.61

following the resolution thereof.  Any such payments shall be made by wire transfer of immediately available funds to the account or accounts designated in writing by the Indemnified Party.

Section 8.5    Third Party Claims.

(a)    Subject to Section 8.4, the Indemnifying Party may assume the defense of any Third Party Claim with counsel selected by the Indemnifying Party and reasonably acceptable to the Indemnified Party by providing to the Indemnified Party within ten (10) Business Days after receiving the applicable Claim Notice written notice of its election to assume such defense.  The Indemnifying Party shall be liable for the fees and expenses of one counsel (together with one local counsel) selected by the Indemnified Party following receipt from the Indemnified Party of a Claim Notice until the Indemnifying Party assumes the defense of a Third Party Claim by providing written notice of such assumption or if the Indemnifying Party fails to assume such defense.  The election by the Indemnifying Party to assume the defense of a Third Party Claim shall constitute a waiver by the Indemnifying Party, as between it and the Indemnified Party, of the right to dispute the obligation to indemnify the Indemnified Party in connection therewith.  The Indemnified Party shall have the right to participate in the defense of any Third Party Claim the defense of which has been assumed by the Indemnifying Party and to employ counsel separate from the counsel employed by the Indemnifying Party, it being agreed, subject to the following sentence, that the Indemnifying Party shall control such defense and shall not be liable to the Indemnified Party for any legal or other expenses incurred by the Indemnified Party in connection with the defense thereof.  Notwithstanding anything to the contrary herein, if (i) the Indemnifying Party does not elect to assume the defense of such Third Party Claim, (ii) the named parties (including any impleaded parties) to an Action in connection therewith include both an Indemnified Party (or any of its Affiliates) and the Indemnifying Party (or any of its Affiliates) and the Indemnified Party reasonably concludes that there may be a conflict of interest between it and the Indemnifying Party (or any of its Affiliates) or legal defenses available to it which are different from or additional to those available to the Indemnifying Party (or any of its Affiliates), or (iii) such Third Party Claim involves a criminal charge, seeks equitable remedies or involves as a party thereto any Governmental Authority, then, following written notice to the Indemnifying Party, the Indemnified Party shall have the right to assume the defense thereof and the Indemnifying Party shall be liable for the fees and expenses of one separate counsel (together with one local counsel) selected by the Indemnified Party to represent the Indemnified Party in connection therewith.  The Indemnified Party may effect a settlement, compromise or discharge of such Third Party Claim without the consent of the Indemnifying Party so long as the same (x) does not obligate the Indemnifying Party to pay any amounts of money, (y) does not obligate the Indemnifying Party to take or refrain from taking any action and (z) does not include any statement or admission as to fault, culpability, or failure to act by or on behalf of any Indemnifying Party.  The Indemnifying Party shall not effect, without the prior written consent of the Indemnified Party, any settlement, compromise or discharge of a Third Party Claim unless the same (x) involves an unconditional release of all claims against the Indemnified Party in form and substance satisfactory to the Indemnified Party, (y) does not obligate the Indemnified Party to take or refrain from taking any action and (z) does not include any statement or admission as to fault, culpability or failure to act by or on behalf of any Indemnified Party.

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001055

PX0594.62

(b)      Each Party shall cooperate in the other's defense or prosecution of a Third Party Claim, such cooperation to include the retention and (upon the other's written request) the provision of records and information that are reasonably relevant thereto, and making such Party's representatives available on a mutually convenient basis to provide additional information and explanation of any such materials.

Section 8.6      Tax Matters.  Notwithstanding anything to the contrary in this Article 8, the rights and obligations of the parties with respect to indemnification for any and all Pre-Closing Taxes shall be governed by Article 6.

## ARTICLE 9

## TERMINATION

Section 9.1      Termination.  Subject to Section 9.2(b) hereof, this Agreement may be terminated and the Transactions abandoned at any time before the Closing:

(a)      by the mutual written consent of the Buyer and the Sellers' Representative;

(b)      by the Buyer or the Sellers' Representative giving written notice of such termination to the other, if the Closing has not occurred within sixty (60) Business Days after the date hereof (the "End Date"); provided, that the failure of the Closing to occur on or before the End Date is not the result of a breach of any representation, warranty, covenant or agreement hereunder by the Party seeking such termination;

(c)      by the Buyer, upon written notice to the Sellers' Representative, if (i) a breach of any representation, warranty, covenant or agreement of the Sellers, VOI HoldCo or the Company herein has occurred that would result in any of the conditions to the obligation of Buyer to consummate the Transactions not being satisfied and such breach (x) is incapable of cure by the End Date or (y) has not been cured by the earlier of 20 days after written notice thereof by the Buyer to the Sellers' Representative and the End Date and (ii) the Buyer is not in material breach of this Agreement; or

(d)      by the Sellers' Representative, upon written notice to the Buyer, if (i) a breach of any representation, warranty, covenant or agreement of the Buyer herein has occurred that would result in any of the conditions to the obligation of the Sellers to consummate the Transactions not being satisfied and such breach (x) is incapable of cure by the End Date or (y) has not been cured by the earlier of 20 days after written notice thereof by the Sellers' Representative to the Buyer and the End Date and (ii) the Sellers, VOI HoldCo and the Company are not in material breach of this Agreement.

Section 9.2      Effect of Termination.

(a)      Except as set forth in Section 9.2(b) hereof, in the event of the termination of this Agreement pursuant to Section 9.1, (a) this Agreement shall forthwith become void except that Section 5.7 and Article 10 shall survive any such termination and (b) there shall be no liability on the part of any Party or their Representatives in connection therewith, except that no

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001056

PX0594.63

termination will affect the right of a Party to seek Damages on account of any willful and material breach of this Agreement by any other Party prior to such termination.

(b)      In the event that (i) this Agreement has not been terminated and the Sellers and VOI Holdco have used reasonable best efforts to effect the Closing, (ii) the Closing is required to occur pursuant to Section 2.4 (without regard to any attempt by the Buyer to terminate this Agreement pursuant to Section 9.1(b)) and (iii) the Closing has not occurred within ten (10) Business Days after the Sellers' Representative has delivered written notice to Parent and the Buyer irrevocably confirming that the Sellers and VOI HoldCo are ready, willing and able to effect the Closing (provided that the conditions set forth in Article 7 remain satisfied on such tenth Business Day), then within three (3) Business Days of the termination of this Agreement by Sellers' Representative following the expiration of such ten Business Day period, the Buyer shall pay to the Sellers' Representative the Termination Fee by wire transfer of immediately available funds, following which payment the Buyer, Parent and their Affiliates shall have no further liability to the Sellers, VOI HoldCo or their Affiliates in relation to the Transactions.  Within three (3) Business Days following the execution of this Agreement, the Buyer shall furnish to the Sellers evidence that the transfer of the Termination Fee to the Escrow Agent has been initiated by or on behalf of the Buyer pursuant to the terms and provisions of that certain Escrow Agreement attached hereto as Exhibit 9. Fidelio Capital AB guarantees the funding of the Termination Fee to the Escrow Agent pursuant to the terms and provisions of the Escrow Agreement.

## ARTICLE 10

## GENERAL PROVISIONS

Section 10.1    Fees and Expenses.  Except as otherwise provided herein, all fees and expenses incurred in connection with or related to the Transaction Documents and the Transactions shall be paid by the Party incurring such fees or expenses.

Section 10.2    Amendment and Modification.  This Agreement may not be amended, modified or supplemented in any manner, whether by course of conduct or otherwise, except by an instrument in writing specifically designated as an amendment hereto, signed on behalf of the Buyer and the Sellers' Representative.

Section 10.3    Waiver.  No waiver hereunder shall be binding unless in writing executed by the Party against whom enforcement of the waiver is sought.  The delay or failure by a Party to exercise a right hereunder shall not operate as a waiver of a breach nor shall it prevent such party from doing so later with respect to such breach and no waiver of a breach of one provision of this Agreement shall operate as a waiver of another breach of such provision or of a breach of any other provision.

Section 10.4    Notices.  All notices and other communications hereunder shall be in writing and shall be deemed duly given (a) on the date of delivery if delivered personally, or if by e-mail, upon written confirmation of receipt by e-mail or otherwise, (b) on the first Business Day following the date of dispatch if delivered utilizing a next-day service by a recognized next-day courier or (c) on the earlier of confirmed receipt or the fifth Business Day following the date

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001057

PX0594.64

of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid. All notices hereunder shall be delivered to the addresses set forth below, or pursuant to such other instructions as may be designated in writing by the party to receive such notice:

(i)     if to the Sellers, VOI HoldCo or (prior to the Closing) the Company, c/o the Sellers' Representative to:

Patrick Gendreau
2061 Crown Drive, St. Augustine, Florida 32092
E-mail:  patrick@vetimplants.com

with a copy (which shall not constitute notice) to:

Wells & Wells, P.A.
901 Ponce de Leon Boulevard, Suite 200
Coral Gables, Florida 33134
Attention: Thomas O. Wells, Esq.
E-mail:  tom@twellslaw.com

(ii)    if to the Buyer or (following the Closing) the Company, to:

c/o Fidelio Capital AB
Birger Jarlsgatan 13
111 45 Stockholm
Sweden
Attention:     Theodor Bonnier  and Gabriel Fitzgerald
E-mail:        Theodor.Bonnier@fideliocapital.se and
Gabriel.Fitzgerald@fideliocapital.se

with copies (which shall not constitute notice) to:

Advokatfirman Vinge
Stureplan 8, Box 1703 SE-111 87
Stockholm, Sweden
Attention:     Jonas Bergström
E-mail:        jonas.Bergstrom@vinge.se

and

Morrison & Foerster LLP
250 West 55th Street
New York, NY 10019
Attention:     Spencer Klein and Jeff Bell
E-mail:        spencerklein@mofo.com and jbell@mofo.com

Section 10.5     Interpretation.

60

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001058

PX0594.65

(a)     In this Agreement, unless provided otherwise or required by context, (i) references to articles, sections (or subdivisions of sections), recitals, preambles, schedules or exhibits are to those of this Agreement, (ii) terms defined in the singular shall include the plural and vice versa, (iii) references to any Law shall include all rules and regulations promulgated thereunder and all amendments, modifications, supplements thereto or restatements or replacements thereof subsequently implemented or enacted, (iv) references to any contract shall be deemed to include all appendices, schedules, attachments, exhibits, annexes or certificates furnished pursuant thereto and all subsequent amendments, restatements and other modifications thereof, (v) references to any Person include such Person's permitted successors and assigns, (vi) the words "herein," "hereby," "hereof," and "hereunder" or other words of similar import refer to this Agreement as a whole, (vii) wherever the word "include," "includes" or "including" is used in this Agreement, it shall be deemed to be followed by the words "without limitation", (viii) the word "or" shall be disjunctive but not exclusive, (ix) references to "as of the date hereof" or words of similar import shall mean "as of immediately prior to the execution and delivery of this Agreement", (x) references to "dollars" or "$" are to U.S. dollars, (xi) references to days are to calendar days; provided, that any action otherwise required to be taken on a day that is not a Business Day shall instead be taken on the next Business Day and (xii) the phrase "directly or indirectly" means directly or indirectly through one or more intermediate Persons or through contractual or other arrangements, and "direct or indirect" has the correlative meaning.

(b)     The table of contents and headings of this Agreement are for convenience of reference and shall not form part of, or affect the interpretation of, this Agreement.  This Agreement and the other Transaction Documents have been negotiated and drafted jointly by the Parties hereto and their attorneys, and no rule of construction disfavoring the drafting party shall apply.

Section 10.6   <u>Entire Agreement</u>.  This Agreement (including the Exhibits, Schedules and Disclosure Schedules hereto) together with the Ancillary Agreements constitute the entire agreement, and supersede all prior written agreements, arrangements, communications and understandings and all prior and contemporaneous oral agreements, arrangements, communications and understandings among the Parties with respect to the subject matter hereof and thereof.

Section 10.7   <u>No Third-Party Beneficiaries</u>.  Nothing in this Agreement, express or implied, is intended to or shall confer upon any Person other than the parties and their respective successors and permitted assigns any legal or equitable right, benefit or remedy of any nature under or by reason of this Agreement.

Section 10.8   <u>Governing Law; Submission to Jurisdiction; Waiver of Jury Trial</u>.

(a)     This Agreement shall be governed by and construed in accordance with the internal Laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction).

(b)     In connection with the adjudication of any disputes relating to this Agreement, each Party hereby irrevocably (i) submits to the exclusive jurisdiction of the state and federal courts sitting in the State of Delaware; (ii) waives, and agrees not to assert, (1) any

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001059

PX0594.66

claim that it is not subject to the jurisdiction of, or any objection to the laying of venue in, any such court or that such Action has been commenced in an improper or inconvenient forum and (2) any right it may have to trial by jury; and (iii) agrees that service of any process, summons or other document delivered to such Party in accordance with Section 10.4 shall be effective with respect to any matter to which it has submitted to jurisdiction hereby.  The foregoing shall not constitute a general consent to service of process and shall have no effect for any purpose except as set forth in this Section 10.8.  Each Party (x) certifies that no Representative of any other Party has represented, expressly or otherwise, that such other Party would not, in the event of litigation, seek to enforce the foregoing waiver and (y) acknowledges that it and each other Party has been induced to enter into the agreements contemplated hereby by, among other things, the mutual waivers, agreements and certifications in this Section 10.8.

Section 10.9   Assignment; Successors.  Neither this Agreement nor any of the rights, interests or obligations under this Agreement may be assigned or delegated, in whole or in part, by operation of law or otherwise, by any Party without the prior written consent of the other Parties, and any such assignment without such prior written consent shall be null and void; provided, however, that without the prior consent of the Sellers or the Company, the Parent or the Buyer may assign this Agreement to any Affiliate of the Parent or the Buyer or pledge its rights hereunder to any bank or other financial institution providing financing to the Parent, the Buyer or its respective Affiliates; provided further, that no assignment shall limit the assignor's obligations hereunder or adversely affect the rights and remedies of the Sellers or VOI HoldCo hereunder. Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of, and be enforceable by, the Parties and their respective successors and assigns. Prior to the Closing, the Parent and Buyer shall provide written notice to the Sellers' Representative of any proposed assignment of this Agreement by the Parent or the Buyer, together with a description of the ownership and affiliation of the assignee to the Parent and/or the Buyer, prior to the effective date of such assignment.

Section 10.10  Enforcement.  The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to seek specific performance of the terms hereof and to seek an injunction to prevent breaches of this Agreement, in addition to any other remedy to which they are entitled at law or in equity.  Each of the Parties further waives (a) any defense in any Action for specific performance that a remedy at law would be adequate and (b) any requirement under any Law to post security as a prerequisite to obtaining equitable relief.

Section 10.11  Severability.  Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision or portion of any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable Law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or portion of any provision in such jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision or portion of any provision had never been contained herein.

Section 10.12  Counterparts.  This Agreement may be executed in counterparts, which may be delivered electronically with the same effect as an original counterpart.

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001060

PX0594.67

Section 10.13   <u>VOI HoldCo Guaranty</u>.

(a)      <u>Guaranty</u>. VOI HoldCo hereby absolutely, unconditionally and irrevocably guarantees (this "<u>Guaranty</u>"), as primary obligor and not merely as surety, the full and punctual payment and performance of all present and future obligations, liabilities, covenants and agreements required to be observed and performed or paid or reimbursed by the Company and the Sellers (the "<u>Obligors</u>") under or relating to this Agreement, plus all costs, expenses and fees (including the reasonable fees and expenses of counsel) of Parent and Buyer (the "<u>Beneficiaries</u>") in any way relating to the enforcement or protection of the Beneficiaries' rights under this Guaranty (collectively, the "<u>Obligations</u>").

(b)      <u>Guaranty Absolute and Unconditional</u>. VOI HoldCo agrees that its Obligations under this Guaranty are irrevocable, continuing, absolute and unconditional and shall not be discharged or impaired or otherwise affected by, and VOI HoldCo hereby irrevocably waives any defenses to enforcement it may have (now or in the future) by reason of:

(i)      Any illegality, invalidity or unenforceability of any Obligation or this Agreement or any related agreement or instrument, or any law, regulation, decree or order of any jurisdiction or any other event affecting any term of the Obligations.

(ii)      Any change in the time, place or manner of payment or performance of, or in any other term of the Obligations, or any rescission, waiver, release, assignment, amendment or other modification of this Agreement.

(iii)      Any taking, exchange, substitution, release, impairment, amendment, waiver, modification or non-perfection of any collateral or any other guaranty for the Obligations, or any manner of sale, disposition or application of proceeds of any collateral or other assets to all or part of the Obligations.

(iv)      Any default, failure or delay, willful or otherwise, in the performance of the Obligations.

(v)      Any change, restructuring or termination of the corporate structure, ownership or existence of VOI HoldCo or any Obligor or any insolvency, bankruptcy, reorganization or other similar proceeding affecting any Obligor or its assets or any resulting restructuring, release or discharge of any Obligations.

(vi)      Any failure of the Beneficiaries to disclose to VOI HoldCo any information relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of any Obligor now or hereafter known to the Beneficiaries, VOI HoldCo waiving any duty of the Beneficiaries to disclose such information.

(vii)      The failure of any other guarantor or third party to execute or deliver this Guaranty or any other guaranty or agreement, or the release or reduction of liability of VOI HoldCo or any other guarantor or surety with respect to the Obligations.

(viii)      The failure of the Beneficiaries to assert any claim or demand or to exercise or enforce any right or remedy under the provisions of this Agreement or otherwise.

63

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001061

PX0594.68

(ix)     The existence of any claim, set-off, counterclaim, recoupment or other rights that VOI HoldCo or any Obligor may have against the Beneficiaries (other than a defense of payment or performance).

(x)     Any other circumstance (including, without limitation, any statute of limitations), act, omission or manner of administering this Agreement or any existence of or reliance on any representation by the Beneficiaries that might vary the risk of VOI HoldCo or otherwise operate as a defense available to, or a legal or equitable discharge of, VOI HoldCo.

(c)     <u>Certain Waivers; Acknowledgments</u>. VOI HoldCo further acknowledges and agrees as follows:

(i)     VOI HoldCo hereby unconditionally and irrevocably waives any right to revoke this Guaranty and acknowledges that this Guaranty is continuing in nature and applies to all presently existing and future Obligations, until the complete, irrevocable and indefeasible payment and satisfaction in full of the Obligations.

(ii)     This Guaranty is a guaranty of payment and performance and not of collection. The Beneficiaries shall not be obligated to enforce or exhaust its remedies against the Obligors or under this Agreement before proceeding to enforce this Guaranty.

(iii)     This Guaranty is a direct guaranty and independent of the obligations of the Obligors under this Agreement. The Beneficiaries may resort to VOI HoldCo for payment and performance of the Obligations whether or not the Beneficiaries shall have resorted to any collateral therefor or shall have proceeded against the Obligors or any other guarantors with respect to the Obligations. The Beneficiaries may, at the Beneficiaries' option, proceed against VOI HoldCo and the Obligors, jointly and severally, or against VOI HoldCo only without having obtained a judgment against the Obligors.

(iv)     VOI HoldCo hereby unconditionally and irrevocably waives promptness, diligence, notice of acceptance, presentment, demand for performance, notice of non-performance, default, acceleration, protest or dishonor and any other notice with respect to any of the Obligations and this Guaranty and any requirement that the Beneficiaries protect, secure, perfect or insure any lien or any property subject thereto.

(v)     VOI HoldCo agrees that its guaranty hereunder shall continue to be effective or be reinstated, as the case may be, if at any time all or part of any payment of any Obligation is voided, rescinded or recovered or must otherwise be returned by the Beneficiaries upon the insolvency, bankruptcy or reorganization of any Obligor.

(d)     <u>Subrogation</u>. VOI HoldCo waives and shall not exercise any rights that it may acquire by way of subrogation, contribution, reimbursement or indemnification for payments made under this Guaranty until all Obligations shall have been indefeasibly paid and discharged in full; *provided however*, that nothing herein shall affect VOI HoldCo's rights to enforce and to collect timely payment related to the Contingent Closing Note, the Remaining Seller Note and the Preferred Units and Common Units issued to VOI HoldCo pursuant to this Agreement.

64

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001062

PX0594.69

*[The remainder of this page is intentionally left blank.]*

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001063

PX0594.70

IN WITNESS WHEREOF, the Buyer, the Company and the Sellers have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**OSSIUM BIDCO, LLC**

By:_____
        Name: Theodor Bonnier
        Title: Authorized Person

**OSSIUM NEWCO, LLC**

By:_____
        Name: Theodor Bonnier
        Title: Authorized Person

**VETERINARY ORTHOPEDIC IMPLANTS, INC.**

By:_____
        Name: Patrick Gendreau
        Title: President

**VOI HOLDINGS, LLC**

By:_____
        Name: Patrick Gendreau
        Title: Manager

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001064

PX0594.71

IN WITNESS WHEREOF, the Buyer, the Company and the Sellers have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**OSSIUM BIDCO, LLC**

By:_____
      Name:
      Title: Authorized Person

**OSSIUM NEWCO, LLC**

By:_____
      Name:
      Title: Authorized Person

**VETERINARY ORTHOPEDIC IMPLANTS, INC.**

By:_____
      Name: Patrick Gendreau
      Title: President

**VOI HOLDINGS, LLC**

By:_____
      Name: Patrick Gendreau
      Title: Manager

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001065

PX0594.72

_____

Claude Gendreau


_____

Timothy Van Horssen


**CLAUDE GENDREAU INVESTMENT TRUST U/A/D MARCH 16, 2013**

By:_____

    Patrick Gendreau, as trustee


_____

Patrick Gendreau


_____

Brian Beale


**Solely in relation to Section 5.12:**

**GENDREAU HOLDINGS LLC**


By:_____

    Name:
    Title:

**Solely in relation to Section 9.2(b):**

**FIDELIO CAPITAL AB**


By:_____

    Name:
    Title:

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Claude Gendreau

_Timothy Van Horssen_

Timothy Van Horssen

**CLAUDE GENDREAU INVESTMENT TRUST
U/A/D MARCH 16, 2013**

By: _____
    Patrick Gendreau, as trustee

_____

Patrick Gendreau

_____

Brian Beale

**Solely in relation to Section 5.12:**

**GENDREAU HOLDINGS LLC**

By: _____
    Name:
    Title:

**Solely in relation to Section 9.2(b):**

**FIDELIO CAPITAL AB**

By: _____
    Name:

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001067

PX0594.74

_____

Claude Gendreau


_____

Timothy Van Horssen


**CLAUDE GENDREAU INVESTMENT TRUST
U/A/D MARCH 16, 2013**

By: _____

Patrick Gendreau, as trustee

_____

Patrick Gendreau


_____

Brian Beale


**Solely in relation to Section 5.12:**

**GENDREAU HOLDINGS LLC**

By: _____

Name: Patrick Gendreau
Title: President

**Solely in relation to Section 9.2(b):**

**FIDELIO CAPITAL AB**


By: _____

Name:


ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001068

PX0594.75

_____
Claude Gendreau


_____
Timothy Van Horssen


**CLAUDE GENDREAU INVESTMENT TRUST
U/A/D MARCH 16, 2013**

By: _____
       Patrick Gendreau, as trustee


_____
Patrick Gendreau


_____
Brian Beale


**Solely in relation to Section 5.12:**

**GENDREAU HOLDINGS LLC**


By: _____
       Name:
       Title:

**Solely in relation to Section 9.2(b):**

**FIDELIO CAPITAL AB**


By: _____
       Name:
       Title:

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001069

PX0594.76

_____

Claude Gendreau

_____

Timothy Van Horssen

**CLAUDE GENDREAU INVESTMENT TRUST U/A/D MARCH 16, 2013**

By:_____
        Patrick Gendreau, as trustee

_____

Patrick Gendreau

_____

Brian Beale

**Solely in relation to Section 5.12:**

**GENDREAU HOLDINGS LLC**

By:_____
        Name:
        Title:

**Solely in relation to Section 9.2(b):**

**FIDELIO CAPITAL AB**

By:_____
        Name: Gabriel Fitzgerald
        Title: CEO

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001070

PX0594.77

## SCHEDULE 1.1

**Permitted Leakage**

**Redacted - Other (Nonresponsive)**

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001071

PX0594.78

**SCHEDULE 2.3**

**Form of Consideration**

**Redacted - Other (Nonresponsive)**

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001072

PX0594.79

# SCHEDULE 4.8

# Buyer Information

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001073

PX0594.80

| Project Voi | | VINGE |
|---|---|---|
| Index Report | | |
| 30 April 2020 | | |

| Index | Title | Doc Type | Date |
|---|---|---|---|
| **5** | | **Folder** | |
| **5.1** | | **Folder** | |
| **5.1.1** | | **Folder** | |
| 5.1.1.1 | | Document | 29/Apr/2020 |
| **5.1.2** | | **Folder** | |
| 5.1.2.1 | | Document | 29/Apr/2020 |
| **5.1.3** | | **Folder** | |
| 5.1.3.1 | | Document | 29/Apr/2020 |
| 5.1.3.2 | | Document | 29/Apr/2020 |
| **5.1.4** | **Redacted - Other (Nonresponsive)** | **Folder** | |
| 5.1.4.1 | | Document | 29/Apr/2020 |
| **5.1.5** | | **Folder** | |
| 5.1.5.1 | | Document | 29/Apr/2020 |
| 5.1.5.2 | | Document | 29/Apr/2020 |
| 5.1.5.3 | | Document | 29/Apr/2020 |
| 5.1.6 | | Placeholder | |
| **5.1.7** | | **Folder** | |

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001074

PX0594.81

| 5.1.7.1 | | Document | 29/Apr/2020 |
|---|---|---|---|
| **5.1.8** | | **Folder** | |
| 5.1.8.1 | | Document | 29/Apr/2020 |
| **5.1.9** | | **Folder** | |
| 5.1.9.1 | | Document | 29/Apr/2020 |
| **5.1.10** | **Redacted - Other (Nonresponsive)** | **Folder** | |
| 5.1.10.1 | | Document | 29/Apr/2020 |
| 5.1.11 | | Document | 29/Apr/2020 |
| **5.2** | | **Folder** | |
| **5.2.1** | | **Folder** | |
| 5.2.1.1 | | Document | 29/Apr/2020 |
| **5.2.2** | | **Folder** | |
| 5.2.2.1 | | Document | 29/Apr/2020 |

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001075

PX0594.82

Exhibit 1

## REORGANIZATION

1.     The Sellers will cause VOI HoldCo to file an IRS Form 2553 electing to be taxable as a Subchapter S corporation.

2.     The Sellers shall contribute all of the stock of VOI to VOI HoldCo.

3.     The Sellers will cause VOI HoldCo to file an IRS Form 8869 electing to treat VOI as a qualified subchapter S subsidiary ("QSSS").

4.     The Sellers will cause VOI HoldCo to convert VOI from a Florida corporation into Veterinary Orthopedic Implants, LLC, a Florida limited liability company ("VOI LLC").

5.     The Sellers will cause VOI HoldCo to create a Florida corporation that will be taxable as a corporation for U.S. federal income tax purposes ("Blocker").

6.     The Sellers will cause VOI HoldCo to contribute one percent (1%) of the membership interests in VOI LLC to Blocker so that VOI LLC is characterized as a partnership for U.S. federal income tax purposes.

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001076

PX0594.83

<u>Exhibit 2</u>

**FORM OF CONTINGENT CLOSING NOTE**

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001077

PX0594.84

CONFIDENTIAL

**Execution Version**

**THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS AND MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED EXCEPT (A) PURSUANT TO A REGISTRATION STATEMENT EFFECTIVE UNDER SUCH ACT AND LAWS OR (B) PURSUANT TO AN EXEMPTION FROM REGISTRATION THEREUNDER. ANY TRANSFER OF THIS NOTE IS FURTHER SUBJECT TO OTHER RESTRICTIONS SET FORTH HEREIN OR (C) PURSUANT TO AN AGREEMENT BETWEEN THE BUYER OR AN AFFILIATE OF THE BUYER, AS ONE PARTY THERETO, AND THE SELLER AS THE OTHER PARTY THERETO.**

### CONTINGENT CLOSING NOTE

This CONTINGENT CLOSING NOTE (this "Note") is entered into as of June 16, 2020, by and between Ossium NewCo LLC, a Delaware limited liability company (the "Buyer"), and VOI Holdings, LLC, a Florida limited liability company (the "Seller" and, collectively with the Buyer, the "Parties", and each, a "Party"). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the MIPA (as defined below).

### Recitals

WHEREAS, pursuant that certain Amended and Restated Membership Interest Purchase and Exchange Agreement, dated as of June 11, 2020 (the "MIPA"), by and among the Buyer, Ossium BidCo, LLC, Veterinary Orthopedic Implants, Inc., a Florida corporation that will be converted to Veterinary Orthopedic Implants, LLC, a Florida limited liability company (collectively, the "Company"), and the individual sellers signatory thereto, the parties thereto agreed to, among other things, enter into this Note pursuant to Section 2.3(a) of the MIPA.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements herein contained, and intending to be legally bound hereby, the Parties agree as follows:

Section 1.    Principal Amount.  The Buyer hereby promises to pay to the Seller, in accordance with the terms set forth herein, an amount equal to (a) [Redacted - Other (Nonresponsive)] [Redacted - Other (Nonresponsive)] ("Initial Principal Amount"), *less* (b) the Indemnification Adjustment (such calculated amount, the "Final Principal Amount").  "Indemnification Adjustment" shall mean the aggregate amount of Damages suffered by the Company and its Affiliates through the Note Payment Date (as defined below) as a result of or in connection with the Patent Litigation or that are otherwise eligible to be set off against this Note pursuant to Section 8.3(e) of the MIPA.

For the avoidance of doubt, if the Indemnification Adjustment is greater than the Initial Principal Amount, then the Final Principal Amount shall be deemed to be zero dollars ($0), and this Note shall be canceled with no amount due hereunder, and the Parties shall have no further obligations hereunder.

ny-1867845

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001078

PX0594.85

"Final Patent Resolution" means the resolution of the Patent Litigation by way of (x) a final and binding order that is not subject to appeal and adjudicates on the merits all the issues involved in the Patent Litigation; or (y) a settlement among the parties to the Patent Litigation.

"Note Payment Date" means the date that is thirty (30) days after the later of (x) the Final Patent Resolution and (y) the resolution of any dispute relating to the amount of the Indemnification Adjustment or any claim for indemnification that would be eligible to be set off against this Note pursuant to Section 8.3(e) of the MIPA.

Interest.  The Final Principal Amount shall bear interest at a rate of [Redacted - Other (Nonresponsive)] per annum, accruing from and after the date hereof until and excluding the Note Payment Date and compounded annually. If the Final Payment Amount is not paid on or prior thirty (30) days after the Note Payment Date, then the Final Principal Amount shall bear interest until paid in full (together with accrued but unpaid interest thereon) at the lesser of (a) the Applicable Default Rate, compounded annually or (b) the maximum rate permitted by applicable law as in effect as of the date of this Note.  If any judgment is rendered in favor of the Seller against the Buyer, said judgment shall bear interest at the applicable judgment rate. In no event shall any agreed to or actual exaction charged, reserved or taken as an advance or forbearance by the Seller as consideration for this Note exceed the limits (if any) imposed or provided by the law applicable from time to time to this Note for the use or detention of money or for forbearance in seeking its collection, and the Seller hereby waives any right to demand such excess. In the event that the interest provisions of this Note shall result at any time or for any reason in an effective rate of interest that exceeds the maximum interest rate permitted by applicable law (if any), then without further agreement or notice the obligation to be fulfilled shall be automatically reduced to such limit and all sums received by the Seller in excess of those lawfully collectible as interest shall be applied against the principal of this Note immediately upon the Seller's receipt thereof, with the same force and effect as though the payor had specifically designated such extra sums to be so applied to principal and the Seller had agreed to accept such extra payment(s) as a premium-free prepayment or prepayments. "Applicable Default Rate" means [Redacted - Other (Nonresponsive)] simple interest calculated for Note Payment Date until such amount is paid in full.

Section 2.      Payment Terms.  No later than three (3) Business Days prior to the Note Payment Date, the Buyer shall provide to the Seller a calculation of the Indemnification Adjustment.  If, within ten (10) Business Days following receipt of such notice, the Seller wishes to dispute such determination, any items disputed by the Seller shall be submitted for resolution to the Independent Accountants who, acting as experts and not arbitrators, shall resolve the disputed items. The Independent Accountants shall only decide the specific items under dispute by the Parties and their decision for each item must be within the range of values assigned to such item by the Parties. The fees and expenses of the Independent Accountants shall be paid by the Party whose asserted position of the Indemnification Adjustment is numerically farthest from the Indemnification Adjustment determined by the Independent Accountant. The Independent Accountants shall make a determination as soon as practicable after their engagement, and their resolution of the disputed items shall be conclusive and binding upon the Parties.

"Independent Accountants" means Deloitte, E&Y, KPMG or PricewaterhouseCoopers, as mutually agreed by the Buyer and the Seller; provided that none of the personnel on the team

ny-1867845

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001079

PX0594.86

acting as the Independent Accountant shall have served on any other team engaged by the Buyer, the Seller or any of their Affiliates during the 4 years prior to the date of such dispute.

On the Note Payment Date, the Buyer shall pay to the Seller, by wire transfer of immediately available funds to a bank account designated by the Seller, an amount equal to (a) the Final Principal Amount calculated in accordance with Section 1, *plus* (b) the accrued and unpaid interest on the Final Principal Amount calculated in accordance with Section 2 (together, the "Note Payment"). The Buyer shall not be required to prepay any portion of the Note Payment prior to the Note Payment Date.

Section 3.      Representations and Warranties.

(a)      The Buyer hereby represents and warrants to the Seller that the execution, delivery and performance by the Buyer of this Note (i) has been duly authorized by all requisite limited liability company action and (ii) will not violate (A) any provision of Law applicable to the Buyer, (B) the Organizational Documents of the Buyer or (C) any order of any Governmental Authority binding on the Buyer.

(b)      The Seller hereby represents and warrants to the Buyer that the execution, delivery and performance by the Seller of this Note (i) has been duly authorized by all requisite corporate action and (ii) will not violate (A) any provision of Law applicable to the Seller, (B) the Organizational Documents of the Seller or (C) any order of any Governmental Authority binding on the Seller.

Section 4.      Contingent Payment Obligation. This Note shall be treated as a contingent payment obligation with a maximum/cap price in accordance with Temporary Treasury Regulation Section 15A.453-1(c)(2)(i). Accordingly, the Parties agree to report the Notes and payments made pursuant to the Note under the installment sales rules.

Section 5.      Miscellaneous.

(a)      Section 10.4 (Notices) and Section 10.8 (Governing Law; Submission to Jurisdiction; Waiver of Jury Trial) of the MIPA are incorporated by reference herein, together with any necessary conforming changes.

(b)      The Parties agree that the indebtedness represented by this Note shall be subordinate to any senior bank debt incurred by the Buyer or any of its Affiliates and any guarantees with respect thereto. The Parties shall execute any other documents reasonably necessary to give effect to the foregoing sentence.

(c)      This Note may not be amended, modified or supplemented in any manner, whether by course of conduct or otherwise, except by an instrument in writing specifically designated as an amendment hereto, signed on behalf of the Buyer and the Seller.

(d)      This Note, the MIPA and the documents and instruments and other agreements specifically referred to herein or therein or delivered pursuant hereto or thereto, including all the exhibits and schedules attached hereto or thereto constitute the entire agreement between the Parties with respect to the subject matter hereof and supersede all prior agreements

ny-1867845

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001080

PX0594.87

and understandings, both written and oral, with respect to the subject matter hereof. Notwithstanding the foregoing, nothing in this Note supersedes or modifies in any way the provisions set forth in the MIPA, including its exhibits, appendices and other related documents.

(e)     Neither this Agreement nor any of the rights, interests or obligations under this Agreement may be assigned or delegated, in whole or in part, by operation of law or otherwise, by any Party without the prior written consent of the other Party, and any such assignment without such prior written consent shall be null and void.  Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of, and be enforceable by, the Parties and their respective successors and assigns.

(f)     This Agreement may be executed in counterparts, which may be delivered electronically with the same effect as an original counterpart.

(g)     If the Seller commences a proceeding to enforce and collect upon this Note and prevails in such proceeding, the Buyer shall pay all reasonable costs incurred by the Seller in connection therewith, including attorneys' fees and disbursements.

*[The remainder of this page is intentionally left blank.]*

4

ny-1867845

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001081

PX0594.88

IN WITNESS WHEREOF, Parties have caused this Note to be executed as of the date first written above by their respective officers thereunto duly authorized.

**BUYER:**

**OSSIUM NEWCO, LLC**

By:  _____
Name:
Title:

**SELLER:**

**VOI HOLDINGS, LLC**

By:  _____
Name:  Patrick Gendreau
Title:    Manager

ny-1867845

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001082

PX0594.89

Exhibit 3

# PATRICK GENDREAU EMPLOYMENT AGREEMENT

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001083

PX0594.90

CONFIDENTIAL
EXECUTION VERSION

# EXECUTIVE EMPLOYMENT AGREEMENT

This Employment Agreement (this "**Agreement**"), dated as of  May 5, 2020, is by and between Veterinary Orthopedic Implants, LLC, a limited liability company organized and existing under the laws of the State of Florida that was formerly Veterinary Orthopedic Implants, Inc., a Florida corporation ("**Employer**"), and Patrick Gendreau, an individual ("**Executive**").

WHEREAS, pursuant to that certain Membership Interest Purchase and Exchange Agreement, dated as of the date hereof (the "**MIPA**"), by and among Ossium Bidco, LLC, a Delaware limited liability company ("**Parent**"), Ossium NewCo, LLC, a Delaware limited liability company ("**Buyer**"), Employer, Executive and certain other parties thereto, Buyer will acquire the issued and outstanding equity interests of Employer.

WHEREAS, the execution and delivery of this Agreement is a condition to the parties' obligations under the MIPA;

WHEREAS, Employer wishes to retain Executive's skill, knowledge and experience for the management the development, assembly, design, manufacturing, marketing and sale by the Employer of its products and services focused on the pet healthcare market for dogs and cats (the "**Business**"); and

WHEREAS, all capitalized terms used in this Agreement but not otherwise defined herein are given the meanings set forth in the MIPA.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Employer and Executive hereby agree as follows:

Section 1.    Employment.

1.1    Term.  This Agreement shall become effective upon the Closing Date.  The term of employment under this Agreement shall begin on the Closing Date and shall expire on the two (2) year anniversary of the Closing Date ("**Initial Term**"); provided, however, that beginning on the first day immediately following the expiration of the Initial Term and on each subsequent one (1) year anniversary of such day, the term of this Agreement will be extended by an additional one (1) year period (each such period, an "**Additional Term**"), unless the Initial Term or Additional Term, as applicable, is at least one hundred and twenty (120) days before the end of the Initial Term or the applicable Additional Term and Employer or Executive notifies the other party that the term of this Agreement will not be extended.  If the term of this Agreement is not extended, the term of employment hereunder shall terminate as of the end of the Initial Term or the end of any Additional Term, as applicable (collectively, the "**Term of Employment**").  Executive's employment with Employer will be at-will, which means Executive or Employer may terminate Executive's employment at any time with or without cause and without advance notice.  For the avoidance of doubt, if the Closing Date does not occur, this Agreement will be void and of no force or effect.

1

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001084

PX0594.91

1.2   Duties.

(a)   Capacity.   During the Term of Employment, Employer agrees to employ Executive and Executive agrees to be employed by Employer in the position of Employer as referenced below the signature of the parties to this Agreement.  He shall assume and perform the duties and responsibilities commensurate with his position, and shall further assume and perform such other responsibilities and duties as may be assigned to him hereafter from time to time by Employer.  Executive shall report directly to, and shall comply with the directives of, the Managing Member of Employer.

(b)   Schedule.   In carrying out his duties and responsibilities hereunder, Executive shall strictly abide by the policies of Employer; provided, however, that if there is a conflict between the policies of Employer and the terms of this Agreement, the terms of this Agreement shall govern Executive's employment.  Executive shall devote all of his time, attention, energies, skills and best efforts exclusively to the performance of his duties and responsibilities for and on behalf of Employer.

(c)   Exclusivity.   Without limiting the generality of Section 1.2(b), during the Term of Employment, Executive shall not, without the prior written approval of Employer, render services of a business, professional or commercial nature for compensation to any other person, firm, corporation or other entity; provided, however, this clause shall not prohibit Executive from making passive investments (other than investments of more than one (1%) percent of the outstanding shares of companies engaged in any business which is directly or indirectly competitive with or similar to the (i) Business or (ii) the business now or hereafter conducted by any of Employer's Affiliates who are engaged in activities of the same or similar nature to the Business (collectively, the "Employer Group Business"), which do not detract from the full-time nature of Executive's employment hereunder.

1.3   Compensation and Benefits.   During the Term of Employment, as compensation for the services to be rendered during such period and the other obligations undertaken by Executive hereunder, Executive shall be entitled to the following compensation:

(a)   Salary.   During the Term of Employment, Employer agrees to pay or cause to be paid to Executive for his services a base salary at the annualized rate specified in this Section 1.3(a) (the base salary as in effect from time to time, the "**Base Salary**"), payable on Employer's regular paydays in accordance with Employer's normal payroll procedures and subject to customary payroll deductions.  The Base Salary will equal two hundred fifty-five thousand dollars ($255,000).

(b)   Expenses.   During the Term of Employment, Employer shall reimburse Executive for reasonable and necessary business expenses (including, but not limited to, monthly cell phone bill charges) in connection with his employment hereunder in accordance with the policies of Employer in effect from time to time and upon Executive timely submitting such expenses for reimbursement and providing Employer with such documentation substantiating such expenses as Employer may reasonably require.

2

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

(c)   Benefits.  During the Term of Employment, Executive shall be eligible to participate in all employee benefit plans maintained by Employer from time to time on the same basis as other executives of Employer in the same or substantially equivalent positions to that of Executive, including paid vacation, paid holidays, health, life and disability insurances, and retirement plans.  All such benefits shall be governed solely by the terms and conditions of the applicable employee benefit plans, which plans Employer may change or cancel from time to time in its discretion.

Section 2.   Confidentiality; Intellectual Property.

2.1   Contemporaneously with the execution of this Agreement, Executive is entering into the Proprietary Information and Invention Assignment Agreement attached as Exhibit A (the "**PIIAA**").

2.2   Notwithstanding anything contained herein or in the PIIAA, Executive or his Related Persons may disclose such portion (and only such portion) of the Proprietary Information as Executive or such Related Persons reasonably determine(s), based on advice of counsel, is/are legally obligated to disclose if (i) Executive receives a request to disclose all or any part of the Proprietary Information under the terms of a subpoena, civil investigative demand or order issued by a Governmental Authority or required by applicable Law; (ii) to the extent permitted by such request and applicable Law, Executive notifies Employer of the existence, terms and circumstances surrounding such request; and (iii) upon the request and at the expense of Employer, Executive exercises his commercially reasonable efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to the disclosed Proprietary Information.

Section 3.   Covenant Not To Compete.

3.1   Acknowledgment.   Executive acknowledges that he is being employed by Employer in a position in which he will have access to Proprietary Information (as defined in the PIIAA), including trade secrets, and the customers and vendors of Employer or its Affiliates, the preservation of which is essential to the success of Employer, and that Employer has a legitimate interest in restricting Executive's ability to take advantage of such Proprietary Information and relationships. Executive further acknowledges that Executive has the ability to receive certain special compensation, which are consideration for the covenants of Executive set forth herein.

3.2   Non-Competition and Non-Solicitation Agreement.  In light of the foregoing, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Executive, Executive hereby covenants and agrees that, during the Term of Employment and for a period of three (3) years following the termination of Executive's employment with Employer, whether voluntary or involuntary, and regardless of the reason for or manner of termination, Executive shall not, alone or with any of his Related Persons, directly or indirectly (as owner, stockholder, partner, lender, other investor, director, officer, employee, consultant or in any other capacity of any nature whatsoever):

(a)   solicit, engage in (or assist others in engaging in), perform, divert or accept any business of the same or similar nature to, or which competes with the Business in the United

3

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

States, Canada, France, or any other country where Employer conducts business as of Executive's last day of employment with Employer (the "**Restricted Territory**").

(b)     have an interest in any Person that engages directly or indirectly in the Business in the Restricted Territory in any capacity, including as a partner, shareholder, member, lender, investor, employee, director, manager, principal, agent, trustee or consultant;

(c)     interfere in any material respect with the business relationships (whether formed prior to or after the date of the MIPA) between Employer or its Affiliates on the one hand and the customers, suppliers or other business relationships of Employer or its Affiliates on the other hand, provided, however, that nothing herein shall prohibit Executive (together with his Related Parties) from being a passive beneficial owner of less than 5% of the outstanding stock of any publicly-traded corporation;

(d)     solicit any employee of Employer or its Affiliates or encourage any such employee to leave or terminate such employment or hire any such employee who has left or terminated such employment;

(e)     solicit or entice, or attempt to solicit or entice any present customer, distributor, vendor, supplier who has a business relationship with Employer or its Affiliates for purposes of terminating or materially decreasing their business or services from Employer or its Affiliates; or

(f)     make an introduction to or referral of any other Person to any customers of Employer or its Affiliates, any potential customers that have been identified and contacted by an officer, manager, director or employee of Employer or its Affiliates for purposes of diverting their business or services to any other Person, from Employer or its Affiliates, or from terminating or materially decreasing their business or services from Employer or its Affiliates.

3.3     Enforcement.  The covenants and obligations of Executive pursuant to this Section 3 shall be specifically enforceable in addition to and not in limitation of any other legal or equitable remedies, including monetary damages, which Employer may have.  Executive recognizes and acknowledges that irreparable injury may result to Employer in its Business in the event of any breach or threatened breach of any covenant or agreement contained herein, and, by reason of the foregoing, Executive consents and agrees that in the event of any such breach or threatened breach, Employer shall be entitled, in addition to any other remedies that they may have, including monetary damages, without posting any bond, to seek equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction. The Executive acknowledges that this Agreement contains covenants which are valid and enforceable, which are reasonable and necessary to protect the legitimate interests of Employer and which will be binding upon Executive.  Therefore, in the event that any of the obligations of Executive are adjudicated to be unreasonable or unenforceable because of the duration of such provision, the area covered thereby or the scope thereof so as to render any of the foregoing covenants unenforceable, then any court making the adjudication is expressly empowered to reform such covenant, and such covenant shall be deemed reformed, in such jurisdiction to the maximum time, geographic, product or service, or other limitations permitted and, in its reduced or revised form, such provisions shall be enforceable and shall be

4

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

enforced. If Executive violates any provisions set forth in this Section 3, then any of the time limitations set forth in this Section 3 shall be extended for a period of time equal to the period of time during which such breach occurs; and, in the event that Employer is required to seek relief from such breach before any court, board or other tribunal, then the time limitations shall be extended for a period of time equal to the pendency of such proceedings, including all appeals. In the event that Employer alleges that Executive has violated any of the covenants contained herein and Employer seeks enforcement of such covenants in any court having jurisdiction thereof, the prevailing party pursuant to such court proceeding shall be entitled to recover from the non-prevailing party all reasonable attorney's fees and costs incurred by the prevailing party in enforcing such covenants.

3.4    <u>Covenants Operate Independently from MIPA</u>.  Executive acknowledges and agrees that the covenants set forth in this Section 3 and under the PIIAA shall operate independently from any similar covenants that may apply to Executive pursuant to the MIPA; *provided however*, that if Executive is an owner of VOI Holdings, LLC which is the seller pursuant to the MIPA and the Buyer fails to perform and/or pay any obligation pursuant to the MIPA that affects the enforcement of the covenant not-to-compete thereunder, then the covenants set forth in this Section 3 shall be similarly affected.

Section 4.    <u>Miscellaneous</u>.

4.1    <u>Remedies</u>.

(a)    <u>Injunctions</u>. Inasmuch as any breach of, or failure to comply with, this Agreement will cause serious and substantial damage to Employer, if Executive should in any way breach or fail to comply with the terms of this Agreement, Employer shall be entitled (without posting any bond) to an injunction restraining Executive from such breach or failure.

(b)    <u>Cumulative Remedies</u>.  All remedies of Employer expressly provided for herein are cumulative of any and all other remedies now existing at law or in equity.  Employer shall, in addition to the remedies herein provided, be entitled to avail itself of all such other remedies as may now or hereafter exist at law or in equity for compensation, and for the specific enforcement of the covenants contained herein.  Any remedy provided for hereunder or provided by law shall not prevent the concurrent or subsequent employment of any other appropriate remedy or remedies, or preclude the recovery by Employer of monetary damages.

4.2    <u>Amendment</u>.  This Agreement may only be amended, modified or supplemented by an agreement in writing signed by the parties hereto.

4.3    <u>Entire Agreement</u>.  This Agreement and any other agreements expressly referred to herein set forth the entire understanding of the parties hereto regarding the subject matter  hereof and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. Notwithstanding the foregoing, nothing in this Agreement or the PIIAA supersedes or modifies in any way Executive's obligations or representations and warranties to the Company or to Buyer set forth in the MIPA, including its exhibits, appendices and other related documents.

5

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001088

PX0594.95

4.4     Notice.  All notices and other communications hereunder shall be in writing and shall be deemed duly given (a) on the date of delivery if delivered personally, or if by e-mail, upon written confirmation of receipt by e-mail or otherwise, (b) on the first Business Day following the date of dispatch if delivered utilizing a next-day service by a recognized next-day courier or (c) on the earlier of confirmed receipt or the fifth Business Day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid.  All notices hereunder shall be delivered to the addresses set forth below, or pursuant to such other instructions as may be designated in writing by the party to receive such notice:

| | |
|---|---|
| If to Employer: | Veterinary Orthopedic Implants, LLC |
| | 310 Commerce Lake Drive, Unit 107 |
| | St. Augustine, Florida 32095 |
| | Attention:  Managing Member |
| | |
| If to Executive: | To the most recent address of Executive set forth in the personnel records of Employer. |

4.5     Assignment.  This Agreement is personal as to Executive and shall not be assignable by Executive.  Employer may assign its rights under this Agreement to any of its Affiliates or person, firm, corporation or other entity which may acquire all or substantially all of the Employer Group Business which is now or hereafter conducted, which may acquire substantially all of the assets of Employer or with or into which Employer may be consolidated or merged; provided that any such assignment shall be subject to the express terms and conditions hereof.

4.6     Governing Law.

(a)     This Agreement shall in all respects be governed by, and construed in accordance with, the internal laws of the State of Florida without giving effect to any choice or conflict of law provision or rule (whether of the State of Florida or any other jurisdiction).

(b)     Any legal suit, action or proceeding arising out of or based upon this Agreement may be instituted exclusively in the federal and state courts sitting in St. Augustine, Florida, and each party hereto irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding.  Service of process, summons, notice or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action or other proceeding brought in any such court.  The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

4.7     Severability.  Each section and subsection of this Agreement constitutes a separate and distinct provision hereof.  It is the intent of the parties hereto that the provisions of this Agreement be enforced to the fullest extent permissible under the laws and public policies applicable in each jurisdiction in which enforcement is sought.  Accordingly, if any provision of this Agreement shall be adjudicated to be invalid, ineffective or unenforceable, the remaining provisions shall not be affected thereby.  The invalid, ineffective or unenforceable provisions shall,

6

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001089

PX0594.96

without further action by the parties, be automatically amended to effect the original purpose and intent of the invalid, ineffective and unenforceable provision; provided, however, that such amendment shall apply only with respect to the operation of such provision in the particular jurisdiction with respect to which such adjudication is made.

4.8   Waiver.  The failure of Employer to insist upon strict adherence to any term of this Agreement on any occasion shall not be construed as a waiver of or deprive Employer of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.  No waiver by either party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving.  Any waiver by Employer must be in writing and signed by a duly authorized representative of Employer other than Executive. No waiver by either party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver.  No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

4.9   Headings.  The headings of this Agreement are for reference only and shall not affect in the interpretation of this Agreement.

4.10   Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

4.11   Third Parties.  This Agreement is for the sole benefit of Employer, Executive and their respective heirs, executors, successors and permitted assigns and nothing expressed or implied in this Agreement is intended to or shall confer upon any other person, firm, corporation, or other entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

4.12   Withholding.  Employer shall be entitled to withhold the amount of all taxes of any applicable jurisdiction required to be withheld by an employer with respect to any amount paid to Executive hereunder.  Employer, in its sole and absolute discretion, shall make all determinations as to whether it is obligated to withhold any taxes hereunder and the amount thereof.

4.13   No Conflict.  Executive hereby represents and warrants to Employer as follows: (i) Executive is not under any obligation to any person, firm, corporation or other entity which is inconsistent or in conflict with the terms and conditions of this Agreement or which would in any manner prevent, limit or impair in any way the performance of Executive's obligations hereunder; and (ii) Executive has not disclosed and will not disclose to Employer, nor use for Employer's benefit, any confidential information or trade secrets of any person, firm, corporation or other entity that was a former employer of Executive, other than confidential information or trade secrets acquired by Executive as a result of his employment with any legal entity that was a predecessor

7

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001090

PX0594.97

to Employer, unless and until such confidential information and trade secrets have become lawfully available to the public or to Employer's industry or unless such disclosure is permitted by agreement with or by consent of any such former employer.  In the event of a breach by Executive of such representation or warranty, Employer may immediately terminate this Agreement and Executive's employment hereunder for Cause.

    4.14   <u>Binding Effect</u>.  This Agreement shall be binding upon and inure to the benefit of the respective parties hereto and their heirs, personal representatives, successors and permitted assigns.

    4.15   <u>Section 409A</u>.

    (a)   To the extent applicable, it is intended that this Agreement comply with the provisions of (or an applicable exemption under) Section 409A of the Internal Revenue Code of 1986, as amended (including the regulations thereunder, "**Section 409A**").  This Agreement will be administered and interpreted in a manner consistent with this intent, and any provision that would cause this Agreement to fail to satisfy Section 409A will have no force and effect until amended to comply therewith (which amendment may be retroactive to the extent permitted by Section 409A).

    (b)   Whenever a payment under this Agreement specifies a payment period with reference to a number of days, the actual date of payment within the specified period shall be within the sole discretion of Employer.

    (c)   Executive's right to receive any installment payments under this Agreement (whether severance payments, reimbursements or otherwise) shall be treated as a right to receive a series of separate payments.

    (d)   Notwithstanding anything contained herein to the contrary, to the extent required in order to avoid accelerated taxation and/or tax penalties under Section 409A, Executive shall not be considered to have terminated employment with Employer for purposes of this Agreement and no payments shall be due to Executive under this Agreement which are payable upon Executive's termination of employment until Executive would be considered to have incurred a Separation from Service (as defined below).

    (e)   Notwithstanding anything to the contrary contained herein, if at the time of Executive's Separation from Service Executive is a "specified employee," as hereinafter defined, any payments or benefits under this Agreement payable or provided in connection with such Separation from Service constitute deferred compensation subject to Section 409A, as determined by Employer in its sole discretion, and would (but for this sentence) be payable or provided within six (6) months following such Separation from Service, then, to the extent delayed commencement of any portion of such payments is required in order to avoid a prohibited distribution under Code Section 409A(a)(2)(B)(i) and the related adverse taxation under Section 409A, such amounts shall instead be accumulated and paid or provided on the first Business Day after the six (6) month anniversary of such Separation from Service.  No interest shall be due on any amounts so deferred. For purposes of this Agreement, "Separation from Service" shall mean a "separation from service"

<center>8</center>

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001091

PX0594.98

as defined in Treas. Reg. § 1.409A-1(h), and the term "specified employee" shall mean an individual determined by Employer to be a specified employee under Treas. Reg. § 1.409A-1(i).

(f)     Any reimbursement pursuant to Section 1.3(b) that would constitute nonqualified deferred compensation subject to Section 409A shall be subject to the following additional rules: (i) no reimbursement of any such expenses shall affect Executive's right to reimbursement of any other such expense in any other taxable year; (ii) reimbursement of the expense shall be made, if at all, not later than the end of the calendar year following the calendar year in which the expense was incurred; and (iii) the right to reimbursement shall not be subject to liquidation or exchange for any other benefit.

(g)     Notwithstanding anything to the contrary, neither Employer nor any of its employees, directors, agents, attorneys or representatives shall have any liability to Executive or any related person with respect any tax consequences arising under Section 409A.

**The remainder of this page is left intentionally blank.**

9

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001092

PX0594.99

IN WITNESS WHEREOF, Employer has caused this Agreement to be duly executed and delivered by a duly authorized officer, and Executive has duly executed and delivered this Agreement, as of the date first above written, the parties intending this document to take effect as a sealed instrument.

**EMPLOYER:**                                     **Veterinary Orthopedic Implants, LLC**

By _____

Name: _____  Patrick Gendreau

Title: _____ President

**EXECUTIVE:**                                    Patrick Gendreau

_____

Position and Title of Employee with Employer per Section 1.2(a):

President and Chief Executive Officer

*[Signature page to Executive Employment Agreement]*

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

EXHIBIT A
PROPRIETARY INFORMATION AND INVENTION ASSIGNMENT AGREEMENT

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001094

PX0594.101

PROPRIETARY INFORMATION AND INVENTION ASSIGNMENT AGREEMENT

Employee Name:  Patrick Gendreau

In consideration of my employment or continued employment by Veterinary Orthopedic Implants, LLC, a Florida limited liability company (the "**Company**"), I hereby agree to the restrictions and obligations placed by the Company on my use and development of certain information, technology, ideas, inventions and other materials, as set forth in this Proprietary Information and Invention Assignment Agreement (the "Agreement").

1.     **Proprietary Information.**

(a)     Definition.  I understand that the term "**Proprietary Information**" in this Agreement means any and all information and materials, in whatever form, tangible or intangible, whether disclosed to or learned or developed by me before or after the execution of this Agreement, whether or not marked or identified as confidential or proprietary, pertaining in any manner to the business of or used by the Company and its affiliates, or pertaining in any manner to any person or entity to whom the Company owes a duty of confidentiality.  Proprietary Information includes, but is not limited to, the following types of information and materials:  (i) research, development, technical or engineering information, know-how, data processing or computer software, programs, tools, data, designs, diagrams, drawings, schematics, sketches or other visual representations, plans, projects, manuals, documents, files, photographs, results, specifications, trade secrets, inventions, discoveries, compositions, ideas, concepts, structures, improvements, products, prototypes, instruments, machinery, equipment, processes, formulas, algorithms, methods, techniques, works in process, systems, technologies, disclosures, applications and other materials; (ii) financial information and materials, including, without limitation, information and materials relating to costs, vendors, suppliers, licensors, profits, markets, sales, distributors, joint venture partners, customers, subscribers, members and bids, whether existing or potential; (iii) business and marketing information and materials, including, without limitation, information and materials relating to future development and new product concepts; (iv) personnel files and information about compensation, benefits and other terms of employment of the Company's other employees and independent contractors; and (v) any other information or materials relating to the past, present, planned or foreseeable business, products, developments, technology or activities of the Company.

(b)     Exclusions.  Proprietary Information does not include any information or materials that I can prove by written evidence: (i) is or becomes publicly known through lawful means and without breach of this Agreement by me; (ii) was rightfully in my possession or part of my general knowledge prior to my employment by the Company, with the exception of the information, ideas or materials acquired by me during the course of my employment with any legal entity that was a predecessor to the Company, which shall continue to be Proprietary Information; or (iii) is disclosed to me without confidential or proprietary restrictions by a third party who rightfully possesses the information or materials without confidential or proprietary restrictions. However, to the extent the Company owes a duty of confidentiality to a third party with respect to such information, idea or material, such information, idea or material shall continue to be Proprietary Information until such time as the Company's duty of confidentiality terminates or

1

expires.  If I am uncertain as to whether particular information or materials are Proprietary Information, I will request the Company's written opinion as to their status.

(c)   Prior Knowledge.  Except as disclosed on Schedule A to this Agreement, I have no information or materials pertaining in any manner to the business of or used by the Company and its affiliates, other than information I have learned as part of my service to the Company or its predecessors as one of its owners and employees.

## 2.   Restrictions on Proprietary Information.

(a)   Restrictions on Use and Disclosure.  I agree that, during my employment and at all times thereafter, I will hold the Proprietary Information in strict confidence and I will not use, reproduce, disclose or deliver, directly or indirectly, any Proprietary Information except to the extent necessary to perform my duties as an employee of the Company or as permitted by a duly authorized representative of the Company.  I will use my best efforts to prevent the unauthorized use, reproduction, disclosure or delivery of Proprietary Information by others.

(b)   Location.  I agree to maintain at my work station and/or any other place under my control only such Proprietary Information as I have a current "need to know."  I agree to return to the appropriate person or location or otherwise properly dispose of Proprietary Information once that need to know no longer exists.

(c)   Third Party Information.  I recognize that the Company has received and will receive Proprietary Information from third parties to whom or which the Company owes a duty of confidentiality.  In addition to the restrictions set forth in this Section 2, I will not use, reproduce, disclose or deliver such Proprietary Information except as permitted by the Company's agreement with such third party.

(d)   Protected Rights; DTSA Notice.

(i)   Notwithstanding anything to the contrary in this Agreement, I understand that nothing in this Agreement prohibits me from exercising protected rights, including rights under the National Labor Relations Act, the right to file a charge with the Equal Employment Opportunity Commission, or the right to report possible violations of law to or participate in an investigation by any federal, state or local government agency or commission.

(ii)   I acknowledge receipt of the following notice pursuant to 18 U.S.C. § 1833(b)(1) (Defend Trade Secrets Act):

An individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made in confidence to a federal, state, or local government official or to an attorney solely for the purpose of reporting or investigating a suspected violation of law. An individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret

2

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001096

PX0594.103

information in the court proceeding, if the individual files any document containing the trade secret under seal; and does not disclose the trade secret, except pursuant to court order.

(e)     No Other Limitations.  I understand and agree that nothing in this Section 2 limits or modifies in any way my duties under any other section of this Agreement or any applicable law regarding the Company's Proprietary Information.

### 3.     Privacy; Protection of Personal Information.

(a)     Privacy.  I acknowledge that the Company may access all information and materials generated, received or maintained by or for me on the premises or equipment of the Company (including, without limitation, computer systems and electronic or voice mail systems), and I hereby waive any privacy rights I may have with respect to such information and materials.

(b)     Protection of Personal Information.  During my employment with the Company and thereafter, I shall hold Personal Information in the strictest confidence and shall not disclose or use Personal Information about other individuals, except in connection with my work for the Company, or unless expressly authorized in writing by an authorized representative of the Company.  I understand that there are laws in the United States and other countries that protect Personal Information, and that I must not use Personal Information about other individuals other than for the purposes for which it was originally used or make any disclosures of other individuals' Personal Information to any third party or from one country to another without prior approval of an authorized representative of the Company.  I understand that nothing in this Agreement prevents me from discussing my wages or other terms and conditions of my employment with coworkers or others, unless such discussion would be for the purpose of engaging in unfair competition or other unlawful conduct.

(c)     Definition of Personal Information.   "**Personal Information**" means personally identifiable information about employees, independent contractors or third party individuals, including names, addresses, telephone or facsimile numbers, Social Security Numbers, background information, credit card or banking information, health information, or other information entrusted to the Company.

### 4.     Inventions.

(a)     Definitions.

(i)     I understand that the term "**Inventions**" in this Agreement means any and all ideas, concepts, inventions, discoveries, developments, modifications, improvements, know-how, trade secrets, data, designs, diagrams, plans, specifications, methods, processes, techniques, formulas, algorithms, tools, works of authorship, derivative works, software, content, textual or artistic works, mask works, video, graphics, sound recordings, structures, products, prototypes, systems, applications, creations and technologies in any stage of development, whether or not patentable or reduced to practice and whether or not copyrightable.

(ii)     I understand that the term "**Business**" in this Agreement means the development, assembly, design, manufacturing, marketing and sale of veterinary orthopedic implants and related products and services.

3

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001097

PX0594.104

(iii)      I understand that the term "**Intellectual Property Rights**" in this Agreement means any and all (A) patents, utility models, industrial rights and similar intellectual property rights registered or applied for in the United States and all other countries throughout the world (including all reissues, divisions, continuations, continuations-in-part, renewals, extensions and reexaminations thereof); (B) rights in trademarks, service marks, trade dress, logos, domain names, rights of publicity, trade names and corporate names (whether or not registered) in the United States and all other countries throughout the world, including all registrations and applications for registration of the foregoing and all goodwill related thereto; (C) copyrights (whether or not registered) and rights in works of authorship, databases and mask works, and registrations and applications for registration thereof in the United States and all other countries throughout the world, including all renewals, extensions, reversions or restorations associated with such copyrights, now or hereafter provided by law, regardless of the medium of fixation or means of expression; (D) rights in trade secrets and other confidential information and know-how in the United States and all other countries throughout the world; (E) other intellectual property or proprietary rights in the United States and all other countries throughout the world, including all neighboring rights and sui generis rights; (F) rights to apply for, file, register establish, maintain, extend or renew any of the foregoing; (G) rights to enforce and protect any of the foregoing, including the right to bring legal actions for past, present and future infringement, misappropriation or other violations of any of the foregoing; and (H) rights to transfer and grant licenses and other rights with respect to any of the foregoing, in the Company's sole discretion and without a duty of accounting.

(b)      Assignment.   I hereby assign, and agree to assign automatically upon creation, to the Company, without additional compensation, my entire right, title and interest (including, without limitation, all Intellectual Property Rights) in and to (a) all Inventions related to the Business that are made, conceived, discovered or developed by me (either alone or jointly with others), or result from or are suggested by any work performed by me (either alone or jointly with others) for or on behalf of the Company or its affiliates, (i) as an owner of the Company or during the period of my employment with the Company or its predecessors, whether before or after the execution of this Agreement and whether or not made, conceived, discovered or developed during regular business hours or (ii) as an owner of the Company or during or after the period of my employment with the Company or its predecessors, whether before or after the execution of this Agreement, if based on or using Proprietary Information or otherwise in connection with my activities as an employee or owner of the Company or any of its predecessors (collectively, the "**Company Inventions**"), and (b) all benefits, privileges, causes of action and remedies relating to the Company Inventions, whether before or hereafter accrued (including, without limitation, the exclusive rights to apply for and maintain all registrations, renewals and/or extensions; to sue for all past, present or future infringements or other violations of any rights in the Invention; and to settle and retain proceeds from any such actions), free and clear of all liens and encumbrances.  I agree that all such Company Inventions are the sole property of the Company or any other entity designated by it, and all Intellectual Property Rights shall vest in and inure to the benefit of the Company or such other entity.   I agree and acknowledge that all copyrightable Company Inventions shall be considered works made for hire prepared within the scope of my employment.

(c)      License.   If, under applicable law notwithstanding the foregoing, I retain any right, title or interest (including any Intellectual Property Right) with respect to any Company Invention, I hereby grant and agree to grant to the Company, without any limitations or additional

4

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

remuneration, a worldwide, exclusive, royalty-free, irrevocable, perpetual, transferable and sublicenseable (through multiple tiers) license to make, have made, use, import, sell, offer to sell, practice any method or process in connection with, copy, distribute, prepare derivative works of, display, perform and otherwise exploit such Company Invention and I agree not to make any claim against the Company or its affiliates, suppliers or customers with respect to such Company Invention.

(d)   Records; Disclosure.   I agree to keep and maintain adequate and current written records regarding all Inventions made, conceived, discovered or developed by me (either alone or jointly with others) during my period of employment or after the termination of my employment if based on or using Proprietary Information or otherwise in connection with my activities as an employee of the Company.   I agree to make available such records and disclose promptly and fully in writing to the Company all such Inventions, regardless of whether or not I believe the Invention is a Company Invention subject to this Agreement, and the Company will examine such disclosure in confidence to make such determination.   Any such records related to Company Inventions shall be the sole property of the Company.

(e)   Assistance and Cooperation.   I agree to cooperate with and assist the Company, and perform, during and after my employment, all acts deemed necessary or desirable by the Company, to apply for, obtain, establish, perfect, maintain, evidence, enforce or otherwise protect any of the full benefits, enjoyment, right, title and interest throughout the world in the Company Inventions.   Such acts may include, but are not limited to, execution of assignments of title and other documents and assistance or cooperation in legal proceedings.   Should the Company be unable to secure my signature on any such document, whether due to my mental or physical incapacity or any other cause, I hereby irrevocably designate and appoint the Company and each of its duly authorized representatives as my agent and attorney-in-fact, with full power of substitution and delegation, to undertake such acts in my name as if executed and delivered by me (which appointment is coupled with an interest), and I waive and quitclaim to the Company any and all claims of any nature whatsoever that I may have or may later have for infringement of any Intellectual Property Rights in or to the Company Inventions.   The Company will compensate me at a reasonable rate for time actually spent by me at the Company's request on such assistance at any time following termination of my employment with the Company.

(f)   Moral Rights.   To the extent allowed by applicable law, the assignment of the Company Inventions includes all rights of paternity, integrity, disclosure and withdrawal and any other rights that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively "**Moral Rights**").   To the extent I retain any such Moral Rights under applicable law, I hereby waive and agree not to institute, support, maintain or permit any action or proceeding on the basis of, or otherwise assert, such Moral Rights.   I hereby authorize the Company to publish the Company Inventions in the Company's sole discretion with or without attributing any of the foregoing to me or identifying me in connection therewith and regardless of the effect on such Company Inventions or my relationship thereto.   I agree to ratify and consent to any action that may be taken or authorized by the Company with respect to such Company Inventions, and I will confirm any such ratifications and consents from time to time as requested by the Company.

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001099

PX0594.106

(g)     Excluded Inventions.  I may identify in Schedule A all Inventions, if any, that I made, conceived, discovered or developed (either alone or jointly with others) prior to my employment by the Company that relate to the current or planned conduct of the Business (collectively, "**Excluded Inventions**"), which I wish to exclude from the scope of this Agreement. I represent and warrant that such list is complete and accurate, and I understand that by not listing an Invention on Schedule A as an Excluded Invention, I am acknowledging that such Invention was not made, conceived, discovered or developed prior to my employment by the Company.

(h)     Employee Inventions and Third Party Inventions.  I shall not, without prior written approval by the Company, make any disclosure to the Company of or incorporate into Company property or Company Inventions any Invention owned by me or in which I have an interest ("**Employee Invention**") or owned by a third party ("**Third Party Invention**").  If, in the course of my employment with the Company, I make any disclosure to the Company of or incorporate into Company property or Company Inventions an Employee Invention, with or without Company approval, I hereby grant and agree to grant to the Company a worldwide, nonexclusive, royalty-free, irrevocable, perpetual, transferable and sublicenseable (through multiple tiers) license to make, have made, use, import, sell, offer to sell, practice any method or process in connection with, copy, distribute, prepare derivative works of, display, perform and otherwise exploit such Employee Invention and I agree not to make any claim against the Company or its affiliates, suppliers or customers with respect to any such Employee Invention.

(i)     Representations; Warranties and Covenants.  I represent, warrant and covenant that:  (i) I have the right to grant the rights and assignments granted herein, without the need for any assignments, releases, consents, approvals, immunities or other rights not yet obtained; (ii) any Company Inventions that are copyrightable works are my original works of authorship; and (iii) neither the Company Inventions nor any element thereof are subject to any restrictions or to any mortgages, liens, pledges, security interests, encumbrances or encroachments.

(j)     Adequate Consideration.  I acknowledge that the Company Inventions and the associated Intellectual Property Rights may have substantial economic value, that any and all proceeds resulting from use and exploitation thereof shall belong solely to the Company, and that the salary, equity incentives, and/or other compensation I receive from the Company for my employment with the Company includes fair and adequate consideration for all assignments, licenses and waivers hereunder.

**5.     Prohibition on Disclosure or Use of Third Party Confidential Information.**  I will not disclose to the Company or induce the Company to use any confidential, proprietary or trade secret information or materials belonging to others (including without limitation any former employers) at any time, nor will I use any such information or materials in the course of my employment with the Company.  I acknowledge that no officer or other employee or representative of the Company has requested or instructed me to disclose or use any such information or materials, and I will immediately inform my supervisor in the event I believe that my work at the Company would make it difficult for me not to disclose to the Company any such information or materials.

**6.     No Conflicts; Former Agreements.**  I represent and warrant that I have no other agreements or relationships with or commitments to any other person or entity that conflict with

6

my obligations to the Company as an employee of the Company or under this Agreement, and that my employment and my performance of the terms of this Agreement will not require me to violate any obligation to or confidence with another.  I agree I will not enter into any oral or written agreement in conflict with this Agreement.  Except as disclosed on <u>Schedule A</u> to this Agreement, I represent and warrant that I have not entered into any other agreements or relationships with or commitments to any other person or entity that obligates me to disclose to any such other person or entity any Proprietary Information or that assigns or obligates me to assign any such other person or entity any Company Inventions.

7.      **Third Party and Government Contracts.**  I understand that the Company has or may enter into contracts with other persons or entities, including the United States government or its agents, under which certain Intellectual Property Rights will be required to be protected, assigned, licensed, or otherwise transferred.  I hereby agree to be bound by all such agreements, and to execute such other documents and agreements as are necessary to enable the Company to meet its obligations under any such contracts.

8.      **Termination; Return of Materials.**  I agree to promptly return all property of the Company, including, without limitation, (a) all source code, books, manuals, records, models, drawings, reports, notes, contracts, lists, blueprints, and other documents or materials and all copies thereof, (b) all equipment furnished to or prepared by me in the course of or incident to my employment, and (c) all written or tangible materials containing Proprietary Information in my possession upon termination of my employment for any reason or at any other time at the Company's request.  Following my termination, I will not retain any written or other tangible material containing any Proprietary Information or information pertaining to any Company Invention.  I understand that my obligations contained in this Agreement will survive the termination of my employment and I will continue to make all disclosures required of me by Section 4(d) above.  In the event of the termination of my employment, I agree, if requested by the Company, to sign and deliver the Termination Certificate attached as <u>Schedule B</u> hereto.  I agree that after the termination of my employment, I will not enter into any agreement that conflicts with my obligations under this Agreement and will inform any subsequent employers of my obligations under this Agreement.  The termination of any employment or other agreement between the Company and me shall not terminate this Agreement and each and all of the terms and conditions hereof shall survive and remain in full force and effect.

9.      **Remedies.**  I recognize that nothing in this Agreement is intended to limit any remedy of the Company under prevailing law governing the protection of trade secrets or other Intellectual Property Rights.  In addition, I acknowledge that any breach by me of this Agreement would cause irreparable injury to the Company for which pecuniary compensation would not afford adequate relief and for which it would be extremely difficult to ascertain the amount of compensation which would afford adequate relief to the Company.  Therefore, I agree that if I breach any provision of this Agreement, the Company shall be entitled to injunctive or other equitable relief to remedy any breach or prevent any threatened breach of this Agreement, without the necessity of posting bond or other security or proving it has sustained any actual damage.  This remedy will be in addition to any other remedies available to the Company at law or in equity.

10.      **Miscellaneous Provisions.**

7

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001101

PX0594.108

(a)    Assignment; Binding Effect.  I acknowledge and agree that my performance is personal hereunder, and that I shall have no right to assign, delegate or otherwise transfer and shall not assign, delegate or otherwise transfer any rights or obligations under this Agreement. Any such assignment, delegation or other transfer shall be null and void.  This Agreement may be assigned or transferred by the Company.  Subject to the foregoing, this Agreement shall inure to the benefit of the Company and its affiliates, successors and assigns, and shall be binding on me and my heirs, executors, administrators, devisees, spouses, agents, legal representatives and successors in interest.

(b)    Governing Law.  This Agreement will be governed by and construed in accordance with the laws of the State of Florida, without giving effect to its conflict of law rules.

(c)    Severability.  If any provision of this Agreement, or application thereof to any person, place, or circumstance, shall be held by a court of competent jurisdiction to be unenforceable, such provision shall be enforced to the greatest extent permitted by law and the remainder of this Agreement shall remain in full force and effect.

(d)    Waivers.  Delay or failure to exercise any right or remedy under this Agreement shall not constitute a waiver of such right or remedy.  Any waiver of any breach of this Agreement shall not operate as a waiver of any subsequent breaches.  All rights or remedies specified for a party herein shall be cumulative and in addition to all other rights and remedies of the party hereunder or under applicable law.

(e)    Interpretation.  This Agreement shall be construed as a whole, according to its fair meaning, and not in favor of or against any party.  Sections and section headings contained in this Agreement are for reference purposes only, and shall not affect in any manner the meaning of interpretation of this Agreement.  Whenever the context requires, references to the singular shall include the plural and the plural the singular and any gender shall include any other gender.

(f)    Entire Agreement; Amendment.  This Agreement, including without limitation, the Schedules and Exhibits hereto, constitutes the entire agreement between the Company and me with respect to the subject matter hereof and replaces and supersedes any prior or existing agreement entered into by me and the Company with respect to the subject matter hereof.  Notwithstanding the foregoing, nothing in this Agreement supersedes or modifies in any way my obligations or representations and warranties to the Company or to Ossium Holdco, LLC set forth in the MIPA, including its exhibits, appendices and other related documents.  This Agreement may not be modified or amended, in whole or in part, except by a writing signed by me and a duly authorized representative of the Company other than me.  I agree that any subsequent change in my duties or compensation for employment will not affect the validity or scope of this Agreement.

IF YOU HAVE ANY QUESTIONS CONCERNING THIS AGREEMENT, YOU MAY WISH TO CONSULT AN ATTORNEY.

I HAVE READ THIS AGREEMENT CAREFULLY AND I UNDERSTAND AND ACCEPT THE OBLIGATIONS THAT IT IMPOSES UPON ME WITHOUT RESERVATION.

8

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001102

PX0594.109

NO PROMISES OR REPRESENTATIONS HAVE BEEN MADE TO ME TO INDUCE ME TO
SIGN THIS AGREEMENT. I SIGN THIS AGREEMENT VOLUNTARILY AND FREELY.

Date: _____04/30/ 2020_____                _____Patrick GENDREAU_____
                                                Employee Name

                                                _____Patrick M._____
                                                Employee Signature

9

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001103

PX0594.110

SCHEDULE A
EMPLOYEE DISCLOSURE

1.   **PROPRIETARY INFORMATION**

EXCEPT AS SET FORTH BELOW, I ACKNOWLEDGE THAT AT THIS TIME I
KNOW NOTHING ABOUT THE BUSINESS OR PROPRIETARY INFORMATION
OF VETERINARY ORTHOPEDIC IMPLANTS, LLC (THE "**COMPANY**"), OTHER
THAN INFORMATION I HAVE LEARNED FROM THE COMPANY:

_____
_____

(Check here _____ if continued on additional attached sheets)

2.   **EXCLUDED INVENTIONS**

___X___   I have made no Inventions prior to my ownership of or employment with
the Company that relate to the current or planned conduct of the Company's
business and that are owned by me (either alone or jointly with others) and
I do not wish to exclude any Excluded Inventions from the scope of the
Agreement.

___X___   The following is a complete and accurate list of all Inventions I have made,
conceived, discovered or developed prior to my ownership of or
employment with the Company that relate to the current or planned conduct
of the Company's business and that are owned by me (either alone or jointly
with others), which I wish to exclude from the scope of the Agreement:

_____
_____

(Check here _____ if continued on additional attached sheets)

3.   **CONFLICTING AGREEMENTS**

___X___   I am not party to any agreement or have any relationship with or
commitment to any other person or entity that obligates me to disclose to
any such other person or entity any Proprietary Information or that assigns
or obligates me to assign to any such other person or entity any Company
Inventions.

___X___   The following is a complete and accurate list of all agreements,
relationships with or commitments to any other person or entity that
obligates me to disclose to any such other person or entity any Proprietary
Information or that assigns or obligates me to assign to any such other
person or entity any Company Inventions.  I have attached copies of any
such agreements in my possession except to the extent that I am prohibited
from doing so due to confidentiality obligations.

_____
_____

(Check here _____ if continued on additional attached sheets)

Date: ___04/30/2020___          _Patrik  Gendreau_
                                Employee Name

                                _[signature]_
                                Employee Signature

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001104

PX0594.111

SCHEDULE B

### TERMINATION CERTIFICATE CONCERNING
### PROPRIETARY INFORMATION AND COMPANY INVENTIONS

This document is to certify that I have returned all property of Veterinary Orthopedic Implants, LLC (the "**Company**"), including, without limitation, (a) all source code, books, manuals, records, models, drawings, reports, notes, contracts, lists, blueprints, and other documents or materials and all copies thereof, (b) all equipment furnished to or prepared by me in the course of or incident to my employment, and (c) all written and tangible materials containing Proprietary Information in my possession.

I further certify that I have reviewed the Proprietary Information and Invention Assignment Agreement (the "**Agreement**") signed by me and that I have complied with and will continue to comply with all of its terms, including, without limitation, (i) the disclosure of any Inventions made, conceived, discovered or developed by me (either alone or jointly with others) during my period of ownership of or employment with the Company or after the termination of my ownership of or employment with the Company if based on or using Proprietary Information or otherwise in connection with my activities as an owner or employee of the Company, and (ii) the preservation as confidential of all Proprietary Information pertaining to the Company. This certificate in no way limits my responsibilities or the Company's rights under the Agreement.

Date: 04/30/2020

Employee Name   PATRICK GENDREAU

Employee Signature

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Exhibit 4

## TIMOTHY VAN HORSSEN EMPLOYMENT AGREEMENT

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001106

PX0594.113

CONFIDENTIAL                                                                          EXECUTION VERSION

# EXECUTIVE EMPLOYMENT AGREEMENT

This Employment Agreement (this "**Agreement**"), dated as of  May 5, 2020, is by and between Veterinary Orthopedic Implants, LLC, a limited liability company organized and existing under the laws of the State of Florida that was formerly Veterinary Orthopedic Implants, Inc., a Florida corporation ("**Employer**"), and Timothy Van Horssen, an individual ("**Executive**").

WHEREAS, pursuant to that certain Membership Interest Purchase and Exchange Agreement, dated as of the date hereof (the "**MIPA**"), by and among Ossium Bidco, LLC, a Delaware limited liability company ("**Parent**"), Ossium NewCo, LLC, a Delaware limited liability company ("**Buyer**"), Employer, Executive and certain other parties thereto, Buyer will acquire the issued and outstanding equity interests of Employer.

WHEREAS, the execution and delivery of this Agreement is a condition to the parties' obligations under the MIPA;

WHEREAS, Employer wishes to retain Executive's skill, knowledge and experience for the management the development, assembly, design, manufacturing, marketing and sale by the Employer of its products and services focused on the pet healthcare market for dogs and cats (the "**Business**"); and

WHEREAS, all capitalized terms used in this Agreement but not otherwise defined herein are given the meanings set forth in the MIPA.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Employer and Executive hereby agree as follows:

Section 1.    <u>Employment</u>.

1.1    <u>Term</u>.  This Agreement shall become effective upon the Closing Date.  The term of employment under this Agreement shall begin on the Closing Date and shall expire on the two (2) year anniversary of the Closing Date ("**Initial Term**"); <u>provided</u>, <u>however</u>, that beginning on the first day immediately following the expiration of the Initial Term and on each subsequent one (1) year anniversary of such day, the term of this Agreement will be extended by an additional one (1) year period (each such period, an "**Additional Term**"), unless (i) the Initial Term or Additional Term, as applicable, is terminated sooner as provided in Section 4 or (ii) at least one hundred and twenty (120) days before the end of the Initial Term or the applicable Additional Term and Employer or Executive notifies the other party that the term of this Agreement will not be extended.  If the term of this Agreement is not extended, the term of employment hereunder shall terminate as of the end of the Initial Term or the end of any Additional Term, as applicable (collectively, the "**Term of Employment**").  Executive's employment with Employer will be at-will, which means Executive or Employer may terminate Executive's employment at any time with or without cause and without advance notice.  For the avoidance of doubt, (x) if the Term of Employment is terminated due to non-renewal as provided herein, and Executive's employment terminates as a result of the non-renewal, the termination of employment shall not be considered

1

a termination of employment without Cause, and (y) if the Closing Date does not occur, this Agreement will be void and of no force or effect.

    1.2    Duties.

    (a)    Capacity.  During the Term of Employment, Employer agrees to employ Executive and Executive agrees to be employed by Employer in the position of Employer as referenced below the signature of the parties to this Agreement.  He shall assume and perform the duties and responsibilities commensurate with his position, and shall further assume and perform such other responsibilities and duties as may be assigned to him hereafter from time to time by Employer.  Executive shall report directly to, and shall comply with the directives of, Employer's President and CEO.

    (b)    Schedule.  In carrying out his duties and responsibilities hereunder, Executive shall strictly abide by the policies of Employer; provided, however, that if there is a conflict between the policies of Employer and the terms of this Agreement, the terms of this Agreement shall govern Executive's employment.  Executive shall devote all of his time, attention, energies, skills and best efforts exclusively to the performance of his duties and responsibilities for and on behalf of Employer.

    (c)    Exclusivity.  Without limiting the generality of Section 1.2(b), during the Term of Employment, Executive shall not, without the prior written approval of Employer, render services of a business, professional or commercial nature for compensation to any other person, firm, corporation or other entity; provided, however, this clause shall not prohibit Executive from making passive investments (other than investments of more than one (1%) percent of the outstanding shares of companies engaged in any business which is directly or indirectly competitive with or similar to the (i) Business or (ii) the business now or hereafter conducted by any of Employer's Affiliates who are engaged in activities of the same or similar nature to the Business (collectively, the "Employer Group Business"), which do not detract from the full-time nature of Executive's employment hereunder.

    1.3    Compensation and Benefits.  During the Term of Employment, as compensation for the services to be rendered during such period and the other obligations undertaken by Executive hereunder, Executive shall be entitled to the following compensation:

    (a)    Salary.  During the Term of Employment, Employer agrees to pay or cause to be paid to Executive for his services a base salary at the annualized rate specified in this Section 1.3(a) (the base salary as in effect from time to time, the "**Base Salary**"), payable on Employer's regular paydays in accordance with Employer's normal payroll procedures and subject to customary payroll deductions.  The Base Salary will equal two hundred twenty-four thousand nine hundred and ten dollars ($224,910).

    (b)    Expenses.  During the Term of Employment, Employer shall reimburse Executive for reasonable and necessary business expenses (including, but not limited to, monthly cell phone bill charges and up to $650 per month for automobile expenses) in connection with his employment hereunder in accordance with the policies of Employer in effect from time to time

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001108

PX0594.115

and upon Executive timely submitting such expenses for reimbursement and providing Employer
with such documentation substantiating such expenses as Employer may reasonably require.

(c)     Benefits.  During the Term of Employment, Executive shall be eligible to
participate in all employee benefit plans maintained by Employer from time to time on the same
basis as other executives of Employer in the same or substantially equivalent positions to that of
Executive, including paid vacation, paid holidays, health, life and disability insurances, and
retirement plans.  All such benefits shall be governed solely by the terms and conditions of the
applicable employee benefit plans, which plans Employer may change or cancel from time to time
in its discretion.

Section 2.     Confidentiality; Intellectual Property.

2.1     Contemporaneously with the execution of this Agreement, Executive is entering
into the Proprietary Information and Invention Assignment Agreement attached as Exhibit A (the
"**PIIAA**").

2.2     Notwithstanding anything contained herein or in the PIIAA, Executive or his
Related Persons may disclose such portion (and only such portion) of the Proprietary Information
as Executive or such Related Persons reasonably determine(s), based on advice of counsel, is/are
legally obligated to disclose if (i) Executive receives a request to disclose all or any part of the
Proprietary Information under the terms of a subpoena, civil investigative demand or order issued
by a Governmental Authority or required by applicable Law; (ii) to the extent permitted by such
request and applicable Law, Executive notifies Employer of the existence, terms and
circumstances surrounding such request; and (iii) upon the request and at the expense of Employer,
Executive exercises his commercially reasonable efforts to obtain an order or other reliable
assurance that confidential treatment will be accorded to the disclosed Proprietary Information.

Section 3.     Covenant Not To Compete.

3.1     Acknowledgment.     Executive acknowledges that he is being employed by
Employer in a position in which he will have access to Proprietary Information (as defined in the
PIIAA), including trade secrets, and the customers and vendors of Employer or its Affiliates, the
preservation of which is essential to the success of Employer, and that Employer has a legitimate
interest in restricting Executive's ability to take advantage of such Proprietary Information and
relationships. Executive further acknowledges that Executive has the ability to receive certain
special compensation, which are consideration for the covenants of Executive set forth herein.

3.2     Non-Competition and Non-Solicitation Agreement.  In light of the foregoing, and
for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged
by Executive, Executive hereby covenants and agrees, that, during the Term of Employment and
for a period of one (1) year following the termination of Executive's employment with Employer,
whether voluntary or involuntary, and regardless of the reason for or manner of termination,
Executive shall not, alone or with any of his Related Persons, directly or indirectly (as owner,
stockholder, partner, lender, other investor, director, officer, employee, consultant or in any other
capacity of any nature whatsoever):

3

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001109

PX0594.116

(a)      solicit, engage in (or assist others in engaging in), perform, divert or accept any business of the same or similar nature to, or which competes with the Business in the United States, Canada, France, or any other country where Employer conducts business as of Executive's last day of employment with Employer (the "**Restricted Territory**").

(b)      have an interest in any Person that engages directly or indirectly in the Business in the Restricted Territory in any capacity, including as a partner, shareholder, member, lender, investor, employee, director, manager, principal, agent, trustee or consultant;

(c)      interfere in any material respect with the business relationships (whether formed prior to or after the date of the MIPA) between Employer or its Affiliates on the one hand and the customers, suppliers or other business relationships of Employer or its Affiliates on the other hand, provided, however, that nothing herein shall prohibit Executive (together with his Related Parties) from being a passive beneficial owner of less than 5% of the outstanding stock of any publicly-traded corporation;

(d)      solicit any employee of Employer or its Affiliates or encourage any such employee to leave or terminate such employment or hire any such employee who has left or terminated such employment;

(e)      solicit or entice, or attempt to solicit or entice any present customer, distributor, vendor, supplier who has a business relationship with Employer or its Affiliates for purposes of terminating or materially decreasing their business or services from Employer or its Affiliates; or

(f)      make an introduction to or referral of any other Person to any customers of Employer or its Affiliates, any potential customers that have been identified and contacted by an officer, manager, director or employee of Employer or its Affiliates for purposes of diverting their business or services to any other Person, from Employer or its Affiliates, or from terminating or materially decreasing their business or services from Employer or its Affiliates.

3.3      <u>Enforcement</u>.  The covenants and obligations of Executive pursuant to this Section 3 shall be specifically enforceable in addition to and not in limitation of any other legal or equitable remedies, including monetary damages, which Employer may have.  Executive recognizes and acknowledges that irreparable injury may result to Employer in its Business in the event of any breach or threatened breach of any covenant or agreement contained herein, and, by reason of the foregoing, Executive consents and agrees that in the event of any such breach or threatened breach, Employer shall be entitled, in addition to any other remedies that they may have, including monetary damages, without posting any bond, to seek equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction. The Executive acknowledges that this Agreement contains covenants which are valid and enforceable, which are reasonable and necessary to protect the legitimate interests of Employer and which will be binding upon Executive.  Therefore, in the event that any of the obligations of Executive are adjudicated to be unreasonable or unenforceable because of the duration of such provision, the area covered thereby or the scope thereof so as to render any of the foregoing covenants unenforceable, then any court making the adjudication is expressly empowered to reform such covenant, and such covenant shall be deemed reformed, in

4

such jurisdiction to the maximum time, geographic, product or service, or other limitations permitted and, in its reduced or revised form, such provisions shall be enforceable and shall be enforced. If Executive violates any provisions set forth in this Section 3, then any of the time limitations set forth in this Section 3 shall be extended for a period of time equal to the period of time during which such breach occurs; and, in the event that Employer is required to seek relief from such breach before any court, board or other tribunal, then the time limitations shall be extended for a period of time equal to the pendency of such proceedings, including all appeals.  In the event that Employer alleges that Executive has violated any of the covenants contained herein and Employer seeks enforcement of such covenants in any court having jurisdiction thereof, the prevailing party pursuant to such court proceeding shall be entitled to recover from the non-prevailing party all reasonable attorney's fees and costs incurred by the prevailing party in enforcing such covenants.

3.4     Covenants Operate Independently from MIPA.   Executive acknowledges and agrees that the covenants set forth in this Section 3 and under the PIIAA shall operate independently from any similar covenants that may apply to Executive pursuant to the MIPA; *provided however*, that if Executive is an owner of VOI Holdings, LLC which is the seller pursuant to the MIPA and the Buyer fails to perform and/or pay any obligation pursuant to the MIPA that affects the enforcement of the covenant not-to-compete thereunder, then the covenants set forth in this Section 3 shall be similarly affected.

Section 4.     Termination of Agreement.

4.1     Employer's Right to Terminate.

(a)     Death.   This Agreement shall terminate immediately upon Executive's death.

(b)     Disability.   In the event that Executive, because of accident, disability or physical or mental illness, is incapable of performing his duties hereunder, with or without reasonable accommodation, unless otherwise prohibited by applicable law, Employer shall have the right to terminate Executive's employment hereunder upon ten (10) days prior written notice to Executive.   For purposes of this Section 4.1(b), Executive shall be deemed to have become incapable of performing his duties hereunder if he shall have been incapable of so doing for: (i) a continuous period of ninety (90) days and remains so incapable at the end of such ninety (90) day period; or (ii) periods amounting in the aggregate to one hundred (120) days within any one period of three hundred sixty-five (365) days and remains so incapable at the end of such aggregate period of one hundred (120) days.

(c)     Cause.   Employer shall have the right to terminate Executive's employment hereunder for Cause immediately without prior notice to Executive.   "**Cause**" shall mean: (i) Executive's failure or refusal to comply with reasonable directives of Employer or to render the services required herein following written notice of such failure or refusal described with reasonable particularity provided to Executive by Employer and Executive's failure to cure such failure or refusal within ten (10) business days thereafter; (ii) Executive's dishonesty, fraud, embezzlement or misappropriation of funds involving assets of Employer or its customers, suppliers or any of their respective affiliates; (iii) indictment or charge of Executive by applicable

5

governmental authorities with, or being convicted of, any felony criminal offense or crime involving moral turpitude; (iv) the willful and repeated breach or habitual neglect by Executive of his duties under this Agreement or his duties as an employee of Employer; or (v) Executive's material breach of this Agreement following written notice of such breach described with reasonable particularity provided to Executive by Employer and Executive's failure to cure such alleged breach within ten (10) business days thereafter. Upon Employer's termination of Executive's employment for Cause, Employer will not have any obligation to continue to pay Executive any salary (except accrued but unpaid salary through the date of Executive's termination of employment), expenses (except for expenses incurred by Executive with respect to his employment with Employer that have not yet been reimbursed to Executive) and benefits pursuant to Section 1.3 hereof.

(d)     Without Cause. Employer shall have the right to terminate Executive's employment hereunder without Cause immediately without prior notice to Executive.  For the avoidance of doubt, termination of employment due to death, disability (pursuant to Section 4.1(b)) or expiration of the Term of Employment without renewal shall not constitute a termination without Cause hereunder. Upon Employer's termination of Executive's employment without Cause, Employer will not have any obligation to continue to pay Executive any salary (except accrued but unpaid salary through the date of Executive's termination of employment), expenses (except for expenses incurred by Executive with respect to his employment with Employer that have not yet been reimbursed to Executive) and benefits pursuant to Section 1.3 hereof except as otherwise set forth in Section 4.3.

4.2     Executive's Right to Terminate.

(a)     Without Good Reason.  Executive shall have the right to terminate his employment at any time during the Term of Employment upon thirty (30) days' notice to Employer.  Employer, in its sole discretion, may require Executive during some or all of the notice period to continue working to transition his duties, not report to work or perform any duties, not access any Employer computer systems or Proprietary Information, and/or return all Employer property. Upon Executive termination of his employment without Good Reason (as defined in Section 4.2(b) hereof), Employer will not have any obligation to continue to pay Executive any salary (except accrued but unpaid salary through the date of Executive's termination of employment), expenses (except for expenses incurred by Executive with respect to his employment with Employer that have not yet been reimbursed to Executive), and benefits pursuant to Section 1.3.

(b)     For Good Reason.  Executive shall have the right to terminate his employment for Good Reason.  "**Good Reason**" shall mean the occurrence of any of the following events, without the written consent of Executive:

(i)     a material reduction in Executive's Base Salary;

(ii)     Employer's continued failure, after receipt of a written notice by Executive and a ten (10) Business Day opportunity to cure, to pay compensation or provide benefits due to Executive under this Agreement;

6

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

(iii)     a required relocation of Executive's principal place of employment that extends Executive's regular commute to and from work by at least fifty (50) miles; or

(iv)     a material reduction in the responsibilities, duties and/or position of Executive or a change to whom Executive reports.

No such event described above will constitute Good Reason unless: (x) Executive gives notice to Employer specifying the condition or event relied upon for such termination within thirty (30) days of the initial existence of such event; and (y) Employer fails to cure the condition or event constituting Good Reason within thirty (30) days following receipt of such notice (the "**Cure Period**").  If Employer fails to remedy the condition constituting Good Reason during the applicable Cure Period, Executive's termination of employment must occur, if at all, within ninety (90) days following the last day of such Cure Period in order for such termination as a result of such condition to constitute a termination for Good Reason. Upon Executive termination of his employment for Good Reason, Employer will not have any obligation to continue to pay Executive any salary (except accrued but unpaid salary through the date of Executive's termination of employment), expenses (except for expenses incurred by Executive with respect to his employment with Employer that have not yet been reimbursed to Executive) and benefits pursuant to Section 1.3 hereof except as otherwise set forth in Section 4.3.

Notwithstanding the foregoing, any failure by a third party provider of benefits, over whose coverage, eligibility and similar decisions Employer has no control, to provide benefits due to Executive (e.g., the decision by a medical insurance company that a given medical procedure is not covered by the medical insurance policy provided by Employer to its employees) shall not constitute Good Reason.

4.3     Rights and Obligations of Executive upon Termination.

(a)     In the event that Executive's employment with Employer is terminated (i) without Cause or (ii) by Executive for Good Reason, Executive shall be eligible to receive an amount equal to one (1) year of his Base Salary in effect immediately prior to such termination (the "**Severance**"). The Severance is contingent upon and shall be payable only during the one (1) year period for which Executive is obligated to comply with and actually complies with the noncompetition and nonsolicitation requirements of section 3.2 of this Agreement   (the "**Noncompete Provisions**"). Notwithstanding the foregoing, Employer may (in its sole discretion) choose to waive its right to enforce the Noncompete Provisions (the "**Non-Compete Waiver**") at any time prior to or after Executive's termination and Executive shall only be entitled to receive the Severance, if any, due and payable under this Agreement through the date of the Non-Compete Waiver (e.g., if the Non-Compete Waiver is made effective by Employer six (6) months after the date of Executive's termination pursuant to this paragraph 4.3(a), Executive shall be eligible for six (6) months of the Severance). The Non-Compete Waiver must be in a writing signed by the Managing Member of Employer and will be effective on the date that it is provided to Executive in accordance with Section 5.4 of this Agreement.  The Non-Compete Waiver will not waive the Employer's right to enforce any other provision of this Agreement or any other agreement between Executive and the Employer.  All payments of the Severance to be made hereunder, if any, shall be paid to Executive in the form of salary continuation, subject to applicable deductions and withholdings, and paid on the Employer's regular payroll dates beginning with the first regularly

7

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001113

PX0594.120

scheduled pay period following the sixtieth (60th) day after the date of termination with the first payment to include any payments attributable to the period between the date of termination and the date of such first payment.  Prior (and as a condition) to the receipt of the Severance, Executive shall be obligated to execute and deliver, and not revoke, a Separation Agreement and Release that becomes effective (and irrevocable) not later than the sixtieth (60th) day after the date of termination, in form and substance satisfactory to Employer.

Section 5.　　　Miscellaneous.

5.1　　Remedies.

(a)　　Injunctions.  Inasmuch as any breach of, or failure to comply with, this Agreement will cause serious and substantial damage to Employer, if Executive should in any way breach or fail to comply with the terms of this Agreement, Employer shall be entitled (without posting any bond) to an injunction restraining Executive from such breach or failure.

(b)　　Cumulative Remedies.  All remedies of Employer expressly provided for herein are cumulative of any and all other remedies now existing at law or in equity.  Employer shall, in addition to the remedies herein provided, be entitled to avail itself of all such other remedies as may now or hereafter exist at law or in equity for compensation, and for the specific enforcement of the covenants contained herein.  Any remedy provided for hereunder or provided by law shall not prevent the concurrent or subsequent employment of any other appropriate remedy or remedies, or preclude the recovery by Employer of monetary damages.

5.2　　Amendment.  This Agreement may only be amended, modified or supplemented by an agreement in writing signed by the parties hereto.

5.3　　Entire Agreement.  This Agreement and any other agreements expressly referred to herein set forth the entire understanding of the parties hereto regarding the subject matter  hereof and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. Notwithstanding the foregoing, nothing in this Agreement or the PIIAA supersedes or modifies in any way Executive's obligations or representations and warranties to the Company or to Buyer set forth in the MIPA, including its exhibits, appendices and other related documents.

5.4　　Notice.  All notices and other communications hereunder shall be in writing and shall be deemed duly given (a) on the date of delivery if delivered personally, or if by e-mail, upon written confirmation of receipt by e-mail or otherwise, (b) on the first Business Day following the date of dispatch if delivered utilizing a next-day service by a recognized next-day courier or (c) on the earlier of confirmed receipt or the fifth Business Day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid.  All notices hereunder shall be delivered to the addresses set forth below, or pursuant to such other instructions as may be designated in writing by the party to receive such notice:

If to Employer:　　　　　　Veterinary Orthopedic Implants, LLC
　　　　　　　　　　　　　　310 Commerce Lake Drive, Unit 107
　　　　　　　　　　　　　　St. Augustine, Florida 32095
　　　　　　　　　　　　　　Attention:  Managing Member

8

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

If to Executive:                    To the most recent address of Executive set forth in
                                    the personnel records of Employer.

5.5    Assignment.   This Agreement is personal as to Executive and shall not be
assignable by Executive.  Employer may assign its rights under this Agreement to any of its
Affiliates or person, firm, corporation or other entity which may acquire all or substantially all of
the Employer Group Business which is now or hereafter conducted, which may acquire
substantially all of the assets of Employer or with or into which Employer may be consolidated or
merged; provided that any such assignment shall be subject to the express terms and conditions
hereof.

5.6    Governing Law.

       (a)    This Agreement shall in all respects be governed by, and construed in
accordance with, the internal laws of the State of Florida without giving effect to any choice or
conflict of law provision or rule (whether of the State of Florida or any other jurisdiction).

       (b)    Any legal suit, action or proceeding arising out of or based upon this
Agreement may be instituted exclusively in the federal and state courts sitting in St. Augustine,
Florida, and each party hereto irrevocably submits to the exclusive jurisdiction of such courts in
any such suit, action or proceeding.  Service of process, summons, notice or other document by
mail to such party's address set forth herein shall be effective service of process for any suit, action
or other proceeding brought in any such court.  The parties irrevocably and unconditionally waive
any objection to the laying of venue of any suit, action or any proceeding in such courts and
irrevocably waive and agree not to plead or claim in any such court that any such suit, action or
proceeding brought in any such court has been brought in an inconvenient forum.

5.7    Severability.  Each section and subsection of this Agreement constitutes a separate
and distinct provision hereof.  It is the intent of the parties hereto that the provisions of this
Agreement be enforced to the fullest extent permissible under the laws and public policies
applicable in each jurisdiction in which enforcement is sought.  Accordingly, if any provision of
this Agreement shall be adjudicated to be invalid, ineffective or unenforceable, the remaining
provisions shall not be affected thereby.  The invalid, ineffective or unenforceable provisions shall,
without further action by the parties, be automatically amended to effect the original purpose and
intent of the invalid, ineffective and unenforceable provision; provided, however, that such
amendment shall apply only with respect to the operation of such provision in the particular
jurisdiction with respect to which such adjudication is made.

5.8    Waiver.  The failure of Employer to insist upon strict adherence to any term of this
Agreement on any occasion shall not be construed as a waiver of or deprive Employer of the right
thereafter to insist upon strict adherence to that term or any other term of this Agreement.  No
waiver by either party of any of the provisions hereof shall be effective unless explicitly set forth
in writing and signed by the party so waiving.  Any waiver by Employer must be in writing and
signed by a duly authorized representative of Employer other than Executive. No waiver by either
party shall operate or be construed as a waiver in respect of any failure, breach or default not
expressly identified by such written waiver, whether of a similar or different character, and whether
occurring before or after that waiver.  No failure to exercise, or delay in exercising, any right,

9

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001115

PX0594.122

remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

5.9    Headings.  The headings of this Agreement are for reference only and shall not affect in the interpretation of this Agreement.

5.10    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

5.11    Third Parties.  This Agreement is for the sole benefit of Employer, Executive and their respective heirs, executors, successors and permitted assigns and nothing expressed or implied in this Agreement is intended to or shall confer upon any other person, firm, corporation, or other entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

5.12    Withholding.  Employer shall be entitled to withhold the amount of all taxes of any applicable jurisdiction required to be withheld by an employer with respect to any amount paid to Executive hereunder.  Employer, in its sole and absolute discretion, shall make all determinations as to whether it is obligated to withhold any taxes hereunder and the amount thereof.

5.13    No Conflict.  Executive hereby represents and warrants to Employer as follows: (i) Executive is not under any obligation to any person, firm, corporation or other entity which is inconsistent or in conflict with the terms and conditions of this Agreement or which would in any manner prevent, limit or impair in any way the performance of Executive's obligations hereunder; and (ii) Executive has not disclosed and will not disclose to Employer, nor use for Employer's benefit, any confidential information or trade secrets of any person, firm, corporation or other entity that was a former employer of Executive, other than confidential information or trade secrets acquired by Executive as a result of his employment with any legal entity that was a predecessor to Employer, unless and until such confidential information and trade secrets have become lawfully available to the public or to Employer's industry or unless such disclosure is permitted by agreement with or by consent of any such former employer.  In the event of a breach by Executive of such representation or warranty, Employer may immediately terminate this Agreement and Executive's employment hereunder for Cause.

5.14    Binding Effect.  This Agreement shall be binding upon and inure to the benefit of the respective parties hereto and their heirs, personal representatives, successors and permitted assigns.

5.15    Section 409A.

(a)    To the extent applicable, it is intended that this Agreement comply with the provisions of (or an applicable exemption under) Section 409A of the Internal Revenue Code of 1986, as amended (including the regulations thereunder, "**Section 409A**").  This Agreement will

10

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001116

PX0594.123

be administered and interpreted in a manner consistent with this intent, and any provision that would cause this Agreement to fail to satisfy Section 409A will have no force and effect until amended to comply therewith (which amendment may be retroactive to the extent permitted by Section 409A).

(b)     Whenever a payment under this Agreement specifies a payment period with reference to a number of days, the actual date of payment within the specified period shall be within the sole discretion of Employer.

(c)     Executive's right to receive any installment payments under this Agreement (whether severance payments, reimbursements or otherwise) shall be treated as a right to receive a series of separate payments.

(d)     Notwithstanding anything contained herein to the contrary, to the extent required in order to avoid accelerated taxation and/or tax penalties under Section 409A, Executive shall not be considered to have terminated employment with Employer for purposes of this Agreement and no payments shall be due to Executive under this Agreement which are payable upon Executive's termination of employment until Executive would be considered to have incurred a Separation from Service (as defined below).

(e)     Notwithstanding anything to the contrary contained herein, if at the time of Executive's Separation from Service Executive is a "specified employee," as hereinafter defined, any payments or benefits under this Agreement payable or provided in connection with such Separation from Service constitute deferred compensation subject to Section 409A, as determined by Employer in its sole discretion, and would (but for this sentence) be payable or provided within six (6) months following such Separation from Service, then, to the extent delayed commencement of any portion of such payments is required in order to avoid a prohibited distribution under Code Section 409A(a)(2)(B)(i) and the related adverse taxation under Section 409A, such amounts shall instead be accumulated and paid or provided on the first Business Day after the six (6) month anniversary of such Separation from Service.  No interest shall be due on any amounts so deferred. For purposes of this Agreement, "Separation from Service" shall mean a "separation from service" as defined in Treas. Reg. § 1.409A-1(h), and the term "specified employee" shall mean an individual determined by Employer to be a specified employee under Treas. Reg. § 1.409A-1(i).

(f)     To the extent any severance payments under Section 4.3(c) constitute deferred compensation subject to Section 409A, any such payments scheduled to occur during the first sixty (60) days following the termination of Executive's employment shall not be paid until the first regularly scheduled pay period following the sixtieth (60th) day following such termination and shall include payment of any amount that was otherwise scheduled to be paid prior thereto. Notwithstanding anything to the contrary, neither Employer nor any of its employees, directors, agents, attorney's or representatives shall have any liability to Executive or any related person with respect any tax consequences arising under Section 409A.

(g)     Any reimbursement pursuant to Section 1.3(b) that would constitute nonqualified deferred compensation subject to Section 409A shall be subject to the following additional rules: (i) no reimbursement of any such expenses shall affect Executive's right to reimbursement of any other such expense in any other taxable year; (ii) reimbursement of the

11

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001117

PX0594.124

expense shall be made, if at all, not later than the end of the calendar year following the calendar year in which the expense was incurred; and (iii) the right to reimbursement shall not be subject to liquidation or exchange for any other benefit.

       (h)    Notwithstanding anything to the contrary, neither Employer nor any of its employees, directors, agents, attorneys or representatives shall have any liability to Executive or any related person with respect any tax consequences arising under Section 409A.

**The remainder of this page is left intentionally blank.**

12

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001118

PX0594.125

IN WITNESS WHEREOF, Employer has caused this Agreement to be duly executed and delivered by a duly authorized officer, and Executive has duly executed and delivered this Agreement, as of the date first above written, the parties intending this document to take effect as a sealed instrument.

**EMPLOYER:**                                    **Veterinary Orthopedic Implants, LLC**

By _____

Name:   Patrick Gendreau

Title:   President

**EXECUTIVE:**                                   **Timothy Van Horssen**

_____

Position and Title of Employee with Employer per Section 1.2(a):

Vice President of Business Development

*[Signature page to Executive Employment Agreement]*

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001119

PX0594.126

IN WITNESS WHEREOF, Employer has caused this Agreement to be duly executed and delivered by a duly authorized officer, and Executive has duly executed and delivered this Agreement, as of the date first above written, the parties intending this document to take effect as a sealed instrument.

**EMPLOYER:**                              **Veterinary Orthopedic Implants, LLC**

By_____
Name:
Title:

**EXECUTIVE:**                             **Timothy Van Horssen**

_Tim Van Horss_____

Position and Title of Employee with Employer per Section 1.2(a):

Vice President of Business Development

*[Signature page to Executive Employment Agreement]*

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001120

PX0594.127

EXHIBIT A
PROPRIETARY INFORMATION AND INVENTION ASSIGNMENT AGREEMENT

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001121

PX0594.128

PROPRIETARY INFORMATION AND INVENTION ASSIGNMENT AGREEMENT

Employee Name:  Timothy Van Horssen

In consideration of my employment or continued employment by Veterinary Orthopedic Implants, LLC, a Florida limited liability company (the "**Company**"), I hereby agree to the restrictions and obligations placed by the Company on my use and development of certain information, technology, ideas, inventions and other materials, as set forth in this Proprietary Information and Invention Assignment Agreement (the "Agreement").

1.      **Proprietary Information.**

(a)     Definition.  I understand that the term "**Proprietary Information**" in this Agreement means any and all information and materials, in whatever form, tangible or intangible, whether disclosed to or learned or developed by me before or after the execution of this Agreement, whether or not marked or identified as confidential or proprietary, pertaining in any manner to the business of or used by the Company and its affiliates, or pertaining in any manner to any person or entity to whom the Company owes a duty of confidentiality.  Proprietary Information includes, but is not limited to, the following types of information and materials:  (i) research, development, technical or engineering information, know-how, data processing or computer software, programs, tools, data, designs, diagrams, drawings, schematics, sketches or other visual representations, plans, projects, manuals, documents, files, photographs, results, specifications, trade secrets, inventions, discoveries, compositions, ideas, concepts, structures, improvements, products, prototypes, instruments, machinery, equipment, processes, formulas, algorithms, methods, techniques, works in process, systems, technologies, disclosures, applications and other materials; (ii) financial information and materials, including, without limitation, information and materials relating to costs, vendors, suppliers, licensors, profits, markets, sales, distributors, joint venture partners, customers, subscribers, members and bids, whether existing or potential; (iii) business and marketing information and materials, including, without limitation, information and materials relating to future development and new product concepts; (iv) personnel files and information about compensation, benefits and other terms of employment of the Company's other employees and independent contractors; and (v) any other information or materials relating to the past, present, planned or foreseeable business, products, developments, technology or activities of the Company.

(b)     Exclusions.  Proprietary Information does not include any information or materials that I can prove by written evidence: (i) is or becomes publicly known through lawful means and without breach of this Agreement by me; (ii) was rightfully in my possession or part of my general knowledge prior to my employment by the Company, with the exception of the information, ideas or materials acquired by me during the course of my employment with any legal entity that was a predecessor to the Company, which shall continue to be Proprietary Information; or (iii) is disclosed to me without confidential or proprietary restrictions by a third party who rightfully possesses the information or materials without confidential or proprietary restrictions. However, to the extent the Company owes a duty of confidentiality to a third party with respect to such information, idea or material, such information, idea or material shall continue to be Proprietary Information until such time as the Company's duty of confidentiality terminates or

1

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001122

PX0594.129

expires.  If I am uncertain as to whether particular information or materials are Proprietary Information, I will request the Company's written opinion as to their status.

      (c)   <u>Prior Knowledge</u>.  Except as disclosed on <u>Schedule A</u> to this Agreement, I have no information or materials pertaining in any manner to the business of or used by the Company and its affiliates, other than information I have learned as part of my service to the Company or its predecessors as one of its owners and employees.

## 2.    Restrictions on Proprietary Information.

      (a)   <u>Restrictions on Use and Disclosure</u>.  I agree that, during my employment and at all times thereafter, I will hold the Proprietary Information in strict confidence and I will not use, reproduce, disclose or deliver, directly or indirectly, any Proprietary Information except to the extent necessary to perform my duties as an employee of the Company or as permitted by a duly authorized representative of the Company.  I will use my best efforts to prevent the unauthorized use, reproduction, disclosure or delivery of Proprietary Information by others.

      (b)   <u>Location</u>.  I agree to maintain at my work station and/or any other place under my control only such Proprietary Information as I have a current "need to know."  I agree to return to the appropriate person or location or otherwise properly dispose of Proprietary Information once that need to know no longer exists.

      (c)   <u>Third Party Information</u>.  I recognize that the Company has received and will receive Proprietary Information from third parties to whom or which the Company owes a duty of confidentiality.  In addition to the restrictions set forth in this Section 2, I will not use, reproduce, disclose or deliver such Proprietary Information except as permitted by the Company's agreement with such third party.

      (d)   <u>Protected Rights; DTSA Notice</u>.

      (i)   Notwithstanding anything to the contrary in this Agreement, I understand that nothing in this Agreement prohibits me from exercising protected rights, including rights under the National Labor Relations Act, the right to file a charge with the Equal Employment Opportunity Commission, or the right to report possible violations of law to or participate in an investigation by any federal, state or local government agency or commission.

      (ii)   I acknowledge receipt of the following notice pursuant to 18 U.S.C. § 1833(b)(1) (Defend Trade Secrets Act):

An individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made in confidence to a federal, state, or local government official or to an attorney solely for the purpose of reporting or investigating a suspected violation of law. An individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001123

PX0594.130

information in the court proceeding, if the individual files any document containing the trade secret under seal; and does not disclose the trade secret, except pursuant to court order.

(e)     No Other Limitations.  I understand and agree that nothing in this Section 2 limits or modifies in any way my duties under any other section of this Agreement or any applicable law regarding the Company's Proprietary Information.

### 3.     Privacy; Protection of Personal Information.

(a)     Privacy.  I acknowledge that the Company may access all information and materials generated, received or maintained by or for me on the premises or equipment of the Company (including, without limitation, computer systems and electronic or voice mail systems), and I hereby waive any privacy rights I may have with respect to such information and materials.

(b)     Protection of Personal Information.  During my employment with the Company and thereafter, I shall hold Personal Information in the strictest confidence and shall not disclose or use Personal Information about other individuals, except in connection with my work for the Company, or unless expressly authorized in writing by an authorized representative of the Company.  I understand that there are laws in the United States and other countries that protect Personal Information, and that I must not use Personal Information about other individuals other than for the purposes for which it was originally used or make any disclosures of other individuals' Personal Information to any third party or from one country to another without prior approval of an authorized representative of the Company.  I understand that nothing in this Agreement prevents me from discussing my wages or other terms and conditions of my employment with coworkers or others, unless such discussion would be for the purpose of engaging in unfair competition or other unlawful conduct.

(c)     Definition of Personal Information.  "**Personal Information**" means personally identifiable information about employees, independent contractors or third party individuals, including names, addresses, telephone or facsimile numbers, Social Security Numbers, background information, credit card or banking information, health information, or other information entrusted to the Company.

### 4.     Inventions.

(a)     Definitions.

(i)     I understand that the term "**Inventions**" in this Agreement means any and all ideas, concepts, inventions, discoveries, developments, modifications, improvements, know-how, trade secrets, data, designs, diagrams, plans, specifications, methods, processes, techniques, formulas, algorithms, tools, works of authorship, derivative works, software, content, textual or artistic works, mask works, video, graphics, sound recordings, structures, products, prototypes, systems, applications, creations and technologies in any stage of development, whether or not patentable or reduced to practice and whether or not copyrightable.

(ii)     I understand that the term "**Business**" in this Agreement means the development, assembly, design, manufacturing, marketing and sale of veterinary orthopedic implants and related products and services.

3

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001124

PX0594.131

(iii)     I understand that the term "**Intellectual Property Rights**" in this Agreement means any and all (A) patents, utility models, industrial rights and similar intellectual property rights registered or applied for in the United States and all other countries throughout the world (including all reissues, divisions, continuations, continuations-in-part, renewals, extensions and reexaminations thereof); (B) rights in trademarks, service marks, trade dress, logos, domain names, rights of publicity, trade names and corporate names (whether or not registered) in the United States and all other countries throughout the world, including all registrations and applications for registration of the foregoing and all goodwill related thereto; (C) copyrights (whether or not registered) and rights in works of authorship, databases and mask works, and registrations and applications for registration thereof in the United States and all other countries throughout the world, including all renewals, extensions, reversions or restorations associated with such copyrights, now or hereafter provided by law, regardless of the medium of fixation or means of expression; (D) rights in trade secrets and other confidential information and know-how in the United States and all other countries throughout the world; (E) other intellectual property or proprietary rights in the United States and all other countries throughout the world, including all neighboring rights and sui generis rights; (F) rights to apply for, file, register establish, maintain, extend or renew any of the foregoing; (G) rights to enforce and protect any of the foregoing, including the right to bring legal actions for past, present and future infringement, misappropriation or other violations of any of the foregoing; and (H) rights to transfer and grant licenses and other rights with respect to any of the foregoing, in the Company's sole discretion and without a duty of accounting.

(b)     Assignment.   I hereby assign, and agree to assign automatically upon creation, to the Company, without additional compensation, my entire right, title and interest (including, without limitation, all Intellectual Property Rights) in and to (a) all Inventions related to the Business that are made, conceived, discovered or developed by me (either alone or jointly with others), or result from or are suggested by any work performed by me (either alone or jointly with others) for or on behalf of the Company or its affiliates, (i) as an owner of the Company or during the period of my employment with the Company or its predecessors, whether before or after the execution of this Agreement and whether or not made, conceived, discovered or developed during regular business hours or (ii) as an owner of the Company or during or after the period of my employment with the Company or its predecessors, whether before or after the execution of this Agreement, if based on or using Proprietary Information or otherwise in connection with my activities as an employee or owner of the Company or any of its predecessors (collectively, the "**Company Inventions**"), and (b) all benefits, privileges, causes of action and remedies relating to the Company Inventions, whether before or hereafter accrued (including, without limitation, the exclusive rights to apply for and maintain all registrations, renewals and/or extensions; to sue for all past, present or future infringements or other violations of any rights in the Invention; and to settle and retain proceeds from any such actions), free and clear of all liens and encumbrances.  I agree that all such Company Inventions are the sole property of the Company or any other entity designated by it, and all Intellectual Property Rights shall vest in and inure to the benefit of the Company or such other entity.   I agree and acknowledge that all copyrightable Company Inventions shall be considered works made for hire prepared within the scope of my employment.

(c)     License.   If, under applicable law notwithstanding the foregoing, I retain any right, title or interest (including any Intellectual Property Right) with respect to any Company Invention, I hereby grant and agree to grant to the Company, without any limitations or additional

4

remuneration, a worldwide, exclusive, royalty-free, irrevocable, perpetual, transferable and sublicenseable (through multiple tiers) license to make, have made, use, import, sell, offer to sell, practice any method or process in connection with, copy, distribute, prepare derivative works of, display, perform and otherwise exploit such Company Invention and I agree not to make any claim against the Company or its affiliates, suppliers or customers with respect to such Company Invention.

(d)     Records; Disclosure.  I agree to keep and maintain adequate and current written records regarding all Inventions made, conceived, discovered or developed by me (either alone or jointly with others) during my period of employment or after the termination of my employment if based on or using Proprietary Information or otherwise in connection with my activities as an employee of the Company.  I agree to make available such records and disclose promptly and fully in writing to the Company all such Inventions, regardless of whether or not I believe the Invention is a Company Invention subject to this Agreement, and the Company will examine such disclosure in confidence to make such determination.  Any such records related to Company Inventions shall be the sole property of the Company.

(e)     Assistance and Cooperation.  I agree to cooperate with and assist the Company, and perform, during and after my employment, all acts deemed necessary or desirable by the Company, to apply for, obtain, establish, perfect, maintain, evidence, enforce or otherwise protect any of the full benefits, enjoyment, right, title and interest throughout the world in the Company Inventions.  Such acts may include, but are not limited to, execution of assignments of title and other documents and assistance or cooperation in legal proceedings.  Should the Company be unable to secure my signature on any such document, whether due to my mental or physical incapacity or any other cause, I hereby irrevocably designate and appoint the Company and each of its duly authorized representatives as my agent and attorney-in-fact, with full power of substitution and delegation, to undertake such acts in my name as if executed and delivered by me (which appointment is coupled with an interest), and I waive and quitclaim to the Company any and all claims of any nature whatsoever that I may have or may later have for infringement of any Intellectual Property Rights in or to the Company Inventions.  The Company will compensate me at a reasonable rate for time actually spent by me at the Company's request on such assistance at any time following termination of my employment with the Company.

(f)     Moral Rights.  To the extent allowed by applicable law, the assignment of the Company Inventions includes all rights of paternity, integrity, disclosure and withdrawal and any other rights that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively "**Moral Rights**").  To the extent I retain any such Moral Rights under applicable law, I hereby waive and agree not to institute, support, maintain or permit any action or proceeding on the basis of, or otherwise assert, such Moral Rights.  I hereby authorize the Company to publish the Company Inventions in the Company's sole discretion with or without attributing any of the foregoing to me or identifying me in connection therewith and regardless of the effect on such Company Inventions or my relationship thereto.  I agree to ratify and consent to any action that may be taken or authorized by the Company with respect to such Company Inventions, and I will confirm any such ratifications and consents from time to time as requested by the Company.

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001126

PX0594.133

(g)   <u>Excluded Inventions</u>.  I may identify in <u>Schedule A</u> all Inventions, if any, that I made, conceived, discovered or developed (either alone or jointly with others) prior to my employment by the Company that relate to the current or planned conduct of the Business (collectively, "**Excluded Inventions**"), which I wish to exclude from the scope of this Agreement. I represent and warrant that such list is complete and accurate, and I understand that by not listing an Invention on Schedule A as an Excluded Invention, I am acknowledging that such Invention was not made, conceived, discovered or developed prior to my employment by the Company.

(h)   <u>Employee Inventions and Third Party Inventions</u>.  I shall not, without prior written approval by the Company, make any disclosure to the Company of or incorporate into Company property or Company Inventions any Invention owned by me or in which I have an interest ("**Employee Invention**") or owned by a third party ("**Third Party Invention**").  If, in the course of my employment with the Company, I make any disclosure to the Company of or incorporate into Company property or Company Inventions an Employee Invention, with or without Company approval, I hereby grant and agree to grant to the Company a worldwide, nonexclusive, royalty-free, irrevocable, perpetual, transferable and sublicenseable (through multiple tiers) license to make, have made, use, import, sell, offer to sell, practice any method or process in connection with, copy, distribute, prepare derivative works of, display, perform and otherwise exploit such Employee Invention and I agree not to make any claim against the Company or its affiliates, suppliers or customers with respect to any such Employee Invention.

(i)   <u>Representations; Warranties and Covenants</u>.  I represent, warrant and covenant that:  (i) I have the right to grant the rights and assignments granted herein, without the need for any assignments, releases, consents, approvals, immunities or other rights not yet obtained; (ii) any Company Inventions that are copyrightable works are my original works of authorship; and (iii) neither the Company Inventions nor any element thereof are subject to any restrictions or to any mortgages, liens, pledges, security interests, encumbrances or encroachments.

(j)   <u>Adequate Consideration</u>.  I acknowledge that the Company Inventions and the associated Intellectual Property Rights may have substantial economic value, that any and all proceeds resulting from use and exploitation thereof shall belong solely to the Company, and that the salary, equity incentives, and/or other compensation I receive from the Company for my employment with the Company includes fair and adequate consideration for all assignments, licenses and waivers hereunder.

**5.**     **Prohibition on Disclosure or Use of Third Party Confidential Information.**  I will not disclose to the Company or induce the Company to use any confidential, proprietary or trade secret information or materials belonging to others (including without limitation any former employers) at any time, nor will I use any such information or materials in the course of my employment with the Company.  I acknowledge that no officer or other employee or representative of the Company has requested or instructed me to disclose or use any such information or materials, and I will immediately inform my supervisor in the event I believe that my work at the Company would make it difficult for me not to disclose to the Company any such information or materials.

**6.**     **No Conflicts; Former Agreements.**  I represent and warrant that I have no other agreements or relationships with or commitments to any other person or entity that conflict with

6

my obligations to the Company as an employee of the Company or under this Agreement, and that my employment and my performance of the terms of this Agreement will not require me to violate any obligation to or confidence with another. I agree I will not enter into any oral or written agreement in conflict with this Agreement. Except as disclosed on <u>Schedule A</u> to this Agreement, I represent and warrant that I have not entered into any other agreements or relationships with or commitments to any other person or entity that obligates me to disclose to any such other person or entity any Proprietary Information or that assigns or obligates me to assign any such other person or entity any Company Inventions.

7. **Third Party and Government Contracts.** I understand that the Company has or may enter into contracts with other persons or entities, including the United States government or its agents, under which certain Intellectual Property Rights will be required to be protected, assigned, licensed, or otherwise transferred. I hereby agree to be bound by all such agreements, and to execute such other documents and agreements as are necessary to enable the Company to meet its obligations under any such contracts.

8. **Termination; Return of Materials.** I agree to promptly return all property of the Company, including, without limitation, (a) all source code, books, manuals, records, models, drawings, reports, notes, contracts, lists, blueprints, and other documents or materials and all copies thereof, (b) all equipment furnished to or prepared by me in the course of or incident to my employment, and (c) all written or tangible materials containing Proprietary Information in my possession upon termination of my employment for any reason or at any other time at the Company's request. Following my termination, I will not retain any written or other tangible material containing any Proprietary Information or information pertaining to any Company Invention. I understand that my obligations contained in this Agreement will survive the termination of my employment and I will continue to make all disclosures required of me by Section 4(d) above. In the event of the termination of my employment, I agree, if requested by the Company, to sign and deliver the Termination Certificate attached as <u>Schedule B</u> hereto. I agree that after the termination of my employment, I will not enter into any agreement that conflicts with my obligations under this Agreement and will inform any subsequent employers of my obligations under this Agreement. The termination of any employment or other agreement between the Company and me shall not terminate this Agreement and each and all of the terms and conditions hereof shall survive and remain in full force and effect.

9. **Remedies.** I recognize that nothing in this Agreement is intended to limit any remedy of the Company under prevailing law governing the protection of trade secrets or other Intellectual Property Rights. In addition, I acknowledge that any breach by me of this Agreement would cause irreparable injury to the Company for which pecuniary compensation would not afford adequate relief and for which it would be extremely difficult to ascertain the amount of compensation which would afford adequate relief to the Company. Therefore, I agree that if I breach any provision of this Agreement, the Company shall be entitled to injunctive or other equitable relief to remedy any breach or prevent any threatened breach of this Agreement, without the necessity of posting bond or other security or proving it has sustained any actual damage. This remedy will be in addition to any other remedies available to the Company at law or in equity.

10. **Miscellaneous Provisions.**

7

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001128

PX0594.135

(a)    <u>Assignment; Binding Effect</u>.  I acknowledge and agree that my performance is personal hereunder, and that I shall have no right to assign, delegate or otherwise transfer and shall not assign, delegate or otherwise transfer any rights or obligations under this Agreement. Any such assignment, delegation or other transfer shall be null and void.  This Agreement may be assigned or transferred by the Company.  Subject to the foregoing, this Agreement shall inure to the benefit of the Company and its affiliates, successors and assigns, and shall be binding on me and my heirs, executors, administrators, devisees, spouses, agents, legal representatives and successors in interest.

(b)    <u>Governing Law</u>.  This Agreement will be governed by and construed in accordance with the laws of the State of Florida, without giving effect to its conflict of law rules.

(c)    <u>Severability</u>.  If any provision of this Agreement, or application thereof to any person, place, or circumstance, shall be held by a court of competent jurisdiction to be unenforceable, such provision shall be enforced to the greatest extent permitted by law and the remainder of this Agreement shall remain in full force and effect.

(d)    <u>Waivers</u>.  Delay or failure to exercise any right or remedy under this Agreement shall not constitute a waiver of such right or remedy.  Any waiver of any breach of this Agreement shall not operate as a waiver of any subsequent breaches.  All rights or remedies specified for a party herein shall be cumulative and in addition to all other rights and remedies of the party hereunder or under applicable law.

(e)    <u>Interpretation</u>.  This Agreement shall be construed as a whole, according to its fair meaning, and not in favor of or against any party.  Sections and section headings contained in this Agreement are for reference purposes only, and shall not affect in any manner the meaning of interpretation of this Agreement.  Whenever the context requires, references to the singular shall include the plural and the plural the singular and any gender shall include any other gender.

(f)    <u>Entire Agreement; Amendment</u>.  This Agreement, including without limitation, the Schedules and Exhibits hereto, constitutes the entire agreement between the Company and me with respect to the subject matter hereof and replaces and supersedes any prior or existing agreement entered into by me and the Company with respect to the subject matter hereof.  Notwithstanding the foregoing, nothing in this Agreement supersedes or modifies in any way my obligations or representations and warranties to the Company or to Ossium Holdco, LLC set forth in the MIPA, including its exhibits, appendices and other related documents.  This Agreement may not be modified or amended, in whole or in part, except by a writing signed by me and a duly authorized representative of the Company other than me.  I agree that any subsequent change in my duties or compensation for employment will not affect the validity or scope of this Agreement.

IF YOU HAVE ANY QUESTIONS CONCERNING THIS AGREEMENT, YOU MAY WISH TO CONSULT AN ATTORNEY.

I HAVE READ THIS AGREEMENT CAREFULLY AND I UNDERSTAND AND ACCEPT THE OBLIGATIONS THAT IT IMPOSES UPON ME WITHOUT RESERVATION.

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001129

PX0594.136

IF YOU HAVE ANY QUESTIONS CONCERNING THIS AGREEMENT, YOU MAY WISH TO CONSULT AN ATTORNEY.

I HAVE READ THIS AGREEMENT CAREFULLY AND I UNDERSTAND AND ACCEPT THE OBLIGATIONS THAT IT IMPOSES UPON ME WITHOUT RESERVATION.

NO PROMISES OR REPRESENTATIONS HAVE BEEN MADE TO ME TO INDUCE ME TO SIGN THIS AGREEMENT. I SIGN THIS AGREEMENT VOLUNTARILY AND FREELY.

Date:   6 – 1 – 20

Timothy Van Horssen
Employee Name

X _____
Employee Signature

[Signature Page to Proprietary Information and Invention Assignment Agreement]

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001130

PX0594.137

**SCHEDULE A**
**EMPLOYEE DISCLOSURE**

1. **PROPRIETARY INFORMATION**

EXCEPT AS SET FORTH BELOW, I ACKNOWLEDGE THAT AT THIS TIME I
KNOW NOTHING ABOUT THE BUSINESS OR PROPRIETARY INFORMATION
OF VETERINARY ORTHOPEDIC IMPLANTS, LLC (THE "**COMPANY**"), OTHER
THAN INFORMATION I HAVE LEARNED FROM THE COMPANY:

_____

_____

(Check here _____ if continued on additional attached sheets)

2. **EXCLUDED INVENTIONS**

_____ I have made no Inventions prior to my ownership of or employment with
the Company that relate to the current or planned conduct of the Company's
business and that are owned by me (either alone or jointly with others) and
I do not wish to exclude any Excluded Inventions from the scope of the
Agreement.

_____ The following is a complete and accurate list of all Inventions I have made,
conceived, discovered or developed prior to my ownership of or
employment with the Company that relate to the current or planned conduct
of the Company's business and that are owned by me (either alone or jointly
with others), which I wish to exclude from the scope of the Agreement:

_____

_____

(Check here _____ if continued on additional attached sheets)

3. **CONFLICTING AGREEMENTS**

_____ I am not party to any agreement or have any relationship with or
commitment to any other person or entity that obligates me to disclose to
any such other person or entity any Proprietary Information or that assigns
or obligates me to assign to any such other person or entity any Company
Inventions.

_____ The following is a complete and accurate list of all agreements,
relationships with or commitments to any other person or entity that
obligates me to disclose to any such other person or entity any Proprietary
Information or that assigns or obligates me to assign to any such other
person or entity any Company Inventions. I have attached copies of any
such agreements in my possession except to the extent that I am prohibited
from doing so due to confidentiality obligations.

_____

_____

(Check here _____ if continued on additional attached sheets)

Date: 5-1-20          Timothy Van Horsen
                      Employee Name

                      X Tim Van Horsen
                      Employee Signature

[Schedule to Proprietary Information and Invention Assignment Agreement]

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

**SCHEDULE B**

**TERMINATION CERTIFICATE CONCERNING
PROPRIETARY INFORMATION AND COMPANY INVENTIONS**

This document is to certify that I have returned all property of Veterinary Orthopedic Implants, LLC (the "**Company**"), including, without limitation, (a) all source code, books, manuals, records, models, drawings, reports, notes, contracts, lists, blueprints, and other documents or materials and all copies thereof, (b) all equipment furnished to or prepared by me in the course of or incident to my employment, and (c) all written and tangible materials containing Proprietary Information in my possession.

I further certify that I have reviewed the Proprietary Information and Invention Assignment Agreement (the "**Agreement**") signed by me and that I have complied with and will continue to comply with all of its terms, including, without limitation, (i) the disclosure of any Inventions made, conceived, discovered or developed by me (either alone or jointly with others) during my period of ownership of or employment with the Company or after the termination of my ownership of or employment with the Company if based on or using Proprietary Information or otherwise in connection with my activities as an owner or employee of the Company, and (ii) the preservation as confidential of all Proprietary Information pertaining to the Company.  This certificate in no way limits my responsibilities or the Company's rights under the Agreement.

Date:_____

_____
Employee Name

_____
Employee Signature

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER



This document is to certify that I have returned all property of Fidelity Orthopedic Implants, LLC (the "**Company**"), including, without limitation, (a) all source code, books, manuals, records, models, drawings, reports, notes, contracts, lists, blueprints, and other documents or materials and all copies thereof, (b) all equipment furnished to or prepared by me in the course of or incident to my employment, and (c) all written and tangible materials containing Proprietary Information in my possession.

I further certify that I have reviewed the Proprietary Information and Invention Assignment Agreement (the "**Agreement**") signed by me and that I have complied with and will continue to comply with all of its terms, including, without limitation, (i) the disclosure of any Inventions made, conceived, discovered or developed by me (either alone or jointly with others) during my period of ownership of or employment with the Company or after the termination of my ownership of or employment with the Company if based on or using Proprietary Information or otherwise in connection with my activities as an owner or employee of the Company, and (ii) the preservation as confidential of all Proprietary Information pertaining to the Company. This certificate in no way limits my responsibilities or the Company's rights under the Agreement.

Date: 5-1-20

Tim Van Hoosen
Employee Name

Tim Van Hoosen
Employee Signature

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Exhibit 5

**REBECCA BALLOU EMPLOYMENT AGREEMENT**

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001134

PX0594.141

CONFIDENTIAL                                                    EXECUTION VERSION

# EXECUTIVE EMPLOYMENT AGREEMENT

This Employment Agreement (this "**Agreement**"), dated as of May 5, 2020, is by and between Veterinary Orthopedic Implants, LLC, a limited liability company organized and existing under the laws of the State of Florida that was formerly Veterinary Orthopedic Implants, Inc., a Florida corporation ("**Employer**"), and Rebecca Ballou, an individual ("**Executive**").

WHEREAS, pursuant to that certain Membership Interest Purchase and Exchange Agreement, dated as of the date hereof (the "**MIPA**"), by and among Ossium Bidco, LLC, a Delaware limited liability company ("**Parent**"), Ossium NewCo, LLC, a Delaware limited liability company ("**Buyer**"), Employer and certain other parties thereto, Buyer will acquire the issued and outstanding equity interests of Employer.

WHEREAS, the execution and delivery of this Agreement is a condition to the parties' obligations under the MIPA;

WHEREAS, Employer wishes to retain Executive's skill, knowledge and experience for the management the development, assembly, design, manufacturing, marketing and sale by the Employer of its products and services focused on the pet healthcare market for dogs and cats (the "**Business**"); and

WHEREAS, all capitalized terms used in this Agreement but not otherwise defined herein are given the meanings set forth in the MIPA.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Employer and Executive hereby agree as follows:

Section 1.    Employment.

1.1    Term.  This Agreement shall become effective upon the Closing Date.  The term of employment under this Agreement shall begin on the Closing Date and shall expire on the two (2) year anniversary of the Closing Date ("**Initial Term**"); provided, however, that beginning on the first day immediately following the expiration of the Initial Term and on each subsequent one (1) year anniversary of such day, the term of this Agreement will be extended by an additional one (1) year period (each such period, an "**Additional Term**"), unless the Initial Term or Additional Term, as applicable, is at least one hundred and twenty (120) days before the end of the Initial Term or the applicable Additional Term and Employer or Executive notifies the other party that the term of this Agreement will not be extended.  If the term of this Agreement is not extended, the term of employment hereunder shall terminate as of the end of the Initial Term or the end of any Additional Term, as applicable (collectively, the "**Term of Employment**").  Executive's employment with Employer will be at-will, which means Executive or Employer may terminate Executive's employment at any time with or without cause and without advance notice.  For the avoidance of doubt, if the Closing Date does not occur, this Agreement will be void and of no force or effect.

1

1.2     Duties.

(a)     Capacity.  During the Term of Employment, Employer agrees to employ Executive and Executive agrees to be employed by Employer in the position of Employer as referenced below the signature of the parties to this Agreement.  She shall assume and perform the duties and responsibilities commensurate with her position, and shall further assume and perform such other responsibilities and duties as may be assigned to her hereafter from time to time by Employer.  Executive shall report directly to, and shall comply with the directives of, the Employer's President and CEO.

(b)     Schedule.   In carrying out her duties and responsibilities hereunder, Executive shall strictly abide by the policies of Employer; provided, however, that if there is a conflict between the policies of Employer and the terms of this Agreement, the terms of this Agreement shall govern Executive's employment.  Executive shall devote all of her time, attention, energies, skills and best efforts exclusively to the performance of her duties and responsibilities for and on behalf of Employer.

(c)     Exclusivity.  Without limiting the generality of Section 1.2(b), during the Term of Employment, Executive shall not, without the prior written approval of Employer, render services of a business, professional or commercial nature for compensation to any other person, firm, corporation or other entity; provided, however, this clause shall not prohibit Executive from making passive investments (other than investments of more than one (1%) percent of the outstanding shares of companies engaged in any business which is directly or indirectly competitive with or similar to the (i) Business or (ii) the business now or hereafter conducted by any of Employer's Affiliates who are engaged in activities of the same or similar nature to the Business (collectively, the "Employer Group Business"), which do not detract from the full-time nature of Executive's employment hereunder.

1.3     Compensation and Benefits.  During the Term of Employment, as compensation for the services to be rendered during such period and the other obligations undertaken by Executive hereunder, Executive shall be entitled to the following compensation:

(a)     Salary.  During the Term of Employment, Employer agrees to pay or cause to be paid to Executive for her services a base salary at the annualized rate specified in this Section 1.3(a) (the base salary as in effect from time to time, the "**Base Salary**"), payable on Employer's regular paydays in accordance with Employer's normal payroll procedures and subject to customary payroll deductions.  The Base Salary will equal one hundred forty-five thousand dollars ($145,000).

(b)     Expenses.  During the Term of Employment, Employer shall reimburse Executive for reasonable and necessary business expenses (including, but not limited to, monthly cell phone bill charges and up to $898 per month for automobile expenses) in connection with her employment hereunder in accordance with the policies of Employer in effect from time to time and upon Executive timely submitting such expenses for reimbursement and providing Employer with such documentation substantiating such expenses as Employer may reasonably require.

2

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

(c)     Benefits.   During the Term of Employment, Executive shall be eligible to participate in all employee benefit plans maintained by Employer from time to time on the same basis as other executives of Employer in the same or substantially equivalent positions to that of Executive, including paid vacation, paid holidays, health, life and disability insurances, and retirement plans.   All such benefits shall be governed solely by the terms and conditions of the applicable employee benefit plans, which plans Employer may change or cancel from time to time in its discretion.

Section 2.     Confidentiality; Intellectual Property.

2.1     Contemporaneously with the execution of this Agreement, Executive is entering into the Proprietary Information and Invention Assignment Agreement attached as Exhibit A (the "**PIIAA**").

2.2     Notwithstanding anything contained herein or in the PIIAA, Executive or her Related Persons may disclose such portion (and only such portion) of the Proprietary Information as Executive or such Related Persons reasonably determine(s), based on advice of counsel, is/are legally obligated to disclose if (i) Executive receives a request to disclose all or any part of the Proprietary Information under the terms of a subpoena, civil investigative demand or order issued by a Governmental Authority or required by applicable Law; (ii) to the extent permitted by such request and applicable Law, Executive notifies Employer of the existence, terms and circumstances surrounding such request; and (iii) upon the request and at the expense of Employer, Executive exercises her commercially reasonable efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to the disclosed Proprietary Information.

Section 3.     Covenant Not To Compete.

3.1     Acknowledgment.   Executive acknowledges that she is being employed by Employer in a position in which she will have access to Proprietary Information (as defined in the PIIAA), including trade secrets, and the customers and vendors of Employer or its Affiliates, the preservation of which is essential to the success of Employer, and that Employer has a legitimate interest in restricting Executive's ability to take advantage of such Proprietary Information and relationships. Executive further acknowledges that Executive has the ability to receive certain special compensation, which are consideration for the covenants of Executive set forth herein.

3.2     Non-Competition and Non-Solicitation Agreement.   In light of the foregoing, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Executive, Executive hereby covenants and agrees that, during the Term of Employment and for a period of three (3) years following the termination of Executive's employment with Employer, whether voluntary or involuntary, and regardless of the reason for or manner of termination, Executive shall not, alone or with any of her Related Persons, directly or indirectly (as owner, stockholder, partner, lender, other investor, director, officer, employee, consultant or in any other capacity of any nature whatsoever):

(a)     solicit, engage in (or assist others in engaging in), perform, divert or accept any business of the same or similar nature to, or which competes with the Business in the United

3

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

PX0594.144

States, Canada, France, or any other country where Employer conducts business as of Executive's last day of employment with Employer (the "**Restricted Territory**").

(b)      have an interest in any Person that engages directly or indirectly in the Business in the Restricted Territory in any capacity, including as a partner, shareholder, member, lender, investor, employee, director, manager, principal, agent, trustee or consultant;

(c)      interfere in any material respect with the business relationships (whether formed prior to or after the date of the MIPA) between Employer or its Affiliates on the one hand and the customers, suppliers or other business relationships of Employer or its Affiliates on the other hand, provided, however, that nothing herein shall prohibit Executive (together with her Related Parties) from being a passive beneficial owner of less than 5% of the outstanding stock of any publicly-traded corporation;

(d)      solicit any employee of Employer or its Affiliates or encourage any such employee to leave or terminate such employment or hire any such employee who has left or terminated such employment;

(e)      solicit or entice, or attempt to solicit or entice any present customer, distributor, vendor, supplier who has a business relationship with Employer or its Affiliates for purposes of terminating or materially decreasing their business or services from Employer or its Affiliates; or

(f)      make an introduction to or referral of any other Person to any customers of Employer or its Affiliates, any potential customers that have been identified and contacted by an officer, manager, director or employee of Employer or its Affiliates for purposes of diverting their business or services to any other Person, from Employer or its Affiliates, or from terminating or materially decreasing their business or services from Employer or its Affiliates.

3.3      Enforcement.  The covenants and obligations of Executive pursuant to this Section 3 shall be specifically enforceable in addition to and not in limitation of any other legal or equitable remedies, including monetary damages, which Employer may have.  Executive recognizes and acknowledges that irreparable injury may result to Employer in its Business in the event of any breach or threatened breach of any covenant or agreement contained herein, and, by reason of the foregoing, Executive consents and agrees that in the event of any such breach or threatened breach, Employer shall be entitled, in addition to any other remedies that they may have, including monetary damages, without posting any bond, to seek equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction. The Executive acknowledges that this Agreement contains covenants which are valid and enforceable, which are reasonable and necessary to protect the legitimate interests of Employer and which will be binding upon Executive.  Therefore, in the event that any of the obligations of Executive are adjudicated to be unreasonable or unenforceable because of the duration of such provision, the area covered thereby or the scope thereof so as to render any of the foregoing covenants unenforceable, then any court making the adjudication is expressly empowered to reform such covenant, and such covenant shall be deemed reformed, in such jurisdiction to the maximum time, geographic, product or service, or other limitations permitted and, in its reduced or revised form, such provisions shall be enforceable and shall be

4

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

enforced. If Executive violates any provisions set forth in this Section 3, then any of the time limitations set forth in this Section 3 shall be extended for a period of time equal to the period of time during which such breach occurs; and, in the event that Employer is required to seek relief from such breach before any court, board or other tribunal, then the time limitations shall be extended for a period of time equal to the pendency of such proceedings, including all appeals.  In the event that Employer alleges that Executive has violated any of the covenants contained herein and Employer seeks enforcement of such covenants in any court having jurisdiction thereof, the prevailing party pursuant to such court proceeding shall be entitled to recover from the non-prevailing party all reasonable attorney's fees and costs incurred by the prevailing party in enforcing such covenants.

Section 4.        Miscellaneous.

    4.1        Remedies.

        (a)        Injunctions. Inasmuch as any breach of, or failure to comply with, this Agreement will cause serious and substantial damage to Employer, if Executive should in any way breach or fail to comply with the terms of this Agreement, Employer shall be entitled (without posting any bond) to an injunction restraining Executive from such breach or failure.

        (b)        Cumulative Remedies.  All remedies of Employer expressly provided for herein are cumulative of any and all other remedies now existing at law or in equity.  Employer shall, in addition to the remedies herein provided, be entitled to avail itself of all such other remedies as may now or hereafter exist at law or in equity for compensation, and for the specific enforcement of the covenants contained herein.  Any remedy provided for hereunder or provided by law shall not prevent the concurrent or subsequent employment of any other appropriate remedy or remedies, or preclude the recovery by Employer of monetary damages.

    4.2        Amendment.  This Agreement may only be amended, modified or supplemented by an agreement in writing signed by the parties hereto.

    4.3        Entire Agreement.  This Agreement and any other agreements expressly referred to herein set forth the entire understanding of the parties hereto regarding the subject matter  hereof and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. Notwithstanding the foregoing, nothing in this Agreement or the PIIAA supersedes or modifies in any way Executive's obligations or representations and warranties to the Company or to Buyer set forth in the MIPA, including its exhibits, appendices and other related documents.

    4.4        Notice.  All notices and other communications hereunder shall be in writing and shall be deemed duly given (a) on the date of delivery if delivered personally, or if by e-mail, upon written confirmation of receipt by e-mail or otherwise, (b) on the first Business Day following the date of dispatch if delivered utilizing a next-day service by a recognized next-day courier or (c) on the earlier of confirmed receipt or the fifth Business Day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid.  All notices hereunder shall be delivered to the addresses set forth below, or pursuant to such other instructions as may be designated in writing by the party to receive such notice:

<div align="center">5</div>

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

If to Employer:                  Veterinary Orthopedic Implants, LLC
                                 310 Commerce Lake Drive, Unit 107
                                 St. Augustine, Florida 32095
                                 Attention:  Managing Member

If to Executive:                 To the most recent address of Executive set forth in
                                 the personnel records of Employer.

4.5     Assignment.  This Agreement is personal as to Executive and shall not be assignable by Executive.  Employer may assign its rights under this Agreement to any of its Affiliates or person, firm, corporation or other entity which may acquire all or substantially all of the Employer Group Business which is now or hereafter conducted, which may acquire substantially all of the assets of Employer or with or into which Employer may be consolidated or merged; provided that any such assignment shall be subject to the express terms and conditions hereof.

4.6     Governing Law.

(a)     This Agreement shall in all respects be governed by, and construed in accordance with, the internal laws of the State of Florida without giving effect to any choice or conflict of law provision or rule (whether of the State of Florida or any other jurisdiction).

(b)     Any legal suit, action or proceeding arising out of or based upon this Agreement may be instituted exclusively in the federal and state courts sitting in St. Augustine, Florida, and each party hereto irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding.  Service of process, summons, notice or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action or other proceeding brought in any such court.  The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

4.7     Severability. Each section and subsection of this Agreement constitutes a separate and distinct provision hereof.  It is the intent of the parties hereto that the provisions of this Agreement be enforced to the fullest extent permissible under the laws and public policies applicable in each jurisdiction in which enforcement is sought.  Accordingly, if any provision of this Agreement shall be adjudicated to be invalid, ineffective or unenforceable, the remaining provisions shall not be affected thereby.  The invalid, ineffective or unenforceable provisions shall, without further action by the parties, be automatically amended to effect the original purpose and intent of the invalid, ineffective and unenforceable provision; provided, however, that such amendment shall apply only with respect to the operation of such provision in the particular jurisdiction with respect to which such adjudication is made.

4.8     Waiver. The failure of Employer to insist upon strict adherence to any term of this Agreement on any occasion shall not be construed as a waiver of or deprive Employer of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.  No waiver by either party of any of the provisions hereof shall be effective unless explicitly set forth

6

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001140

PX0594.147

in writing and signed by the party so waiving.  Any waiver by Employer must be in writing and signed by a duly authorized representative of Employer other than Executive. No waiver by either party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver.  No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

4.9    Headings.  The headings of this Agreement are for reference only and shall not affect in the interpretation of this Agreement.

4.10    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

4.11    Third Parties.  This Agreement is for the sole benefit of Employer, Executive and their respective heirs, executors, successors and permitted assigns and nothing expressed or implied in this Agreement is intended to or shall confer upon any other person, firm, corporation, or other entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

4.12    Withholding.  Employer shall be entitled to withhold the amount of all taxes of any applicable jurisdiction required to be withheld by an employer with respect to any amount paid to Executive hereunder.  Employer, in its sole and absolute discretion, shall make all determinations as to whether it is obligated to withhold any taxes hereunder and the amount thereof.

4.13    No Conflict.  Executive hereby represents and warrants to Employer as follows: (i) Executive is not under any obligation to any person, firm, corporation or other entity which is inconsistent or in conflict with the terms and conditions of this Agreement or which would in any manner prevent, limit or impair in any way the performance of Executive's obligations hereunder; and (ii) Executive has not disclosed and will not disclose to Employer, nor use for Employer's benefit, any confidential information or trade secrets of any person, firm, corporation or other entity that was a former employer of Executive, other than confidential information or trade secrets acquired by Executive as a result of her employment with any legal entity that was a predecessor to Employer, unless and until such confidential information and trade secrets have become lawfully available to the public or to Employer's industry or unless such disclosure is permitted by agreement with or by consent of any such former employer.  In the event of a breach by Executive of such representation or warranty, Employer may immediately terminate this Agreement and Executive's employment hereunder for Cause.

4.14    Binding Effect.  This Agreement shall be binding upon and inure to the benefit of the respective parties hereto and their heirs, personal representatives, successors and permitted assigns.

7

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001141

PX0594.148

4.15    Section 409A.

(a)    To the extent applicable, it is intended that this Agreement comply with the provisions of (or an applicable exemption under) Section 409A of the Internal Revenue Code of 1986, as amended (including the regulations thereunder, "**Section 409A**").  This Agreement will be administered and interpreted in a manner consistent with this intent, and any provision that would cause this Agreement to fail to satisfy Section 409A will have no force and effect until amended to comply therewith (which amendment may be retroactive to the extent permitted by Section 409A).

(b)    Whenever a payment under this Agreement specifies a payment period with reference to a number of days, the actual date of payment within the specified period shall be within the sole discretion of Employer.

(c)    Executive's right to receive any installment payments under this Agreement (whether severance payments, reimbursements or otherwise) shall be treated as a right to receive a series of separate payments.

(d)    Notwithstanding anything contained herein to the contrary, to the extent required in order to avoid accelerated taxation and/or tax penalties under Section 409A, Executive shall not be considered to have terminated employment with Employer for purposes of this Agreement and no payments shall be due to Executive under this Agreement which are payable upon Executive's termination of employment until Executive would be considered to have incurred a Separation from Service (as defined below).

(e)    Notwithstanding anything to the contrary contained herein, if at the time of Executive's Separation from Service Executive is a "specified employee," as hereinafter defined, any payments or benefits under this Agreement payable or provided in connection with such Separation from Service constitute deferred compensation subject to Section 409A, as determined by Employer in its sole discretion, and would (but for this sentence) be payable or provided within six (6) months following such Separation from Service, then, to the extent delayed commencement of any portion of such payments is required in order to avoid a prohibited distribution under Code Section 409A(a)(2)(B)(i) and the related adverse taxation under Section 409A, such amounts shall instead be accumulated and paid or provided on the first Business Day after the six (6) month anniversary of such Separation from Service.  No interest shall be due on any amounts so deferred.  For purposes of this Agreement, "Separation from Service" shall mean a "separation from service" as defined in Treas. Reg. § 1.409A-1(h), and the term "specified employee" shall mean an individual determined by Employer to be a specified employee under Treas. Reg. § 1.409A-1(i).

(f)    Any reimbursement pursuant to Section 1.3(b) that would constitute nonqualified deferred compensation subject to Section 409A shall be subject to the following additional rules: (i) no reimbursement of any such expenses shall affect Executive's right to reimbursement of any other such expense in any other taxable year; (ii) reimbursement of the expense shall be made, if at all, not later than the end of the calendar year following the calendar year in which the expense was incurred; and (iii) the right to reimbursement shall not be subject to liquidation or exchange for any other benefit.

8

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

(g)      Notwithstanding anything to the contrary, neither Employer nor any of its employees, directors, agents, attorneys or representatives shall have any liability to Executive or any related person with respect any tax consequences arising under Section 409A.

**The remainder of this page is left intentionally blank.**

9

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

IN WITNESS WHEREOF, Employer has caused this Agreement to be duly executed and delivered by a duly authorized officer, and Executive has duly executed and delivered this Agreement, as of the date first above written, the parties intending this document to take effect as a sealed instrument.

**EMPLOYER:** **Veterinary Orthopedic Implants, LLC**

By _____

Name:

Title: _____ Patrick Gendron

**EXECUTIVE:** **Rebecca Ballou** *Gendreau*

Position and Title of Employee with Employer per Section 1.2(a):

Vice President of Operations

*[Signature page to Executive Employment Agreement]*

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

EXHIBIT A
PROPRIETARY INFORMATION AND INVENTION ASSIGNMENT AGREEMENT

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001145

PX0594.152

PROPRIETARY INFORMATION AND INVENTION ASSIGNMENT AGREEMENT

Employee Name:  Rebecca Ballou

In consideration of my employment or continued employment by Veterinary Orthopedic Implants, LLC, a Florida limited liability company (the "**Company**"), I hereby agree to the restrictions and obligations placed by the Company on my use and development of certain information, technology, ideas, inventions and other materials, as set forth in this Proprietary Information and Invention Assignment Agreement (the "Agreement").

1.     **Proprietary Information.**

(a)     Definition.  I understand that the term "**Proprietary Information**" in this Agreement means any and all information and materials, in whatever form, tangible or intangible, whether disclosed to or learned or developed by me before or after the execution of this Agreement, whether or not marked or identified as confidential or proprietary, pertaining in any manner to the business of or used by the Company and its affiliates, or pertaining in any manner to any person or entity to whom the Company owes a duty of confidentiality.  Proprietary Information includes, but is not limited to, the following types of information and materials:  (i) research, development, technical or engineering information, know-how, data processing or computer software, programs, tools, data, designs, diagrams, drawings, schematics, sketches or other visual representations, plans, projects, manuals, documents, files, photographs, results, specifications, trade secrets, inventions, discoveries, compositions, ideas, concepts, structures, improvements, products, prototypes, instruments, machinery, equipment, processes, formulas, algorithms, methods, techniques, works in process, systems, technologies, disclosures, applications and other materials; (ii) financial information and materials, including, without limitation, information and materials relating to costs, vendors, suppliers, licensors, profits, markets, sales, distributors, joint venture partners, customers, subscribers, members and bids, whether existing or potential; (iii) business and marketing information and materials, including, without limitation, information and materials relating to future development and new product concepts; (iv) personnel files and information about compensation, benefits and other terms of employment of the Company's other employees and independent contractors; and (v) any other information or materials relating to the past, present, planned or foreseeable business, products, developments, technology or activities of the Company.

(b)     Exclusions.  Proprietary Information does not include any information or materials that I can prove by written evidence: (i) is or becomes publicly known through lawful means and without breach of this Agreement by me; (ii) was rightfully in my possession or part of my general knowledge prior to my employment by the Company, with the exception of the information, ideas or materials acquired by me during the course of my employment with any legal entity that was a predecessor to the Company, which shall continue to be Proprietary Information; or (iii) is disclosed to me without confidential or proprietary restrictions by a third party who rightfully possesses the information or materials without confidential or proprietary restrictions. However, to the extent the Company owes a duty of confidentiality to a third party with respect to such information, idea or material, such information, idea or material shall continue to be Proprietary Information until such time as the Company's duty of confidentiality terminates or

1

expires.  If I am uncertain as to whether particular information or materials are Proprietary Information, I will request the Company's written opinion as to their status.

(c)   Prior Knowledge.  Except as disclosed on Schedule A to this Agreement, I have no information or materials pertaining in any manner to the business of or used by the Company and its affiliates, other than information I have learned as part of my service to the Company or its predecessors as one of its owners and employees.

## 2.   Restrictions on Proprietary Information.

(a)   Restrictions on Use and Disclosure.  I agree that, during my employment and at all times thereafter, I will hold the Proprietary Information in strict confidence and I will not use, reproduce, disclose or deliver, directly or indirectly, any Proprietary Information except to the extent necessary to perform my duties as an employee of the Company or as permitted by a duly authorized representative of the Company.  I will use my best efforts to prevent the unauthorized use, reproduction, disclosure or delivery of Proprietary Information by others.

(b)   Location.  I agree to maintain at my work station and/or any other place under my control only such Proprietary Information as I have a current "need to know."  I agree to return to the appropriate person or location or otherwise properly dispose of Proprietary Information once that need to know no longer exists.

(c)   Third Party Information.  I recognize that the Company has received and will receive Proprietary Information from third parties to whom or which the Company owes a duty of confidentiality.  In addition to the restrictions set forth in this Section 2, I will not use, reproduce, disclose or deliver such Proprietary Information except as permitted by the Company's agreement with such third party.

(d)   Protected Rights; DTSA Notice.

(i)   Notwithstanding anything to the contrary in this Agreement, I understand that nothing in this Agreement prohibits me from exercising protected rights, including rights under the National Labor Relations Act, the right to file a charge with the Equal Employment Opportunity Commission, or the right to report possible violations of law to or participate in an investigation by any federal, state or local government agency or commission.

(ii)   I acknowledge receipt of the following notice pursuant to 18 U.S.C. § 1833(b)(1) (Defend Trade Secrets Act):

An individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made in confidence to a federal, state, or local government official or to an attorney solely for the purpose of reporting or investigating a suspected violation of law. An individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret

2

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001147

PX0594.154

information in the court proceeding, if the individual files any document containing the trade secret under seal; and does not disclose the trade secret, except pursuant to court order.

(e)     No Other Limitations.  I understand and agree that nothing in this Section 2 limits or modifies in any way my duties under any other section of this Agreement or any applicable law regarding the Company's Proprietary Information.

### 3.     Privacy; Protection of Personal Information.

(a)     Privacy.  I acknowledge that the Company may access all information and materials generated, received or maintained by or for me on the premises or equipment of the Company (including, without limitation, computer systems and electronic or voice mail systems), and I hereby waive any privacy rights I may have with respect to such information and materials.

(b)     Protection of Personal Information.  During my employment with the Company and thereafter, I shall hold Personal Information in the strictest confidence and shall not disclose or use Personal Information about other individuals, except in connection with my work for the Company, or unless expressly authorized in writing by an authorized representative of the Company.  I understand that there are laws in the United States and other countries that protect Personal Information, and that I must not use Personal Information about other individuals other than for the purposes for which it was originally used or make any disclosures of other individuals' Personal Information to any third party or from one country to another without prior approval of an authorized representative of the Company.  I understand that nothing in this Agreement prevents me from discussing my wages or other terms and conditions of my employment with coworkers or others, unless such discussion would be for the purpose of engaging in unfair competition or other unlawful conduct.

(c)     Definition of Personal Information.  "**Personal Information**" means personally identifiable information about employees, independent contractors or third party individuals, including names, addresses, telephone or facsimile numbers, Social Security Numbers, background information, credit card or banking information, health information, or other information entrusted to the Company.

### 4.     Inventions.

(a)     Definitions.

(i)     I understand that the term "**Inventions**" in this Agreement means any and all ideas, concepts, inventions, discoveries, developments, modifications, improvements, know-how, trade secrets, data, designs, diagrams, plans, specifications, methods, processes, techniques, formulas, algorithms, tools, works of authorship, derivative works, software, content, textual or artistic works, mask works, video, graphics, sound recordings, structures, products, prototypes, systems, applications, creations and technologies in any stage of development, whether or not patentable or reduced to practice and whether or not copyrightable.

(ii)     I understand that the term "**Business**" in this Agreement means the development, assembly, design, manufacturing, marketing and sale of veterinary orthopedic implants and related products and services.

3

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001148

PX0594.155

(iii)     I understand that the term "**Intellectual Property Rights**" in this Agreement means any and all (A) patents, utility models, industrial rights and similar intellectual property rights registered or applied for in the United States and all other countries throughout the world (including all reissues, divisions, continuations, continuations-in-part, renewals, extensions and reexaminations thereof); (B) rights in trademarks, service marks, trade dress, logos, domain names, rights of publicity, trade names and corporate names (whether or not registered) in the United States and all other countries throughout the world, including all registrations and applications for registration of the foregoing and all goodwill related thereto; (C) copyrights (whether or not registered) and rights in works of authorship, databases and mask works, and registrations and applications for registration thereof in the United States and all other countries throughout the world, including all renewals, extensions, reversions or restorations associated with such copyrights, now or hereafter provided by law, regardless of the medium of fixation or means of expression; (D) rights in trade secrets and other confidential information and know-how in the United States and all other countries throughout the world; (E) other intellectual property or proprietary rights in the United States and all other countries throughout the world, including all neighboring rights and sui generis rights; (F) rights to apply for, file, register establish, maintain, extend or renew any of the foregoing; (G) rights to enforce and protect any of the foregoing, including the right to bring legal actions for past, present and future infringement, misappropriation or other violations of any of the foregoing; and (H) rights to transfer and grant licenses and other rights with respect to any of the foregoing, in the Company's sole discretion and without a duty of accounting.

(b)     Assignment.   I hereby assign, and agree to assign automatically upon creation, to the Company, without additional compensation, my entire right, title and interest (including, without limitation, all Intellectual Property Rights) in and to (a) all Inventions related to the Business that are made, conceived, discovered or developed by me (either alone or jointly with others), or result from or are suggested by any work performed by me (either alone or jointly with others) for or on behalf of the Company or its affiliates, (i) as an owner of the Company or during the period of my employment with the Company or its predecessors, whether before or after the execution of this Agreement and whether or not made, conceived, discovered or developed during regular business hours or (ii) as an owner of the Company or during or after the period of my employment with the Company or its predecessors, whether before or after the execution of this Agreement, if based on or using Proprietary Information or otherwise in connection with my activities as an employee or owner of the Company or any of its predecessors (collectively, the "**Company Inventions**"), and (b) all benefits, privileges, causes of action and remedies relating to the Company Inventions, whether before or hereafter accrued (including, without limitation, the exclusive rights to apply for and maintain all registrations, renewals and/or extensions; to sue for all past, present or future infringements or other violations of any rights in the Invention; and to settle and retain proceeds from any such actions), free and clear of all liens and encumbrances.   I agree that all such Company Inventions are the sole property of the Company or any other entity designated by it, and all Intellectual Property Rights shall vest in and inure to the benefit of the Company or such other entity.   I agree and acknowledge that all copyrightable Company Inventions shall be considered works made for hire prepared within the scope of my employment.

(c)     License.   If, under applicable law notwithstanding the foregoing, I retain any right, title or interest (including any Intellectual Property Right) with respect to any Company Invention, I hereby grant and agree to grant to the Company, without any limitations or additional

4

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

remuneration, a worldwide, exclusive, royalty-free, irrevocable, perpetual, transferable and sublicenseable (through multiple tiers) license to make, have made, use, import, sell, offer to sell, practice any method or process in connection with, copy, distribute, prepare derivative works of, display, perform and otherwise exploit such Company Invention and I agree not to make any claim against the Company or its affiliates, suppliers or customers with respect to such Company Invention.

(d)    Records; Disclosure.  I agree to keep and maintain adequate and current written records regarding all Inventions made, conceived, discovered or developed by me (either alone or jointly with others) during my period of employment or after the termination of my employment if based on or using Proprietary Information or otherwise in connection with my activities as an employee of the Company.  I agree to make available such records and disclose promptly and fully in writing to the Company all such Inventions, regardless of whether or not I believe the Invention is a Company Invention subject to this Agreement, and the Company will examine such disclosure in confidence to make such determination.  Any such records related to Company Inventions shall be the sole property of the Company.

(e)    Assistance and Cooperation.  I agree to cooperate with and assist the Company, and perform, during and after my employment, all acts deemed necessary or desirable by the Company, to apply for, obtain, establish, perfect, maintain, evidence, enforce or otherwise protect any of the full benefits, enjoyment, right, title and interest throughout the world in the Company Inventions.  Such acts may include, but are not limited to, execution of assignments of title and other documents and assistance or cooperation in legal proceedings.  Should the Company be unable to secure my signature on any such document, whether due to my mental or physical incapacity or any other cause, I hereby irrevocably designate and appoint the Company and each of its duly authorized representatives as my agent and attorney-in-fact, with full power of substitution and delegation, to undertake such acts in my name as if executed and delivered by me (which appointment is coupled with an interest), and I waive and quitclaim to the Company any and all claims of any nature whatsoever that I may have or may later have for infringement of any Intellectual Property Rights in or to the Company Inventions.  The Company will compensate me at a reasonable rate for time actually spent by me at the Company's request on such assistance at any time following termination of my employment with the Company.

(f)    Moral Rights.  To the extent allowed by applicable law, the assignment of the Company Inventions includes all rights of paternity, integrity, disclosure and withdrawal and any other rights that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively "**Moral Rights**").  To the extent I retain any such Moral Rights under applicable law, I hereby waive and agree not to institute, support, maintain or permit any action or proceeding on the basis of, or otherwise assert, such Moral Rights.  I hereby authorize the Company to publish the Company Inventions in the Company's sole discretion with or without attributing any of the foregoing to me or identifying me in connection therewith and regardless of the effect on such Company Inventions or my relationship thereto.  I agree to ratify and consent to any action that may be taken or authorized by the Company with respect to such Company Inventions, and I will confirm any such ratifications and consents from time to time as requested by the Company.

5

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001150

PX0594.157

(g)     Excluded Inventions.  I may identify in Schedule A all Inventions, if any, that I made, conceived, discovered or developed (either alone or jointly with others) prior to my employment by the Company that relate to the current or planned conduct of the Business (collectively, "**Excluded Inventions**"), which I wish to exclude from the scope of this Agreement. I represent and warrant that such list is complete and accurate, and I understand that by not listing an Invention on Schedule A as an Excluded Invention, I am acknowledging that such Invention was not made, conceived, discovered or developed prior to my employment by the Company.

(h)     Employee Inventions and Third Party Inventions.  I shall not, without prior written approval by the Company, make any disclosure to the Company of or incorporate into Company property or Company Inventions any Invention owned by me or in which I have an interest ("**Employee Invention**") or owned by a third party ("**Third Party Invention**").  If, in the course of my employment with the Company, I make any disclosure to the Company of or incorporate into Company property or Company Inventions an Employee Invention, with or without Company approval, I hereby grant and agree to grant to the Company a worldwide, nonexclusive, royalty-free, irrevocable, perpetual, transferable and sublicenseable (through multiple tiers) license to make, have made, use, import, sell, offer to sell, practice any method or process in connection with, copy, distribute, prepare derivative works of, display, perform and otherwise exploit such Employee Invention and I agree not to make any claim against the Company or its affiliates, suppliers or customers with respect to any such Employee Invention.

(i)     Representations; Warranties and Covenants.  I represent, warrant and covenant that:  (i) I have the right to grant the rights and assignments granted herein, without the need for any assignments, releases, consents, approvals, immunities or other rights not yet obtained; (ii) any Company Inventions that are copyrightable works are my original works of authorship; and (iii) neither the Company Inventions nor any element thereof are subject to any restrictions or to any mortgages, liens, pledges, security interests, encumbrances or encroachments.

(j)     Adequate Consideration.  I acknowledge that the Company Inventions and the associated Intellectual Property Rights may have substantial economic value, that any and all proceeds resulting from use and exploitation thereof shall belong solely to the Company, and that the salary, equity incentives, and/or other compensation I receive from the Company for my employment with the Company includes fair and adequate consideration for all assignments, licenses and waivers hereunder.

**5.     Prohibition on Disclosure or Use of Third Party Confidential Information.**  I will not disclose to the Company or induce the Company to use any confidential, proprietary or trade secret information or materials belonging to others (including without limitation any former employers) at any time, nor will I use any such information or materials in the course of my employment with the Company.  I acknowledge that no officer or other employee or representative of the Company has requested or instructed me to disclose or use any such information or materials, and I will immediately inform my supervisor in the event I believe that my work at the Company would make it difficult for me not to disclose to the Company any such information or materials.

**6.     No Conflicts; Former Agreements.**  I represent and warrant that I have no other agreements or relationships with or commitments to any other person or entity that conflict with

6

my obligations to the Company as an employee of the Company or under this Agreement, and that my employment and my performance of the terms of this Agreement will not require me to violate any obligation to or confidence with another. I agree I will not enter into any oral or written agreement in conflict with this Agreement. Except as disclosed on <u>Schedule A</u> to this Agreement, I represent and warrant that I have not entered into any other agreements or relationships with or commitments to any other person or entity that obligates me to disclose to any such other person or entity any Proprietary Information or that assigns or obligates me to assign any such other person or entity any Company Inventions.

7.     **Third Party and Government Contracts.**  I understand that the Company has or may enter into contracts with other persons or entities, including the United States government or its agents, under which certain Intellectual Property Rights will be required to be protected, assigned, licensed, or otherwise transferred. I hereby agree to be bound by all such agreements, and to execute such other documents and agreements as are necessary to enable the Company to meet its obligations under any such contracts.

8.     **Termination; Return of Materials.**  I agree to promptly return all property of the Company, including, without limitation, (a) all source code, books, manuals, records, models, drawings, reports, notes, contracts, lists, blueprints, and other documents or materials and all copies thereof, (b) all equipment furnished to or prepared by me in the course of or incident to my employment, and (c) all written or tangible materials containing Proprietary Information in my possession upon termination of my employment for any reason or at any other time at the Company's request. Following my termination, I will not retain any written or other tangible material containing any Proprietary Information or information pertaining to any Company Invention. I understand that my obligations contained in this Agreement will survive the termination of my employment and I will continue to make all disclosures required of me by Section 4(d) above. In the event of the termination of my employment, I agree, if requested by the Company, to sign and deliver the Termination Certificate attached as <u>Schedule B</u> hereto. I agree that after the termination of my employment, I will not enter into any agreement that conflicts with my obligations under this Agreement and will inform any subsequent employers of my obligations under this Agreement. The termination of any employment or other agreement between the Company and me shall not terminate this Agreement and each and all of the terms and conditions hereof shall survive and remain in full force and effect.

9.     **Remedies.**  I recognize that nothing in this Agreement is intended to limit any remedy of the Company under prevailing law governing the protection of trade secrets or other Intellectual Property Rights. In addition, I acknowledge that any breach by me of this Agreement would cause irreparable injury to the Company for which pecuniary compensation would not afford adequate relief and for which it would be extremely difficult to ascertain the amount of compensation which would afford adequate relief to the Company. Therefore, I agree that if I breach any provision of this Agreement, the Company shall be entitled to injunctive or other equitable relief to remedy any breach or prevent any threatened breach of this Agreement, without the necessity of posting bond or other security or proving it has sustained any actual damage. This remedy will be in addition to any other remedies available to the Company at law or in equity.

10.    **Miscellaneous Provisions.**

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001152

PX0594.159

(a)     Assignment; Binding Effect.  I acknowledge and agree that my performance is personal hereunder, and that I shall have no right to assign, delegate or otherwise transfer and shall not assign, delegate or otherwise transfer any rights or obligations under this Agreement. Any such assignment, delegation or other transfer shall be null and void.  This Agreement may be assigned or transferred by the Company.  Subject to the foregoing, this Agreement shall inure to the benefit of the Company and its affiliates, successors and assigns, and shall be binding on me and my heirs, executors, administrators, devisees, spouses, agents, legal representatives and successors in interest.

(b)     Governing Law.  This Agreement will be governed by and construed in accordance with the laws of the State of Florida, without giving effect to its conflict of law rules.

(c)     Severability.  If any provision of this Agreement, or application thereof to any person, place, or circumstance, shall be held by a court of competent jurisdiction to be unenforceable, such provision shall be enforced to the greatest extent permitted by law and the remainder of this Agreement shall remain in full force and effect.

(d)     Waivers.  Delay or failure to exercise any right or remedy under this Agreement shall not constitute a waiver of such right or remedy.  Any waiver of any breach of this Agreement shall not operate as a waiver of any subsequent breaches.  All rights or remedies specified for a party herein shall be cumulative and in addition to all other rights and remedies of the party hereunder or under applicable law.

(e)     Interpretation.  This Agreement shall be construed as a whole, according to its fair meaning, and not in favor of or against any party.  Sections and section headings contained in this Agreement are for reference purposes only, and shall not affect in any manner the meaning of interpretation of this Agreement.  Whenever the context requires, references to the singular shall include the plural and the plural the singular and any gender shall include any other gender.

(f)     Entire Agreement; Amendment.  This Agreement, including without limitation, the Schedules and Exhibits hereto, constitutes the entire agreement between the Company and me with respect to the subject matter hereof and replaces and supersedes any prior or existing agreement entered into by me and the Company with respect to the subject matter hereof.  Notwithstanding the foregoing, nothing in this Agreement supersedes or modifies in any way my obligations or representations and warranties to the Company or to Ossium Holdco, LLC set forth in the MIPA, including its exhibits, appendices and other related documents.  This Agreement may not be modified or amended, in whole or in part, except by a writing signed by me and a duly authorized representative of the Company other than me.  I agree that any subsequent change in my duties or compensation for employment will not affect the validity or scope of this Agreement.

IF YOU HAVE ANY QUESTIONS CONCERNING THIS AGREEMENT, YOU MAY WISH TO CONSULT AN ATTORNEY.

I HAVE READ THIS AGREEMENT CAREFULLY AND I UNDERSTAND AND ACCEPT THE OBLIGATIONS THAT IT IMPOSES UPON ME WITHOUT RESERVATION.

8

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001153

PX0594.160

NO PROMISES OR REPRESENTATIONS HAVE BEEN MADE TO ME TO INDUCE ME TO SIGN THIS AGREEMENT.  I SIGN THIS AGREEMENT VOLUNTARILY AND FREELY.

Date: _4/30/20_

_Rebecca Ballou-Gendreau_
Employee Name

_Ballou-Gendreau_
Employee Signature

9

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

## SCHEDULE A
## EMPLOYEE DISCLOSURE

1. **PROPRIETARY INFORMATION**

EXCEPT AS SET FORTH BELOW, I ACKNOWLEDGE THAT AT THIS TIME I KNOW NOTHING ABOUT THE BUSINESS OR PROPRIETARY INFORMATION OF VETERINARY ORTHOPEDIC IMPLANTS, LLC (THE "**COMPANY**"), OTHER THAN INFORMATION I HAVE LEARNED FROM THE COMPANY:

_____
_____

(Check here _____ if continued on additional attached sheets)

2. **EXCLUDED INVENTIONS**

_____   I have made no Inventions prior to my ownership of or employment with the Company that relate to the current or planned conduct of the Company's business and that are owned by me (either alone or jointly with others) and I do not wish to exclude any Excluded Inventions from the scope of the Agreement.

_____   The following is a complete and accurate list of all Inventions I have made, conceived, discovered or developed prior to my ownership of or employment with the Company that relate to the current or planned conduct of the Company's business and that are owned by me (either alone or jointly with others), which I wish to exclude from the scope of the Agreement:

_____
_____

(Check here _____ if continued on additional attached sheets)

3. **CONFLICTING AGREEMENTS**

_____   I am not party to any agreement or have any relationship with or commitment to any other person or entity that obligates me to disclose to any such other person or entity any Proprietary Information or that assigns or obligates me to assign to any such other person or entity any Company Inventions.

_____   The following is a complete and accurate list of all agreements, relationships with or commitments to any other person or entity that obligates me to disclose to any such other person or entity any Proprietary Information or that assigns or obligates me to assign to any such other person or entity any Company Inventions.  I have attached copies of any such agreements in my possession except to the extent that I am prohibited from doing so due to confidentiality obligations.

_____
_____

(Check here _____ if continued on additional attached sheets)

Date:_____        _____
                                      Employee Name

                                      _____
                                      Employee Signature

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001155

PX0594.162

**SCHEDULE A**
**EMPLOYEE DISCLOSURE**

1.   **PROPRIETARY INFORMATION**

EXCEPT AS SET FORTH BELOW, I ACKNOWLEDGE THAT AT THIS TIME I
KNOW NOTHING ABOUT THE BUSINESS OR PROPRIETARY INFORMATION
OF VETERINARY ORTHOPEDIC IMPLANTS, LLC (THE "**COMPANY**"), OTHER
THAN INFORMATION I HAVE LEARNED FROM THE COMPANY:

_____

(Check here _____ if continued on additional attached sheets)

2.   **EXCLUDED INVENTIONS**

_RBG_   I have made no Inventions prior to my ownership of or employment with
the Company that relate to the current or planned conduct of the Company's
business and that are owned by me (either alone or jointly with others) and
I do not wish to exclude any Excluded Inventions from the scope of the
Agreement.

_____   The following is a complete and accurate list of all Inventions I have made,
conceived, discovered or developed prior to my ownership of or
employment with the Company that relate to the current or planned conduct
of the Company's business and that are owned by me (either alone or jointly
with others), which I wish to exclude from the scope of the Agreement:

_____

(Check here _____ if continued on additional attached sheets)

3.   **CONFLICTING AGREEMENTS**

_RBG_   I am not party to any agreement or have any relationship with or
commitment to any other person or entity that obligates me to disclose to
any such other person or entity any Proprietary Information or that assigns
or obligates me to assign to any such other person or entity any Company
Inventions.

_____   The following is a complete and accurate list of all agreements,
relationships with or commitments to any other person or entity that
obligates me to disclose to any such other person or entity any Proprietary
Information or that assigns or obligates me to assign to any such other
person or entity any Company Inventions. I have attached copies of any
such agreements in my possession except to the extent that I am prohibited
from doing so due to confidentiality obligations.

_____

(Check here _____ if continued on additional attached sheets)

Date: _4/30/20_   _Rebecca Ballou-Gendreau_
Employee Name

_RBGendreau_
Employee Signature

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001156

PX0594.163

## SCHEDULE B

### TERMINATION CERTIFICATE CONCERNING
### PROPRIETARY INFORMATION AND COMPANY INVENTIONS

This document is to certify that I have returned all property of Veterinary Orthopedic Implants, LLC (the "**Company**"), including, without limitation, (a) all source code, books, manuals, records, models, drawings, reports, notes, contracts, lists, blueprints, and other documents or materials and all copies thereof, (b) all equipment furnished to or prepared by me in the course of or incident to my employment, and (c) all written and tangible materials containing Proprietary Information in my possession.

I further certify that I have reviewed the Proprietary Information and Invention Assignment Agreement (the "**Agreement**") signed by me and that I have complied with and will continue to comply with all of its terms, including, without limitation, (i) the disclosure of any Inventions made, conceived, discovered or developed by me (either alone or jointly with others) during my period of ownership of or employment with the Company or after the termination of my ownership of or employment with the Company if based on or using Proprietary Information or otherwise in connection with my activities as an owner or employee of the Company, and (ii) the preservation as confidential of all Proprietary Information pertaining to the Company.  This certificate in no way limits my responsibilities or the Company's rights under the Agreement.

Date: _4/30/20_____

_Rebecca Ballou-Gendreau_
Employee Name

_RBallou-Gendreau_
Employee Signature

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

<u>Exhibit 6</u>

# **<u>OPERATING AGREEMENT</u>**

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001158

PX0594.165

**AMENDED AND RESTATED**

**LIMITED LIABILITY COMPANY AGREEMENT**

among

**OSSIUM NEWCO, LLC**

and

**THE MEMBERS NAMED HEREIN**

dated as of

[--], 2020

THE UNITS REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS AND MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED (EXCEPT AS PROVIDED IN SECTION 11.3 HEREOF), HYPOTHECATED OR OTHERWISE DISPOSED EXCEPT (A) PURSUANT TO A REGISTRATION STATEMENT EFFECTIVE UNDER SUCH ACT AND LAWS OR (B) PURSUANT TO AN EXEMPTION FROM REGISTRATION THEREUNDER. ANY TRANSFER OF THE UNITS REPRESENTED BY THIS AGREEMENT IS FURTHER SUBJECT TO OTHER RESTRICTIONS SET FORTH IN THIS AGREEMENT.

ny-1889866

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001159

PX0594.166

# TABLE OF CONTENTS

**Page**

ARTICLE 1 DEFINITIONS ..................................................................................................1

    Section 1.1    Definitions .................................................................................1

    Section 1.2    Interpretation ...........................................................................12

ARTICLE 2 ORGANIZATION ..........................................................................................13

    Section 2.1    Formation................................................................................13

    Section 2.2    Name.......................................................................................13

    Section 2.3    Tax Status ...............................................................................13

    Section 2.4    Registered Office; Registered Agent .....................................13

    Section 2.5    Purpose; Powers .....................................................................13

    Section 2.6    Term........................................................................................14

    Section 2.7    No State-Law Partnership.......................................................14

ARTICLE 3 UNITS .............................................................................................................14

    Section 3.1    Units Generally; Initial Capital Contribution .......................14

    Section 3.2    Additional Capital Contributions...........................................14

    Section 3.3    Authorization of Common and Preferred Units .....................15

    Section 3.4    Certification of Units..............................................................15

    Section 3.5    No Interest on Capital Contributions .....................................16

    Section 3.6    Treatment of Loans From Members .......................................16

ARTICLE 4 MEMBERS ......................................................................................................16

    Section 4.1    Admission of New Members ..................................................16

    Section 4.2    Representations and Warranties of Members.........................16

    Section 4.3    No Personal Liability..............................................................17

    Section 4.4    Withdrawal .............................................................................18

    Section 4.5    Death; Dissolution .................................................................18

    Section 4.6    Voting .....................................................................................18

    Section 4.7    Meetings .................................................................................18

    Section 4.8    Power of Members..................................................................19

    Section 4.9    No Interest in Company Property............................................19

ARTICLE 5 CAPITAL ACCOUNTS ...................................................................................19

    Section 5.1    Maintenance of Capital Accounts..........................................19

i

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001160

PX0594.167

Section 5.2     Succession Upon Transfer .................................................................. 19

Section 5.3     Negative Capital Accounts ................................................................. 20

Section 5.4     No Withdrawal of Capital Contributions ........................................... 20

Section 5.5     Treatment of Loans From Members .................................................... 20

Section 5.6     Modifications ...................................................................................... 20

ARTICLE 6 ALLOCATIONS ............................................................................................. 20

Section 6.1     Allocation of Net Income and Net Loss ............................................. 20

Section 6.2     Regulatory and Special Allocations ................................................... 21

Section 6.3     Tax Allocations ................................................................................... 21

Section 6.4     Allocations in Respect of Transferred Units ...................................... 22

Section 6.5     Curative Allocations ........................................................................... 22

ARTICLE 7 ......................................................................................................................... 23

DISTRIBUTIONS ............................................................................................................... 23

Section 7.1     General ................................................................................................. 23

Section 7.2     Tax Distributions ................................................................................ 24

Section 7.3     Tax Withholding; Withholding Advances ........................................... 25

Section 7.4     Distributions in Kind .......................................................................... 26

ARTICLE 8 MANAGEMENT ............................................................................................ 26

Section 8.1     Management of the Company .............................................................. 26

Section 8.2     Officers ................................................................................................ 26

Section 8.3     Board of Managers .............................................................................. 27

Section 8.4     Resignation of the Managing Member ................................................ 28

Section 8.5     Compensation; No Employment ......................................................... 28

ARTICLE 9 PRE-EMPTIVE RIGHTS ............................................................................... 28

Section 9.1     Pre-emptive Right ............................................................................... 28

Section 9.2     Procedures Relating to Pre-emptive Right .......................................... 29

ARTICLE 10 TRANSFER; CONVERSION ....................................................................... 30

Section 10.1    General Restrictions on Transfer ........................................................ 30

Section 10.2    Managing Member Right of First Refusal .......................................... 31

Section 10.3    Drag-along Right; Tag-along Right ..................................................... 32

Section 10.4    Managing Member Call Right ............................................................ 35

Section 10.5    Conversion to Corporation; Registration ............................................ 37

ARTICLE 11 COVENANTS ............................................................................................... 38

ii

ny-1889866

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001161

PX0594.168

Section 11.1   Confidentiality ......................................................................................38
Section 11.2   Covenant Not to Compete ....................................................................38
Section 11.3   Pledge of Minority Members ................................................................39
ARTICLE 12 ACCOUNTING; TAX RETURNS .............................................................40
Section 12.1   Financial Statements .............................................................................40
Section 12.2   Inspection Rights ..................................................................................40
Section 12.3   Tax Matters Member .............................................................................40
Section 12.4   Tax Returns ...........................................................................................41
Section 12.5   Company Funds .....................................................................................42
ARTICLE 13 DISSOLUTION AND LIQUIDATION .....................................................42
Section 13.1   Events of Dissolution ...........................................................................42
Section 13.2   Effectiveness of Dissolution .................................................................42
Section 13.3   Liquidation ............................................................................................42
Section 13.4   Cancellation of Certificate ...................................................................43
Section 13.5   Survival of Rights, Duties and Obligations .........................................43
Section 13.6   Recourse for Claims ..............................................................................43
ARTICLE 14 EXCULPATION AND INDEMNIFICATION ...........................................44
Section 14.1   Exculpation of Covered Persons ..........................................................44
Section 14.2   Liabilities and Duties of Covered Persons ...........................................44
Section 14.3   Indemnification ......................................................................................45
Section 14.4   Survival ..................................................................................................46
ARTICLE 15 MISCELLANEOUS ..................................................................................47
Section 15.1   Expenses ................................................................................................47
Section 15.2   Further Assurances ................................................................................47
Section 15.3   Notices ...................................................................................................47
Section 15.4   Headings ................................................................................................48
Section 15.5   Severability ............................................................................................48
Section 15.6   Entire Agreement ...................................................................................48
Section 15.7   Successors and Assigns .........................................................................48
Section 15.8   No Third-Party Beneficiaries ................................................................48
Section 15.9   Amendment ...........................................................................................49
Section 15.10  Waiver ...................................................................................................49
Section 15.11  Governing Law ......................................................................................49

iii

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001162

PX0594.169

Section 15.12   Arbitration ................................................................................................49

Section 15.13   Equitable Remedies ...................................................................................50

Section 15.14   Attorneys' Fees..........................................................................................50

Section 15.15   Remedies Cumulative................................................................................50

Section 15.16   Counterparts...............................................................................................50

ny-1889866

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001163

PX0594.170

## AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

This Amended and Restated Limited Liability Company Agreement (this "Agreement") of Ossium NewCo, LLC, a Delaware limited liability company (the "Company"), is entered into as of [--], 2020, by and among the Company, the Members executing this Agreement as of the date hereof and each other Person who after the date hereof becomes a Member of the Company and becomes a party to this Agreement by executing a Joinder Agreement. This Agreement amends and restates, in its entirety, the Original LLCA (as defined below).

## RECITALS

WHEREAS, the Company was formed under the laws of the State of Delaware by the filing of a Certificate of Formation with the Secretary of State of the State of Delaware on April 17, 2020, a copy of which is attached hereto as Exhibit A (the "Certificate of Formation");

WHEREAS, the Initial Member entered into the initial Limited Liability Company Agreement of the Company, dated as of April 17, 2020 (the "Original LLCA");

WHEREAS, the Initial Member of the Company desires that the Original LLCA be amended and restated to, among other things, admit additional Members of the Company; and

WHEREAS, the Members wish to enter into this Agreement setting forth the terms and conditions governing the ownership, operation and management of the Company.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1

## DEFINITIONS

Section 1.1    Definitions. Capitalized terms used herein and not otherwise defined shall have the meanings set forth in this Section 1.1:

"Acquisition Documents" means, collectively, those agreements and related ancillary documents entered into by and among the Company, one or more of the Minority Members and other relevant parties pursuant to which, among other things, such Minority Members agreed to contribute to the Company certain ownership interests in one or more Persons in exchange for Units and/or sell certain ownership interests in one or more Persons to a member of the Company Group.

"Action" means any claim, action, demand, suit, inquiry, proceeding, audit, summons, subpoena, investigation, hearing, injunction, seizure or other proceeding by or before any Governmental Authority, or any arbitration, mediation or other similar proceeding.

ny-1889866

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001164

PX0594.171

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(a)　crediting to such Capital Account any amount which such Member is obligated to restore or is deemed to be obligated to restore pursuant to Treasury Regulations Sections 1.704-1(b)(2)(ii)(c), 1.704-2(g)(1) and 1.704-2(i); and

(b)　debiting to such Capital Account the items described in Treasury Regulation Section 1.704-1(b)(2)(ii)(*d*)(*4*), (*5*) and (*6*).

"Admission Date" means, with respect to any Member, the date on which such Member became a member of the Company by entering into the Original LLCA, this Agreement or a Joinder Agreement.

"Affiliate" means, with respect to any Person, any other Person who, directly or indirectly (including through one or more intermediaries), controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control," when used with respect to any specified Person, shall mean the power, direct or indirect, to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities or partnership or other ownership interests, by contract or otherwise; and the terms "controlling" and "controlled" shall have correlative meanings.

"Agreement" means this Amended and Restated Limited Liability Company Agreement, as executed and as it may be amended, modified, supplemented or restated from time to time, as provided herein.

"Applicable Law" means all applicable provisions of (a) constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations or orders of any Governmental Authority; (b) any consents or approvals of any Governmental Authority; and (c) any orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with, any Governmental Authority.

"Bankruptcy" means, with respect to a Member, the occurrence of any of the following: (a) the filing of an application by such Member for, or a consent to, the appointment of a trustee of such Member's assets; (b) the filing by such Member of a voluntary petition in bankruptcy or the filing of a pleading in any court of record admitting in writing such Member's inability to pay its debts as they come due; (c) the making by such Member of a general assignment for the benefit of such Member's creditors; (d) the filing by such Member of an answer admitting the material allegations of, or such Member's consenting to, or defaulting in answering a bankruptcy petition filed against such Member in any bankruptcy proceeding; or (e) the expiration of sixty (60) days following the entry of an order, judgment or decree by any court of competent jurisdiction adjudicating such Member a bankrupt or appointing a trustee of such Member's assets.

"Board of Managers" has the meaning set forth in Section 8.3(a).

2

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001165

PX0594.172

"Book Depreciation" means, with respect to any Company property for each Fiscal Year, the Company's depreciation, amortization, or other cost recovery deductions determined for U.S. federal income tax purposes, except that if the Book Value of an property differs from its adjusted tax basis at the beginning of such Fiscal Year, Book Depreciation shall be an amount which bears the same ratio to such beginning Book Value as the U.S. federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; *provided*, that if the adjusted basis for U.S. federal income tax purposes of a property at the beginning of such Fiscal Year is zero and the Book Value of the property is positive, Book Depreciation shall be determined with reference to such beginning Book Value using any permitted method selected by the Managing Member in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(*g*)(3).

"Book Value" means, with respect to any Company property, the adjusted basis of such property for U.S. federal income tax purposes, except as follows:

(a)     the initial Book Value of any Company property contributed by a Member to the Company shall be the gross fair market value of such Company property as of the date of such contribution, as reasonably determined by the Managing Member;

(b)     immediately prior to the distribution by the Company of any Company property to a Member, the Book Value of such property shall be adjusted to its gross fair market value as of the date of such distribution, as reasonably determined by the Managing Member;

(c)     the Book Value of all Company property shall be adjusted to equal their respective gross fair market values, as reasonably determined by the Managing Member, as of the following times:

(i)     the acquisition of an additional Membership Interest in the Company by a new or existing Member in consideration of a Capital Contribution of more than a de minimis amount;

(ii)     the distribution by the Company to a Member of more than a de minimis amount of property (other than cash) as consideration for all or a part of such Member's Membership Interest in the Company;

(iii)     the liquidation of the Company within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(g); and

(iv)     in connection with the grant of an interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a member capacity, or by a new Member acting in a partner capacity in anticipation of being a Member;

*provided*, that adjustments pursuant to clauses (i), (ii) and (iv) above need not be made if the Managing Member reasonably determines that such adjustment is not necessary or appropriate to reflect the relative economic interests of the Members and that the absence of such adjustment does not adversely and disproportionately affect any Member;

3

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001166

PX0594.173

(d)      the Book Value of each Company property shall be increased or decreased, as the case may be, to reflect any adjustments to the adjusted tax basis of such Company property pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Account balances pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(*m*); *provided*, that Book Values shall not be adjusted pursuant to this paragraph (d) to the extent that an adjustment pursuant to paragraph (c) above is made in conjunction with a transaction that would otherwise result in an adjustment pursuant to this paragraph (d); and

(e)      if the Book Value of a Company property has been determined pursuant to paragraph (a) or adjusted pursuant to paragraphs (c) or (d) above, such Book Value shall thereafter be adjusted to reflect the Book Depreciation taken into account with respect to such Company property for purposes of computing Net Income and Net Loss.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in New York, New York, Stockholm, Sweden or Zurich, Switzerland are authorized or required to close.

"Call Purchase Price" has the meaning set forth in Section 10.4(b).

"Capital Account" has the meaning set forth in Section 5.1.

"Capital Contribution" means, for any Member, the total amount of cash and cash equivalents and the Book Value of any property contributed to the Company by such Member as reasonably determined by the Managing Member and reflected on the Members Schedule.

"Cause," with respect to any Member who is also an employee of the Company Group, has the meaning set forth in the Employment Agreement of such Member or, in case the meaning is not set forth in the Employment Agreement of such Member or such Member is not party to an Employment Agreement with the Company Group, as is defined under applicable employment law, which with respect to a Member subject to applicable employment law shall mean that such employee is dismissed or notified of dismissal or that such employee's employment is terminated or notified for termination on personal grounds related to a breach of the employee's duties under the employment or the termination or notice of termination of any other agreement entered into by such Member based on similar circumstances.

"Certificate of Formation" has the meaning set forth in the Recitals.

"Change of Control" means: (a) the direct or indirect sale of all or substantially all of the consolidated assets of the Company Group to a Third Party Purchaser; (b) a direct or indirect sale resulting in a majority of the votes of all Units or of all units in Ossium HoldCo, LLC (determined on a Fully Diluted Basis) being held by a Third Party Purchaser; or (c) a merger, consolidation, recapitalization or reorganization of the Company or Ossium HoldCo, LLC with or into a Third Party Purchaser that results in the Members and the members of Ossium HoldCo, LLC immediately following such merger, consolidation, recapitalization or reorganization holding less than a majority of the votes of all voting securities of the company surviving such merger, consolidation, recapitalization or reorganization (determined on a fully diluted  basis). For the avoidance of doubt, an Initial Public Offering shall not constitute a Change of Control.

<div align="center">4</div>

ny-1889866

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001167

PX0594.174

"Code" means the Internal Revenue Code of 1986, as amended.

"Common Unit" has the meaning set forth in Section 3.3(a).

"Company" has the meaning set forth in the Preamble.

"Company Group" means, collectively, the Company and the direct and indirect Subsidiaries of the Company.

"Company Group Indemnitees" has the meaning set forth in Section 11.3.

"Company Minimum Gain" means "partnership minimum gain" as defined in Section 1.704-2(b)(2) of the Treasury Regulations, substituting the term "Company" for the term "partnership" as the context requires.

"Company Tax Representative" has the meaning set forth in Section 12.3(a).

"Compound Yield" has the meaning set forth in Section 7.1(d).

"Confidential Information" has the meaning set forth in Section 11.1(a).

"Controlled Entity" means a personal holding company of any Member; *provided*, that such company (a) is incorporated under the Laws of a jurisdiction approved by the Managing Member, as determined based on the Managing Member's reasonable good faith discretion, (b) is and will be wholly-owned and controlled by such Member, and (c) does not and will not conduct any business other than to hold the Units or Unit Equivalents, as applicable, and cash and does not have any liens, encumbrances, or liabilities or any obligations other than pursuant to this Agreement; *provided*, further, that (i) such Controlled Entity shall be admitted as a New Member pursuant to Section 4.1(b) and become a party to this Agreement by the execution of a Joinder Agreement and (ii) such Member shall be jointly and severally liable with the Controlled Entity under this Agreement so long as such Controlled Entity continues to hold such Member's Units.  For the avoidance of doubt, all provisions of this agreement applicable to a Member who holds Units through a Controlled Entity shall apply *mutatis mutandis* to such Controlled Entity (or the Units held by such Controlled Entity, as applicable).

"Conversion" has the meaning set forth in Section 10.5(a).

"Corporation" has the meaning set forth in Section 10.5(a).

"Covered Person" means (a) the Managing Member, (b) each other Member, (c) each officer, director, advisory committee member, shareholder, partner, member, Affiliate, employee, agent or representative of each Member, and each of their Affiliates, (d) each member of the Board of Managers and (e) the Company Tax Representative.

"Delaware Act" means the Delaware Limited Liability Company Act, Title 6, Chapter 18, §§ 18-101, *et seq*, and any successor statute, as it may be amended from time to time.

5

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001168

PX0594.175

"<u>Distribution</u>" means a distribution made by the Company to a Member, whether in cash, property or securities of the Company and whether by liquidating distribution or otherwise; *provided*, that none of the following shall be a Distribution: (a) any redemption or repurchase by the Company or any Member of any Units or Unit Equivalents; (b) any subdivision (by a split of Units or otherwise) or any combination (by a reverse split of Units or otherwise) of any outstanding Units; or (c) any fees or remuneration approved by the Managing Member and paid to any Member in such Member's capacity as a service provider for or employee of the Company Group. "<u>Distribute</u>" when used as a verb shall have a correlative meaning.

"<u>Drag-along Right</u>" has the meaning set forth in Section 10.3(a).

"<u>Drag/Tag Notice</u>" has the meaning set forth in Section 10.3(d).

"<u>Drag/Tag Transaction</u>" has the meaning set forth in Section 10.3(a).

"<u>Electronic Transmission</u>" means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

"<u>Employment Agreement</u>" means the any agreement (whether formalized or not) pursuant to which a Member is (a) employed by any member of the Company Group; (b) retained as a consultant on a regular and substantive basis by any member of the Company Group; or (c) retained as a member of the board of directors of any member of the Company Group, in each case, as amended and restated from time to time.

"<u>Equity Securities</u>" means any and all Units and Unit Equivalents.

"<u>Excess Amount</u>" has the meaning set forth in Section 7.2(c).

"<u>Excluded Securities</u>" Redacted - Other (Nonresponsive)

Redacted - Other (Nonresponsive)

6

ny-1889866

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001169

PX0594.176

<div style="border:1px solid black;">

# Redacted - Other (Nonresponsive)

</div>

"Exercise Member" has the meaning set forth in Section 9.2(c).

"Exercise Period" has the meaning set forth in Section 9.2(b).

"Fair Value" means, as applied to the Units as of any date of determination, the fair value as last reported by the Managing Member to its investors prior to the determination date, such valuation being prepared in all material respects in accordance with the International Private Equity and Venture Capital Valuation Guidelines (developed by the IPEV Board (among others)), as amended from time to time. If it, in the opinion of the Managing Member, is apparent that an event has occurred after the date of the latest fair value reported by the Managing Member prior to the determination date that has, or is likely to have, a significant impact on the value of the Units, the value of the Units shall instead be based on the latest value reported by the Managing Member immediately following such event, by application of the principles set out above.

"Fiscal Year" means the calendar year, unless otherwise determined by the Managing Member.

"Forfeited Units" has the meaning set forth in Section 11.3.

"Fully Diluted Basis" means, as of any date of determination, with respect to all the Units, all issued and outstanding Units of the Company and all Units issuable upon the exercise, exchange or conversion of any outstanding Unit Equivalents as of such date, whether or not such Unit Equivalent is at the time exercisable.

"Governmental Authority" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court or tribunal of competent jurisdiction.

"Indemnification Deduction" has the meaning set forth in Section 11.3.

"Initial Member" means Ossium BidCo, LLC.

"Initial Public Offering" means the first registered offering of shares of capital stock of the Company on a stock exchange, regulated market place or other recognized exchange for the public trading of shares of ownership interest in any Person.

7

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001170

PX0594.177

"Issuance Notice" has the meaning set forth in Section 9.2(a).

"Joinder Agreement" means a joinder agreement substantially in the form attached as Exhibit A hereto, subject to such changes as may be determined by the Managing Member.

"Liquidator" has the meaning set forth in Section 13.3(a).

"Losses" has the meaning set forth in Section 14.3(a).

"Managing Member" means Ossium BidCo, LLC or any of its successors, assignees or designees that is a Member.

"Member" means (a) each Person identified on the Members Schedule as of the date hereof as a Member, including the Managing Member, and who has executed this Agreement or a counterpart hereof or a Joinder Agreement; and (b) and each Person who is hereafter admitted as a Member in accordance with the terms of this Agreement and the Delaware Act, in each case so long as such Person is shown on the Company's books and records as the owner of one or more Units. The Members shall constitute the "members" (as that term is defined in the Delaware Act) of the Company.

"Member Nonrecourse Debt" means "partner nonrecourse debt" as defined in Treasury Regulation Section 1.704-2(b)(4), substituting the term "Company" for the term "partnership" and the term "Member" for the term "partner" as the context requires.

"Member Nonrecourse Debt Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if the Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulation Section 1.704-2(i)(3).

"Member Nonrecourse Deduction" means "partner nonrecourse deduction" as defined in Treasury Regulation Section 1.704-2(i), substituting the term "Member" for the term "partner" as the context requires.

"Members Schedule" has the meaning set forth in Section 3.1.

"Minority Members" means all of the Members, excluding the Managing Member.

"Misallocated Item" has the meaning set forth in Section 6.5.

"Net Income" and "Net Loss" mean, for each Fiscal Year or other period specified in this Agreement, an amount equal to the Company's taxable income or taxable loss, or particular items thereof, determined in accordance with Code Section 703(a) (where, for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or taxable loss), but with the following adjustments (without duplication):

ny-1889866

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001171

PX0594.178

(a)      any income realized by the Company that is exempt from U.S. federal income taxation, as described in Code Section 705(a)(1)(B), shall be added to such taxable income or taxable loss, notwithstanding that such income is not includable in gross income;

(b)      any expenditures of the Company described in Code Section 705(a)(2)(B), including any items treated under Treasury Regulation Section 1.704-1(b)(2)(iv)(*i*) as items described in Code Section 705(a)(2)(B), shall be subtracted from such taxable income or taxable loss, notwithstanding that such expenditures are not deductible for U.S. federal income tax purposes;

(c)      any gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for U.S. federal income tax purposes shall be computed by reference to the Book Value of the property so disposed, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

(d)      any items of depreciation, amortization and other cost recovery deductions with respect to Company property having a Book Value that differs from its adjusted tax basis shall be computed by reference to the property's Book Value (as adjusted for Book Depreciation) in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(*g*);

(e)      if the Book Value of any Company property is adjusted as provided in the definition of Book Value, then the amount of such adjustment shall be treated as an item of gain or loss and included in the computation of such taxable income or taxable loss; and

(f)      to the extent an adjustment to the adjusted tax basis of any Company property pursuant to Code Section 734(b) is required, pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(*m*), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the property) or loss (if the adjustment decreases such basis).

"New Member" has the meaning set forth in Section 4.1(a).

"New Member Period" has the meaning set forth in Section 10.1(a).

"New Units" has the meaning set forth in Section 9.1(a).

"Non-Exercising Member" has the meaning set forth in Section 9.2(c).

"Nonrecourse Liability" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"Officers" has the meaning set forth in Section 8.2.

"Original Investment" has the meaning set forth in Section 8.4.

"Ossium Holdco Reorganization" means the transaction or transactions pursuant to which the Managing Member will contribute to the Company in exchange for Units (a) all of the

9

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001172

PX0594.179

interests in BioMedtrix LLC and (b) all of the shares of Ossium Holdco AB which directly owns all of the shares of Kyon AG and which indirectly owns all of the shares of Kyon Pharma Inc.

"Over-allotment Exercise Period" has the meaning set forth in Section 9.2(c).

"Over-allotment Notice" has the meaning set forth in Section 9.2(c).

"Person" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"Pre-emptive Member" has the meaning set forth in Section 9.1(a).

"Preference Amount" has the meaning set forth in Section 7.1(d).

"Preference Yield" has the meaning set forth in Section 7.1(d).

"Preferred Unit" has the meaning set forth in Section 3.3(b).

"Proposed Transfer" has the meaning set forth in Section 8.2.

"Proprietary Information" means any and all information and materials, in whatever form, tangible or intangible, whether disclosed to or learned or developed by a Member before or after the execution of this Agreement, whether or not marked or identified as confidential or proprietary, pertaining in any manner to the business of or used by the Company Group, or pertaining in any manner to any person or entity to whom any member of the Company Group owes a duty of confidentiality.  Proprietary Information includes, but is not limited to, the following types of information and materials:  (i) research, development, technical or engineering information, know-how, data processing or computer software, programs, tools, data, designs, diagrams, drawings, schematics, sketches or other visual representations, plans, projects, manuals, documents, files, photographs, results, specifications, trade secrets, inventions, discoveries, compositions, ideas, concepts, structures, improvements, products, prototypes, instruments, machinery, equipment, processes, formulas, algorithms, methods, techniques, works in process, systems, technologies, disclosures, applications and other materials; (ii) financial information and materials, including information and materials relating to costs, vendors, suppliers, licensors, profits, markets, sales, distributors, joint venture partners, customers, subscribers, members and bids, whether existing or potential; (iii) business and marketing information and materials, including information and materials relating to future development and new product concepts; (iv) personnel files and information about compensation, benefits and other terms of employment of the Company Group's employees and independent contractors; and (v) any other information or materials relating to the past, present, planned or foreseeable business, products, developments, technology or activities of the Company Group.  Proprietary Information does not include information that (A) is or becomes publicly known through lawful means and without breach of this Agreement or any other agreement between any Member and any member of the Company Group; (B) was rightfully in the possession of a Member or part of his, her or its general knowledge prior to such Member's Admission Date, with the exception of the information, ideas or materials acquired by such Member during the course of the Member's association with or investment in any legal entity that was a predecessor to the Company, which

10

ny-1889866

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001173

PX0594.180

shall continue to be Proprietary Information; or (C) is disclosed to such Member without confidential or proprietary restrictions by a third party who rightfully possesses the information or materials without confidential or proprietary restrictions.  However, to the extent any member of the Company Group owes a duty of confidentiality to a third party with respect to such information, idea or material, such information, idea or material shall continue to be Proprietary Information until such time as such member of the Company Group's duty of confidentiality terminates or expires.

"Regulatory Allocations" has the meaning set forth in Section 6.2(d).

 "Representative" means, with respect to any Person, any and all directors, managers, officers, employees, consultants, financial advisors, counsel, partners, shareholders, members, accountants and other agents of such Person.

"Repurchase Notice" has the meaning set forth in Section 10.4(b).

"Repurchase Units" has the meaning set forth in Section 10.4(b).

"Requisite Holders" means the Members holding the Units representing more than fifty percent (50%) of the votes of all Units (on a Fully Diluted Basis).

"Restricted Period" has the meaning set forth in Section 11.1(a).

"ROFR" has the meaning set forth in Section 8.2.

"ROFR Notice" has the meaning set forth in Section 8.2.

"ROFR Response Period" has the meaning set forth in Section 8.2.

"Securities Act" means the Securities Act of 1933, as amended, or any successor federal statute, and the rules and regulations thereunder, which shall be in effect at the time.

"Shortfall Amount" has the meaning set forth in Section 7.2(b).

"Subsidiary" means, with respect to any Person, any other Person of which a majority of the outstanding shares or other equity interests having the power to vote for directors or comparable managers are owned, directly or indirectly, by the first Person.

"Tag-along Member" has the meaning set forth in Section 10.3(e).

"Tag-along Notice" has the meaning set forth in Section 10.3(e).

"Tag-along Right" has the meaning set forth in Section 10.3(a).

"Tax Amounts" means, for each Member, the product of (a) the Tax Rate and (b) the Member's net taxable income allocated to it pursuant to this Agreement for the Fiscal Year (or other applicable period), as reasonably determined by the Managing Member.

"Tax Distribution" has the meaning set forth in Section 7.2(a).

11

ny-1889866

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001174

PX0594.181

"Tax Rate" means the highest aggregate marginal effective rate of U.S. federal, state and local income tax applicable to an individual resident in the State of California, taking into account any difference in rates applicable to ordinary income, capital gains and dividends.

"Taxing Authority" has the meaning set forth in Section 7.3(b).

"Third Party Purchaser" means any Person who, immediately prior to the contemplated transaction, does not directly or indirectly own or have the right to acquire any outstanding Units (or Unit Equivalents) or any units (or unit equivalents) in Ossium HoldCo, LLC.

"Transfer" means to, directly or indirectly, sell, transfer, assign, pledge, encumber, hypothecate or similarly dispose of, either voluntarily or involuntarily, by operation of law or otherwise, or to enter into any contract, option or other arrangement or understanding with respect to the sale, transfer, assignment, pledge, encumbrance, hypothecation or similar disposition of, any Units owned by a Person or any interest (including a beneficial interest) in any Units or Unit Equivalents owned by a Person. "Transfer" when used as a noun shall have a correlative meaning. "Transferor" and "Transferee" mean a Person who makes or receives a Transfer, respectively.

"Triggering Event" means those events set forth in Section 10.4(a)(i) through (vi).

"Unallocated Item" has the meaning set forth in Section 6.5.

"Uncompounded Yield" has the meaning set forth in Section 7.1(d).

"Unit" means a unit representing a fractional part of the membership interests of the Members in the Company, which includes Common Units and Preferred Units.

"Unit Equivalents" means any security or obligation that is by its terms, directly or indirectly, convertible into, exchangeable or exercisable for Units, and any option, warrant or other right to subscribe for, purchase or acquire Units.

"Withholding Advances" has the meaning set forth in Section 7.3(b).

Section 1.2    Interpretation. For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. The definitions given for any defined terms in this Agreement shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. Unless the context otherwise requires, references herein: (x) to Articles, Sections, and Exhibits mean the Articles and Sections of, and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any

12

ny-1889866

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001175

PX0594.182

instrument to be drafted. The Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein. References herein to days shall be to calendar days; provided, that any action otherwise required to be taken on a day that is not a Business Day shall instead be taken on the next Business Day.

## ARTICLE 2

## ORGANIZATION

Section 2.1   Formation.

(a)   The Company was formed on April 17, 2020, pursuant to the provisions of the Delaware Act, upon the filing of the Certificate of Formation with the Secretary of State of the State of Delaware.

(b)   This Agreement shall constitute the "limited liability company agreement" (as that term is used in the Delaware Act) of the Company. The rights, powers, duties, obligations and liabilities of the Members shall be determined pursuant to the Delaware Act and this Agreement. To the extent that the rights, powers, duties, obligations and liabilities of any Member are different by reason of any provision of this Agreement than they would be under the Delaware Act in the absence of such provision, this Agreement shall, to the extent permitted by the Delaware Act, control.

Section 2.2   Name. The name of the Company is "Ossium NewCo, LLC" or such other name or names as may be designated by the Managing Member; provided, that the name shall always contain the words "Limited Liability Company" or the abbreviation "L.L.C." or the designation "LLC."

Section 2.3   Tax Status. The Members intend that the Company shall be treated as a partnership for U.S. federal and, if applicable, state and local income tax purposes. The Company and each Member shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment and no Member shall take any action inconsistent with such treatment.

Section 2.4   Registered Office; Registered Agent.

(a)   The registered office of the Company shall be the office of the initial registered agent named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Managing Member may designate from time to time in the manner provided by the Delaware Act and Applicable Law.

(b)   The registered agent for service of process on the Company in the State of Delaware shall be the initial registered agent named in the Certificate of Formation or such other Person or Persons as the Managing Member may designate from time to time in the manner provided by the Delaware Act and Applicable Law.

Section 2.5   Purpose; Powers.

ny-1889866

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001176

PX0594.183

(a)     The purpose of the Company is to engage in any lawful act or activity for which limited liability companies may be formed under the Delaware Act and to engage in any and all activities necessary or incidental thereto.

(b)     The Company shall have all the powers necessary or convenient to carry out the purposes for which it is formed, including the powers granted by the Delaware Act.

Section 2.6     <u>Term</u>. The term of the Company commenced on the date the Certificate of Formation was filed with the Secretary of State of the State of Delaware and shall continue in existence perpetually until the Company is dissolved in accordance with the provisions of this Agreement.

Section 2.7     <u>No State-Law Partnership</u>. The Members intend that the Company shall not be a partnership (including, without limitation, a limited partnership) or joint venture, and that no Member or Officer of the Company shall be a partner or joint venturer of any other Member or Officer of the Company, for any purposes other than as set forth in Section 2.3.

## ARTICLE 3

## UNITS

Section 3.1     <u>Units Generally; Initial Capital Contribution</u>. The membership interests of the Members shall be represented by issued and outstanding Units, which may be divided into one or more types, classes or series.  Each type, class or series of Units shall have the privileges, preference, duties, liabilities, obligations and rights, including voting rights, if any, set forth in this Agreement with respect to such type, class or series.  Contemporaneously with its execution of this Agreement or the Original LLCA, each Member as of the date hereof has made an initial Capital Contribution in connection with the applicable Acquisition Documents and is deemed to own membership interests in the amounts set forth opposite such Member's name and address on a schedule of all Members (including New Members admitted to the Company after the date hereof) to be maintained by the Managing Member, attached hereto as Schedule I, which shall include each Member's mailing addresses, the number and series of Units held by them (the "<u>Members Schedule</u>").  Each Member, besides the Managing Member, shall be entitled to see the portion of the Members Schedule in relation to the Units and Capital Contributions of itself and its Affiliates and each other Member's notice information only.  The Managing Member shall update the Members Schedule upon the issuance or Transfer of any Units to any new or existing Member.

Section 3.2     <u>Additional Capital Contributions</u>.

(a)     No Member shall be required to make any additional Capital Contributions to the Company.  Any future Capital Contributions made by any Member shall only be made at the direction and with the consent of the Managing Member.  To the extent that a Member makes an additional Capital Contribution to the Company, the Managing Member shall revise the Members Schedule to reflect an increase in the Units of the contributing Member that fairly and equitably reflects the value of its additional Capital Contribution in relation to the aggregate amount of all Capital Contributions made by the Members.

14

ny-1889866

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001177

PX0594.184

(b)      The Managing Member shall have the right to cause the Company to (i) create and issue additional Units and Unit Equivalents (in each case whether or not constituting Excluded Securities), including Units and Unit Equivalents of classes having rights different from, and senior to, the rights of the Company's existing classes of Units and Unit Equivalents and (ii) borrow money from any Person including the Managing Member and its Affiliates.  Any additional issuances of New Units (other than Excluded Securities and issuances of Units and Unit Equivalents in connection with an Initial Public Offering) shall be subject to the right of the Members set forth in Section 9.1.

Section 3.3      Authorization of Common and Preferred Units.

(a)      The Company is hereby authorized to issue a class of Units designated Common Units (each a "Common Unit").  Common Units shall have the rights to voting as set out in Section 4.6 and rights to the Company's assets and Distributions as set out in Section 7.1(c) and Section 13.3(c).

(b)      The Company is hereby authorized to issue a class of Units designated Preferred Units (each, a "Preferred Unit").  Preferred Units shall have rights to voting as set out in Section 4.6 and preferential rights to the Company's assets and Distributions as set out in Section 7.1(c) and Section 13.3(c).

Section 3.4      Certification of Units.

(a)      The Units shall be issued in uncertificated form, unless otherwise determined by the Managing Member.

(b)      In the event that the Managing Member shall issue certificates representing Units in accordance with Section 3.4(a), then in addition to any other legend required by Applicable Law, all certificates representing issued and outstanding Units shall bear a legend substantially in the following form:

THE UNITS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE LIMITED LIABILITY COMPANY AGREEMENT AMONG THE COMPANY AND ITS MEMBERS (INCLUDING THE PLEDGE CONTAINED IN SECTION 11.3 THEREOF), A COPY OF WHICH IS ON FILE AT THE PRINCIPAL OFFICE OF THE COMPANY. NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THE UNITS REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH LIMITED LIABILITY COMPANY AGREEMENT.

THE UNITS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS AND MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED (EXCEPT AS PROVIDED IN SECTION 11.3 OF THE LIMITED LIABILITY COMPANY AGREEMENT AMONG THE COMPANY AND ITS MEMBERS), HYPOTHECATED OR OTHERWISE DISPOSED  EXCEPT (A) PURSUANT TO A REGISTRATION STATEMENT EFFECTIVE UNDER SUCH ACT AND LAWS OR (B) PURSUANT TO AN EXEMPTION FROM REGISTRATION THEREUNDER.

ny-1889866

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001178

PX0594.185

Section 3.5    No Interest on Capital Contributions. No Member shall be entitled to receive any distribution from the Company, except as provided in this Agreement. No Member shall receive any interest, salary or drawing with respect to its Capital Contributions, except as otherwise provided in this Agreement.

Section 3.6    Treatment of Loans From Members. Loans by any Member to the Company, including without limitation, any promissory notes owed by the Company to a Member issued in connection with the Acquisition Documents, shall not be considered Capital Contributions.

# ARTICLE 4

## MEMBERS

Section 4.1    Admission of New Members.

(a)    New Members may be admitted by the Managing Member from time to time (i) in connection with an issuance of Units by the Company pursuant to Section 3.2, and (ii) in connection with a Transfer of Units, subject to compliance with the provisions of Article 10, and in either case, following compliance with the provisions of Section 4.1(b) (each, a "New Member").

(b)    In order for any Person not already a Member of the Company to be admitted as a Member, whether pursuant to an issuance of Units or Transfer of Units, such Person shall have executed and delivered to the Company a Joinder Agreement.  Upon the amendment of the Members Schedule by the Managing Member and the satisfaction of any other applicable conditions, including, if a condition, the receipt by the Company of payment for the issuance of the applicable Units, such Person shall be admitted as a Member and deemed listed as such on the books and records of the Company and thereupon shall be issued his, her or its Units.

Section 4.2    Representations and Warranties of Members. By execution and delivery of this Agreement or a Joinder Agreement, as applicable, each of the Members, whether admitted as of the date hereof or pursuant to Section 4.1, represents and warrants to the Company and acknowledges that:

(a)    The Units have not been registered under the Securities Act or the securities laws of any other jurisdiction, are issued in reliance upon federal and state exemptions for transactions not involving a public offering and cannot be disposed of unless (i) they are subsequently registered or exempted from registration under the Securities Act and (ii) the provisions of this Agreement have been complied with;

(b)    Such Member is an "accredited investor" within the meaning of Rule 501 promulgated under the Securities Act, as amended by Section 413(a) of the Dodd-Frank Wall Street Reform and Consumer Protection Act, and agrees that it will not take any action that could have an adverse effect on the availability of the exemption from registration provided by Rule 501 promulgated under the Securities Act with respect to the offer and sale of the Units;

ny-1889866

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001179

PX0594.186

(c)     Such Member's Units are being acquired for its own account solely for investment and not with a view to resale or distribution thereof;

(d)     Such Member has conducted its own independent review and analysis of the business, operations, assets, liabilities, results of operations, financial condition and prospects of the Company and the Company Group and such Member acknowledges that it has been provided adequate access to the personnel, properties, premises and records of the Company and the Company Group for such purpose;

(e)     The determination of such Member to acquire Units has been made by such Member independent of any other Member and independent of any statements or opinions as to the advisability of such purchase or as to the business, operations, assets, liabilities, results of operations, financial condition and prospects of the Company Group that may have been made or given by any other Member or by any Representative of any other Member;

(f)     Such Member has such knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of an investment in the Company and making an informed decision with respect thereto;

(g)     Such Member is able to bear the economic and financial risk of an investment in the Company for an indefinite period of time;

(h)     The execution, delivery and performance of this Agreement or the Joinder Agreement, as applicable, have been duly authorized by such Member and do not require such Member to obtain any consent or approval that has not been obtained and do not contravene or result in a default in any material respect under any provision of any law or regulation applicable to such Member or other governing documents or any agreement or instrument to which such Member is a party or by which such Member is bound;

(i)     This Agreement is valid, binding and enforceable against such Member in accordance with its terms, except as may be limited by Bankruptcy, insolvency, reorganization, moratorium, and other similar laws of general applicability relating to or affecting creditors' rights or general equity principles (regardless of whether considered at law or in equity); and

(j)     Neither the issuance of any Units to any Member nor any provision contained herein will entitle the Member to remain in the employment of any member of the Company Group or affect the right of such member of the Company Group to terminate the Member's employment at any time for any reason, other than as otherwise provided in such Member's employment agreement or other similar agreement with the member of the Company Group, if applicable.

None of the foregoing shall replace, diminish or otherwise adversely affect any Member's representations and warranties made by it in any other agreement between such Member and the Company.

Section 4.3     No Personal Liability. Except as otherwise provided in the Delaware Act, by Applicable Law or expressly in this Agreement, no Member will be obligated personally for

17

ny-1889866

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001180

PX0594.187

any debt, obligation or liability of the Company, any member of the Company Group or other Members, whether arising in contract, tort or otherwise, solely by reason of being a Member.

Section 4.4    Withdrawal.

(a)    Subject to Section 4.4(b) and Section 4.4(c), with the consent of the Managing Member, a Member may withdraw from the Company. A Member shall not be entitled to exercise any vote or consent or similar right after the date of withdrawal. In the event of withdrawal of any Member who transferred any of his, her or its Units to a Controlled Entity, such withdrawal shall be deemed to have occurred also with respect to such Controlled Entity.

(b)    As soon as any Person who is a Member ceases to hold any Units, such Person shall no longer be a Member; *provided*, *however*, that this Agreement shall continue to apply with respect to any Units that have been called in accordance with Section 10.4 until full payment is made therefor in accordance with the terms of this Agreement.

(c)    The obligations of a Member under Article 9 shall survive the withdrawal of such Member from the Company or such Member ceasing to hold any Units.

(d)    Subject to Section 10.1 and Section 10.4, the Managing Member shall cause the Members Schedule to be amended from time to time to reflect the withdrawal of any Member.

Section 4.5    Death; Dissolution. The death of any Member or the dissolution of any Member that is an entity shall not cause the dissolution of the Company and the Company and its business shall be continued by the remaining Member or Members. The Units owned by the deceased or dissolved Member (and as to such dissolved Member, to the extent that such dissolved Member is not reinstated) shall, subject to Section 10.1 and Section 10.4, automatically be Transferred to such Member's successors; *provided*, that such successors shall be bound by, and take the Units subject to, the terms and conditions of this Agreement, and *provided, further,* that no such successor shall be entitled to exercise any vote or consent or similar right, unless and until such successor is admitted as a New Member, subject to compliance with Section 4.1(b) and Section 10.1(c). Subject to the other terms of this Agreement, the Managing Member shall cause the Members Schedule to be amended from time to time to reflect the death or dissolution of any Member.

Section 4.6    Voting. Except as otherwise provided by this Agreement or as otherwise required by the Delaware Act or Applicable Law, each Member shall be entitled to one (1) vote per Common Unit, and ten (10) votes per Preferred Unit, on all matters upon which the Members have the right to vote pursuant to this Agreement.

Section 4.7    Meetings.

(a)    Calling a Meeting. Meetings of the Members may be called by the Managing Member.

(b)    Action without Meeting. Any matter that is to be voted on, consented to or approved by Members may be taken without a meeting, without prior notice and without a

ny-1889866

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001181

PX0594.188

vote if consented to, in writing or by Electronic Transmission, by the Requisite Holders.  A record shall be maintained by the Managing Member of each such action taken by written consent of a Member or Members.

Section 4.8    Power of Members. The Members shall have the power to exercise any and all rights or powers granted to Members pursuant to the express terms of this Agreement and the Delaware Act. Except as otherwise specifically provided by this Agreement or required by the Delaware Act, no Member, in its capacity as a Member, shall have the power to act for or on behalf of, or to bind, the Company.

Section 4.9    No Interest in Company Property. No real or personal property of the Company shall be deemed to be owned by any Member individually, but shall be owned by, and title shall be vested solely in, the Company. Without limiting the foregoing, each Member hereby irrevocably waives during the term of the Company any right that such Member may have to maintain any action for partition with respect to the property of the Company.

# ARTICLE 5

# CAPITAL ACCOUNTS

Section 5.1    Maintenance of Capital Accounts. The Company shall establish and maintain for each Member a separate capital account (a "Capital Account") on its books and records in accordance with this Section 5.1. Each Capital Account shall be established and maintained in accordance with the following provisions:

(a)    Each Member's Capital Account shall be increased by the amount of:

(i)    such Member's Capital Contributions (net of liabilities that the Company is considered to assume or take subject to related to such Capital Contribution); and

(ii)    any Net Income or other item of income or gain allocated to such Member pursuant to Article 6.

(b)    Each Member's Capital Account shall be decreased by:

(i)    the amount of cash or cash equivalents or the Book Value of any property (net of liabilities that such Member is considered to assume or take subject to) distributed to such Member pursuant to Article 5 and Section 13.3(c); and

(ii)    the amount of any Net Loss or other item of loss or deduction allocated to such Member pursuant to Article 6.

Section 5.2    Succession Upon Transfer. In the event that any Units are Transferred in accordance with the terms of this Agreement, the Transferee shall succeed to the Capital Account of the Transferor to the extent it relates to the Transferred Units and, subject to Section 6.4, shall receive allocations and distributions pursuant to Article 6, Article 5 and Article 13 in respect of such Units.

ny-1889866

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001182

PX0594.189

Section 5.3    Negative Capital Accounts. In the event that any Member shall have a deficit balance in his, her or its Capital Account, such Member shall have no obligation, during the term of the Company or upon dissolution or liquidation thereof, to restore such negative balance or make any Capital Contributions to the Company by reason thereof, except as may be required by Applicable Law or in respect of any negative balance resulting from a withdrawal of capital or dissolution in contravention of this Agreement.

Section 5.4    No Withdrawal of Capital Contributions. No Member shall be entitled to withdraw any part of his, her or its Capital Account or to receive any distribution from the Company, except as provided in this Agreement. No Member shall receive any interest, salary or drawing with respect to its Capital Contributions or its Capital Account, except as otherwise provided in this Agreement. The Capital Accounts are maintained for the sole purpose of allocating items of income, gain, loss and deduction among the Members and shall have no effect on the amount of any distributions to any Members, in liquidation or otherwise.

Section 5.5    Treatment of Loans From Members. Loans by any Member to the Company, including without limitation, any promissory notes owed by the Company to a Member issued in connection with the Acquisition Documents, shall not be considered Capital Contributions and shall not affect the maintenance of such Member's Capital Account, other than to the extent provided in Section 5.1(b)(i), if applicable.

Section 5.6    Modifications. The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.704-1(b) of the Treasury Regulations and shall be interpreted and applied in a manner consistent with such Treasury Regulations. If the Managing Member determines that it is prudent to modify the manner in which the Capital Accounts, or any increases or decreases to the Capital Accounts, are computed in order to comply with such Treasury Regulations, the Managing Member may authorize such modifications.

## ARTICLE 6

## ALLOCATIONS

Section 6.1    Allocation of Net Income and Net Loss. For each Fiscal Year (or portion thereof), except as otherwise provided in this Agreement, Net Income and Net Loss (and, to the extent necessary, individual items of income, gain, loss or deduction) of the Company shall be allocated among the Members in a manner such that, after giving effect to the special allocations set forth in Section 6.2, the Capital Account balance of each Member, immediately after making such allocations, is, as nearly as possible, equal to (i) the distributions that would be made to such Member pursuant to Section 13.3(c) if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their Book Value, all Company liabilities were satisfied (limited with respect to each Nonrecourse Liability to the Book Value of the assets securing such liability), and the net assets of the Company were distributed, in accordance with Section 13.3(c), to the Members immediately after making such allocations, minus (ii) such Member's share of Company Minimum Gain and Member Nonrecourse Debt Minimum Gain, computed immediately prior to the hypothetical sale of assets, in each case as reasonably determined by the Managing Member.

20

ny-1889866

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001183

PX0594.190

Section 6.2    Regulatory and Special Allocations. Notwithstanding the provisions of Section 6.1:

(a)    If there is a net decrease in Company Minimum Gain (determined according to Treasury Regulations Section 1.704-2(d)(1)) during any Fiscal Year, each Member shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined by the Managing Member in accordance with Treasury Regulations Section 1.704-2(g). The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2). This Section 6.2(a) is intended to comply with the "minimum gain chargeback" requirement in Treasury Regulation Section 1.704-2(f) and shall be interpreted consistently therewith.

(b)    Member Nonrecourse Deductions shall be allocated in the manner required by Treasury Regulations Section 1.704-2(i). Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), if there is a net decrease in Member Nonrecourse Debt Minimum Gain during any Fiscal Year, each Member that has a share of such Member Minimum Gain shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to that Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain. Items to be allocated pursuant to this paragraph shall be determined in accordance with Treasury Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2). This Section 6.2(b) is intended to comply with the "minimum gain chargeback" requirements in Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)    In the event any Member unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii)(*d*)(*4*), (*5*) or (*6*), Net Income shall be specially allocated to such Member in an amount and manner sufficient to eliminate the Adjusted Capital Account Deficit created by such adjustments, allocations or distributions as quickly as possible. This Section 6.2(c) is intended to comply with the qualified income offset requirement in Treasury Regulations Section 1.704-1(b)(2)(ii)(*d*) and shall be interpreted consistently therewith.

(d)    The allocations set forth in paragraphs (a), (b) and (c) above (the "Regulatory Allocations") are intended to comply with certain requirements of the Treasury Regulations under Code Section 704. Notwithstanding any other provisions of this Article 6 (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating Net Income and Net Loss among Members so that, to the extent possible, the net amount of such allocations of Net Income and Net Loss and other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to such Member if the Regulatory Allocations had not occurred.

Section 6.3    Tax Allocations.

(a)    Subject to Section 6.3(b) through Section 6.3(e), all income, gains, losses and deductions of the Company shall be allocated, for U.S. federal, state and local income tax purposes, among the Members in accordance with the allocation of such income, gains, losses and deductions among the Members for computing their Capital Accounts, except that if any

21

ny-1889866

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001184

PX0594.191

such allocation for tax purposes is not permitted by the Code or other Applicable Law, the Company's subsequent income, gains, losses and deductions shall be allocated among the Members for tax purposes, to the extent permitted by the Code and other Applicable Law, so as to reflect as nearly as possible the allocation set forth herein in computing their Capital Accounts, in each case as reasonably determined by the Managing Member.

(b)     Items of Company taxable income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall be allocated among the Members in accordance with Code Section 704(c) and using the "traditional method" described in Treasury Regulations Section 1.704-3(b), so as to take account of any variation between the adjusted basis of such property to the Company for U.S. federal income tax purposes and its Book Value, in each case as reasonably determined by the Managing Member.

(c)     If the Book Value of any Company asset is adjusted pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(*f*) as provided in clause (c) of the definition of Book Value, subsequent allocations of items of taxable income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c), in each case as reasonably determined by the Managing Member.

(d)     Allocations of tax credit, tax credit recapture and any items related thereto shall be allocated to the Members according to their interests in such items taking into account the principles of Treasury Regulations Section 1.704-1(b)(4)(ii), in each case as reasonably determined by the Managing Member.

(e)     Allocations pursuant to this Section 6.3 are solely for purposes of U.S. federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Income, Net Loss, Distributions or other items pursuant to any provisions of this Agreement.

Section 6.4     Allocations in Respect of Transferred Units. In the event of a Transfer of Units during any Fiscal Year made in compliance with the provisions of Article 10, Net Income, Net Loss and other items of income, gain, loss and deduction of the Company attributable to such Units for such Fiscal Year shall be determined using the interim closing of the books method.

Section 6.5     Curative Allocations. In the event that the Managing Member determines, after consultation with counsel experienced in income tax matters, that the allocation of any item of Company income, gain, loss or deduction is not specified in this Article 6 (an "Unallocated Item"), or that the allocation of any item of Company income, gain, loss or deduction hereunder is clearly inconsistent with the Members' economic interests in the Company (determined by reference to the general principles of Treasury Regulations Section 1.704-1(b) and the factors set forth in Treasury Regulations Section 1.704-1(b)(3)(ii)) (a "Misallocated Item"), then the Managing Member may allocate such Unallocated Items, or reallocate such Misallocated Items, to reflect such economic interests.

ny-1889866

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001185

PX0594.192

# ARTICLE 7

## DISTRIBUTIONS

Section 7.1    General.

(a)    Subject to Section 7.1(b), (c) and (d) and Section 7.2, the Managing Member shall have sole discretion regarding the amounts and timing of distributions to Members, including to decide to forego payment of Distributions in order to provide for the retention and establishment of reserves of, or payment to third parties of, such funds as it deems necessary with respect to the reasonable business needs of the Company (which needs may include the payment or the making of provision for the payment when due of the Company's obligations, including, but not limited to, present and anticipated debts and obligations, capital needs and expenses, the payment of any management or administrative fees and expenses, and reasonable reserves for contingencies).

(b)    Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any Distribution to Members if such Distribution would violate § 18-607 of the Delaware Act or other Applicable Law.

(c)    Provided that all Tax Distributions pursuant to Section 7.2 have been distributed by the Company to the applicable Member, the Company may make Distributions to the Members out of the Company's proceeds when and in the amounts deemed appropriate by the Managing Member in its sole discretion.  Any such Distributions shall be made to the Members based on the priority set forth as follows:

(i)    first, Preferred Units shall receive one hundred percent (100%) of any Distributions until each Preferred Unit has received Distributions in an amount equal to the Uncompounded Yield as of the date of such Distribution (such Distribution shall be allocated pro rata among the Preferred Units in proportion to the amount of Uncompounded Yield of such Preferred Units);

(ii)    second, Preferred Units shall receive one hundred percent (100%) of any remaining Distributions until each Preferred Unit has received Distributions pursuant to this Section 7.1(c) in an amount equal to the Preference Amount as of the date of such Distribution (such Distribution shall be allocated pro rata among the Preferred Units in proportion to the Preference Amount of such Preferred Units); and

(iii)    third, Common Units shall receive one hundred percent (100%) of any remaining Distribution in an equal amount per Common Unit.

In the event only shares of one class of Units are outstanding, one hundred (100%) of all Distributions shall be allotted to such class of Units.

(d)    Certain Terms.

23

ny-1889866

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001186

PX0594.193

(i)      "Compounded Yield" means the accrued and compounded Preference Yield (with interest accrued daily and compounded annually on the last calendar day of each year starting December 31, 2020) at any given point in time.

(ii)      "Preference Amount" means, with respect to each Preferred Unit, an amount equal to (i) $1.00, *plus* (ii) any Compounded Yield, *less* (iii) any Distributions made in accordance with Section 7.1(c)(i) above, in each case adjusted for any potential split, bonus payments or similar adjustments.

(iii)      "Preference Yield" means an amount equal to an interest rate of twelve percent (12%) per annum as from July 1, 2020 (computed on the basis of a three hundred sixty (360) day year consisting of twelve (12) months of thirty (30) days), payable in cash or in Preferred Units as determined by the Managing Member, to each Member who holds Preferred Units on the Preference Amount (such interest to accrue daily and be compounded annually on the last calendar day of each year starting December 31, 2020).

(iv)      "Uncompounded Yield" means the accrued, but not compounded, Preference Yield at any given point in time.

(e)      No Guaranteed Payment. The Distributions made by the Company to Members pursuant to Sections 7.1(c), 7.2 and 11.3(c) shall not be guaranteed payments under Code Section 707(c).

Section 7.2      Tax Distributions.

(a)      Subject to any restrictions in any of the Company's and/or any member of the Company Group's then applicable debt-financing arrangements, and subject to the Managing Member's sole discretion to retain any other amounts necessary to satisfy the Company's and/or such member of the Company Group's obligations, at least five (5) days before each date prescribed by the Code for a calendar-year corporation to pay quarterly installments of estimated tax, the Company shall distribute available cash to each Member in an amount equal to one quarter of the Member's estimated Tax Amount (each such distribution, a "Tax Distribution").

(b)      If the aggregate Tax Distributions to any Member with respect to such Fiscal Year are less than such Member's Tax Amount for such Fiscal Year (a "Shortfall Amount"), the Company shall use commercially reasonable efforts to distribute cash in proportion to and to the extent of each Member's Shortfall Amount. The Company shall use commercially reasonable efforts to distribute Shortfall Amounts with respect to a Fiscal Year before the 75th day of the next succeeding Fiscal Year.

(c)      If the aggregate Tax Distributions made to any Member pursuant to this Section 7.2 for any Fiscal Year exceed such Member's Tax Amount (an "Excess Amount"), such Excess Amount shall reduce subsequent Tax Distributions that would be made to such Member pursuant to this Section 7.2.

(d)      For the avoidance of doubt, (x) Section 7.2 is intended to provide each holder of a Preferred Unit the same dollar amount of Tax Distributions calculated on a per unit basis as each other holder of a Preferred Unit and to provide each holder of a Common Unit the

24

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001187

PX0594.194

same dollar amount of Tax Distributions calculated on a per unit basis as each other holder of a Common Unit and shall be interpreted consistently therewith and (y) any Tax Distributions made pursuant to this Section 7.2 shall not be treated for purposes of this Agreement as Distributions pursuant to Section 7.1(c) and shall not reduce the amount otherwise distributable pursuant to Section 7.1(c).

Section 7.3    Tax Withholding; Withholding Advances.

(a)    Tax Withholding. If requested by the Managing Member, each Member shall, if able to do so, deliver to the Managing Member:

(i)    an affidavit in form satisfactory to the Managing Member that the applicable Member (or its members, as the case may be) is not subject to withholding under the provisions of any U.S. federal, state, local, non-U.S. or other Applicable Law;

(ii)    any certificate that the Managing Member may reasonably request with respect to any such laws; and/or

(iii)    any other form or instrument reasonably requested by the Managing Member relating to any Member's status under such law.

If a Member fails or is unable to deliver to the Managing Member the affidavit described in Section 7.3(a)(i), the Managing Member may withhold amounts from such Member in accordance with Section 7.3(b).

(b)    Withholding Advances. The Company is hereby authorized at all times to make payments ("Withholding Advances") with respect to each Member in amounts required to discharge any obligation of the Company (as reasonably determined by the Managing Member based on the advice of legal or tax counsel to the Company) to withhold or make payments to any U.S. federal, state, local or non-U.S. taxing authority (a "Taxing Authority") with respect to any distribution by the Company to such Member and to withhold the same from distributions to such Member. Any funds withheld from a distribution by reason of this Section 7.3(b) shall nonetheless be deemed distributed to the Member in question for all purposes under this Agreement.

(c)    Indemnification. Each Member hereby agrees to indemnify and hold harmless the Company and the other Members from and against any liability with respect to taxes, interest or penalties which may be asserted by reason of the Company's failure to deduct and withhold tax on amounts distributable to such Member. The provisions of this Section 7.3(c) and the obligations of a Member pursuant to Section 7.3(a) shall survive the termination, dissolution, liquidation and winding up of the Company and the withdrawal of such Member from the Company or Transfer of its Units. The Company may pursue and enforce all rights and remedies it may have against each Member under this Section 7.3, including bringing a lawsuit to collect repayment with interest of any Withholding Advances.

(d)    Overwithholding. Neither the Company nor the Managing Member shall be liable for any excess taxes withheld in respect of any distribution to a Member. In the event of

25

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001188

PX0594.195

an overwithholding, a Member's sole recourse shall be to apply for a refund from the appropriate Taxing Authority.

Section 7.4    <u>Distributions in Kind</u>.

(a)    The Managing Member is hereby authorized, in its sole discretion, to make Distributions to the Members in the form of securities or other property held by the Company. In any non-cash Distribution, the securities or property so distributed will be distributed among the Members in the same proportion and priority as cash equal to the fair market value of such securities or property (as reasonably determined by the Managing Member) would be distributed among the Members pursuant to this Agreement.

(b)    Any Distribution of securities shall be subject to such conditions and restrictions as the Managing Member determines are required or advisable to ensure compliance with Applicable Law. In furtherance of the foregoing, the Managing Member may require that the Members execute and deliver such documents as the Managing Member may deem necessary or appropriate to ensure compliance with all federal and state securities laws that apply to such distribution and any further Transfer of the distributed securities, and may appropriately legend the certificates that represent such securities to reflect any restriction on Transfer with respect to such laws.

## ARTICLE 8

## MANAGEMENT

Section 8.1    <u>Management of the Company</u>. The business and affairs of the Company shall be managed by the Managing Member, under the oversight of the Board of Managers as set forth in Section 8.3. Except as otherwise provided herein, the Managing Member shall have full and complete discretion to manage and control the business and affairs of the Company, to make all decisions affecting the business and affairs of the Company and to take all such actions as it deems necessary or appropriate to accomplish the purposes of the Company set forth in Section 2.5. The actions of the Managing Member taken in accordance with the provisions of this Agreement shall bind the Company. No other Member of the Company shall have any authority or right to act on behalf of or bind the Company, unless otherwise provided herein or unless specifically authorized by the Managing Member pursuant to a resolution expressly authorizing such action which resolution is duly adopted by the Managing Member.

Section 8.2    <u>Officers</u>. The Managing Member may appoint individuals as officers of the Company (the "<u>Officers</u>") as it deems necessary or desirable to carry on the business of the Company and the Managing Member may delegate to such Officers such power and authority as the Managing Member deems advisable. No Officer need be a Member of the Company. Any individual may hold two or more offices of the Company. Each Officer shall hold office until his or her successor is designated by the Managing Member or until his or her earlier death, resignation or removal. Any Officer may resign at any time upon written notice to the Managing Member. Any Officer may be removed by the Managing Member with or without cause at any time. A vacancy in any office occurring because of death, resignation, removal or otherwise, may, but need not, be filled by the Managing Member.

ny-1889866

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001189

PX0594.196

Section 8.3    Board of Managers.

(a)    The Managing Member shall appoint a board (the "Board of Managers") initially consisting of Slobodan Tepic, Christopher Sidebotham, Patrick Gendreau and such other Persons determined by the Managing Member in its sole discretion.

(b)    The Managing Member shall consult with the Board of Managers prior to taking any action materially affecting the business of the Company; provided, that such failure to consult with the Board of Managers shall not void any action taken by the Managing Member; provided, further, that the Managing Member shall be liable for any actual Losses resulting from conduct that willfully breaches its obligations set forth herein, including this Section 8.3(b).

(c)    Ordinary meetings of the Board of Managers shall be held quarterly and special meetings of the Board of Managers may be called by the Managing Member or upon written request to the Managing Member of a majority of the Board of Managers. Meetings of the Board of Managers shall be held in the United States of America, or such other place as shall be determined by the Managing Member or the Board of Managers.

(d)    In the case of any meeting of the Board of Managers, notice thereof must be delivered at least five (5) Business Days prior to such meeting (or in the case of urgent matters, such shorter notice as may be practical under the circumstances but in any event no less than 48 hours' notice). The notice shall contain a reasonably detailed agenda setting forth, among other things, those subjects which the Managing Member or any member of the Board of Managers may have proposed for the discussion at said meeting. Presence of any member of the Board of Managers at any meeting of the Board of Managers shall be deemed to be an effective waiver of notice with respect thereto.

(e)    The quorum for any meeting of the Board of Managers shall be met if a majority of the Board of Managers, including at least two (2) members of the Board of Managers appointed by the Managing Member are present.

(f)    Any member of the Board of Managers may participate in any meeting of the Board of Managers by telephone, video conference or by any other similar electronic means through which all participants may communicate simultaneously. Such participation shall constitute presence at such meeting for purposes of Section 8.3(e).

(g)    Any member of the Board of Managers may resign at any time upon written notice to the Managing Member.  A vacancy on the Board of Managers occurring because of death, resignation, removal or otherwise, may, but need not, be filled by the Managing Member.

(h)    The members of the Board of Managers shall not be compensated for their services on the Board of Managers, but the Company shall reimburse the members of the Board of Managers for all ordinary, necessary and direct expenses incurred by the members of the Board of Managers on behalf of the Company in carrying out the duties of the Board of Managers.

27

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001190

PX0594.197

Section 8.4    Resignation of the Managing Member.  The Member who is the Managing Member may resign at any time by delivering its written resignation to the Company, which shall include the appointment of a replacement Managing Member.  Such resignation shall be effective upon receipt thereof unless it is specified to be effective at some other time or upon the occurrence of some other event. The Company's acceptance of a resignation shall not be necessary to make it effective. The resignation of the Managing Member shall not affect its rights as a Member and shall not constitute a withdrawal of such Member.

Section 8.5    Compensation; No Employment. The Managing Member shall not be compensated for its services as the Managing Member, but the Company shall reimburse the Managing Member for all ordinary, necessary and direct expenses incurred by the Managing Member on behalf of the Company in carrying out the Company's business activities. Furthermore, notwithstanding anything to the contrary set forth in this Agreement, the parties acknowledge and agree that the Managing Member shall have the right to cause members of the Company Group to separately enter into services agreements with Fidelio Capital AB or its Affiliates providing for the payment of reasonable management or advisory fees for actual work performed and reimbursement of expenses.

## ARTICLE 9

## PRE-EMPTIVE RIGHTS

Section 9.1    Pre-emptive Right.

(a)    Issuance of New Units.  Notwithstanding anything herein to the contrary, the Company shall, and the Managing Member shall cause the Company to, issue any New Units at a price equal to their Fair Value at the time of issuance.  Subject to Section 3.2, in connection with any proposed issuance by the Company of any Units for cash (other than any issuance of Excluded Securities or issuances of Units in connection with an Initial Public Offering) (the "New Units"), each Member shall have the right (the "Pre-emptive Right") to purchase its pro rata portion of such New Units (each such Member, a "Pre-emptive Member").  If any Pre-emptive Member does not exercise his, her or its Pre-emptive Right, then each exercising Pre-emptive Member shall have the right to purchase its pro rata portion of the New Units with respect to which Pre-emptive Members do not exercise their Pre-emptive Rights.  A Pre-emptive Member's "pro rata portion" for purposes of this Article 7 means a fraction determined by dividing (x) the number of Common Units and Preferred Units owned by such Minority Member immediately prior to the date of such issuance, by (y) the total number of Common Units and Preferred Units held by all Members immediately prior to such date, in each case, calculated on a Fully Diluted Basis.  For the avoidance of doubt, (i) if the Company proposes to issue a combination of both Common Units and Preferred Units, an exercising Member may not purchase less than all of its pro rata portion of the Units being offered in such issuance and (ii) no Member shall have any Pre-emptive Right with respect to any proposed issuances by the Company of any Preferred Units of any class for consideration in kind.

(b)    Issuance of Unit Equivalents. Subject to Section 3.2, in connection with any proposed issuances by the Company of any Unit Equivalents that are convertible into Units (other than any issuance of Excluded Securities or issuance of Units in connection with an Initial

28

ny-1889866

Public Offering), each Member shall have the right to purchase its pro rata portion of such Unit Equivalents as if the issuance applied to the Units that may be subscribed for or converted into to pursuant to such Unit Equivalent.

Section 9.2     Procedures Relating to Pre-emptive Right.

(a)     Additional Issuance Notices. The Company shall give written notice (an "Issuance Notice") of any proposed issuance described in Section 7.1 to the Pre-emptive Members as soon as practicable after determining its intention to issue the New Units. The Issuance Notice shall set forth the material terms and conditions of the proposed issuance, including:

(i)     the number and description of the New Units proposed to be issued;

(ii)     the proposed issuance date, which shall be at least 45 days from the date of the Issuance Notice; and

(iii)     the proposed purchase price per New Unit.

(b)     Exercise of Pre-emptive Rights. Each Pre-emptive Member shall for a period of 30 days following the receipt of an Issuance Notice (the "Exercise Period") have the right to elect irrevocably to purchase its pro rata portion of the New Units at the purchase price set forth in the Issuance Notice by delivering a written notice to the Company. The closing of any purchase by any Pre-emptive Member shall be consummated concurrently with the consummation of the issuance described in the Issuance Notice.

(c)     Over-Allotment.  No later than three (3) Business Days following the expiration of the Exercise Period, the Company shall notify each Pre-emptive Member in writing of the number of New Units that each Pre-emptive Member has agreed to purchase (including, for the avoidance of doubt, where such number is zero) (the "Over-allotment Notice"). Each Pre-emptive Member exercising its rights to purchase its pro rata portion of the New Units in full (an "Exercising Member") shall have a right of over-allotment to purchase its pro rata portion (determined as if the Units owned by the Exercising Members were the only Units of the Company) of the New Units that that any Pre-emptive Members elected not to purchase, by giving written notice to the Company within five (5) Business Days of receipt of the Over-allotment Notice (the "Over-allotment Exercise Period").

(d)     Sales to the Prospective Buyer. Following the expiration of the Over-allotment Exercise Period, the Company shall be free to complete the issuance of any New Units that the Pre-emptive Members have elected not to purchase, on terms no less favorable to the Company than those set forth in the Issuance Notice (except that the amount of New Units to be issued by the Company may be reduced); *provided*, that such issuance is closed within ninety (90) days after the expiration of the Over-allotment Exercise Period.  In the event the Company has not sold such New Units within such time period, the Company shall not thereafter issue or sell any New Units without first again offering such securities to the Pre-emptive Members in accordance with the procedures set forth in this Section 9.2.

29

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001192

PX0594.199

(e)     Closing of the Issuance. Any New Units issued in accordance with this Section 9.2 shall be issued free and clear of any liens (other than those arising hereunder or any other agreement between each Exercising Member and the Company).  At the closing of such issuance, each Exercising Member shall deliver to the Company the purchase price for the New Units purchased by it by wire transfer of immediately available funds.  Each party to the purchase and sale of New Units shall take all such other actions as may be reasonably necessary to consummate the purchase and sale including entering into such additional agreements as the Managing Member determines to be necessary or appropriate.

(f)     Expedited Timing.  Notwithstanding anything to the contrary in this Article 9, the Managing Member shall be entitled to implement an issuance of New Units by purchasing all New Units which the Members are jointly entitled to purchase and, as soon as reasonably practicable thereafter, offer the other Members the right to purchase, in a secondary offering, the New Units which they otherwise would have been entitled to purchase, on the same terms and pursuant to the procedures set forth in this Section 9.2.

## ARTICLE 10

## TRANSFER; CONVERSION

Section 10.1   General Restrictions on Transfer.

(a)     For a period of two (2) years from and after the applicable Admission Date for a Minority Member ("New Member Period"), such Minority Member may not Transfer any Units or Unit Equivalents without the prior approval of the Managing Member, except for any Transfers to (x) a Controlled Entity or (y) pursuant to Section 10.3 or Section 10.4. Following the New Member Period, subject to Section 10.1(b), no Minority Member may Transfer any Units or Unit Equivalents except for a Transfer of no less than all of the Units or Unit Equivalents held by such Minority Member (i) to a Third Party Purchaser, subject to Section 10.2, (ii) to a Controlled Entity, or (iii) pursuant to Section 10.3 or Section 10.4.

(b)     Without the consent of the Managing Member, no Minority Member may (i) pledge or otherwise encumber any of the Units, Unit Equivalents held by such Minority Member or, in the event such Minority Member holds Units or Unit Equivalents through a Controlled Entity, any equity in such Controlled Entity (other than pursuant to Section 11.3 hereof) or enter into any agreement or arrangement in respect of the voting rights attached to and arising out of such Units, Unit Equivalents or equity in such Controlled Entity, (ii) Transfer any of the Units or Unit Equivalents held by such Minority Member to any Person that, directly or indirectly, competes with the business of the Company Group or Fidelio Capital AB, to be determined in the Managing Member's reasonable good faith discretion, or (iii) in the event such Minority Member holds Units or Unit Equivalents through a Controlled Entity, transfer any equity in such Controlled Entity, either to a third party or to another Minority Member.

(c)     No Transfer of Units or Unit Equivalents to a Person not already a Member of the Company shall be deemed completed unless and until the prospective Transferee is admitted as a Member of the Company in accordance with Section 4.1(b).

30

ny-1889866

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001193

PX0594.200

(d)     Notwithstanding any other provision of this Agreement, prior to the consummation of an Initial Public Offering, each Minority Member agrees that, unless otherwise determined by the Managing Member, it will not, directly or indirectly, Transfer any of its Units or Unit Equivalents, and the Company agrees that it shall not issue any Units or Unit Equivalents:

(i)     if such Transfer would violate the Securities Act or other applicable federal or state securities or blue sky laws, or, with respect to a Transfer of Units or Unit Equivalents, if requested by the Company, the Transferor fails to deliver to the Company an opinion of counsel in form and substance satisfactory to the Company to the effect that such Transfer may be effected without registration under the Securities Act;

(ii)     if such Transfer or issuance would cause the Company to be considered a "publicly traded partnership" under Section 7704(b) of the Code within the meaning of Treasury Regulation Section 1.7704-1(h)(1)(ii), including the look-through rule in Treasury Regulation Section 1.7704-1(h)(3);

(iii)     if such Transfer or issuance would affect the Company's existence or qualification as a limited liability company under the Delaware Act;

(iv)     if such Transfer or issuance would cause the Company to lose its status as a partnership for U.S. federal income tax purposes;

(v)     if such Transfer or issuance would cause any member of the Company Group, Fidelio Capital AB, Ossium Topco AB or any of its Subsidiaries to be required to register as an investment company under the Investment Company Act of 1940, as amended; or

(vi)     if the Managing Member determines that such Transfer would have a material adverse effect on the Company or the Initial Public Offering as a result of any regulatory or other restrictions imposed by any Governmental Authority.

(e)     Any Transfer or attempted Transfer of any Units or Unit Equivalents in violation of this Agreement shall be null and void *ab initio*, no such Transfer shall be recorded on the Company's books and the purported Transferee in any such Transfer shall not be treated (and the purported Transferor shall continue be treated) as the owner of such Units or Unit Equivalents for all purposes of this Agreement.  A Person who acquires Units but who is not admitted as a substituted Member pursuant to Section 4.1 shall be entitled only to distributions with respect to such Units in accordance with this Agreement, and shall have no right to any information or accounting of the affairs of the Company, shall not be entitled to inspect any books or records of the Company, and shall not have any of the rights of a Member under the Delaware Act or this Agreement.

Section 10.2    Managing Member Right of First Refusal.  If any Minority Member wishes to Transfer all of the Units and Unit Equivalents held by such Minority Member to any third party (the "Proposed Transfer"), such Minority Member shall first give written notice (a "ROFR Notice") of such Transfer to the Managing Member, including the number of Units or Unit Equivalents proposed to be Transferred, the identity of the proposed purchaser (including its

31

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001194

PX0594.201

ultimate beneficial owner), the proposed Transfer date, which shall be at least 45 days from and after the date on which the Managing Member received the ROFR Notice (the "ROFR Response Period"), and the proposed cash purchase price per unit.  The Managing Member (or any designee of the Managing Member, including the Company) shall, for a period of 30 days following the receipt of a ROFR Notice have the right (the "ROFR") to purchase all (but not less than all) of the Units at the purchase price set forth in the ROFR Notice by delivering a written notice to such selling Minority Member.  If the Managing Member or its designee chooses to exercise the ROFR, the ROFR purchase shall be consummated on the proposed Transfer date set forth in the ROFR Notice.  If the Managing Member does not exercise its ROFR, then the selling Minority Member shall have 90 days following the date of the expiration of the ROFR Response Period to consummate the Proposed Transfer set forth in the ROFR Notice.  If at the end of such period the selling Minority Member has not completed the Proposed Transfer, then the Minority Member may not proceed with the Proposed Transfer without fully complying with the provisions of this Section 10.2 again. This ROFR shall not apply to a transfer of Units by a Minority Member to a Controlled Entity.

Section 10.3    Drag-along Right; Tag-along Right.

(a)    At any time prior to the consummation of an Initial Public Offering, if the Managing Member proposes to consummate, in one transaction or a series of related transactions, a Change of Control (such transaction, a "Drag/Tag Transaction"), (i) the Managing Member shall have the right (the "Drag-along Right") to require each Minority Member to participate in such Drag/Tag Transaction (including, if requested by the Managing Member, by converting their Unit Equivalents into the Units to be sold in a Drag/Tag Transaction or, in connection with a Drag/Tag Transaction involving Ossium HoldCo, LLC, by (x) exchanging their Units for equity interests in Ossium HoldCo, LLC having such percentage and classes of units in Ossium HoldCo, LLC (as reasonably determined by the Managing Member) so as to ensure that the Minority Member receives the same amount of transaction proceeds as the relevant Minority Member would have received in case the Minority Member would have sold its Units in the Company (whereby, for the avoidance of doubt, the value of the Units received by the Minority Member in the Company or Ossium HoldCo, LLC (as applicable) in exchange for the transferred Units or Unit Equivalents (as applicable) shall, immediately after such transfer, not be lower or higher than the Fair Value of the transferred Unit Equivalents or Units immediately prior to such transfer compared to the Fair Value of the units or other equity interests of Ossium HoldCo, LLC), or at the Managing Member's reasonable discretion (y) selling their pro rata portion of Units in the Company to the Managing Member or its designee (including the Company)) so as to ensure that the Minority Member receives the same amount of transaction proceeds as the Minority Member would have received in case the Managing Member would have sold its Units in the Company in such Change of Control transaction (as reasonably determined by the Managing Member), and (ii) assuming the Managing Member does not exercise its Drag-along Right, each Minority Member shall have the right (the "Tag-along Right") to participate in such Drag/Tag Transaction, and in each case, to sell such Minority Member's pro rata portion of Units in such Drag/Tag Transaction.  Notwithstanding anything herein to the contrary, the Drag-along Right and Tag-along Right shall only apply in the event the applicable Drag/Tag Transaction actually closes. In case of an exchange of Units for equity interests in Ossium HoldCo, LLC, each Minority Member shall be obliged to adhere (by executing a joinder agreement) as a "Member" to the Limited Liability Company Agreement

32

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001195

PX0594.202

regarding the joint ownership of Ossium HoldCo, LLC dated 9 March 2020, a copy of which is attached hereto as Exhibit B (as amended and restated from time to time).

A Minority Member's "pro rata portion" for purposes of this Section 10.3 means, (A) if the Drag/Tag Transaction involves a sale of only Common Units, a fraction determined by dividing (x) the number of Common Units owned by such Minority Member immediately prior to the date of such proposed Drag/Tag Transaction, by (y) the total number of Common Units held by all Members immediately prior to such date, in each case, calculated on a Fully Diluted Basis; (B) if the Drag/Tag Transaction involves a sale of only Preferred Units, a fraction determined by dividing (x) the number of Preferred Units owned by such Minority Member immediately prior to the date of such proposed Drag/Tag Transaction, by (y) the total number of Preferred Units held by all Members immediately prior to such date, in each case, calculated on a Fully Diluted Basis; and (C) if the Drag/Tag Transaction involves a sale of a combination of Common Units and Preferred Units, then the pro rata portion applicable to those Common Units to be sold shall be determined by clause (A), and the pro rata portion applicable to those Preferred Units to be sold shall be determined by clause (B) above; *provided*, as applied to clause (i) of this Section 10.3(a) only, that if the Managing Members sells all of its Units in such Drag/Tag Transaction, regardless of the class of such Units to be sold, then each Minority Member shall be required to participate in such Drag/Tag Transaction by selling all of his, her or its Units in the Drag/Tag Transaction.

(b)      For the avoidance of doubt, the Tag-along Rights of the Minority Members shall not apply to a sale of Units to an Affiliate of the Company or a Person which, directly or indirectly, is controlling, controlled by or under common control with the Managing Member, Fidelio Capital AB or any other Person who acquires control of the Company; *provided however,* Tag-along Rights of the Minority Members shall apply to the extent that such Affiliate or Person which, directly or indirectly, is controlling, controlled by or under common control with the Managing Member, Fidelio Capital AB or any other Person who acquires control of the Company desires to transfer and/or sell any Units to a Third Party Purchaser (which is not an Affiliate or Person which, directly or indirectly, is controlling, controlled by or under common control with the Managing Member, Fidelio Capital AB or any other Person who acquires control of the Company).

(c)      If the Drag-along Right is exercised or, if the Drag-along Right is not exercised but the Tag-along Right is exercised, in each case, pursuant to Section 10.3(a), the sale of Units by the Minority Members shall receive the same form and amount of consideration to be received by the Managing Member per Unit and the terms and conditions of such sale shall be the same as those upon which the Managing Member sells its Units, except (i) as otherwise set forth in this Agreement, (ii) in the case of any Drag/Tag Transaction for consideration that includes non-cash property, the Managing Member may require each Minority Member to accept cash in an amount equal to the fair market value of such non-cash property consideration as determined by the Managing Member in its reasonable good faith discretion, and (iii) each Minority Member shall execute the applicable purchase agreement and make or provide the same representations, warranties, covenants, indemnities and agreements as those made by the Managing Member (except that each Minority Member may also be required to execute customary non-competition and non-solicitation covenants in connection therewith, provided,

33

ny-1889866

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001196

PX0594.203

however, that such non-compete undertakings shall not be more burdensome than the non-compete undertakings in Section 11.2).

      (d)    <u>Drag/Tag Notice</u>.  No more than 10 Business Days after exercising its Drag-along Right or, otherwise, at least 30 days prior to the closing of a Drag/Tag Transaction, the Managing Member shall deliver a written notice (the "<u>Drag/Tag Notice</u>") to each Minority Member describing in reasonable detail:

      (i)    The identity of the proposed purchaser;

      (ii)    The proposed date, time and location of the closing of the sale;

      (iii)    The number of Common Units and Preferred Units to be sold by the Managing Member, the proposed amount of consideration for the Drag/Tag Transaction and the other material terms and conditions of the Drag/Tag Transaction, including a description of any non-cash consideration in sufficient detail to permit the valuation thereof and including, if applicable, the purchase price per Unit; and

      (iv)    A copy of any form of agreement proposed to be executed in connection therewith.

      (e)    <u>Exercise of Tag-along Right</u>.  If the Managing Member elects not to exercise its Drag-along Right, each Minority Member shall, for a period of 30 days following the receipt of a Drag/Tag Notice have the right to exercise its Tag-along Right by delivering a written notice thereof to the Managing Member.  The election of a Minority Member in such a notice shall be irrevocable, and such Tag-along Member shall be bound and obligated to consummate the Transfer on the terms and conditions set forth in this Section 10.3.  Each Minority Member who does not deliver such a notice shall be deemed to have waived such Minority Member's Tag-along Right, and the Managing Member shall (subject to the rights of any other Minority Members exercising their Tag-along Rights) thereafter be free to sell to the proposed transferee the Units and/or Unit Equivalents identified in the Drag/Tag Notice at a per Unit price that is no greater than the per Unit price set forth in the Drag/Tag Notice and on other terms and conditions which are not in the aggregate materially more favorable to the Minority Member than those set forth in the Drag/Tag Notice, without any further obligation to the Minority Members.

      (f)    <u>Expenses</u>. The fees and expenses of the Managing Member or the Company incurred in connection with a Drag/Tag Transaction and for the benefit of all Minority Members (it being understood that costs incurred by or on behalf of the Managing Member for its sole benefit will not be considered to be for the benefit of all Minority Members) and, to the extent not paid or reimbursed by the applicable purchaser, shall be paid by the Company or the extent that the Company cannot make such payment, shall be shared by the Managing Member and all the Minority Members on a pro-rata basis, based on the consideration received by each such Member; *provided*, that no Minority Member shall be obligated to make any out-of-pocket expenditure prior to the consummation of the Drag/Tag Transaction.

      (g)    <u>Power of Attorney</u>.  Each of the Minority Members hereby grants a power of attorney to the Managing Member with full power of substitution and coupled with an interest,

<div align="center">34</div>

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001197

PX0594.204

to act on behalf of such Minority Member, and to perform such actions related to negotiating reasonable contractual terms such as price and lock-up restrictions, execute such documents and enter into such undertakings which are deemed necessary in order to complete a Drag/Tag Transaction in accordance herewith and subject to the terms of this Agreement, including Section 10.3(c).

Section 10.4    Managing Member Call Right.

(a)    Call Right.  Subject to Section 10.4(b), following a Triggering Event the Managing Member shall have the right to require the applicable Minority Member and such Minority Member's Controlled Entity to sell to the Managing Member (or a designee of the Managing Member, including the Company) all or any portion of such Minority Member's or its Controlled Entity's Units and Unit Equivalents, as determined by the Managing Member, at the following respective purchase prices:

|  | Applicable Triggering Event | Call Purchase Price |
|---|---|---|
| (i) | Such Minority Member's employment with the Company Group is terminated or notified for termination (for the avoidance of doubt, the termination that follows a notice of termination shall be considered a separate and new Triggering Event) within twenty (24) months of such Minority Member's initial Admission Date (x) by such Minority Member, other than for death or disability, or (y) for Cause. | The lower of (A) the amount paid for the relevant Units and Unit Equivalents held by such Minority Member *less* the aggregate amount of any Distributions and any amounts otherwise received by such Minority Member from the Company on such equity (the "Original Investment") and (B) seventy-five percent (75%) of the then Fair Value of the relevant Units and Unit Equivalents held by such Minority Member. |
| (ii) | Such Minority Member's employment with the Company Group is terminated for any reason other than those set forth in row (i) above (which for the avoidance of doubt shall include the Minority Member's death, disability, dissolution or retirement in accordance with the terms of his or her employment agreement with the Company Group). | The then Fair Value of the relevant Units and Unit Equivalents held by such Minority Member. |
| (iii) | The member of the Company Group where such Minority Member is employed is divested or ceases to be controlled by the Company or its Affiliates. | The then Fair Value of the relevant Units and Unit Equivalents held by such Minority Member. |
| (iv) | Such Minority Member undergoes a Bankruptcy event. | The then Fair Value of the relevant Units and Unit Equivalents held by such Minority Member. |
| (v) | Such Minority Member is required to Transfer his or her Units (directly or indirectly through a transfer of shares in a Controlled Entity) pursuant to divorce | The then Fair Value of the relevant Units and Unit Equivalents held by such Minority Member. |

35

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001198

PX0594.205

| | proceedings. | |
|---|---|---|
| (vi) | Such Minority Member (x) materially breaches the terms of this Agreement (for the avoidance of doubt, a breach of any term set forth in Article 10, Section 11.1 and Section 11.2 shall always be considered a material breach if such breach has not been remedied (if capable of being remedied) within ten (10) Business Days after the breaching Party's receipt of a written notice from the Managing Member requesting it to remedy such breach) or (y) commits any criminal acts. | The lower of (x) seventy-five percent (75%) of the Original Investment and (ii) seventy-five percent (75%) of the then Fair Value of the relevant Units and Unit Equivalents held by such Minority Member. |

References to employment or an employment agreement in this Section 10.4 shall apply *mutatis mutandis* to any arrangement (whether or not formalized) pursuant to which a Minority Member is (a) employed by a Group Company; (b) retained as a consultant on a regular and substantive basis by a Group Company; or (c) retained as a member of the board of directors of a Group Company (in each case as amended and restated from time to time).

(b)     Procedure.  If a Triggering Event occurs, the applicable Minority Member shall notify the Managing Member thereof in writing as soon as reasonably practicable but in no event later than 30 days following such occurrence.  The Managing Member shall have the right to exercise the call right and acquire, or appoint a designee (which may be the Company) to acquire, all or part of the Units held by the applicable Minority Member, as determined by the Managing Member, by giving written notice to such Minority Member within six (6) months from the date the Managing Member's receipt of the notice referred to in the previous sentence or, absent such notice, from the date the Managing Member acquires actual knowledge of the Triggering Event.  If the Managing Member desires to exercise its right to purchase Units pursuant to this Section 10.4, the Managing Member or its designee shall deliver to the applicable Minority Member a written notice (the "Repurchase Notice") specifying the number of Units to be repurchased by the Managing Member or its designee (the "Repurchased Units"), the closing date of such purchase (which shall not be less than 5 Business Days following delivery of the Repurchase Notice) and the respective Call Purchase Price therefor in accordance with Section 10.4(a) (the "Call Purchase Price").  The Managing Member or its applicable designee shall pay the applicable Call Purchase Price to the Minority Member by wire transfer of immediately available funds to an account designated by the Minority Member.

(c)     Cooperation.  The applicable Minority Member shall take all actions as may be reasonably necessary or reasonably requested by the Managing Member to consummate the sale contemplated by this Section 10.4, including delivering certificates and instruments and consents as may be deemed necessary or appropriate by the Managing Member.  At the closing of such transaction, the Managing Member shall update the Members Schedule.

(d)     Acknowledgement.  The Company, the Managing Member and each Member (including New Members) acknowledge, as of such Member's Admission Date, that the occurrence of a Triggering Event with respect to such Member is not more likely than not to occur in the future.

36

ny-1889866

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001199

PX0594.206

Section 10.5    Conversion to Corporation; Registration.

(a)    In the event that the Managing Member shall determine, in its sole discretion, that it is in the best interest of the Company to facilitate an offering of Equity Securities in the Company or a successor through an Initial Public Offering, then the Managing Member shall have the power to cause the Company to be reorganized as a corporation under the General Corporation Law of the State of Delaware by incorporation, merger, contribution or other permissible manner (a "Conversion" and the successor of the Company pursuant to such Conversion, the "Corporation"), and the Minority Members shall cooperate in good faith to effectuate such Conversion and public offering, including taking such actions as are, in the opinion of the Managing Member, necessary or appropriate, including (i) dissolving the Company, creating one or more subsidiaries of the newly formed corporation and transferring to such subsidiaries any or all of the assets of the Company (including by merger) or (ii) causing the Minority Members to, and the Minority Members agree to, exchange their Units for shares of common stock of the Corporation.  In connection with a Conversion of Ossium HoldCo, LLC (rather than the Company), each Minority Member shall exchange their Units or Unit Equivalents for equity interests in Ossium HoldCo, LLC having such percentage and classes of units in Ossium HoldCo, LLC (as reasonably determined by the Managing Member) so as to ensure that the value of the equity interests received by the Minority Member in Ossium HoldCo, LLC in exchange for the transferred Units or Unit Equivalents (as applicable) shall, immediately after such transfer, not be lower or higher than the Fair Value of the transferred Unit Equivalents or Units immediately prior to such transfer compared to the Fair Value of the units or other equity interests of Ossium HoldCo, LLC).  Each Minority Member shall in connection with such exchange accede to the limited liability company agreement of Ossium HoldCo, LLC.

(b)    Following a Conversion, the Managing Member shall have the right to initiate an Initial Public Offering, upon which the Members shall abide by all obligations and restrictions imposed by and any advice and instructions given (including any lock-up, non-competition, and non-solicitation obligations) by the investment bank(s) advising on the offering or the relevant stock exchange.  In connection with any Conversion, Members who hold Common Units and Preferred Units shall be entitled to receive common stock of the Corporation in proportion to the proceeds that each such Member would receive if the Company were sold for the then-applicable Fair Value and the proceeds were Distributed in accordance with Section 7.1(c).  Whether or not in connection with an Initial Public Offering, the Managing Member shall have the right to undertake any refinancing, recapitalization, restructuring or other reorganization of the Company Group (including a Conversion).  In connection with an Initial Public Offering, the Managing Member shall have the right to negotiate, execute and otherwise act on behalf of each Minority Member in relation thereto, including with respect to contractual terms such as regarding price, any lock-up agreements, and non-competition and non-solicitation agreements. Each of the Minority Members hereby grants a power of attorney to the Managing Member with full power of substitution and coupled with an interest, to act on behalf of such Minority Member in connection with the foregoing.

(c)    The fees and expenses of the Managing Member incurred in connection with a Conversion and/or Initial Public Offering for the benefit of all Minority Members (it being understood that costs incurred by or on behalf of the Managing Member for its sole benefit will not be considered to be for the benefit of all Minority Members) shall be shared by the Managing

37

ny-1889866

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001200

PX0594.207

Member and all the Minority Members on a pro-rata basis, based on the number of shares of common stock of the Corporation owned by each; *provided*, that no Minority Member shall be obligated to make any out-of-pocket expenditure prior to the consummation of the Initial Public Offering.

## ARTICLE 11

## COVENANTS

Section 11.1   Confidentiality.

(a)   Each Member acknowledges that during the term of this Agreement, he, she or it will have access to and become acquainted with Proprietary Information of the Company Group, Fidelio Capital AB, Ossium Topco AB and its Subsidiaries. In addition, each Member acknowledges that: (i) the Company has invested, and continues to invest, substantial time, expense and specialized knowledge in developing its Proprietary Information; (ii) the Proprietary Information provides the Company with a competitive advantage over others in the marketplace; and (iii) the Company would be irreparably harmed if the Proprietary Information were disclosed to competitors or made available to the public. Without limiting the applicability of any other agreement to which any Minority Member is subject, for the period beginning from a Minority Member's Admission Date until the date that is the second (2nd) anniversary after the date on which the Minority Member ceases to be a Member (the "Restricted Period"), no Minority Member shall, directly or indirectly, disclose or use (other than solely for the purposes of such Minority Member monitoring and analyzing his, her or its investment in the Company or the Company Group or performing his or her duties as an Officer, employee, consultant or other service provider of the Company Group, Fidelio Capital AB, Ossium Topco AB or any of its Subsidiaries) at any time, including, use for personal, commercial or proprietary advantage or profit, either during his or her association or employment with the Company or thereafter, any Proprietary Information of which such Minority Member is or becomes aware. Each Minority Member in possession of Proprietary Information shall take all appropriate steps to safeguard such information and to protect it against disclosure, misuse, espionage, loss and theft.

(b)   Each Member acknowledges that he, she or it may disclose such portion (and only such portion) of the Proprietary Information, as such Member reasonably determines, based on advice of counsel, is legally obligated to disclose if (i) such Member receives a request to disclose all or any part of the Proprietary Information under the terms of a subpoena, civil investigative demand or order issued by a Governmental Authority or required by Applicable Law; (ii) to the extent permitted by such request and Applicable Law, such Member notifies the Company Group of the existence, terms and circumstances surrounding such request; and (iii) upon the request and at the expense of the Company Group, such Member exercises commercially reasonable efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to the disclosed Proprietary Information.

Section 11.2   Covenant Not to Compete.

(a)   During the Restricted Period, except for the benefit of the Company Group, each Minority Member shall not, and shall not permit any of their respective Affiliates to,

ny-1889866

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001201

PX0594.208

directly or indirectly, (i) engage in or assist others in engaging in any business which competes with the business of the Company Group; (ii) have an interest in any Person that engages directly or indirectly in the business of the Company Group in any capacity, including as a partner, shareholder, member, lender, investor, employee, director, manager, principal, agent, trustee or consultant; or (iii) interfere in any material respect with the business relationships (whether formed prior to or after the date of this Agreement) between any member of the Company Group, on the one hand, and the customers, suppliers or other business relationships of any member of the Company Group, on the other hand.

(b)     During the Restricted Period, each Minority Member shall not, and shall not permit any of their respective Affiliates to, directly or indirectly, hire or solicit any employee of any member of the Company Group or encourage any such employee to leave or terminate such employment or hire any such employee who has left or terminated such employment.

(c)     During the Restricted Period, each Minority Member shall not, and shall not permit any of their respective Affiliates to, directly or indirectly, solicit or entice, or attempt to solicit or entice any present or potential customer, distributor, vendor, supplier, advisor or any other Person who has a business relationship with any member of the Company Group for purposes of diverting their business or services to any other Person, from any such member of the Company Group, or terminating or materially decreasing their business or services from any member of the Company Group.

(d)     The Minority Members acknowledge that a breach or threatened breach of this Section 11.2 would give rise to irreparable harm to the Company Group, for which monetary damages would not be an adequate remedy, and hereby agree that in the event of a breach or a threatened breach of any such obligations, the Company Group shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to seek equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

(e)     The Minority Members acknowledge that the restrictions contained in this Section 11.2 are reasonable and necessary to protect the legitimate interests of the Company Group.  In the event that any covenant contained in this Section 11.2 should ever be adjudicated to exceed the time, geographic, product or service, or other limitations permitted by Applicable Law in any jurisdiction, then any court is expressly empowered to reform such covenant, and such covenant shall be deemed reformed, in such jurisdiction to the maximum time, geographic, product or service, or other limitations permitted by Applicable Law.  The covenants contained in this Section 11.2 and each provision hereof are severable and distinct covenants and provisions.  The invalidity or unenforceability of any such covenant or provision as written shall not invalidate or render unenforceable the remaining covenants or provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such covenant or provision in any other jurisdiction.

Section 11.3   Pledge of Minority Members.  Each Minority Member hereby pledges, grants a security interest in, assigns, transfers and delivers unto the Managing Member and the Company (or their respective designees), the Units held by such Minority Member as collateral

39

ny-1889866

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001202

PX0594.209

security for the payment and performance by such Minority Member of his, her or its undertakings and obligations to any member of the Company Group, or any of their Affiliates (collectively, the "Company Group Indemnitees") under or pursuant to this Agreement and any of the Acquisition Documents to which such Minority Member is a party.  In the event that any Minority Member has an outstanding obligation to indemnify any Company Group Indemnitee under or pursuant to this Agreement or one or more of the Acquisition Documents, the Managing Member shall be entitled, without further notice to such Minority Member and without necessity for legal proceedings, to deduct from the Units (the "Indemnification Deduction") held by such Minority Member the number of Units (the "Forfeited Units"), based on the then Fair Value of such Units sufficient to satisfy such Minority Member's outstanding indemnification obligations to such Company Group Indemnitee, and the Forfeited Units shall be forfeited by such Minority Member.  The Managing Member shall promptly notify the applicable Minority Member of any such Indemnification Deduction and update the number of Units held by such the Minority Member in the Members Schedule to reflect such Indemnification Deduction.

## ARTICLE 12

## ACCOUNTING; TAX RETURNS

Section 12.1    Financial Statements. As soon as available, the Company shall furnish to each Member audited consolidated balance sheets of the Company as at the end of each such Fiscal Year and consolidated statements of income and cash flows for such Fiscal Year; *provided*, that following a Triggering Event, the applicable Member shall not be entitled to receive the financial statements provided pursuant to this Section 12.1.

Section 12.2    Inspection Rights. Upon reasonable notice from a Member, the Company shall, and shall cause its Officers and employees to, afford each Member and its Representatives reasonable access during normal business hours to the corporate, financial and similar records, reports and documents of the Company; *provided*, that without the prior approval of the Managing Member, no Minority Member shall be permitted to review, inspect or otherwise have access to any information set forth in the Members Schedule in relation to any Member other than the inspecting Minority Member and its Affiliates (except for each other Member's notice information); *provided further*, that following a Triggering Event, the applicable Member shall not be entitled to any rights under this Section 12.2.

Section 12.3    Company Tax Representative.

(a)    Appointment.  The Members hereby appoint the Managing Member as the "Company Tax Representative" who shall serve as the "partnership representative" (as such term is defined in Code Section 6223(a)) for the Company.

(b)    Tax Examinations and Audits.  The Company Tax Representative is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by Taxing Authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith. Each Member agrees to take all actions that the Company Tax Representative informs it are reasonably necessary in connection with an audit by any Taxing

40

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001203

PX0594.210

Authority, including without limitation (i) providing any information reasonably requested in connection with any tax audit or related proceeding (which information may be freely disclosed to the Internal Revenue Service or other relevant taxing authorities), (ii) paying all liabilities attributable to such Member as the result of an election under Section 6226 of the Code, (iii) filing any amended returns that the Company Tax Representative determines to be necessary or appropriate to reduce an imputed underpayment under Section 6225(c) of the Code and/or (iv) complying with the requirements of any alternative procedure set forth in Section 6225(c) of the Code.  If any income tax audit of the Company results in the imposition of a tax liability on the Company itself and the Managing Member reasonably determines that any portion of such liability (including associated interest and penalties) is attributable to a Member, then such amount shall, at the Managing Member's election and without duplication be (i) paid to the Company immediately upon demand by the Managing Member, and/or (ii) treated as a Withholding Advance pursuant to Section 7.3.  Any payment by a Member pursuant to clause (i) shall not be treated as a Capital Contribution.  The provisions of this Section 12.3(b) shall survive the termination, dissolution, liquidation and winding up of the Company and the withdrawal of such Member from the Company or Transfer of its Units. The Company may pursue and enforce all rights and remedies it may have against each Member under this Section 12.3(b), including bringing a lawsuit to collect repayment with interest.

      (c)    <u>Income Tax Elections</u>.  The Managing Member shall have sole discretion to make any income tax election it deems advisable on behalf of the Company. All determinations as to tax elections and accounting principles shall be made solely by the Managing Member.

      (d)    <u>Tax Returns and Tax Deficiencies</u>.  Each Member agrees that such Member shall not treat any Company item inconsistently on such Member's U.S. federal, state, non-U.S. or other income tax return with the treatment of the item on the Company's return. The Company Tax Representative shall have sole discretion to determine whether the Company (either on its own behalf or on behalf of the Members) will contest or continue to contest any tax deficiencies assessed or proposed to be assessed by any Taxing Authority. Any deficiency for taxes imposed on any Member (including penalties, additions to tax or interest imposed with respect to such taxes) will be paid by such Member and if required to be paid (and actually paid) by the Company, will be recoverable from such Member as provided in Section 7.3(c) and Section 12.3(b).

      (e)    <u>Resignation</u>.  The Company Tax Representative may resign at any time. If the Managing Member ceases to be the Company Tax Representative for any reason, the Requisite Holders shall appoint a new Company Tax Representative.

      Section 12.4    <u>Tax Returns</u>. At the expense of the Company, the Managing Member (or any Officer that the Managing Member may designate pursuant to Section 8.2) shall endeavor to cause the preparation and timely filing (including extensions) of all tax returns required to be filed by the Company pursuant to the Code as well as all other required tax returns in each jurisdiction in which the Company Group owns property or does business. As soon as reasonably possible after the end of each Fiscal Year, the Managing Member or designated Officer will cause to be delivered to each Person such information with respect to the Company as may be

<div align="center">41</div>

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001204

PX0594.211

necessary for the preparation of such Person's U.S. federal, state and local and non-U.S. income tax returns for such Fiscal Year.

Section 12.5   Company Funds. All funds of the Company shall be deposited in its name, or in such name as may be designated by the Managing Member, in such checking, savings or other accounts, or held in its name in the form of such other investments as shall be designated by the Managing Member. The funds of the Company shall not be commingled with the funds of any other Person. All withdrawals of such deposits or liquidations of such investments by the Company shall be made exclusively upon the signature or signatures of such Officer or Officers as the Managing Member may designate.

## ARTICLE 13

## DISSOLUTION AND LIQUIDATION

Section 13.1   Events of Dissolution. The Company shall be dissolved and is affairs wound up only upon the occurrence of any of the following events:

(a)      The determination of the Managing Member to dissolve the Company;

(b)      The sale, exchange, involuntary conversion, or other disposition or Transfer of all or substantially all the assets of the Company; or

(c)      The entry of a decree of judicial dissolution under § 18-802 of the Delaware Act.

Section 13.2   Effectiveness of Dissolution. Dissolution of the Company shall be effective on the day on which the event described in Section 13.1 occurs, but the Company shall not terminate until the winding up of the Company has been completed, the assets of the Company have been distributed as provided in Section 13.3 and the Certificate of Formation shall have been cancelled as provided in Section 13.4.

Section 13.3   Liquidation. If the Company is dissolved pursuant to Section 13.1, the Company shall be liquidated and its business and affairs wound up in accordance with the Delaware Act and the following provisions:

(a)      Liquidator.  The Managing Member or a Person selected by the Managing Member shall act as liquidator to wind up the Company (the "Liquidator"). The Liquidator shall have full power and authority to sell, assign, and encumber any or all of the Company's assets and to wind up and liquidate the affairs of the Company in an orderly and business-like manner.

(b)      Accounting.  As promptly as possible after dissolution and again after final liquidation, the Liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable.

ny-1889866

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001205

PX0594.212

(c)     Distribution of Proceeds.  The Liquidator shall liquidate the assets of the Company and distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of Applicable Law:

(i)     First, to the payment of all of the Company's debts and liabilities to its creditors (including Members, if applicable) and the expenses of liquidation (including sales commissions incident to any sales of assets of the Company);

(ii)     Second, to the establishment of and additions to reserves that are determined by the Managing Member in its sole discretion to be reasonably necessary for any contingent unforeseen liabilities or obligations of the Company; and

(iii)     Third, to the Members in the same manner as Distributions are made under Section 7.1(c).

(d)     Discretion of Liquidator.  Notwithstanding the provisions of Section 13.3(c) that require the liquidation of the assets of the Company, but subject to the order of priorities set forth in Section 13.3(c), if upon dissolution of the Company the Liquidator determines that an immediate sale of part or all of the Company's assets would be impractical or could cause undue loss to the Members, the Liquidator may defer the liquidation of any assets except those necessary to satisfy Company liabilities and reserves, and may, in his, her or its absolute discretion, distribute to the Members, in lieu of cash, as tenants in common and in accordance with the provisions of Section 13.3(c), undivided interests in such Company assets as the Liquidator deems not suitable for liquidation. Any such distribution in kind shall be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any agreements governing the operating of such properties at such time.

Section 13.4     Cancellation of Certificate. Upon completion of the distribution of the assets of the Company as provided in Section 13.3(c) hereof, the Company shall be terminated and the Liquidator shall cause the cancellation of the Certificate of Formation in the State of Delaware and of all qualifications and registrations of the Company as a foreign limited liability company in jurisdictions other than the State of Delaware and shall take such other actions as may be necessary to terminate the Company.

Section 13.5     Survival of Rights, Duties and Obligations. Dissolution, liquidation, winding up or termination of the Company for any reason shall not release any party from any Loss which at the time of such dissolution, liquidation, winding up or termination already had accrued to any other party or which thereafter may accrue in respect of any act or omission prior to such dissolution, liquidation, winding up or termination. For the avoidance of doubt, none of the foregoing shall replace, diminish or otherwise adversely affect any Member's right to indemnification pursuant to Section 14.3.

Section 13.6     Recourse for Claims. Each Member shall look solely to the assets of the Company for all distributions with respect to the Company, and shall have no recourse therefor (upon dissolution or otherwise) against the Managing Member, any Officers, the Liquidator or any other Member.

43

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001206

PX0594.213

# ARTICLE 14

## EXCULPATION AND INDEMNIFICATION

Section 14.1    Exculpation of Covered Persons.

(a)    Standard of Care.  The Managing Member and each member of the Board of Managers shall, except as otherwise provided herein, act in a manner that it, he or she reasonably believes in good faith to be in the best interests of the Company, with the aim of equal economic treatment of the Members in proportion to their economic interest in the Company while acknowledging that the Members have different rights and obligations under this Agreement and hold different numbers and classes of Units. Except as otherwise set forth herein, no Covered Person shall be liable to the Company or any other Covered Person for any loss, damage or claim incurred by reason of any action taken or omitted to be taken by such Covered Person in good-faith reliance on the provisions of this Agreement, so long as such action or omission does not constitute fraud or willful misconduct by such Covered Person.

(b)    Good Faith Reliance.  A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements (including financial statements and information, opinions, reports or statements as to the value or amount of the assets, liabilities, Net Income or Net Loss of the Company or any facts pertinent to the existence and amount of assets from which distributions might properly be paid) of the following Persons or groups: (i) the Managing Member; (ii) one or more Officers or employees of the Company; (iii) any attorney, independent accountant, appraiser or other expert or professional employed or engaged by or on behalf of the Company; or (iv) any other Person selected in good faith by or on behalf of the Company, in each case as to matters that such relying Person reasonably believes to be within such other Person's professional or expert competence. The preceding sentence shall in no way limit any Person's right to rely on information to the extent provided in § 18-406 of the Delaware Act.

Section 14.2    Liabilities and Duties of Covered Persons.

(a)    Limitation of Liability.  This Agreement is not intended to, and does not, create or impose any fiduciary duty on any Covered Person. Furthermore, each of the Members and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied by Applicable Law, and in doing so, acknowledges and agrees that the duties and obligation of each Covered Person to each other and to the Company are only as expressly set forth in this Agreement. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person.

(b)    Duties.  Whenever in this Agreement a Covered Person is permitted or required to make a decision (including a decision that is in such Covered Person's "discretion" or under a grant of similar authority or latitude), the Covered Person shall be entitled to consider only such interests and factors as such Covered Person desires, including its own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person. Whenever in this Agreement a Covered Person is permitted or

44

ny-1889866

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

required to make a decision in such Covered Person's "good faith," the Covered Person shall act under such express standard and shall not be subject to any other or different standard imposed by this Agreement or any other Applicable Law.

Section 14.3    Indemnification.

(a)    Indemnification.  To the fullest extent permitted by the Delaware Act, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution or replacement only to the extent that such amendment, substitution or replacement permits the Company to provide broader indemnification rights than the Delaware Act permitted the Company to provide prior to such amendment, substitution or replacement), the Company shall indemnify, hold harmless, defend, pay and reimburse any Covered Person against any and all losses, claims, damages, judgments, fines or liabilities, including reasonable legal fees or other expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines or liabilities, and any amounts expended in settlement of any claims (collectively, "Losses") to which such Covered Person may become subject by reason of:

(i)    Any act or omission or alleged act or omission performed or omitted to be performed on behalf of the Company, any Member or any member of the Company Group of the foregoing in connection with the business of the Company; or

(ii)    The fact that such Covered Person is or was acting in connection with the business of the Company as a partner, member, stockholder, controlling Affiliate, manager, director, officer, employee or agent of the Company, any Member, or any of their respective controlling Affiliates, or that such Covered Person is or was serving at the request of the Company as a partner, member, manager, director, officer, employee or agent of any Person including the Company or any Company Subsidiary; *provided*, that (x) such Covered Person acted in good faith and in a manner believed by such Covered Person to be in, or not opposed to, the best interests of the Company and, with respect to any criminal proceeding, had no reasonable cause to believe his conduct was unlawful, and (y) such Covered Person's conduct did not constitute fraud or willful misconduct, in either case as determined by a final, nonappealable order of a court of competent jurisdiction. In connection with the foregoing, the termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that the Covered Person did not act in good faith or, with respect to any criminal proceeding, had reasonable cause to believe that such Covered Person's conduct was unlawful, or that the Covered Person's conduct constituted fraud or willful misconduct.

(b)    Reimbursement.  The Company shall promptly reimburse (and/or advance to the extent reasonably required) each Covered Person for reasonable legal or other expenses (as incurred) of such Covered Person in connection with investigating, preparing to defend or defending any claim, lawsuit or other proceeding relating to any Losses for which such Covered Person may be indemnified pursuant to this Section 14.3; *provided*, that if it is finally judicially determined that such Covered Person is not entitled to the indemnification provided by this Section 14.3, then such Covered Person shall promptly reimburse the Company for any reimbursed or advanced expenses.

ny-1889866

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001208

PX0594.215

(c)     Entitlement to Indemnity.  The indemnification provided by this Section 14.3 shall not be deemed exclusive of any other rights to indemnification to which those seeking indemnification may be entitled under any agreement or otherwise. The provisions of this Section 14.3 shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this Section 14.3 and shall inure to the benefit of the executors, administrators, legatees and distributees of such Covered Person.

(d)     Insurance.  To the extent available on commercially reasonable terms, the Company may purchase, at its expense, insurance to cover Losses covered by the foregoing indemnification provisions and to otherwise cover Losses for any breach or alleged breach by any Covered Person of such Covered Person's duties in such amount and with such deductibles as the Managing Member may determine; *provided*, that the failure to obtain such insurance shall not affect the right to indemnification of any Covered Person under the indemnification provisions contained herein, including the right to be reimbursed or advanced expenses or otherwise indemnified for Losses hereunder. If any Covered Person recovers any amounts in respect of any Losses from any insurance coverage, then such Covered Person shall, to the extent that such recovery is duplicative, reimburse the Company for any amounts previously paid to such Covered Person by the Company in respect of such Losses.

(e)     Funding of Indemnification Obligation.  Notwithstanding anything contained herein to the contrary, any indemnity by the Company relating to the matters covered in this Section 14.3 shall be provided out of and to the extent of Company assets only, and no Member (unless such Member otherwise agrees in writing) shall have personal liability on account thereof or shall be required to make additional Capital Contributions to help satisfy such indemnity by the Company.

(f)     Savings Clause.  If this Section 14.3 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Covered Person pursuant to this Section 14.3 to the fullest extent permitted by any applicable portion of this Section 14.3 that shall not have been invalidated and to the fullest extent permitted by Applicable Law.

(g)     Amendment.  The provisions of this Section 14.3 shall be a contract between the Company, on the one hand, and each Covered Person who served in such capacity at any time while this Section 14.3 is in effect, on the other hand, pursuant to which the Company and each such Covered Person intend to be legally bound. No amendment, modification or repeal of this Section 14.3 that adversely affects the rights of a Covered Person to indemnification for Losses incurred or relating to a state of facts existing prior to such amendment, modification or repeal shall apply in such a way as to eliminate or reduce such Covered Person's entitlement to indemnification for such Losses without the Covered Person's prior written consent.

Section 14.4     Survival. The provisions of this Article 14 shall survive the dissolution, liquidation, winding up and termination of the Company.

ny-1889866

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001209

PX0594.216

# ARTICLE 15

## MISCELLANEOUS

Section 15.1   <u>Expenses</u>. Except as otherwise expressly provided herein, all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred in connection with the preparation and execution of this Agreement, or any amendment or waiver hereof, and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses; provided, that the Company shall pay such costs and expenses incurred by or on behalf of the Managing Member and Fidelio Capital AB.

Section 15.2   <u>Further Assurances</u>. In connection with this Agreement and the transactions contemplated hereby, the Company and each Member hereby agrees, at the request of the Company or any other Member, to execute and deliver such additional documents, instruments, conveyances and assurances and to take such further actions as may be required to carry out the provisions hereof and give effect to the transactions contemplated hereby.

Section 15.3   <u>Notices</u>.  All notices and other communications hereunder shall be in writing and shall be deemed duly given (a) on the date of delivery if delivered personally, or if by e-mail, upon written confirmation of receipt by e-mail or otherwise, (b) on the first Business Day following the date of dispatch if delivered utilizing a next-day service by a recognized next-day courier or (c) on the earlier of confirmed receipt or the fifth Business Day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid. All notices hereunder shall be delivered to the addresses set forth below, or pursuant to such other instructions as may be designated in writing by the party to receive such notice:

| | |
|---|---|
| If to the Company: | Ossium NewCo, LLC<br>c/o Fidelio Capital AB<br>Birger Jarlsgatan 13<br>111 45 Stockholm<br>Sweden<br>Attention:  Theodor Bonnier and Gabriel Fitzgerald<br>E-mail:  Theodor.bonnier@fideliocapital.se and<br>gabrielfitzgerald@fideliocapital.se |
| with copies (which shall not constitute notice) to: | Advokatfirman Vinge<br>Stureplan 8, Box 1703 SE-111 87<br>Stockholm, Sweden<br>Attention:      Jonas Bergström<br>E-mail:          jonas.Bergstrom@vinge.se<br><br>and<br><br>Morrison & Foerster LLP<br>250 West 55th Street<br>New York, NY 10019 |

47

ny-1889866

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001210

PX0594.217

Attention:    Spencer Klein and Jeff Bell
E-mail:    spencerklein@mofo.com and jbell@mofo.com

If to a Member, to such Member's respective mailing address as set forth on the Members Schedule.

Section 15.4    <u>Headings</u>. The headings in this Agreement are inserted for convenience of reference only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Agreement or any provision of this Agreement.

Section 15.5    <u>Severability</u>. If any court of competent jurisdiction determines that any term or provision of this Agreement is held to be invalid, illegal or unenforceable under Applicable Law in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction and such court shall have the power to modify any such unenforceable provision in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language, as applicable, or by making such other modifications as it deems warranted to carry out the intent and agreement of the parties as embodied herein to the maximum extent permitted by Applicable Law. The parties hereto expressly agree that this Agreement as so modified by the court shall be binding upon and enforceable against each of them.

Section 15.6    <u>Entire Agreement</u>.

(a)    This Agreement, together with the Certificate of Formation, each Joinder Agreement and all related Exhibits and Schedules, constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

(b)    In the event of an inconsistency or conflict between the provisions of this Agreement and any provision of Joinder Agreement, and all related Exhibits and Schedules with respect to the subject matter of such agreements, the Managing Member shall resolve such conflict in its sole discretion.

Section 15.7    <u>Successors and Assigns</u>. Subject to the restrictions on Transfers set forth herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

Section 15.8    <u>No Third-Party Beneficiaries</u>. Except as provided in Article 14, which shall be for the benefit of and enforceable by Covered Persons as described therein, this Agreement is for the sole benefit of the parties hereto (and their respective heirs, executors, administrators, successors and assigns) and nothing herein, express or implied, is intended to or shall confer upon any other Person, including any creditor of the Company, any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

48

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001211

PX0594.218

Section 15.9   Amendment. No provision of this Agreement may be amended or modified except by an instrument in writing executed by the Company and the Requisite Holders, which shall include the Managing Member. Any such written amendment or modification will be binding upon the Company and each Member; *provided*, that an amendment or modification modifying the rights or obligations of any Member in a manner that is materially and disproportionately adverse to (a) such Member relative to the rights of other Members in respect of Units of the same class or series or (b) a class or series of Units relative to the rights of another class or series of Units, shall in each case be effective only with that Member's consent or the consent of the Members holding a majority of the Units in that class or series, as applicable. Notwithstanding the foregoing, amendments to the Members Schedule following any new issuance, redemption, repurchase or Transfer of Units in accordance with this Agreement may be made by the Managing Member without the consent of or execution by the Members. In the event an amendment to this Agreement is approved by the written consent of the Requisite Holders, which shall include the Managing Member, in lieu of a meeting and such consent is less than unanimous, the Company shall provide prompt notice of such amendment to the Members who did not consent and would have been entitled to notice of the Members' meeting.

Section 15.10   Waiver. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

Section 15.11   Governing Law. All issues and questions concerning the application, construction, validity, interpretation and enforcement of this Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Delaware.

Section 15.12   Arbitration.

(a)   General.  In the event of any Action among the parties arising out of or relating to this Agreement, any Joinder Agreement or the Certificate of Formation, whether in contract, tort, equity or otherwise, and whether relating to the meaning, interpretation, effect, validity, performance or enforcement of this Agreement, any Joinder Agreement or the Certificate of Formation, such Action shall be resolved by and through an arbitration proceeding to be conducted under the auspices and the commercial arbitration rules of the American Arbitration Association (or any like organization successor thereto) at New York, New York. The arbitrability of the dispute, claim or controversy shall likewise be determined in the arbitration. The arbitration proceeding shall be conducted in as expedited a manner as is then permitted by the commercial arbitration rules (formal or informal) of the American Arbitration Association.  Both the foregoing agreement of the parties to arbitrate any and all such disputes,

ny-1889866

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001212

PX0594.219

claims and controversies, and the results, determinations, findings, judgments and/or awards rendered through any such arbitration shall be final and binding on the parties and may be specifically enforced by legal proceedings in any court of competent jurisdiction.

(b)     Governing Law.  For the avoidance of doubt, the arbitrator(s) shall follow any applicable federal law and Delaware state law (with respect to all matters of substantive law) in rendering an award.

(c)     Costs of Arbitration.  The cost of the arbitration proceeding and any proceeding in court to confirm or to vacate any arbitration award, as applicable (including each party's attorneys' fees and costs), shall be borne by the unsuccessful party or, at the discretion of the arbitrator(s), may be prorated between the parties in such proportion as the arbitrator(s) determines to be equitable and shall be awarded as part of the arbitrator's award.

Section 15.13  Equitable Remedies. Each party hereto acknowledges that a breach or threatened breach by such party of any of its obligations under this Agreement would give rise to irreparable harm to the other parties, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, each of the other parties hereto shall, in addition to any and all other rights and remedies that may be available to them in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

Section 15.14  Attorneys' Fees. In the event that any party hereto institutes any legal suit, action or proceeding, including arbitration, against another party in respect of a matter arising out of or relating to this Agreement, the prevailing party in the suit, action or proceeding shall be entitled to receive, in addition to all other damages to which it may be entitled, the costs incurred by such party in conducting the suit, action or proceeding, including reasonable attorneys' fees and expenses and court costs.

Section 15.15  Remedies Cumulative. The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise.

Section 15.16  Counterparts. This Agreement may be executed in counterparts, which may be delivered electronically with the same effect as an original counterpart.

[SIGNATURE PAGE FOLLOWS]

50

ny-1889866

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001213

PX0594.220

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

THE COMPANY:                    OSSIUM NEWCO, LLC


By: _____
       Name:
       Title: Authorized Person


THE MEMBERS:



OSSIUM BIDCO, LLC



By: _____
       Name:
       Title: Authorized Person


VOI HOLDINGS, LLC



By:_____
       Name:
       Title:

ny-1889866

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

**Exhibit A**

**<u>Certificate of Formation</u>**

See attached

1

ny-1889866

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001215

PX0594.222



# Delaware

### The First State

Page 1

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF

DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT

COPY OF THE CERTIFICATE OF FORMATION OF "OSSIUM NEWCO, LLC",

FILED IN THIS OFFICE ON THE SEVENTEENTH DAY OF APRIL, A.D.

2020, AT 11:09 O`CLOCK A.M.



Jeffrey W. Bullock, Secretary of State

7938187  8100
SR# 20202908658

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 202783791
Date: 04-17-20

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001216

PX0594.223

State of Delaware
Secretary of State
Division of Corporations
Delivered 11:09 AM 04/17/2020
FILED 11:09 AM 04/17/2020
SR 20202908658 - File Number 7938187

# CERTIFICATE OF FORMATION

## OF

## OSSIUM NEWCO, LLC

This Certificate of Formation of Ossium NewCo, LLC is being duly executed and filed by the undersigned, an authorized person, to form a limited liability company under the Delaware Limited Liability Company Act (6 *Del.C.* § 18-101, *et seq.*, the "Act").

1.    The name of the limited liability company is "Ossium NewCo, LLC".

2.    The address of its registered office in the State of Delaware is Corporation Trust Center, 1209 Orange Street, in the city of Wilmington, County of New Castle, 19801. The name of its registered agent at such address is The Corporation Trust Company.

IN WITNESS WHEREOF, this Certificate of Formation has been duly executed as of the 17th day of April, 2020, and is being filed in accordance with Section 18-206 of the Act.

/s/ Daniel Lopez
Daniel Lopez
Authorized Person

ny-1904460

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001217

PX0594.224

**Exhibit B**

**<u>Limited Liability Company Agreement of Ossium Holdco, LLC</u>**

See attached

ny-1889866

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001218

PX0594.225

*Execution Version*

*CONFIDENTIAL*

---

## AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

among

### OSSIUM HOLDCO, LLC

and

### THE MEMBERS NAMED HEREIN

dated as of

June 12, 2020

THE UNITS REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS AND MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED EXCEPT (A) PURSUANT TO A REGISTRATION STATEMENT EFFECTIVE UNDER SUCH ACT AND LAWS OR (B) PURSUANT TO AN EXEMPTION FROM REGISTRATION THEREUNDER. ANY TRANSFER OF THE UNITS REPRESENTED BY THIS AGREEMENT IS FURTHER SUBJECT TO OTHER RESTRICTIONS SET FORTH IN THIS AGREEMENT.

---

ny-1865422

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

# TABLE OF CONTENTS

**Page**

ARTICLE 1 DEFINITIONS ............................................................................................... 1
    1.1       Definitions ................................................................................................ 1
    1.2       Interpretation ............................................................................................ 9
ARTICLE 2 ORGANIZATION ......................................................................................... 9
    2.1       Formation .................................................................................................. 9
    2.2       Name ......................................................................................................... 10
    2.3       Tax Status ................................................................................................ 10
    2.4       Registered Office; Registered Agent ....................................................... 10
    2.5       Purpose; Powers ...................................................................................... 10
    2.6       Term ......................................................................................................... 10
ARTICLE 3 UNITS .......................................................................................................... 11
    3.1       Units Generally; Initial Capital Contribution ........................................ 11
    3.2       Additional Capital Contributions ........................................................... 11
    3.3       Authorization of Units ............................................................................ 11
    3.4       Certification of Units .............................................................................. 11
    3.5       No Interest on Capital Contributions ..................................................... 12
    3.6       Treatment of Loans From Members ....................................................... 12
ARTICLE 4 MEMBERS ................................................................................................... 12
    4.1       Admission of New Members .................................................................. 12
    4.2       Representations and Warranties of Members ......................................... 13
    4.3       No Personal Liability .............................................................................. 14
    4.4       Withdrawal .............................................................................................. 14
    4.5       Death; Dissolution .................................................................................. 14
    4.6       Voting ...................................................................................................... 15
    4.7       Meetings .................................................................................................. 15
    4.8       Power of Members .................................................................................. 15
    4.9       No Interest in Company Property ............................................................ 15
ARTICLE 5 DISTRIBUTIONS ........................................................................................ 15
    5.1       General .................................................................................................... 15
    5.2       Tax Withholding; Withholding Advances .............................................. 16

i

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001220

PX0594.227

| | | |
|---|---|---|
| 5.3 | Distributions in Kind | 17 |
| ARTICLE 6 MANAGEMENT | | 17 |
| 6.1 | Management of the Company | 17 |
| 6.2 | Officers | 17 |
| 6.3 | Resignation of the Managing Member | 18 |
| 6.4 | Compensation; No Employment | 18 |
| ARTICLE 7 PRE-EMPTIVE RIGHTS | | 18 |
| 7.1 | Pre-emptive Right | 18 |
| 7.2 | Procedures Relating to Pre-emptive Right | 19 |
| ARTICLE 8 TRANSFER; CONVERSION | | 20 |
| 8.1 | General Restrictions on Transfer | 20 |
| 8.2 | Managing Member Right of First Refusal | 21 |
| 8.3 | Drag-along Right; Tag-along Right | 22 |
| 8.4 | Managing Member Call Right | 24 |
| 8.5 | Conversion to Corporation; Registration | 26 |
| ARTICLE 9 COVENANTS | | 27 |
| 9.1 | Confidentiality | 27 |
| 9.2 | Covenant Not to Compete | 28 |
| 9.3 | Pledge of Minority Members | 29 |
| ARTICLE 10 ACCOUNTING; TAX RETURNS | | 29 |
| 10.1 | Financial Statements | 29 |
| 10.2 | Inspection Rights | 29 |
| 10.3 | Tax Returns | 29 |
| 10.4 | Company Funds | 30 |
| ARTICLE 11 DISSOLUTION AND LIQUIDATION | | 30 |
| 11.1 | Events of Dissolution | 30 |
| 11.2 | Effectiveness of Dissolution | 30 |
| 11.3 | Liquidation | 30 |
| 11.4 | Cancellation of Certificate | 31 |
| 11.5 | Survival of Rights, Duties and Obligations | 31 |
| 11.6 | Recourse for Claims | 31 |
| ARTICLE 12 EXCULPATION AND INDEMNIFICATION | | 32 |
| 12.1 | Exculpation of Covered Persons | 32 |

ii

ny-1865422

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001221

PX0594.228

| 12.2 | Liabilities and Duties of Covered Persons | 32 |
| 12.3 | Indemnification | 32 |
| 12.4 | Survival | 34 |
| ARTICLE 13 MISCELLANEOUS | | 34 |
| 13.1 | Expenses | 34 |
| 13.2 | Further Assurances | 35 |
| 13.3 | Notices | 35 |
| 13.4 | Headings | 36 |
| 13.5 | Severability | 36 |
| 13.6 | Entire Agreement | 36 |
| 13.7 | Successors and Assigns | 36 |
| 13.8 | No Third-Party Beneficiaries | 36 |
| 13.9 | Amendment | 36 |
| 13.10 | Waiver | 37 |
| 13.11 | Governing Law | 37 |
| 13.12 | Arbitration | 37 |
| 13.13 | Equitable Remedies | 38 |
| 13.14 | Attorneys' Fees | 38 |
| 13.15 | Remedies Cumulative | 38 |
| 13.16 | Counterparts | 38 |

ny-1865422

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001222

PX0594.229

# AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

This Amended and Restated Limited Liability Company Agreement of Ossium HoldCo, LLC, a Delaware limited liability company (the "Company"), is entered into as of June 12, 2020, by and among the Company, the Members as of the date hereof and each other Person who after the date hereof becomes a Member of the Company and becomes a party to this Agreement by executing a Joinder Agreement.

## RECITALS

WHEREAS, the Company was formed under the laws of the State of Delaware by the filing of a Certificate of Formation with the Secretary of State of the State of Delaware on February 26, 2020 (the "Certificate of Formation");

WHEREAS, the Members of the Company entered into a Limited Liability Company Agreement of the Company, dated as of March 9, 2020 (the "Original LLCA");

WHEREAS, pursuant to Section 13.9 of the Original LLCA, the Original LLCA may be amended by an instrument in writing executed by the Company and the Requisite Holders, which shall include the Managing Member; *provided*, that an amendment or modification modifying the rights or obligations of any Member in a manner that is materially and disproportionately adverse to a class or series of Units relative to the rights of another class or series of Units, shall be effective only with the consent of the Members holding a majority of the Units in that class or series, as applicable; and

WHEREAS, the undersigned, constituting (a) the Requisite Holders, including the Managing Member, and (b) a majority of the Members holding Preferred Units, desire that the Original LLCA be amended and restated in its entirety to, among other things, reclassify the outstanding Preferred Units into Common Units (the "Recapitalization"), such that, following such Recapitalization, each Member holds the Common Units set forth on the Members Schedule.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1

## DEFINITIONS

1.1     Definitions. Capitalized terms used herein and not otherwise defined shall have the meanings set forth in this Section 1.1:

"Acquisition Documents" means, collectively, those agreements and related ancillary documents entered into by and among the Company, one or more of the Minority Members and other relevant parties pursuant to which, among other things, such Minority Members agreed to contribute to the Company certain ownership interests in one or more

ny-1865422

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001223

PX0594.230

Persons in exchange for Units and/or sell certain ownership interests in one or more Persons to a member of the Company Group.

"Action" means any claim, action, demand, suit, inquiry, proceeding, audit, summons, subpoena, investigation, hearing, injunction, seizure or other proceeding by or before any Governmental Authority, or any arbitration, mediation or other similar proceeding.

"Admission Date" means, with respect to any Member, the date on which such Member became a member of the Company by entering into the Original LLCA, this Agreement or a Joinder Agreement.

"Affiliate" means, with respect to any Person, any other Person who, directly or indirectly (including through one or more intermediaries), controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control," when used with respect to any specified Person, shall mean the power, direct or indirect, to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities or partnership or other ownership interests, by contract or otherwise; and the terms "controlling" and "controlled" shall have correlative meanings.

"Agreement" means this Amended and Restated Limited Liability Company Agreement, as executed and as it may be amended, modified, supplemented or restated from time to time, as provided herein.

"Applicable Law" means all applicable provisions of (a) constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations or orders of any Governmental Authority; (b) any consents or approvals of any Governmental Authority; and (c) any orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with, any Governmental Authority.

"Bankruptcy" means, with respect to a Member, the occurrence of any of the following: (a) the filing of an application by such Member for, or a consent to, the appointment of a trustee of such Member's assets; (b) the filing by such Member of a voluntary petition in bankruptcy or the filing of a pleading in any court of record admitting in writing such Member's inability to pay its debts as they come due; (c) the making by such Member of a general assignment for the benefit of such Member's creditors; (d) the filing by such Member of an answer admitting the material allegations of, or such Member's consenting to, or defaulting in answering a bankruptcy petition filed against such Member in any bankruptcy proceeding; or (e) the expiration of sixty (60) days following the entry of an order, judgment or decree by any court of competent jurisdiction adjudicating such Member a bankrupt or appointing a trustee of such Member's assets.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in New York, New York, Stockholm, Sweden or Zurich, Switzerland are authorized or required to close.

"Call Purchase Price" has the meaning set forth in Section 8.4(b).

ny-1865422

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001224

PX0594.231

"Capital Contribution" means, for any Member, the total amount of cash and cash equivalents and the value of any property contributed to the Company by such Member as reasonably determined by the Managing Member and reflected on the Members Schedule.

"Cause," with respect to any Member who is also an employee of the Company Group, has the meaning set forth in the Employment Agreement of such Member or, in case the meaning is not set forth in the Employment Agreement of such Member or such Member is not party to an Employment Agreement with the Company Group, as is defined under applicable employment law, which with respect to a Member subject to applicable employment law shall mean that such employee is dismissed or notified of dismissal or that such employee's employment is terminated or notified for termination on personal grounds related to a breach of the employee's duties under the employment or, in case such Member is not employed by the Company Group, the termination or notice of termination of any other agreement entered into by such Member based on similar circumstances.

"Certificate of Formation" has the meaning set forth in the Recitals.

"Change of Control" means: (a) the direct or indirect sale of all or substantially all of the consolidated assets of the Company Group to a Third Party Purchaser; (b) a direct or indirect sale resulting in a majority of the votes of all Units (determined on a Fully Diluted Basis) being held by a Third Party Purchaser; or (c) a merger, consolidation, recapitalization or reorganization of the Company with or into a Third Party Purchaser that results in the Members immediately prior to such merger, consolidation, recapitalization or reorganization holding less than a majority of the votes of all voting securities of the company surviving such merger, consolidation, recapitalization or reorganization (determined on a fully diluted basis).  For the avoidance of doubt, an Initial Public Offering shall not constitute a Change of Control.

"Code" means the Internal Revenue Code of 1986, as amended.

"Common Unit" has the meaning set forth in Section 3.3.

"Company" has the meaning set forth in the Preamble.

"Company Group" means, collectively, the Company and the direct and indirect Subsidiaries of the Company.

"Company Group Indemnitees" has the meaning set forth in Section 9.3.

"Confidential Information" has the meaning set forth in Section 9.1(a).

"Controlled Entity" means a personal holding company of any Member; *provided*, that such company (a) is incorporated under the Laws of a jurisdiction approved by the Managing Member, as determined based on the Managing Member's reasonable good faith discretion, (b) is and will be wholly-owned and controlled by such Member, and (c) does not and will not conduct any business other than to hold the Units or Unit Equivalents, as applicable, and cash and does not have any liens, encumbrances, or liabilities or any obligations other than pursuant to this Agreement; *provided*, further, that (i) such Controlled Entity shall be admitted as a New Member pursuant to Section 4.1(b) and become a party to this Agreement by the

3

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001225

PX0594.232

execution of a Joinder Agreement and (ii) such Member shall be jointly and severally liable with the Controlled Entity under this Agreement so long as such Controlled Entity continues to hold such Member's Units. For the avoidance of doubt, all provisions of this Agreement applicable to a Member who holds Units through a Controlled Entity shall apply *mutatis mutandis* to such Controlled Entity (or the Units held by such Controlled Entity, as applicable).

"Conversion" has the meaning set forth in Section 8.5(a).

"Corporation" has the meaning set forth in Section 8.5(a).

"Covered Person" means (a) the Managing Member, (b) each other Member, (c) each officer, director, advisory committee member, shareholder, partner, member, Affiliate, employee, agent or representative of each Member, and each of their Affiliates.

"Delaware Act" means the Delaware Limited Liability Company Act, Title 6, Chapter 18, §§ 18-101, *et seq*, and any successor statute, as it may be amended from time to time.

"Distribution" means a distribution made by the Company to a Member, whether in cash, property or securities of the Company and whether by liquidating distribution or otherwise; *provided*, that none of the following shall be a Distribution: (a) any redemption or repurchase by the Company or any Member of any Units or Unit Equivalents; (b) any subdivision (by a split of Units or otherwise) or any combination (by a reverse split of Units or otherwise) of any outstanding Units; or (c) any fees or remuneration approved by the Managing Member and paid to any Member in such Member's capacity as a service provider for or employee of the Company Group. "Distribute" when used as a verb shall have a correlative meaning.

"Drag-along Right" has the meaning set forth in Section 8.3(a).

"Drag/Tag Notice" has the meaning set forth in Section 8.3(d).

"Drag/Tag Transaction" has the meaning set forth in Section 8.3(a).

"Electronic Transmission" means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

"Employment Agreement" means any agreement (whether formalized or not) pursuant to which a Member is (a) employed by any member of the Company Group; (b) retained as a consultant on a regular and substantive basis by any member of the Company Group; or (c) retained as a member of the board of directors of any member of the Company Group, in each case, as amended and restated from time to time.

"Equity Securities" means any and all Units and Unit Equivalents.

4

ny-1865422

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001226

PX0594.233

"Excluded Securities" **Redacted - Other (Nonresponsive)**



**Redacted - Other (Nonresponsive)**

"Exercise Member" has the meaning set forth in Section 7.2(c).

"Exercise Period" has the meaning set forth in Section 7.2(b).

"Fair Value" means, as applied to the Units as of any date of determination, the fair value as last reported by the Managing Member to its investors prior to the determination date, such valuation being prepared in all material respects in accordance with the International Private Equity and Venture Capital Valuation Guidelines (developed by the IPEV Board (among others)), as amended from time to time.  If it, in the opinion of the Managing Member, is apparent that an event has occurred after the date of the latest fair value reported by the Managing Member prior to the determination date that has, or is likely to have, a significant impact on the value of the Units, the value of the Units shall instead be based on the latest value reported by the Managing Member immediately following such event, by application of the principles set out above.

"Fiscal Year" means the calendar year, unless otherwise determined by the Managing Member.

"Forfeited Units" has the meaning set forth in Section 9.3.

5

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001227

PX0594.234

"<u>Fully Diluted Basis</u>" means, as of any date of determination, with respect to all the Units, all issued and outstanding Units of the Company and all Units issuable upon the exercise, exchange or conversion of any outstanding Unit Equivalents as of such date, whether or not such Unit Equivalent is at the time exercisable.

"<u>Governmental Authority</u>" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court or tribunal of competent jurisdiction.

"<u>Indemnification Deduction</u>" has the meaning set forth in Section 9.3.

"<u>Initial Public Offering</u>" means the first registered offering of shares of capital stock of the Company on a stock exchange, regulated market place or other recognized exchange for the public trading of shares of ownership interest in any Person.

"<u>Issuance Notice</u>" has the meaning set forth in Section 7.2(a).

"<u>Joinder Agreement</u>" means a joinder agreement substantially in the form attached as Exhibit A hereto, subject to such changes as may be determined by the Managing Member.

"<u>Liquidator</u>" has the meaning set forth in Section 11.3(a).

"<u>Losses</u>" has the meaning set forth in Section 12.3(a).

"<u>Managing Member</u>" means Ossium Topco AB or any of its successors, assignees or designees that is a Member.

"<u>Member</u>" means (a) each Person identified on the Members Schedule as of the date hereof as a Member, including the Managing Member, and who has executed the Original LLCA, this Agreement or a counterpart hereof or a Joinder Agreement; and (b) each Person who is hereafter admitted as a Member in accordance with the terms of this Agreement and the Delaware Act, in each case so long as such Person is shown on the Company's books and records as the owner of one or more Units. The Members shall constitute the "members" (as that term is defined in the Delaware Act) of the Company.

"<u>Members Schedule</u>" has the meaning set forth in Section 3.1.

"<u>Minority Members</u>" means all of the Members, excluding the Managing Member.

"<u>New Member</u>" has the meaning set forth in Section 4.1(a).

"<u>New Member Period</u>" has the meaning set forth in Section 8.1(a).

6

ny-1865422

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001228

PX0594.235

"New Units" has the meaning set forth in Section 7.1(a).

"Non-Exercising Member" has the meaning set forth in Section 7.2(c).

"Officers" has the meaning set forth in Section 6.2.

"Original Investment" has the meaning set forth in Section 8.4.

"Ossium Holdco Reorganization" means the transaction or transactions pursuant to which the Managing Member and the other shareholders of Ossium Holdco AB will contribute their shares in Ossium Holdco AB to the Company in exchange for Units.

"Over-allotment Exercise Period" has the meaning set forth in Section 7.2(c).

"Over-allotment Notice" has the meaning set forth in Section 7.2(c).

"Person" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"Pre-emptive Member" has the meaning set forth in Section 7.1(a).

"Preferred Units" has the meaning set forth in Section 3.1.

"Proposed Transfer" has the meaning set forth in Section 8.2.

"Proprietary Information" means any and all information and materials, in whatever form, tangible or intangible, whether disclosed to or learned or developed by a Member before or after the execution of this Agreement, whether or not marked or identified as confidential or proprietary, pertaining in any manner to the business of or used by the Company Group, or pertaining in any manner to any person or entity to whom any member of the Company Group owes a duty of confidentiality.  Proprietary Information includes, but is not limited to, the following types of information and materials:  (i) research, development, technical or engineering information, know-how, data processing or computer software, programs, tools, data, designs, diagrams, drawings, schematics, sketches or other visual representations, plans, projects, manuals, documents, files, photographs, results, specifications, trade secrets, inventions, discoveries, compositions, ideas, concepts, structures, improvements, products, prototypes, instruments, machinery, equipment, processes, formulas, algorithms, methods, techniques, works in process, systems, technologies, disclosures, applications and other materials; (ii) financial information and materials, including information and materials relating to costs, vendors, suppliers, licensors, profits, markets, sales, distributors, joint venture partners, customers, subscribers, members and bids, whether existing or potential; (iii) business and marketing information and materials, including information and materials relating to future development and new product concepts; (iv) personnel files and information about compensation, benefits and other terms of employment of the Company Group's employees and independent contractors; and (v) any other information or materials relating to the past, present, planned or foreseeable business, products, developments, technology or activities of the Company Group.  Proprietary Information does not include information that (A) is or becomes publicly known through lawful

7

ny-1865422

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001229

PX0594.236

means and without breach of this Agreement or any other agreement between any Member and any member of the Company Group; (B) was rightfully in the possession of a Member or part of his, her or its general knowledge prior to such Member's Admission Date, with the exception of the information, ideas or materials acquired by such Member during the course of the Member's association with or investment in any legal entity that was a predecessor to the Company, which shall continue to be Proprietary Information; or (C) is disclosed to such Member without confidential or proprietary restrictions by a third party who rightfully possesses the information or materials without confidential or proprietary restrictions.  However, to the extent any member of the Company Group owes a duty of confidentiality to a third party with respect to such information, idea or material, such information, idea or material shall continue to be Proprietary Information until such time as such member of the Company Group's duty of confidentiality terminates or expires.

"Representative" means, with respect to any Person, any and all directors, managers, officers, employees, consultants, financial advisors, counsel, partners, shareholders, members, accountants and other agents of such Person.

"Repurchase Notice" has the meaning set forth in Section 8.4(b).

"Repurchase Units" has the meaning set forth in Section 8.4(b).

"Requisite Holders" means the Members holding the Units representing more than fifty percent (50%) of the votes of all Units (on a Fully Diluted Basis).

"Restricted Period" has the meaning set forth in Section 9.1(a).

"ROFR" has the meaning set forth in Section 8.2.

"ROFR Notice" has the meaning set forth in Section 8.2.

"ROFR Response Period" has the meaning set forth in Section 8.2.

"Securities Act" means the Securities Act of 1933, as amended, or any successor federal statute, and the rules and regulations thereunder, which shall be in effect at the time.

"Subsidiary" means, with respect to any Person, any other Person of which a majority of the outstanding shares or other equity interests having the power to vote for directors or comparable managers are owned, directly or indirectly, by the first Person.

"Tag-along Member" has the meaning set forth in Section 8.3(e).

"Tag-along Notice" has the meaning set forth in Section 8.3(e).

"Tag-along Right" has the meaning set forth in Section 8.3(a).

"Taxing Authority" has the meaning set forth in Section 5.2(b).

ny-1865422

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001230

PX0594.237

"<u>Third Party Purchaser</u>" means any Person who, immediately prior to the contemplated transaction, does not directly or indirectly own or have the right to acquire any outstanding Units (or Unit Equivalents).

"<u>Transfer</u>" means to, directly or indirectly, sell, transfer, assign, pledge, encumber, hypothecate or similarly dispose of, either voluntarily or involuntarily, by operation of law or otherwise, or to enter into any contract, option or other arrangement or understanding with respect to the sale, transfer, assignment, pledge, encumbrance, hypothecation or similar disposition of, any Units owned by a Person or any interest (including a beneficial interest) in any Units or Unit Equivalents owned by a Person. "<u>Transfer</u>" when used as a noun shall have a correlative meaning. "<u>Transferor</u>" and "<u>Transferee</u>" mean a Person who makes or receives a Transfer, respectively.

"<u>Triggering Event</u>" means those events set forth in Section 8.4(i)(i) through (vi).

"<u>Unit</u>" means a unit representing a fractional part of the membership interests of the Members in the Company, which includes Common Units.

"<u>Unit Equivalents</u>" means any security or obligation that is by its terms, directly or indirectly, convertible into, exchangeable or exercisable for Units, and any option, warrant or other right to subscribe for, purchase or acquire Units.

"<u>Withholding Advances</u>" has the meaning set forth in Section 5.2(b).

1.2   Interpretation. For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. The definitions given for any defined terms in this Agreement shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. Unless the context otherwise requires, references herein: (x) to Articles, Sections, and Exhibits mean the Articles and Sections of, and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein. References herein to days shall be to calendar days; provided, that any action otherwise required to be taken on a day that is not a Business Day shall instead be taken on the next Business Day.

## ARTICLE 2

## ORGANIZATION

2.1   Formation.

9

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001231

PX0594.238

(a)      The Company was formed on February 26, 2020, pursuant to the provisions of the Delaware Act, upon the filing of the Certificate of Formation with the Secretary of State of the State of Delaware.

(b)      This Agreement shall constitute the "limited liability company agreement" (as that term is used in the Delaware Act) of the Company. The rights, powers, duties, obligations and liabilities of the Members shall be determined pursuant to the Delaware Act and this Agreement. To the extent that the rights, powers, duties, obligations and liabilities of any Member are different by reason of any provision of this Agreement than they would be under the Delaware Act in the absence of such provision, this Agreement shall, to the extent permitted by the Delaware Act, control.

2.2      Name. The name of the Company is "Ossium HoldCo, LLC" or such other name or names as may be designated by the Managing Member; *provided*, that the name shall always contain the words "Limited Liability Company" or the abbreviation "L.L.C." or the designation "LLC."

2.3      Tax Status. The Company will elect to be treated as a corporation for U.S. federal income tax purposes taxable as a C corporation pursuant to Code Section 11.

2.4      Registered Office; Registered Agent.

(a)      The registered office of the Company shall be the office of the initial registered agent named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Managing Member may designate from time to time in the manner provided by the Delaware Act and Applicable Law.

(b)      The registered agent for service of process on the Company in the State of Delaware shall be the initial registered agent named in the Certificate of Formation or such other Person or Persons as the Managing Member may designate from time to time in the manner provided by the Delaware Act and Applicable Law.

2.5      Purpose; Powers.

(a)      The purpose of the Company is to engage in any lawful act or activity for which limited liability companies may be formed under the Delaware Act and to engage in any and all activities necessary or incidental thereto.

(b)      The Company shall have all the powers necessary or convenient to carry out the purposes for which it is formed, including the powers granted by the Delaware Act.

2.6      Term. The term of the Company commenced on the date the Certificate of Formation was filed with the Secretary of State of the State of Delaware and shall continue in existence perpetually until the Company is dissolved in accordance with the provisions of this Agreement.

ny-1865422

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001232

PX0594.239

# ARTICLE 3

## UNITS

3.1     Units Generally; Initial Capital Contribution. The membership interests of the Members shall be represented by issued and outstanding Units, which may be divided into one or more types, classes or series.  Each type, class or series of Units shall have the privileges, preference, duties, liabilities, obligations and rights, including voting rights, if any, set forth in this Agreement with respect to such type, class or series. Contemporaneously with the execution of the Original LLCA, each Member as of the date indicated on the Members Schedule made an initial Capital Contribution in connection with the applicable Acquisition Documents and was issued Common Units and preferred membership interests in the Company ("Preferred Units"). Upon execution and delivery of this Agreement, all Preferred Units are hereby reclassified into Common Units, without any further action on the part of the Company or any Member, such that each Member is deemed to own membership interests in the amounts set forth opposite such Member's name and address on a schedule of all Members (including New Members admitted to the Company after the date hereof) to be maintained by the Managing Member, attached hereto as Schedule I, which shall include each Member's mailing addresses, the number and series of Units held by them (the "Members Schedule").  Each Member, besides the Managing Member, shall be entitled to see the portion of the Members Schedule in relation to the Units and Capital Contributions of itself and its Affiliates and each other Member's notice information only.  The Managing Member shall update the Members Schedule upon the issuance or Transfer of any Units to any new or existing Member.

3.2     Additional Capital Contributions.

(a)     No Member shall be required to make any additional Capital Contributions to the Company.  Any future Capital Contributions made by any Member shall only be made at the direction and with the consent of the Managing Member.  To the extent that a Member makes an additional Capital Contribution to the Company, the Managing Member shall revise the Members Schedule to reflect an increase in the Units of the contributing Member that fairly and equitably reflects the value of its additional Capital Contribution in relation to the aggregate amount of all Capital Contributions made by the Members.

(b)     The Managing Member shall have the right to cause the Company to (i) create and issue additional Units and Unit Equivalents (in each case whether or not constituting Excluded Securities), including Units and Unit Equivalents of classes having rights different from, and senior to, the rights of the Company's existing classes of Units and Unit Equivalents and (ii) borrow money from any Person including the Managing Member and its Affiliates.  Any additional issuances of New Units (other than Excluded Securities and issuances of Units and Unit Equivalents in connection with an Initial Public Offering) shall be subject to the right of the Members set forth in Section 7.1.

3.3     Authorization of Units.  The Company is hereby authorized to issue a class of Units designated Common Units (each a "Common Unit").

3.4     Certification of Units.

11

ny-1865422

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001233

PX0594.240

(a)     The Units shall be issued in uncertificated form, unless otherwise determined by the Managing Member.

(b)     In the event that the Managing Member shall issue certificates representing Units in accordance with Section 3.4(a), then in addition to any other legend required by Applicable Law, all certificates representing issued and outstanding Units shall bear a legend substantially in the following form:

THE UNITS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE LIMITED LIABILITY COMPANY AGREEMENT AMONG THE COMPANY AND ITS MEMBERS (INCLUDING THE PLEDGE CONTAINED IN SECTION 9.3 THEREOF), A COPY OF WHICH IS ON FILE AT THE PRINCIPAL OFFICE OF THE COMPANY. NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THE UNITS REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH LIMITED LIABILITY COMPANY AGREEMENT.

THE UNITS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS AND MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED  EXCEPT (A) PURSUANT TO A REGISTRATION STATEMENT EFFECTIVE UNDER SUCH ACT AND LAWS OR (B) PURSUANT TO AN EXEMPTION FROM REGISTRATION THEREUNDER.

3.5     No Interest on Capital Contributions. No Member shall be entitled to receive any distribution from the Company, except as provided in this Agreement. No Member shall receive any interest, salary or drawing with respect to its Capital Contributions, except as otherwise provided in this Agreement.

3.6     Treatment of Loans From Members. Loans by any Member to the Company shall not be considered Capital Contributions.

## ARTICLE 4

## MEMBERS

4.1     Admission of New Members.

(a)     New Members may be admitted by the Managing Member from time to time (i) in connection with an issuance of Units by the Company pursuant to Section 3.2, and (ii) in connection with a Transfer of Units, subject to compliance with the provisions of Article 8, and in either case, following compliance with the provisions of Section 4.1(b) (each, a "New Member").

(b)     In order for any Person not already a Member of the Company to be admitted as a Member, whether pursuant to an issuance of Units or Transfer of Units, such Person shall have executed and delivered to the Company a Joinder Agreement.  Upon the

12

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001234

PX0594.241

amendment of the Members Schedule by the Managing Member and the satisfaction of any other applicable conditions, including, if a condition, the receipt by the Company of payment for the issuance of the applicable Units, such Person shall be admitted as a Member and deemed listed as such on the books and records of the Company and thereupon shall be issued his, her or its Units.

4.2     Representations and Warranties of Members. By execution and delivery of the Original LLCA, this Agreement or a Joinder Agreement, as applicable, each of the Members, whether admitted as of the date of the Original LLCA or pursuant to Section 4.1, represents and warrants to the Company and acknowledges that:

(a)     The Units have not been registered under the Securities Act or the securities laws of any other jurisdiction, are issued in reliance upon federal and state exemptions for transactions not involving a public offering and cannot be disposed of unless (i) they are subsequently registered or exempted from registration under the Securities Act and (ii) the provisions of this Agreement have been complied with;

(b)     Such Member is an "accredited investor" within the meaning of Rule 501 promulgated under the Securities Act, as amended by Section 413(a) of the Dodd-Frank Wall Street Reform and Consumer Protection Act, and agrees that it will not take any action that could have an adverse effect on the availability of the exemption from registration provided by Rule 501 promulgated under the Securities Act with respect to the offer and sale of the Units;

(c)     Such Member's Units are being acquired for its own account solely for investment and not with a view to resale or distribution thereof;

(d)     Such Member has conducted its own independent review and analysis of the business, operations, assets, liabilities, results of operations, financial condition and prospects of the Company and the Company Group and such Member acknowledges that it has been provided adequate access to the personnel, properties, premises and records of the Company and the Company Group for such purpose;

(e)     The determination of such Member to acquire Units has been made by such Member independent of any other Member and independent of any statements or opinions as to the advisability of such purchase or as to the business, operations, assets, liabilities, results of operations, financial condition and prospects of the Company Group that may have been made or given by any other Member or by any Representative of any other Member;

(f)     Such Member has such knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of an investment in the Company and making an informed decision with respect thereto;

(g)     Such Member is able to bear the economic and financial risk of an investment in the Company for an indefinite period of time;

(h)     The execution, delivery and performance of the Original LLCA, this Agreement or the Joinder Agreement, as applicable, have been duly authorized by such Member and do not require such Member to obtain any consent or approval that has not been obtained

13

ny-1865422

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001235

PX0594.242

and do not contravene or result in a default in any material respect under any provision of any law or regulation applicable to such Member or other governing documents or any agreement or instrument to which such Member is a party or by which such Member is bound;

(i)      This Agreement is valid, binding and enforceable against such Member in accordance with its terms, except as may be limited by Bankruptcy, insolvency, reorganization, moratorium, and other similar laws of general applicability relating to or affecting creditors' rights or general equity principles (regardless of whether considered at law or in equity); and

(j)      Neither the issuance of any Units to any Member nor any provision contained herein will entitle the Member to remain in the employment of any member of the Company Group or affect the right of such member of the Company Group to terminate the Member's employment at any time for any reason, other than as otherwise provided in such Member's employment agreement or other similar agreement with the member of the Company Group, if applicable.

None of the foregoing shall replace, diminish or otherwise adversely affect any Member's representations and warranties made by it in any other agreement between such Member and the Company.

4.3      No Personal Liability. Except as otherwise provided in the Delaware Act, by Applicable Law or expressly in this Agreement, no Member will be obligated personally for any debt, obligation or liability of the Company, any member of the Company Group or other Members, whether arising in contract, tort or otherwise, solely by reason of being a Member.

4.4      Withdrawal.

(a)      Subject to Section 4.4(b) and Section 4.4(c), with the consent of the Managing Member, a Member may withdraw from the Company.  A Member shall not be entitled to exercise any vote or consent or similar right after the date of withdrawal.  In the event of withdrawal of any Member who transferred any of his, her or its Units to a Controlled Entity, such withdrawal shall be deemed to have occurred also with respect to such Controlled Entity.

(b)      As soon as any Person who is a Member ceases to hold any Units, such Person shall no longer be a Member; *provided*, *however*, that this Agreement shall continue to apply with respect to any Units that have been called in accordance with Section 8.4 until full payment is made therefor in accordance with the terms of this Agreement.

(c)      The obligations of a Member under Article 9 shall survive the withdrawal of such Member from the Company or such Member ceasing to hold any Units.

(d)      Subject to Section 8.1 and Section 8.4, the Managing Member shall cause the Members Schedule to be amended from time to time to reflect the withdrawal of any Member.

4.5      Death; Dissolution. The death of any Member or the dissolution of any Member that is an entity shall not cause the dissolution of the Company and the Company and its business shall be continued by the remaining Member or Members.  The Units owned by the deceased or

ny-1865422

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001236

PX0594.243

dissolved Member (and as to such dissolved Member, to the extent that such dissolved Member is not reinstated) shall, subject to Section 8.1 and Section 8.4, automatically be Transferred to such Member's successors; *provided*, that such successors shall be bound by, and take the Units subject to, the terms and conditions of this Agreement, and *provided, further,* that no such successor shall be entitled to exercise any vote or consent or similar right, unless and until such successor is admitted as a New Member, subject to compliance with Section 4.1(b) and Section 8.1(c). Subject to the other terms of this Agreement, the Managing Member shall cause the Members Schedule to be amended from time to time to reflect the death or dissolution of any Member.

4.6     Voting. Except as otherwise provided by this Agreement or as otherwise required by the Delaware Act or Applicable Law, each Member shall be entitled to one (1) vote per Unit on all matters upon which the Members have the right to vote pursuant to this Agreement.

4.7     Meetings.

(a)     Calling a Meeting.  Meetings of the Members may be called by the Managing Member.

(b)     Action without Meeting.  Any matter that is to be voted on, consented to or approved by Members may be taken without a meeting, without prior notice and without a vote if consented to, in writing or by Electronic Transmission, by the Requisite Holders.  A record shall be maintained by the Managing Member of each such action taken by written consent of a Member or Members.

4.8     Power of Members. The Members shall have the power to exercise any and all rights or powers granted to Members pursuant to the express terms of this Agreement and the Delaware Act. Except as otherwise specifically provided by this Agreement or required by the Delaware Act, no Member, in its capacity as a Member, shall have the power to act for or on behalf of, or to bind, the Company.

4.9     No Interest in Company Property. No real or personal property of the Company shall be deemed to be owned by any Member individually, but shall be owned by, and title shall be vested solely in, the Company. Without limiting the foregoing, each Member hereby irrevocably waives during the term of the Company any right that such Member may have to maintain any action for partition with respect to the property of the Company.

## ARTICLE 5

## DISTRIBUTIONS

5.1     General.

(a)     Subject to Section 5.1(b) and (c), the Managing Member shall have sole discretion regarding the amounts and timing of distributions to Members, including to decide to forego payment of Distributions in order to provide for the retention and establishment of reserves of, or payment to third parties of, such funds as it deems necessary with respect to the reasonable business needs of the Company (which needs may include the payment or the making

ny-1865422

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001237

PX0594.244

of provision for the payment when due of the Company's obligations, including, but not limited to, present and anticipated debts and obligations, capital needs and expenses, the payment of any management or administrative fees and expenses, and reasonable reserves for contingencies).

(b)     Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any Distribution to Members if such Distribution would violate § 18-607 of the Delaware Act or other Applicable Law.

(c)     The Company may make Distributions to the Members out of the Company's proceeds when and in the amounts deemed appropriate by the Managing Member in its sole discretion.  One hundred percent (100%) of the amount of such Distribution shall be allocated to the holders of Units pro rata in proportion to the number of Units held by each holder.

5.2     Tax Withholding; Withholding Advances.

(a)     Tax Withholding. If requested by the Managing Member, each Member shall, if able to do so, deliver to the Managing Member:

(i)     an affidavit in form satisfactory to the Managing Member that the applicable Member (or its members, as the case may be) is not subject to withholding under the provisions of any federal, state, local, foreign or other Applicable Law;

(ii)     any certificate that the Managing Member may reasonably request with respect to any such laws; and/or

(iii)     any other form or instrument reasonably requested by the Managing Member relating to any Member's status under such law.

If a Member fails or is unable to deliver to the Managing Member the affidavit described in Section 5.2(a)(i), the Managing Member may withhold amounts from such Member in accordance with Section 5.2(b).

(b)     Withholding Advances. The Company is hereby authorized at all times to make payments ("Withholding Advances") with respect to each Member in amounts required to discharge any obligation of the Company (as determined by the Tax Matters Member based on the advice of legal or tax counsel to the Company) to withhold or make payments to any federal, state, local or foreign taxing authority (a "Taxing Authority") with respect to any distribution by the Company to such Member and to withhold the same from distributions to such Member. Any funds withheld from a distribution by reason of this Section 5.2(b) shall nonetheless be deemed distributed to the Member in question for all purposes under this Agreement.

(c)     Indemnification. Each Member hereby agrees to indemnify and hold harmless the Company and the other Members from and against any liability with respect to taxes, interest or penalties which may be asserted by reason of the Company's failure to deduct and withhold tax on amounts distributable to such Member. The provisions of this Section 5.2(c) and the obligations of a Member pursuant to Section 5.2(b) shall survive the termination, dissolution, liquidation and winding up of the Company and the withdrawal of such Member

16

ny-1865422

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001238

PX0594.245

from the Company or Transfer of its Units. The Company may pursue and enforce all rights and remedies it may have against each Member under this Section 5.2, including bringing a lawsuit to collect repayment with interest of any Withholding Advances.

(d)     Overwithholding. Neither the Company nor the Managing Member shall be liable for any excess taxes withheld in respect of any distribution to a Member. In the event of an overwithholding, a Member's sole recourse shall be to apply for a refund from the appropriate Taxing Authority.

5.3     Distributions in Kind.

(a)     The Managing Member is hereby authorized, in its sole discretion, to make Distributions to the Members in the form of securities or other property held by the Company. In any non-cash Distribution, the securities or property so distributed will be distributed among the Members in the same proportion and priority as cash equal to the fair market value of such securities or property (as determined by the Managing Member) would be distributed among the Members pursuant to Section 5.1(c).

(b)     Any Distribution of securities shall be subject to such conditions and restrictions as the Managing Member determines are required or advisable to ensure compliance with Applicable Law. In furtherance of the foregoing, the Managing Member may require that the Members execute and deliver such documents as the Managing Member may deem necessary or appropriate to ensure compliance with all federal and state securities laws that apply to such distribution and any further Transfer of the distributed securities, and may appropriately legend the certificates that represent such securities to reflect any restriction on Transfer with respect to such laws.

# ARTICLE 6

# MANAGEMENT

6.1     Management of the Company. The business and affairs of the Company shall be managed by the Managing Member. The Managing Member shall have full and complete discretion to manage and control the business and affairs of the Company, to make all decisions affecting the business and affairs of the Company and to take all such actions as it deems necessary or appropriate to accomplish the purposes of the Company set forth in Section 2.5. The actions of the Managing Member taken in accordance with the provisions of this Agreement shall bind the Company. No other Member of the Company shall have any authority or right to act on behalf of or bind the Company, unless otherwise provided herein or unless specifically authorized by the Managing Member pursuant to a resolution expressly authorizing such action which resolution is duly adopted by the Managing Member.

6.2     Officers. The Managing Member may appoint individuals as officers of the Company (the "Officers") as it deems necessary or desirable to carry on the business of the Company and the Managing Member may delegate to such Officers such power and authority as the Managing Member deems advisable. No Officer need be a Member of the Company. Any individual may hold two or more offices of the Company. Each Officer shall hold office until his

ny-1865422

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001239

PX0594.246

or her successor is designated by the Managing Member or until his earlier death, resignation or removal. Any Officer may resign at any time upon written notice to the Managing Member. Any Officer may be removed by the Managing Member with or without cause at any time. A vacancy in any office occurring because of death, resignation, removal or otherwise, may, but need not, be filled by the Managing Member.

6.3     Resignation of the Managing Member.  The Member who is the Managing Member may resign at any time by delivering its written resignation to the Company, which shall include the appointment of a replacement Managing Member.  Such resignation shall be effective upon receipt thereof unless it is specified to be effective at some other time or upon the occurrence of some other event. The Company's acceptance of a resignation shall not be necessary to make it effective. The resignation of the Managing Member shall not affect its rights as a Member and shall not constitute a withdrawal of such Member.

6.4     Compensation; No Employment. The Managing Member shall not be compensated for its services as the Managing Member, but the Company shall reimburse the Managing Member for all ordinary, necessary and direct expenses incurred by the Managing Member on behalf of the Company in carrying out the Company's business activities. Furthermore, notwithstanding anything to the contrary set forth in this Agreement, the parties acknowledge and agree that the Managing Member shall have the right to cause members of the Company Group to separately enter into services agreements with Fidelio Capital AB or its Affiliates providing for the payment of reasonable management or advisory fees for actual work performed and reimbursement of expenses.

## ARTICLE 7

## PRE-EMPTIVE RIGHTS

7.1     Pre-emptive Right.

(a)     Issuance of New Units.  Notwithstanding anything herein to the contrary, the Company shall, and the Managing Member shall cause the Company to, issue any New Units at a price equal to their Fair Value at the time of issuance.  Subject to Section 3.2, in connection with any proposed issuance by the Company of any Units for cash (other than any issuance of Excluded Securities or issuances of Units in connection with an Initial Public Offering) (the "New Units"), each Member shall have the right (the "Pre-emptive Right") to purchase its pro rata portion of such New Units (each such Member, a "Pre-emptive Member").  If any Pre-emptive Member does not exercise his, her or its Pre-emptive Right, then each exercising Pre-emptive Member shall have the right to purchase its pro rata portion of the New Units with respect to which Pre-emptive Members do not exercise their Pre-emptive Rights.  A Pre-emptive Member's "pro rata portion" for purposes of this Article 7 means a fraction determined by dividing (x) the number of Units owned by such Minority Member immediately prior to the date of such issuance, by (y) the total number of Units held by all Members immediately prior to such date, in each case, calculated on a Fully Diluted Basis.

(b)     Issuance of Unit Equivalents. Subject to Section 3.2, in connection with any proposed issuances by the Company of any Unit Equivalents that are convertible into Units

18

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001240

PX0594.247

(other than any issuance of Excluded Securities or issuance of Units in connection with an Initial Public Offering), each Member shall have the right to purchase its pro rata portion of such Unit Equivalents as if the issuance applied to the Units that may be subscribed for or converted into to pursuant to such Unit Equivalent.

7.2     Procedures Relating to Pre-emptive Right.

(a)     Additional Issuance Notices. The Company shall give written notice (an "Issuance Notice") of any proposed issuance described in Section 7.1 to the Pre-emptive Members as soon as practicable after determining its intention to issue the New Units. The Issuance Notice shall set forth the material terms and conditions of the proposed issuance, including:

(i)     the number and description of the New Units proposed to be issued;

(ii)     the proposed issuance date, which shall be at least 45 days from the date of the Issuance Notice; and

(iii)     the proposed purchase price per New Unit.

(b)     Exercise of Pre-emptive Rights. Each Pre-emptive Member shall for a period of 30 days following the receipt of an Issuance Notice (the "Exercise Period") have the right to elect irrevocably to purchase its pro rata portion of the New Units at the purchase price set forth in the Issuance Notice by delivering a written notice to the Company. The closing of any purchase by any Pre-emptive Member shall be consummated concurrently with the consummation of the issuance described in the Issuance Notice.

(c)     Over-Allotment.  No later than three (3) Business Days following the expiration of the Exercise Period, the Company shall notify each Pre-emptive Member in writing of the number of New Units that each Pre-emptive Member has agreed to purchase (including, for the avoidance of doubt, where such number is zero) (the "Over-allotment Notice"). Each Pre-emptive Member exercising its rights to purchase its pro rata portion of the New Units in full (an "Exercising Member") shall have a right of over-allotment to purchase its pro rata portion (determined as if the Units owned by the Exercising Members were the only Units of the Company) of the New Units that that any Pre-emptive Members elected not to purchase, by giving written notice to the Company within five (5) Business Days of receipt of the Over-allotment Notice (the "Over-allotment Exercise Period").

(d)     Sales to the Prospective Buyer. Following the expiration of the Over-allotment Exercise Period, the Company shall be free to complete the issuance of any New Units that the Pre-emptive Members have elected not to purchase, on terms no less favorable to the Company than those set forth in the Issuance Notice (except that the amount of New Units to be issued by the Company may be reduced); *provided*, that such issuance is closed within ninety (90) days after the expiration of the Over-allotment Exercise Period.  In the event the Company has not sold such New Units within such time period, the Company shall not thereafter issue or sell any New Units without first again offering such securities to the Pre-emptive Members in accordance with the procedures set forth in this Section 7.2.

19

ny-1865422

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001241

PX0594.248

(e)  Closing of the Issuance.  Any New Units issued in accordance with this Section 7.2 shall be issued free and clear of any liens (other than those arising hereunder or any other agreement between each Exercising Member and the Company).  At the closing of such issuance, each Exercising Member shall deliver to the Company the purchase price for the New Units purchased by it by wire transfer of immediately available funds.  Each party to the purchase and sale of New Units shall take all such other actions as may be reasonably necessary to consummate the purchase and sale including entering into such additional agreements as the Managing Member determines to be necessary or appropriate.

(f)  Expedited Timing.  Notwithstanding anything to the contrary in this Article 7, the Managing Member shall be entitled to implement an issuance of New Units by purchasing, directly or through its designee, all New Units which the Managing Member are jointly entitled to purchase and, as soon as reasonably practicable thereafter, offer the other Members the right to purchase, in a secondary offering, the New Units which they otherwise would have been entitled to purchase, on the same terms and pursuant to the procedures set forth in this Section 7.2.

## ARTICLE 8

## TRANSFER; CONVERSION

8.1  General Restrictions on Transfer.

(a)  For a period of two (2) years from and after the applicable Admission Date for a Minority Member ("New Member Period"), such Minority Member may not Transfer any Units or Unit Equivalents without the prior approval of the Managing Member, except for any Transfers to (x) a Controlled Entity or (y) pursuant to Section 8.3 or Section 8.4.  Following the New Member Period, subject to Section 8.1(b), no Minority Member may Transfer any Units or Unit Equivalents except for a Transfer of no less than all of the Units or Unit Equivalents held by such Minority Member (i) to a Third Party Purchaser, subject to Section 8.2, (ii) to a Controlled Entity or (iii) pursuant to Section 8.3 or Section 8.4.

(b)  Without the consent of the Managing Member, no Minority Member may (i) pledge or otherwise encumber any of the Units or Unit Equivalents held by such Minority Member or, in the event such Minority Member holds Units or Unit Equivalents through a Controlled Entity, any equity in such Controlled Entity (other than pursuant to Section 9.3 hereof) or enter into any agreement or arrangement in respect of the voting rights attached to and arising out of such Units, Unit Equivalents or equity in such Controlled Entity, (ii) Transfer any of the Units or Unit Equivalents held by such Minority Member to any Person that, directly or indirectly, competes with the business of the Company Group or Fidelio Capital AB, to be determined in the Managing Member's reasonable good faith discretion, or (iii) in the event such Minority Member holds Units or Unit Equivalents through a Controlled Entity, transfer any equity in such Controlled Entity, either to a third party or to another Minority Member.

(c)  No Transfer of Units or Unit Equivalents to a Person not already a Member of the Company shall be deemed completed unless and until the prospective Transferee is admitted as a Member of the Company in accordance with Section 4.1(b).

20

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001242

PX0594.249

(d)      Notwithstanding any other provision of this Agreement, prior to the
consummation of an Initial Public Offering, each Minority Member agrees that, unless otherwise
determined by the Managing Member, it will not, directly or indirectly, Transfer any of its Units
or Unit Equivalents, and the Company agrees that it shall not issue any Units or Unit
Equivalents:

(i)      if such Transfer would violate the Securities Act or other
applicable federal or state securities or blue sky laws, or, with respect to a Transfer of Units or
Unit Equivalents, if requested by the Company, the Transferor fails to deliver to the Company an
opinion of counsel in form and substance satisfactory to the Company to the effect that such
Transfer may be effected without registration under the Securities Act;

(ii)      if such Transfer or issuance would affect the Company's existence
or qualification as a limited liability company under the Delaware Act;

(iii)      if such Transfer or issuance would cause any member of the
Company Group, Fidelio Capital AB, Ossium Topco AB or any of its Subsidiaries to be required
to register as an investment company under the Investment Company Act of 1940, as amended;
or

(iv)      if the Managing Member determines that such Transfer would
have a material adverse effect on the Company or the Initial Public Offering as a result of any
regulatory or other restrictions imposed by any Governmental Authority.

(e)      Any Transfer or attempted Transfer of any Units or Unit Equivalents in
violation of this Agreement shall be null and void *ab initio*, no such Transfer shall be recorded
on the Company's books and the purported Transferee in any such Transfer shall not be treated
(and the purported Transferor shall continue be treated) as the owner of such Units or Unit
Equivalents for all purposes of this Agreement.  A Person who acquires Units but who is not
admitted as a substituted Member pursuant to Section 4.1 shall be entitled only to distributions
with respect to such Units in accordance with this Agreement, and shall have no right to any
information or accounting of the affairs of the Company, shall not be entitled to inspect any
books or records of the Company, and shall not have any of the rights of a Member under the
Delaware Act or this Agreement.

8.2      Managing Member Right of First Refusal.  If any Minority Member wishes to
Transfer all of the Units or Unit Equivalents held by such Minority Member to any third party
(the "Proposed Transfer"), such Minority Member shall first give written notice (a "ROFR
Notice") of such Transfer to the Managing Member, including the number of Units or Unit
Equivalents proposed to be Transferred, the identity of the proposed purchaser (including its
ultimate beneficial owner), the proposed Transfer date, which shall be at least 45 days from and
after the date on which the Managing Member received the ROFR Notice (the "ROFR Response
Period"), and the proposed cash purchase price per unit.  The Managing Member (or any
designee of the Managing Member, including the Company) shall, for a period of 30 days
following the receipt of a ROFR Notice have the right (the "ROFR") to purchase all (but not less
than all) of the Units at the purchase price set forth in the ROFR Notice by delivering a written
notice to such selling Minority Member.  If the Managing Member or its designee chooses to

21

ny-1865422

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

exercise the ROFR, the ROFR purchase shall be consummated on the proposed Transfer date set forth in the ROFR Notice.  If the Managing Member does not exercise its ROFR, then the selling Minority Member shall have 90 days following the date of the expiration of the ROFR Response Period to consummate the Proposed Transfer set forth in the ROFR Notice.  If at the end of such period the selling Minority Member has not completed the Proposed Transfer, then the Minority Member may not proceed with the Proposed Transfer without fully complying with the provisions of this Section 8.2 again. This ROFR shall not apply to a transfer of the Units by a Minority Member to a Controlled Entity.

8.3     Drag-along Right; Tag-along Right.

(a)     At any time prior to the consummation of an Initial Public Offering, if the Managing Member proposes to consummate, in one transaction or a series of related transactions, a Change of Control (such transaction, a "Drag/Tag Transaction"), (i) the Managing Member shall have the right (the "Drag-along Right") to require each Minority Member to participate in such Drag/Tag Transaction (including, if requested by the Managing Member, by converting their Unit Equivalents into the Units to be sold in a Drag-along Sale) by selling their pro rata portion of each relevant class of Units, and (ii) assuming the Managing Member does not exercise its Drag-along Right, each Minority Member shall have the right (the "Tag-along Right") to participate in such Drag/Tag Transaction, and in each case, to sell such Minority Member's pro rata portion of Units in such Drag/Tag Transaction.  Notwithstanding anything herein to the contrary, the Drag-along Right and Tag-along Right shall only apply in the event the applicable Drag/Tag Transaction actually closes.

A Minority Member's "pro rata portion" for purposes of this Section 8.3 means a fraction determined by dividing (x) the number of Units owned by such Minority Member immediately prior to the date of such proposed Drag/Tag Transaction, by (y) the total number of Units held by all Members immediately prior to such date, in each case, calculated on a Fully Diluted Basis.

(b)     For the avoidance of doubt, the Tag-along Rights of the Minority Members shall not apply to a sale of Units to an Affiliate of the Company or a Person which, directly or indirectly, is controlling, controlled by or under common control with the Managing Member, Fidelio Capital AB or any other Person who acquires control of the Company; *provided, however,* Tag-along Rights of the Minority Members shall apply to the extent that such Affiliate or Person which, directly or indirectly, is controlling, controlled by or under common control with the Managing Member, Fidelio Capital AB or any other Person who acquires control of the Company desires to transfer and/or sell any Units to a Third Party Purchaser (which is not an Affiliate or Person which, directly or indirectly, is controlling, controlled by or under common control with the Managing Member, Fidelio Capital AB or any other Person who acquires control of the Company).

(c)     If the Drag-along Right is exercised or, if the Drag-along Right is not exercised but the Tag-along Right is exercised, in each case, pursuant to Section 8.3(a), the sale of Units by the Minority Members shall receive the same form and amount of consideration to be received by the Managing Member per Unit and the terms and conditions of such sale shall be the same as those upon which the Managing Member sells its Units, except (i) as otherwise set forth in this Agreement, (ii) in the case of any Drag/Tag Transaction for consideration that

22

ny-1865422

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001244

PX0594.251

includes non-cash property, the Managing Member may require each Minority Member to accept cash in an amount equal to the fair market value of such non-cash property consideration as determined by the Managing Member in its reasonable good faith discretion, and (iii) each Minority Member shall execute the applicable purchase agreement and make or provide the same representations, warranties, covenants, indemnities and agreements as those made by the Managing Member (except that each Minority Member may also be required to execute customary non-competition and non-solicitation covenants in connection therewith).

(d)      Drag/Tag Notice.  No more than 10 Business Days after exercising its Drag-along Right or, otherwise, at least 30 days prior to the closing of a Drag/Tag Transaction, the Managing Member shall deliver a written notice (the "Drag/Tag Notice") to each Minority Member describing in reasonable detail:

(i)      The identity of the proposed purchaser;

(ii)      The proposed date, time and location of the closing of the sale;

(iii)      The number of Units to be sold by the Managing Member, the proposed amount of consideration for the Drag/Tag Transaction and the other material terms and conditions of the Drag/Tag Transaction, including a description of any non-cash consideration in sufficient detail to permit the valuation thereof and including, if applicable, the purchase price per Unit; and

(iv)      A copy of any form of agreement proposed to be executed in connection therewith.

(e)      Exercise of Tag-along Right.  If the Managing Member elects not to exercise its Drag-along Right, each Minority Member shall, for a period of 30 days following the receipt of an Drag/Tag Notice have the right to exercise its Tag-along Right by delivering a written notice thereof to the Managing Member.  The election of a Minority Member in such a notice shall be irrevocable, and such Tag-along Member shall be bound and obligated to consummate the Transfer on the terms and conditions set forth in this Section 8.3.  Each Minority Member who does not deliver such a notice shall be deemed to have waived such Minority Member's Tag-along Right, and the Managing Member shall (subject to the rights of any other Minority Members exercising their Tag-along Rights) thereafter be free to sell to the proposed transferee the Units and/or Unit Equivalents identified in the Drag/Tag Notice at a per Unit price that is no greater than the per Unit price set forth in the Drag/Tag Notice and on other terms and conditions which are not in the aggregate materially more favorable to the Minority Member than those set forth in the Drag/Tag Notice, without any further obligation to the Minority Members.

(f)      Expenses. The fees and expenses of the Managing Member or the Company incurred in connection with a Drag/Tag Transaction and for the benefit of all Minority Members (it being understood that costs incurred by or on behalf of the Managing Member for its sole benefit will not be considered to be for the benefit of all Minority Members) and, to the extent not paid or reimbursed by the applicable purchaser, shall be paid by the Company or, to the extent that the Company cannot make such payment, shall be shared by the Managing

23

ny-1865422

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001245

PX0594.252

Member and all the Minority Members on a pro-rata basis, based on the consideration received by each such Member; *provided*, that no Minority Member shall be obligated to make any out-of-pocket expenditure prior to the consummation of the Drag/Tag Transaction.

(g)     Power of Attorney.  Each of the Minority Members hereby grants a power of attorney to the Managing Member with full power of substitution and coupled with an interest, to act on behalf of such Minority Member, and to perform such actions related to negotiating reasonable contractual terms such as price and lock-up restrictions, execute such documents and enter into such undertakings which are deemed necessary in order to complete a Drag/Tag Transaction in accordance herewith and subject to the terms of this Agreement, including Section 8.3(c).

8.4     Managing Member Call Right.

(a)     Call Right.  Subject to Section 8.4(b), following a Triggering Event the Managing Member shall have the right to require the applicable Minority Member and such Minority Member's Controlled Entity to sell to the Managing Member (or a designee of the Managing Member, including the Company) all or any portion of such Minority Member's or its Controlled Entity's Units and Unit Equivalents, as determined by the Managing Member, at the following respective purchase prices:

|      | Applicable Triggering Event | Call Purchase Price |
|------|-----------------------------|---------------------|
| (i)  | Such Minority Member's employment with the Company Group is terminated or notified for termination (for the avoidance of doubt, the termination that follows a notice of termination shall be considered a separate and new Triggering Event) within twenty (24) months of such Minority Member's initial Admission Date (x) by such Minority Member, other than for death or disability, or (y) for Cause. | The lower of (A) the amount paid for the relevant Units and Unit Equivalents held by such Minority Member *less* the aggregate amount of any Distributions and any amounts otherwise received by such Minority Member from the Company on such equity (the "<u>Original Investment</u>")  and   (B) seventy-five percent (75%) of the then Fair Value of the relevant Units and Unit Equivalents held by such Minority Member. |
| (ii) | Such Minority Member's employment with the Company Group is terminated for any reason other than those set forth in row (i) above (which for the avoidance of doubt shall include the Minority Member's death, disability, dissolution or retirement in accordance with the terms of his or her employment agreement with the Company Group). | The then Fair Value of the relevant Units and Unit Equivalents held by such Minority Member. |
| (iii)| The member of the Company Group where such Minority Member is employed is divested or ceases to be controlled by the Company or its Affiliates. | The then Fair Value of the relevant Units and Unit Equivalents held by such Minority Member. |

24

ny-1865422

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001246

PX0594.253

| (iv) | Such Minority Member undergoes a Bankruptcy event. | The then Fair Value of the relevant Units and Unit Equivalents held by such Minority Member. |
| (v) | Such Minority Member is required to Transfer his or her Units (directly or indirectly through a transfer of shares in a Controlled Entity) pursuant to divorce proceedings. | The then Fair Value of the relevant Units and Unit Equivalents held by such Minority Member. |
| (vi) | Such Minority Member (x) materially breaches the terms of this Agreement (for the avoidance of doubt, a breach of any term set forth in Article 8 and Section 9.1 and Section 9.2 shall always be considered a material breach if such breach has not been remedied (if capable of being remedied) within ten (10) Business Days after the breaching party's receipt of a written notice from the Managing Member requesting it to remedy such breach) or (y) commits any criminal acts. | The lower of (x) seventy-five percent (75%) of the Original Investment and (ii) seventy-five percent (75%) of the then Fair Value of the relevant Units and Unit Equivalents held by such Minority Member. |

References to employment or an employment agreement in this Section 8.4 shall apply *mutatis mutandis* to any arrangement (whether or not formalized) pursuant to which a Minority Member is (a) employed by a Group Company; (b) retained as a consultant on a regular and substantive basis by a Group Company; or (c) retained as a member of the board of directors of a Group Company (in each case as amended and restated from time to time).

(b)     Procedure.  If a Triggering Event occurs, the applicable Minority Member shall notify the Managing Member thereof in writing as soon as reasonably practicable but in no event later than 30 days following such occurrence.  The Managing Member shall have the right to exercise the call right and acquire, or appoint a designee (which may be the Company) to acquire, all or part of the Units held by the applicable Minority Member, as determined by the Managing Member, by giving written notice to such Minority Member within six (6) months from the date the Managing Member's receipt of the notice referred to in the previous sentence or, absent such notice, from the date the Managing Member acquires actual knowledge of the Triggering Event.  If the Managing Member desires to exercise its right to purchase Units pursuant to this Section 8.4, the Managing Member or its designee shall deliver to the applicable Minority Member a written notice (the "Repurchase Notice") specifying the number of Units to be repurchased by the Managing Member or its designee (the "Repurchased Units"), the closing date of such purchase (which shall not be less than 5 Business Days following delivery of the Repurchase Notice) and the respective Call Purchase Price therefor in accordance with Section 8.4(a) (the "Call Purchase Price").  The Managing Member or its applicable designee shall pay the applicable Call Purchase Price to the Minority Member by wire transfer of immediately available funds to an account designated by the Minority Member.

(c)     Cooperation.  The applicable Minority Member shall take all actions as may be reasonably necessary or reasonably requested by the Managing Member to consummate

ny-1865422

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001247

PX0594.254

the sale contemplated by this Section 8.4, including delivering certificates and instruments and consents as may be deemed necessary or appropriate by the Managing Member.  At the closing of such transaction, the Managing Member shall update the Members Schedule.

(d)      Acknowledgement.  The Company, the Managing Member and each Member (including New Members) acknowledge, as of such Member's Admission Date, that the occurrence of a Triggering Event with respect to such Member is not more likely than not to occur in the future.

8.5      Conversion to Corporation; Registration.

(a)      In the event that the Managing Member shall determine, in its sole discretion, that it is in the best interest of the Company to facilitate an offering of Equity Securities in the Company or a successor through an Initial Public Offering, then the Managing Member shall have the power to cause the Company to be reorganized as a corporation under the General Corporation Law of the State of Delaware by incorporation, merger, contribution or other permissible manner (a "Conversion" and the successor of the Company pursuant to such Conversion, the "Corporation"), and the Minority Members shall cooperate in good faith to effectuate such Conversion and public offering, including taking such actions as are, in the opinion of the Managing Member, necessary or appropriate, including (i) dissolving the Company, creating one or more subsidiaries of the newly formed corporation and transferring to such subsidiaries any or all of the assets of the Company (including by merger) or (ii) causing the Minority Members to, and the Minority Members agree to, exchange their Units for shares of common stock of the Corporation.  The Members and the Company intend for any Conversion to qualify as a reorganization under Section 368(a)(1)(F) of the Code.  Neither the Company nor any Member shall take any position inconsistent with such characterization on any return or filing or otherwise with any Taxing Authority unless otherwise required by Applicable Law.

(b)      Following a Conversion, the Managing Member shall have the right to initiate an Initial Public Offering, upon which the Members shall abide by all obligations and restrictions imposed by and any advice and instructions given (including any lock-up, non-competition, and non-solicitation obligations) by the investment bank(s) advising on the offering or the relevant stock exchange.  In connection with any Conversion, Members who hold Units shall be entitled to receive common stock of the Corporation in proportion to the proceeds that each such Member would receive if the Company were sold for the then-applicable Fair Value and the proceeds were Distributed in accordance with Section 5.1(c).  Whether or not in connection with an Initial Public Offering, the Managing Member shall have the right to undertake any refinancing, recapitalization, restructuring or other reorganization of the Company Group (including a Conversion).  In connection with an Initial Public Offering, the Managing Member shall have the right to negotiate, execute and otherwise act on behalf of each Minority Member in relation thereto, including with respect to contractual terms such as regarding price, any lock-up agreements, and non-competition and non-solicitation agreements. Each of the Minority Members hereby grants a power of attorney to the Managing Member with full power of substitution and coupled with an interest, to act on behalf of such Minority Member in connection with the foregoing.

ny-1865422

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001248

PX0594.255

(c)     The fees and expenses of the Managing Member incurred in connection with a Conversion and/or Initial Public Offering for the benefit of all Minority Members (it being understood that costs incurred by or on behalf of the Managing Member for its sole benefit will not be considered to be for the benefit of all Minority Members) shall be shared by the Managing Member and all the Minority Members on a pro-rata basis, based on the number of shares of common stock of the Corporation owned by each; *provided*, that no Minority Member shall be obligated to make any out-of-pocket expenditure prior to the consummation of the Initial Public Offering.

## ARTICLE 9

## COVENANTS

9.1     Confidentiality.

(a)     Each Member acknowledges that during the term of this Agreement, he, she or it will have access to and become acquainted with Proprietary Information of the Company Group, Fidelio Capital AB, Ossium Topco AB and its Subsidiaries. In addition, each Member acknowledges that: (i) the Company has invested, and continues to invest, substantial time, expense and specialized knowledge in developing its Proprietary Information; (ii) the Proprietary Information provides the Company with a competitive advantage over others in the marketplace; and (iii) the Company would be irreparably harmed if the Proprietary Information were disclosed to competitors or made available to the public. Without limiting the applicability of any other agreement to which any Minority Member is subject, for the period beginning from a Minority Member's Admission Date until the date that is the second (2nd) anniversary after the date on which the Minority Member ceases to be a Member (the "Restricted Period"), no Minority Member shall, directly or indirectly, disclose or use (other than solely for the purposes of such Minority Member monitoring and analyzing his, her or its investment in the Company or the Company Group or performing his or her duties as an Officer, employee, consultant or other service provider of the Company Group, Fidelio Capital AB or Ossium Topco AB or any of its Subsidiaries) at any time, including, use for personal, commercial or proprietary advantage or profit, either during his or her association or employment with the Company or thereafter, any Proprietary Information of which such Minority Member is or becomes aware. Each Minority Member in possession of Proprietary Information shall take all appropriate steps to safeguard such information and to protect it against disclosure, misuse, espionage, loss and theft.

(b)     Each Member acknowledges that he, she or it may disclose such portion (and only such portion) of the Proprietary Information, as such Member reasonably determines, based on advice of counsel, is legally obligated to disclose if (i) such Member receives a request to disclose all or any part of the Proprietary Information under the terms of a subpoena, civil investigative demand or order issued by a Governmental Authority or required by Applicable Law; (ii) to the extent permitted by such request and Applicable Law, such Member notifies the Company Group of the existence, terms and circumstances surrounding such request; and (iii) upon the request and at the expense of the Company Group, such Member exercises commercially reasonable efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to the disclosed Proprietary Information.

27

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001249

PX0594.256

9.2     Covenant Not to Compete.

(a)     During the Restricted Period, each Minority Member shall not, and shall not permit any of their respective Affiliates to, directly or indirectly, (i) engage in or assist others in engaging in any business which competes with the business of the Company Group; (ii) have an interest in any Person that engages directly or indirectly in the business of the Company Group in any capacity, including as a partner, shareholder, member, lender, investor, employee, director, manager, principal, agent, trustee or consultant; or (iii) interfere in any material respect with the business relationships (whether formed prior to or after the date of this Agreement) between any member of the Company Group, on the one hand, and the customers, suppliers or other business relationships of any member of the Company Group, on the other hand.

(b)     During the Restricted Period, each Minority Member shall not, and shall not permit any of their respective Affiliates to, directly or indirectly, hire or solicit any employee of any member of the Company Group or encourage any such employee to leave or terminate such employment or hire any such employee who has left or terminated such employment.

(c)     During the Restricted Period, each Minority Member shall not, and shall not permit any of their respective Affiliates to, directly or indirectly, solicit or entice, or attempt to solicit or entice any present or potential customer, distributor, vendor, supplier, advisor or any other Person who has a business relationship with any member of the Company Group for purposes of diverting their business or services to any other Person, from any such member of the Company Group, or terminating or materially decreasing their business or services from any member of the Company Group.

(d)     The Minority Members acknowledge that a breach or threatened breach of this Section 9.2 would give rise to irreparable harm to the Company Group, for which monetary damages would not be an adequate remedy, and hereby agree that in the event of a breach or a threatened breach of any such obligations, the Company Group shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to seek equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

(e)     The Minority Members acknowledge that the restrictions contained in this Section 9.2 are reasonable and necessary to protect the legitimate interests of the Company Group.  In the event that any covenant contained in this Section 9.2 should ever be adjudicated to exceed the time, geographic, product or service, or other limitations permitted by Applicable Law in any jurisdiction, then any court is expressly empowered to reform such covenant, and such covenant shall be deemed reformed, in such jurisdiction to the maximum time, geographic, product or service, or other limitations permitted by Applicable Law.  The covenants contained in this Section 9.2 and each provision hereof are severable and distinct covenants and provisions. The invalidity or unenforceability of any such covenant or provision as written shall not invalidate or render unenforceable the remaining covenants or provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such covenant or provision in any other jurisdiction.

28

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

9.3     Pledge of Minority Members.  Each Minority Member hereby pledges, grants a security interest in, assigns, transfers and delivers unto the Managing Member and the Company (or their respective designees), the Units held by such Minority Member as collateral security for the payment and performance by such Minority Member of his, her or its undertakings and obligations to any member of the Company Group, or any of their Affiliates (collectively, the "Company Group Indemnitees") under or pursuant to this Agreement and any of the Acquisition Documents to which such Minority Member is a party.  In the event that any Minority Member has an outstanding obligation to indemnify any Company Group Indemnitee under or pursuant to this Agreement or one or more of the Acquisition Documents, the Managing Member shall be entitled, without further notice to such Minority Member and without necessity for legal proceedings, to deduct from the Units (the "Indemnification Deduction") held by such Minority Member the number of Units (the "Forfeited Units"), based on the then Fair Value of such Units sufficient to satisfy such Minority Member's outstanding indemnification obligations to such Company Group Indemnitee, and the Forfeited Units shall be forfeited by such Minority Member.  The Managing Member shall promptly notify the applicable Minority Member of any such Indemnification Deduction and update the number of Units held by such Minority Member in the Members Schedule to reflect such Indemnification Deduction.

## ARTICLE 10

## ACCOUNTING; TAX RETURNS

10.1     Financial Statements. As soon as available, the Company shall furnish to each Member audited consolidated balance sheets of the Company as at the end of each such Fiscal Year and consolidated statements of income and cash flows for such Fiscal Year; *provided*, that following a Triggering Event, the applicable Member shall not be entitled to receive the financial statements provided pursuant to this Section 10.1.

10.2     Inspection Rights. Upon reasonable notice from a Member, the Company shall, and shall cause its Officers and employees to, afford each Member and its Representatives reasonable access during normal business hours to the corporate, financial and similar records, reports and documents of the Company; *provided*, that without the prior approval of the Managing Member, no Minority Member shall be permitted to review, inspect or otherwise have access to any information set forth in the Members Schedule in relation to any Member other than the inspecting Minority Member and its Affiliates (except for each other Member's notice information); *provided further*, that following a Triggering Event, the applicable Member shall not be entitled to any rights under this Section 10.2.

10.3     Tax Returns. At the expense of the Company, the Managing Member (or any Officer that the Managing Member may designate pursuant to Section 6.2) shall endeavor to cause the preparation and timely filing (including extensions) of all tax returns required to be filed by the Company pursuant to the Code as well as all other required tax returns in each jurisdiction in which the Company Group owns property or does business. As soon as reasonably possible after the end of each Fiscal Year, the Managing Member or designated Officer will cause to be delivered to each Person such information with respect to the Company as may be necessary for the preparation of such Person's U.S. federal, state, local and non-U.S. income tax returns for such Fiscal Year.

ny-1865422

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001251

PX0594.258

10.4    Company Funds. All funds of the Company shall be deposited in its name, or in such name as may be designated by the Managing Member, in such checking, savings or other accounts, or held in its name in the form of such other investments as shall be designated by the Managing Member. The funds of the Company shall not be commingled with the funds of any other Person. All withdrawals of such deposits or liquidations of such investments by the Company shall be made exclusively upon the signature or signatures of such Officer or Officers as the Managing Member may designate.

## ARTICLE 11

## DISSOLUTION AND LIQUIDATION

11.1    Events of Dissolution. The Company shall be dissolved and is affairs wound up only upon the occurrence of any of the following events:

(a)    The determination of the Managing Member to dissolve the Company;

(b)    The sale, exchange, involuntary conversion, or other disposition or Transfer of all or substantially all the assets of the Company; or

(c)    The entry of a decree of judicial dissolution under § 18-802 of the Delaware Act.

11.2    Effectiveness of Dissolution. Dissolution of the Company shall be effective on the day on which the event described in Section 11.1 occurs, but the Company shall not terminate until the winding up of the Company has been completed, the assets of the Company have been distributed as provided in Section 11.3 and the Certificate of Formation shall have been cancelled as provided in Section 11.4.

11.3    Liquidation. If the Company is dissolved pursuant to Section 11.1, the Company shall be liquidated and its business and affairs wound up in accordance with the Delaware Act and the following provisions:

(a)    Liquidator.  The Managing Member or a Person selected by the Managing Member shall act as liquidator to wind up the Company (the "Liquidator"). The Liquidator shall have full power and authority to sell, assign, and encumber any or all of the Company's assets and to wind up and liquidate the affairs of the Company in an orderly and business-like manner.

(b)    Accounting.  As promptly as possible after dissolution and again after final liquidation, the Liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable.

(c)    Distribution of Proceeds.  The Liquidator shall liquidate the assets of the Company and distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of Applicable Law:

30

ny-1865422

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001252

PX0594.259

(i)    First, to the payment of all of the Company's debts and liabilities to its creditors (including Members, if applicable) and the expenses of liquidation (including sales commissions incident to any sales of assets of the Company);

(ii)    Second, to the establishment of and additions to reserves that are determined by the Managing Member in its sole discretion to be reasonably necessary for any contingent unforeseen liabilities or obligations of the Company; and

(iii)    Third, to the Members in the same manner as distributions are made under Section 5.1(c).

(d)    <u>Discretion of Liquidator</u>.  Notwithstanding the provisions of Section 11.3(c) that require the liquidation of the assets of the Company, but subject to the order of priorities set forth in Section 11.3(c), if upon dissolution of the Company the Liquidator determines that an immediate sale of part or all of the Company's assets would be impractical or could cause undue loss to the Members, the Liquidator may defer the liquidation of any assets except those necessary to satisfy Company liabilities and reserves, and may, in his, her or its absolute discretion, distribute to the Members, in lieu of cash, as tenants in common and in accordance with the provisions of Section 11.3(c), undivided interests in such Company assets as the Liquidator deems not suitable for liquidation. Any such distribution in kind shall be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any agreements governing the operating of such properties at such time.

11.4    Cancellation of Certificate. Upon completion of the distribution of the assets of the Company as provided in Section 11.3(c) hereof, the Company shall be terminated and the Liquidator shall cause the cancellation of the Certificate of Formation in the State of Delaware and of all qualifications and registrations of the Company as a foreign limited liability company in jurisdictions other than the State of Delaware and shall take such other actions as may be necessary to terminate the Company.

11.5    Survival of Rights, Duties and Obligations. Dissolution, liquidation, winding up or termination of the Company for any reason shall not release any party from any Loss which at the time of such dissolution, liquidation, winding up or termination already had accrued to any other party or which thereafter may accrue in respect of any act or omission prior to such dissolution, liquidation, winding up or termination. For the avoidance of doubt, none of the foregoing shall replace, diminish or otherwise adversely affect any Member's right to indemnification pursuant to Section 12.3.

11.6    Recourse for Claims. Each Member shall look solely to the assets of the Company for all distributions with respect to the Company, and shall have no recourse therefor (upon dissolution or otherwise) against the Managing Member, any Officers, the Liquidator or any other Member.

ny-1865422

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001253

PX0594.260

# ARTICLE 12

## EXCULPATION AND INDEMNIFICATION

12.1    Exculpation of Covered Persons.

(a)    Standard of Care.  No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage or claim incurred by reason of any action taken or omitted to be taken by such Covered Person in good-faith reliance on the provisions of this Agreement, so long as such action or omission does not constitute fraud or willful misconduct by such Covered Person.

(b)    Good Faith Reliance.  A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements (including financial statements and information, opinions, reports or statements as to the value or amount of the assets, liabilities, Net Income or Net Loss of the Company or any facts pertinent to the existence and amount of assets from which distributions might properly be paid) of the following Persons or groups: (i) the Managing Member; (ii) one or more Officers or employees of the Company; (iii) any attorney, independent accountant, appraiser or other expert or professional employed or engaged by or on behalf of the Company; or (iv) any other Person selected in good faith by or on behalf of the Company, in each case as to matters that such relying Person reasonably believes to be within such other Person's professional or expert competence. The preceding sentence shall in no way limit any Person's right to rely on information to the extent provided in § 18-406 of the Delaware Act.

12.2    Liabilities and Duties of Covered Persons.

(a)    Limitation of Liability.  This Agreement is not intended to, and does not, create or impose any fiduciary duty on any Covered Person. Furthermore, each of the Members and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied by Applicable Law, and in doing so, acknowledges and agrees that the duties and obligation of each Covered Person to each other and to the Company are only as expressly set forth in this Agreement. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person.

(b)    Duties.  Whenever in this Agreement a Covered Person is permitted or required to make a decision (including a decision that is in such Covered Person's "discretion" or under a grant of similar authority or latitude), the Covered Person shall be entitled to consider only such interests and factors as such Covered Person desires, including its own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person. Whenever in this Agreement a Covered Person is permitted or required to make a decision in such Covered Person's "good faith," the Covered Person shall act under such express standard and shall not be subject to any other or different standard imposed by this Agreement or any other Applicable Law.

12.3    Indemnification.

ny-1865422

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001254

PX0594.261

(a)     Indemnification.  To the fullest extent permitted by the Delaware Act, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution or replacement only to the extent that such amendment, substitution or replacement permits the Company to provide broader indemnification rights than the Delaware Act permitted the Company to provide prior to such amendment, substitution or replacement), the Company shall indemnify, hold harmless, defend, pay and reimburse any Covered Person against any and all losses, claims, damages, judgments, fines or liabilities, including reasonable legal fees or other expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines or liabilities, and any amounts expended in settlement of any claims (collectively, "Losses") to which such Covered Person may become subject by reason of:

(i)     Any act or omission or alleged act or omission performed or omitted to be performed on behalf of the Company, any Member or any member of the Company Group of the foregoing in connection with the business of the Company; or

(ii)     The fact that such Covered Person is or was acting in connection with the business of the Company as a partner, member, stockholder, controlling Affiliate, manager, director, officer, employee or agent of the Company, any Member, or any of their respective controlling Affiliates, or that such Covered Person is or was serving at the request of the Company as a partner, member, manager, director, officer, employee or agent of any Person including the Company or any Company Subsidiary; *provided*, that (x) such Covered Person acted in good faith and in a manner believed by such Covered Person to be in, or not opposed to, the best interests of the Company and, with respect to any criminal proceeding, had no reasonable cause to believe his conduct was unlawful, and (y) such Covered Person's conduct did not constitute fraud or willful misconduct, in either case as determined by a final, nonappealable order of a court of competent jurisdiction. In connection with the foregoing, the termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that the Covered Person did not act in good faith or, with respect to any criminal proceeding, had reasonable cause to believe that such Covered Person's conduct was unlawful, or that the Covered Person's conduct constituted fraud or willful misconduct.

(b)     Reimbursement.  The Company shall promptly reimburse (and/or advance to the extent reasonably required) each Covered Person for reasonable legal or other expenses (as incurred) of such Covered Person in connection with investigating, preparing to defend or defending any claim, lawsuit or other proceeding relating to any Losses for which such Covered Person may be indemnified pursuant to this Section 12.3; *provided*, that if it is finally judicially determined that such Covered Person is not entitled to the indemnification provided by this Section 12.3, then such Covered Person shall promptly reimburse the Company for any reimbursed or advanced expenses.

(c)     Entitlement to Indemnity.  The indemnification provided by this Section 12.3 shall not be deemed exclusive of any other rights to indemnification to which those seeking indemnification may be entitled under any agreement or otherwise. The provisions of this Section 12.3 shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person

33

ny-1865422

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001255

PX0594.262

became entitled to indemnification under this Section 12.3 and shall inure to the benefit of the executors, administrators, legatees and distributees of such Covered Person.

(d) <u>Insurance</u>. To the extent available on commercially reasonable terms, the Company may purchase, at its expense, insurance to cover Losses covered by the foregoing indemnification provisions and to otherwise cover Losses for any breach or alleged breach by any Covered Person of such Covered Person's duties in such amount and with such deductibles as the Managing Member may determine; *provided*, that the failure to obtain such insurance shall not affect the right to indemnification of any Covered Person under the indemnification provisions contained herein, including the right to be reimbursed or advanced expenses or otherwise indemnified for Losses hereunder. If any Covered Person recovers any amounts in respect of any Losses from any insurance coverage, then such Covered Person shall, to the extent that such recovery is duplicative, reimburse the Company for any amounts previously paid to such Covered Person by the Company in respect of such Losses.

(e) <u>Funding of Indemnification Obligation</u>. Notwithstanding anything contained herein to the contrary, any indemnity by the Company relating to the matters covered in this Section 12.3 shall be provided out of and to the extent of Company assets only, and no Member (unless such Member otherwise agrees in writing) shall have personal liability on account thereof or shall be required to make additional Capital Contributions to help satisfy such indemnity by the Company.

(f) <u>Savings Clause</u>. If this Section 12.3 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Covered Person pursuant to this Section 12.3 to the fullest extent permitted by any applicable portion of this Section 12.3 that shall not have been invalidated and to the fullest extent permitted by Applicable Law.

(g) <u>Amendment</u>. The provisions of this Section 12.3 shall be a contract between the Company, on the one hand, and each Covered Person who served in such capacity at any time while this Section 12.3 is in effect, on the other hand, pursuant to which the Company and each such Covered Person intend to be legally bound. No amendment, modification or repeal of this Section 12.3 that adversely affects the rights of a Covered Person to indemnification for Losses incurred or relating to a state of facts existing prior to such amendment, modification or repeal shall apply in such a way as to eliminate or reduce such Covered Person's entitlement to indemnification for such Losses without the Covered Person's prior written consent.

12.4   Survival. The provisions of this Article 12 shall survive the dissolution, liquidation, winding up and termination of the Company.

## ARTICLE 13

## MISCELLANEOUS

13.1   Expenses. Except as otherwise expressly provided herein, all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred in connection with the preparation and execution of this Agreement, or any amendment or waiver

ny-1865422

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001256

PX0594.263

hereof, and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses; provided, that the Company shall pay such costs and expenses incurred by or on behalf of the Managing Member and Fidelio Capital AB.

13.2    Further Assurances. In connection with this Agreement and the transactions contemplated hereby, the Company and each Member hereby agrees, at the request of the Company or any other Member, to execute and deliver such additional documents, instruments, conveyances and assurances and to take such further actions as may be required to carry out the provisions hereof and give effect to the transactions contemplated hereby.

13.3    Notices.  All notices and other communications hereunder shall be in writing and shall be deemed duly given (a) on the date of delivery if delivered personally, or if by e-mail, upon written confirmation of receipt by e-mail or otherwise, (b) on the first Business Day following the date of dispatch if delivered utilizing a next-day service by a recognized next-day courier or (c) on the earlier of confirmed receipt or the fifth Business Day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid.  All notices hereunder shall be delivered to the addresses set forth below, or pursuant to such other instructions as may be designated in writing by the party to receive such notice:

| | |
|---|---|
| If to the Company: | Ossium HoldCo, LLC<br>c/o Fidelio Capital AB<br>Birger Jarlsgatan 13<br>111 45 Stockholm<br>SWEDEN<br>Attention:  Theodor Bonnier and Gabriel Fitzgerald<br>E-mail:  Theodor.bonnier@fideliocapital.se and<br>gabrielfitzgerald@fideliocapital.se |
| with copies (which shall not constitute notice) to: | Advokatfirman Vinge<br>Stureplan 8, Box 1703 SE-111 87<br>Stockholm, Sweden<br>Attention:     Jonas Bergström<br>E-mail:         jonas.Bergstrom@vinge.se |
| | and |
| | Morrison & Foerster LLP<br>250 West 55th Street<br>New York, NY 10019<br>Attention:     Spencer Klein and Jeff Bell<br>E-mail:         spencerklein@mofo.com and jbell@mofo.com |

If to a Member, to such Member's respective mailing address as set forth on the Members Schedule.

ny-1865422

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001257

PX0594.264

13.4     Headings. The headings in this Agreement are inserted for convenience of reference only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Agreement or any provision of this Agreement.

13.5     Severability. If any court of competent jurisdiction determines that any term or provision of this Agreement is held to be invalid, illegal or unenforceable under Applicable Law in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction and such court shall have the power to modify any such unenforceable provision in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language, as applicable, or by making such other modifications as it deems warranted to carry out the intent and agreement of the parties as embodied herein to the maximum extent permitted by Applicable Law. The Company and the Members expressly agree that this Agreement as so modified by the court shall be binding upon and enforceable against each of them.

13.6     Entire Agreement.

(a)     This Agreement, together with the Certificate of Formation, each Joinder Agreement and all related Exhibits and Schedules, constitutes the sole and entire agreement of the Company and the Members with respect to the subject matter contained herein and therein, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

(b)     In the event of an inconsistency or conflict between the provisions of this Agreement and any provision of Joinder Agreement, and all related Exhibits and Schedules with respect to the subject matter of such agreements, the Managing Member shall resolve such conflict in its sole discretion.

13.7     Successors and Assigns. Subject to the restrictions on Transfers set forth herein, this Agreement shall be binding upon and shall inure to the benefit of the Company, the Members and their respective heirs, executors, administrators, successors and assigns.

13.8     No Third-Party Beneficiaries. Except as provided in Article 12, which shall be for the benefit of and enforceable by Covered Persons as described therein, this Agreement is for the sole benefit of the Company and the Members (and their respective heirs, executors, administrators, successors and assigns) and nothing herein, express or implied, is intended to or shall confer upon any other Person, including any creditor of the Company, any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

13.9     Amendment. No provision of this Agreement may be amended or modified except by an instrument in writing executed by the Company and the Requisite Holders, which shall include the Managing Member. Any such written amendment or modification will be binding upon the Company and each Member; *provided*, that an amendment or modification modifying the rights or obligations of any Member in a manner that is materially and disproportionately

36

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

adverse to (a) such Member relative to the rights of other Members in respect of Units of the same class or series or (b) a class or series of Units relative to the rights of another class or series of Units, shall in each case be effective only with that Member's consent or the consent of the Members holding a majority of the Units in that class or series, as applicable. Notwithstanding the foregoing, amendments to the Members Schedule following any new issuance, redemption, repurchase or Transfer of Units in accordance with this Agreement may be made by the Managing Member without the consent of or execution by the Members. In the event an amendment to this Agreement requiring Member approval is approved by the written consent of the Requisite Holders, which shall include the Managing Member, in lieu of a meeting and such consent is less than unanimous, the Company shall provide prompt notice of such amendment to the Members who did not consent and would have been entitled to notice of the Members' meeting.

13.10   Waiver. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

13.11   Governing Law. All issues and questions concerning the application, construction, validity, interpretation and enforcement of this Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Delaware.

13.12   Arbitration.

(a)      General.  In the event of any Action among the parties arising out of or relating to the Original LLCA, this Agreement, any Joinder Agreement or the Certificate of Formation, whether in contract, tort, equity or otherwise, and whether relating to the meaning, interpretation, effect, validity, performance or enforcement of the Original LLCA, this Agreement, any Joinder Agreement or the Certificate of Formation, such Action shall be resolved by and through an arbitration proceeding to be conducted under the auspices and the commercial arbitration rules of the American Arbitration Association (or any like organization successor thereto) at New York, New York. The arbitrability of the dispute, claim or controversy shall likewise be determined in the arbitration. The arbitration proceeding shall be conducted in as expedited a manner as is then permitted by the commercial arbitration rules (formal or informal) of the American Arbitration Association.  Both the foregoing agreement of the parties to arbitrate any and all such disputes, claims and controversies, and the results, determinations, findings, judgments and/or awards rendered through any such arbitration shall be final and binding on the parties and may be specifically enforced by legal proceedings in any court of competent jurisdiction.

37

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001259

PX0594.266

(b)   <u>Governing Law</u>.  For the avoidance of doubt, the arbitrator(s) shall follow any applicable federal law and Delaware state law (with respect to all matters of substantive law) in rendering an award.

(c)   <u>Costs of Arbitration</u>.  The cost of the arbitration proceeding and any proceeding in court to confirm or to vacate any arbitration award, as applicable (including each party's attorneys' fees and costs), shall be borne by the unsuccessful party or, at the discretion of the arbitrator(s), may be prorated between the parties in such proportion as the arbitrator(s) determines to be equitable and shall be awarded as part of the arbitrator's award.

13.13   Equitable Remedies. The Company and each Member acknowledge that a breach or threatened breach by such party of any of its respective obligations under this Agreement would give rise to irreparable harm to the other parties, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, the Company and each other Member, as applicable, shall, in addition to any and all other rights and remedies that may be available to them in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

13.14   Attorneys' Fees. In the event that the Company or any Member institutes any legal suit, action or proceeding, including arbitration, against another party in respect of a matter arising out of or relating to this Agreement, the prevailing party in the suit, action or proceeding shall be entitled to receive, in addition to all other damages to which it may be entitled, the costs incurred by such party in conducting the suit, action or proceeding, including reasonable attorneys' fees and expenses and court costs.

13.15   Remedies Cumulative. The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise.

13.16   Counterparts. This Agreement may be executed in counterparts, which may be delivered electronically with the same effect as an original counterpart.

[SIGNATURE PAGE FOLLOWS]

38

ny-1865422

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001260

PX0594.267

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

THE COMPANY:                    OSSIUM HOLDCO, LLC


                                By: OSSIUM TOPCO AB
                                Its: Managing Member

                                By: _____
                                Name: Theodor Bonnier
                                Title: Director

                                By: _____
                                Name: Jacob Wiström
                                Title: Director


THE MEMBERS:


                                _____
                                CHRISTOPHER SIDEBOTHAM



                                OSSIUM TOPCO AB

                                By: _____
                                Name: Theodor Bonnier
                                Title: Director

                                By: _____
                                Name: Jacob Wiström
                                Title: Director


ny-1865422


HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001261

PX0594.268

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

THE COMPANY:                          OSSIUM HOLDCO, LLC

                                      By: OSSIUM TOPCO AB
                                      Its: Managing Member

                                      By: _____
                                           Name:
                                           Title:

                                      By: _____
                                           Name:
                                           Title:

THE MEMBERS:

                                      _____
                                      CHRISTOPHER SIDEBOTHAM

                                      OSSIUM TOPCO AB

                                      By: _____
                                           Name:
                                           Title:

                                      By: _____
                                           Name:
                                           Title:

ny-1865422

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

**Schedule I**
**Members Schedule**

| Name | Address | Date of Contribution | Contribution Value | Common Units | Preferred Units |
|------|---------|----------------------|--------------------|--------------|-----------------|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

ny-1889866

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY,
SUBJECT TO PROTECTIVE ORDER

Fidelio_0001263

PX0594.270

Exhibit 7

**PERCENTAGE INTERESTS AND UNITS AT EXECUTION AND CLOSING**

| Seller | Percentage Interest | Units |
|---|---|---|
| Brian Beale | | |
| Claude Gendreau | | |
| Timothy Van Horssen | Redacted - Other (Nonresponsive) | |
| Claude Gendreau Investment Trust u/a/d March 16, 2013 | | |
| Patrick Gendreau | | |

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Exhibit 8

## FORM OF REMAINING SELLER NOTE

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

CONFIDENTIAL

<div align="right">Execution Version</div>

**THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS AND MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED EXCEPT (A) PURSUANT TO A REGISTRATION STATEMENT EFFECTIVE UNDER SUCH ACT AND LAWS OR (B) PURSUANT TO AN EXEMPTION FROM REGISTRATION THEREUNDER. ANY TRANSFER OF THIS NOTE IS FURTHER SUBJECT TO OTHER RESTRICTIONS SET FORTH HEREIN.**

<div align="center">PROMISSORY NOTE</div>

This PROMISSORY NOTE (this "Note") is entered into as of June 16, 2020, by and between Ossium NewCo LLC, a Delaware limited liability company (the "Buyer"), and VOI Holdings, LLC, a Florida limited liability company (the "Seller" and, collectively with the Buyer, the "Parties", and each, a "Party"). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the MIPA (as defined below).

<div align="center">Recitals</div>

WHEREAS, pursuant that certain Amended and Restated Membership Interest Purchase and Exchange Agreement, dated as of June 11, 2020 (the "MIPA"), by and among the Buyer, Ossium HoldCo, LLC, a Delaware limited liability company, Veterinary Orthopedic Implants, Inc., a Florida corporation that will be converted after the execution of the MIPA but prior to the issuance of this Note to Veterinary Orthopedic Implants, LLC, a Florida limited liability company (collectively, the "Company"), and the other parties named therein, the parties thereto agreed to, among other things, enter into this Note pursuant to Section 2.3(a) of the MIPA.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements herein contained, and intending to be legally bound hereby, the Parties agree as follows:

Section 1.    Principal Amount.  The Buyer hereby promises to pay to the Seller, in accordance with the terms set forth herein, an amount equal to (a) Redacted - Other (Nonresponsive)

# Redacted - Other (Nonresponsive) (the "Principal Amount").

Section 2.    Interest.

(a)    Pre-Default Interest Rate. Prior to any Default (as defined below), the Principal Amount shall bear interest at a rate of Redacted - Other (Nonresponsive), accruing from and after the date hereof until and excluding the Note Maturity Date (as defined below), payable in arrears on each December 31 (each such date being referred to herein as an "Interest Capitalization Date"). Notwithstanding any provision in this Note to the contrary, through the Note Maturity Date, in lieu of paying in cash the interest accrued to any Interest Capitalization Date, any accrued but unpaid interest shall be capitalized and added as of such Interest Capitalization Date to the principal amount of this Note (the "PIK Amount"). Such PIK Amount shall bear interest from the applicable Interest Capitalization Date at the same rate per annum

<div align="center">1</div>

ny-1889535

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

and be payable in the same manner as in the case of the Principal Amount and shall otherwise be treated as principal of this Note for all purposes. From and after each Interest Capitalization Date, the principal amount of this Note shall, without further action on the part of the Buyer or the Seller be deemed to be increased by the PIK Amount so capitalized and added to principal in accordance with the provisions hereof.

(b)     Default Interest Rate.  If this Note is not paid in full on or before the Note Payment Date, then the Note Payment shall bear interest until being paid in full (together with accrued but unpaid interest thereon) at the lesser of (i) **Redacted - Other (Nonresponsive)** compounded annually or (ii) the maximum rate permitted by applicable law as in effect as of the date of this Note ("<u>Default Interest</u>").  If any judgment is rendered in favor of the Seller against the Buyer or the Company, said judgment shall bear interest at the applicable judgment rate. In no event shall any agreed to or actual exaction charged, reserved or taken as an advance or forbearance by the Seller as consideration for this Note exceed the limits (if any) imposed or provided by the law applicable from time to time to this Note for the use or detention of money or for forbearance in seeking its collection, and the Seller hereby waives any right to demand such excess. In the event that the interest provisions of this Note shall result at any time or for any reason in an effective rate of interest that exceeds the maximum interest rate permitted by applicable law (if any), then without further agreement or notice the obligation to be fulfilled shall be automatically reduced to such limit and all sums received by the Seller in excess of those lawfully collectible as interest shall be applied against the principal of this Note immediately upon the Seller's receipt thereof, with the same force and effect as though the payor had specifically designated such extra sums to be so applied to principal and the Seller had agreed to accept such extra payment(s) as a premium-free prepayment or prepayments.

"<u>Note Maturity Date</u>" means January 31, 2023.

"<u>Default</u>" shall mean the occurrence of any of the following:

1.  the failure to pay or perform any obligations, liabilities or indebtedness owed by the Buyer or the Company under the Note Documents (as defined below) within five (5) days of such amounts being due, whether under this Note or under another present or future agreement, note or instrument as and when due (whether due by demand, maturity or by acceleration), including without limitation that certain Contingent Closing Note as defined in the MIPA;

2.  the insolvency of the Buyer or the Company, the appointment of a receiver, manager, trustee or liquidator for any of the property of the Buyer or the Company or an assignment for the benefit of the Buyer's or the Company's creditors;

3.  the institution of a proceeding in bankruptcy against the Buyer or the Company, whether voluntarily or involuntarily, or the institution of proceedings by the Buyer or the Company to obtain relief against their respective creditors;

4.  any default or event of default described in the Company Guaranty Agreement relating to this Note;

2

ny-1889535

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001267

PX0594.274

5.  make any distributions to equity owners of the Buyer other than Tax Distributions as defined in the Limited Liability Company Operating Agreement of the Buyer;

6.  an event or series of events resulting in Fidelio Capital AB, a Swedish limited liability company with registration number 559109-8818, directly or indirectly ceasing to control at least fifty point one (50.1) per cent of the votes in the Buyer;

7.  merge with, consolidate or convert the Buyer or the Company into another entity;

8.  cease operations of the Buyer or the Company; and

9.  the acceleration of the Fidelio Note.

"Note Documents" shall mean this Note, the Company Guaranty, the MIPA the documents and instruments and other agreements specifically referred to herein or therein or delivered pursuant hereto or thereto, including all the exhibits and schedules attached hereto or thereto constitute the entire agreement between the Parties with respect to the subject matter hereof and supersede all prior agreements and understandings, both written and oral, with respect to the subject matter hereof.

Section 3.    Payment Terms.  On the Note Payment Date (as defined below), the Buyer shall pay to the Seller, by wire transfer of immediately available funds to a bank account designated by the Seller, an amount equal to (a) the Principal Amount, *plus* (b) the accrued and unpaid interest on the Principal Amount, including the accrued but unpaid PIK Amount and/or the Default Interest hereon, calculated in accordance with Section 2 (together, the "Note Payment").  The Buyer shall not be required to prepay any portion of the Note Payment prior to the Note Payment Date; *provided however,* if any prepayment is made pursuant to the Fidelio Note, then the Buyer will make a ratable prepayment of this Note.

"Note Payment Date" means the earlier of (a) thirty (30) days after the Note Maturity Date or (b) a Default has occurred and Seller has demanded payment.

Section 4.    Guaranty by the Company. The Company guarantees the payment and performance of all of the obligations set forth in this Note pursuant to that certain Company Guaranty Agreement executed of even date herewith (the "Company Guaranty Agreement").

Section 5.    Representations and Warranties.

(a)    The Buyer hereby represents and warrants to the Seller that the execution, delivery and performance by the Buyer of this Note (i) has been duly authorized by all requisite limited liability company action and (ii) will not violate (A) any provision of Law applicable to the Buyer, (B) the Organizational Documents of the Buyer or (C) any order of any Governmental Authority binding on the Buyer.

(b)    The Seller hereby represents and warrants to the Buyer that the execution, delivery and performance by the Seller of this Note (i) has been duly authorized by all requisite limited liability company action and (ii) will not violate (A) any provision of Law applicable to

3

ny-1889535

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001268

PX0594.275

the Seller, (B) the Organizational Documents of the Seller or (C) any order of any Governmental Authority binding on the Seller.

Section 6.    <u>Change to Holder of Note</u>.  Seller may transfer any of its rights and obligations hereunder to another party. Unless (i) a Default has occurred and is continuing, or (ii) such party is an affiliate of Seller, the consent of the Buyer will be required (not to be unreasonably withheld or delayed). The Buyer will be deemed to have given its consent to a proposed transfer if no express refusal is received by the Seller within ten (10) Business Days from the date on which the Buyer received the request for consent. The transfer must not give rise to increased costs or expenses for the Buyer under the Note Documents or otherwise.

Section 7.    <u>Miscellaneous</u>.

(a)    Section 10.4 (Notices) and Section 10.8 (Governing Law; Submission to Jurisdiction; Waiver of Jury Trial) of the MIPA are incorporated by reference herein, together with any necessary conforming changes.

(b)    The Parties agree that the indebtedness represented by this Note shall be *pari passu* to any indebtedness owing to Fidelio Capital AB or its Affiliates incurred by the Buyer in connection with the transactions contemplated by the MIPA (the "<u>Fidelio Note</u>") and subordinate to any senior bank debt incurred by the Buyer or any of its Affiliates and any guarantees with respect thereto.  The Parties shall execute any other documents reasonably necessary to give effect to the foregoing sentence. To the extent that the Fidelio Note is amended or modified, then the Buyer shall provide written notice of such amendment or modification to the Seller within five (5) days thereof and the Seller shall have the right (but no obligation) to cause the Buyer to amend or modify this Note in a similar manner as such amendment or modification to the Fidelio Note. Further, if there is a default in the Fidelio Note or the Guaranty Agreement with respect to the Fidelio Note or a Default as set forth herein, then the Borrower shall provide written note to the Seller within five (5) days of the occurrence of such default of the Fidelio Note or the Guaranty Agreement with respect to the Fidelio Note or a Default as set forth herein.

(c)    This Note may not be amended, modified or supplemented in any manner, whether by course of conduct or otherwise, except by an instrument in writing specifically designated as an amendment hereto, signed on behalf of the Buyer and the Seller.

(d)    This Note Documents incorporate all of the terms of the parties hereto. Notwithstanding the foregoing, nothing in this Note supersedes or modifies in any way the provisions set forth in the MIPA, including its exhibits, appendices and other related documents.

(e)    Neither this Agreement nor any of the rights, interests or obligations under this Agreement may be assigned or delegated, in whole or in part, by operation of law or otherwise, by any Party without the prior written consent of the other Party, and any such assignment without such prior written consent shall be null and void.  Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of and be enforceable by the Parties and their respective successors and assigns.

ny-1889535

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001269

PX0594.276

(f)    This Agreement may be executed in counterparts, which may be delivered electronically with the same effect as an original counterpart.

(g)    If the Seller commences a proceeding to enforce and collect upon this Note and prevails in such proceeding, the Buyer shall pay all reasonable costs incurred by the Seller in connection therewith, including attorneys' fees and disbursements.

*[The remainder of this page is intentionally left blank.]*

ny-1889535

5

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001270

PX0594.277

IN WITNESS WHEREOF, the Parties have caused this Note to be executed as of the date first written above by their respective officers thereunto duly authorized.

**BUYER:**

**OSSIUM NEWCO, LLC**

By: _____
Name:
Title:  Authorized Person

**SELLER:**

**VOI HOLDINGS, LLC**

By: _____
Name:
Title:

ny-1889535

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001271

PX0594.278

Exhibit 9

## **ESCROW AGREEMENT**

ny-1917489

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001272

PX0594.279

CONFIDENTIAL

*Execution Version*

<u>ESCROW AGREEMENT</u>

THIS ESCROW AGREEMENT (this "<u>Agreement</u>") is made and entered into as of May 5, 2020, by and among Ossium BidCo, LLC, a limited liability company organized under the laws of the State of Delaware (the "<u>Buyer</u>"), VOI Holdings, LLC, a Florida limited liability company ("<u>VOI HoldCo</u>" and, together with the Buyer, sometimes referred to individually as a "<u>Party</u>" and collectively as the "<u>Parties</u>"), and Citibank, N.A., as escrow agent (the "<u>Escrow Agent</u>"). Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the Purchase Agreement (as defined below).

<u>RECITALS</u>

WHEREAS, the Buyer, VOI HoldCo, Ossium NewCo, LLC, a limited liability company organized under the laws of the State of Delaware, Veterinary Orthopedic Implants, Inc., a corporation organized under the laws of the State of Florida, and Claude Gendreau, Timothy Van Horssen, the Claude Gendreau Investment Trust u/a/d March 16, 2013, Patrick Gendreau and Brian Beale have entered into a Membership Interest Purchase and Exchange Agreement, dated as of May 5, 2020 (the "<u>Purchase Agreement</u>"), pursuant to which the Buyer will (a) issue to VOI HoldCo the Buyer Units in exchange for the Rollover Units and (b) purchase from VOI HoldCo all of VOI HoldCo's right, title and interest in and to the Purchased Units.

WHEREAS, pursuant to the Purchase Agreement, the Parties have agreed to establish an escrow account (a) for purposes of providing a source of satisfaction for the payment of any Termination Fee owed by the Buyer to VOI HoldCo pursuant to and in accordance with Section 9.2(b) of the Purchase Agreement;

WHEREAS, the execution and delivery of this Agreement is a condition to the Parties' obligations under the Purchase Agreement; and

WHEREAS, Buyer, the Sellers and the Escrow Agent desire to establish the terms and conditions by which the escrow account will be established and maintained.

NOW THEREFORE, in consideration of the foregoing and of the mutual covenants hereinafter set forth, the parties hereto agree as follows:

1.    <u>Appointment</u>.  The Parties hereby appoint the Escrow Agent as their escrow agent for the purposes set forth herein, and the Escrow Agent hereby accepts such appointment and agrees to act as escrow agent in accordance with the terms and conditions set forth herein.

2.    <u>Escrow Funds</u>.

(a)    Simultaneous with the execution and delivery of this Agreement, the Buyer is causing to be deposited with the Escrow Agent the Escrow Amount in immediately available funds.  The Escrow Agent hereby acknowledges receipt of the Escrow Amount, together with all products and proceeds thereof, including all interest, dividends, gains and other income (collectively, the "<u>Escrow Earnings</u>") earned with respect thereto (collectively, the

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

"Escrow Funds") in separate and distinct account (the "Escrow Account"), subject to the terms
and conditions of this Agreement.

(b)     For greater certainty, all escrow earnings shall be retained by the Escrow
Agent and reinvested in the Escrow Funds and shall become part of the Escrow Funds; and shall
be disbursed as part of the Escrow Funds in accordance with the terms and conditions of this
Agreement.

3.     Investment of Escrow Funds.

(a)     Unless otherwise instructed in writing by the Parties, the Escrow Agent
shall hold the Escrow Funds in a "noninterest-bearing deposit account" insured by the Federal
Deposit Insurance Corporation ("FDIC") to the applicable limits.  The Escrow Funds shall at all
times remain available for distribution in accordance with Section 4 below.

(b)     The Escrow Agent shall send an account statement to each of the Parties
on a monthly basis reflecting activity in the Escrow Account for the preceding month.

(c)     The Escrow Agent shall have no responsibility for any investment losses
resulting from the investment, reinvestment or liquidation of the escrowed property, as
applicable, provided that the Escrow Agent has made such investment, reinvestment or
liquidation of the escrowed property in accordance with the terms, and subject to the conditions
of this Agreement. The Escrow Agent does not have a duty nor will it undertake any duty to
provide investment advice.

4.     Disposition and Termination of the Escrow Funds.

(a)     Escrow Funds.  The Parties shall act in accordance with, and the Escrow
Agent shall hold and release the Escrow Funds as provided in, this Section 4(a) as follows:

(i)     Upon the earlier of (1) a receipt of a Joint Release Instruction with
respect to the Escrow Funds, the Escrow Agent shall promptly, but in any event within two (2)
Business Days after receipt of a Joint Release Instruction, or (2) a receipt of a certified copy of
the final judgment, order or award of the relevant court or arbitrator, directing the Escrow Agent
to release the Escrow Funds to the party designated therein, together with a certificate duly
signed by the prevailing party in the proceeding certifying that such judgment, order or award is
final and non-appealable (a "Final Decree") and which shall include the payment instructions for
the prevailing party, disburse all or part of the Escrow Funds in accordance with such Joint
Release Instruction or such Final Decree.

(ii)     All payments of any part of the Escrow Funds shall be made by
wire transfer of immediately available funds or check as set forth in the Joint Release Instruction.

(iii)     Any instructions setting forth, claiming, containing, objecting to,
or in any way related to the transfer or distribution of any funds on deposit in any Escrow
Account under the terms of this Agreement must be in writing, executed by the appropriate Party
or Parties as evidenced by the signatures of the person or persons set forth on Exhibit A-1 and
Exhibit A-2 and delivered to the Escrow Agent either (i) by confirmed facsimile only at the fax

2

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

number set forth in <u>Section 11</u> below or (ii) attached to an e-mail received on a Business Day from an e-mail address set forth in <u>Section 11</u> below. In the event a Joint Release Instruction is delivered to the Escrow Agent, whether in writing, by facsimile or otherwise, the Escrow Agent is authorized to seek confirmation of such instruction by telephone call back to the person or persons designated in <u>Exhibits</u> <u>A-1</u> and/or <u>A-2</u> annexed hereto (the "<u>Call Back Authorized Individuals</u>"), and the Escrow Agent may rely upon the confirmations of anyone purporting to be a Call Back Authorized Individual.  To assure accuracy of the instructions it receives, the Escrow Agent may record such call backs.  If the Escrow Agent is unable to verify the instructions, or is not satisfied with the verification it receives, it will not execute the instruction until all such issues have been resolved.  The persons and telephone numbers for call backs may be changed only in writing, executed by an authorized signer of applicable Party set forth on <u>Exhibit A-1</u> or <u>Exhibit A-2</u>, actually received and acknowledged by the Escrow Agent.

(b)     <u>Certain Definitions</u>.

(i)     "<u>Business Day</u>" means any day that is not a Saturday, a Sunday or other day on which banks are not required or authorized by law to be closed in New York, New York.

(ii)     "<u>Escrow Amount</u>" means [ **Redacted - Other (Nonresponsive)** ]

(iii)     "<u>Joint Release Instruction</u>" means the joint written instruction executed by an authorized signer of each of the Buyer and VOI HoldCo directing the Escrow Agent to disburse all or a portion of the Escrow Funds, as applicable.

(iv)     "<u>Person</u>" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or a governmental entity or any department, agency or political subdivision thereof.

5.     <u>Escrow Agent</u>.  The Escrow Agent undertakes to perform only such duties as are expressly set forth herein, which shall be deemed purely ministerial in nature, and no duties, including but not limited to any fiduciary duties, shall be implied.  The Escrow Agent shall neither be responsible for, nor chargeable with, knowledge of, nor have any requirements to comply with, the terms and conditions of any other agreement, instrument or document between the Parties, in connection herewith, if any, including without limitation the Purchase Agreement, nor shall the Escrow Agent be required to determine if any Person has complied with any such agreements, nor shall any additional obligations of the Escrow Agent be inferred from the terms of such agreements, even though reference thereto may be made in this Agreement. Notwithstanding the terms of any other agreement between the Parties, the terms and conditions of this Agreement will control the actions of Escrow Agent.  The Escrow Agent may rely upon and shall not be liable for acting or refraining from acting upon any Joint Release Instruction furnished to it hereunder and believed by it to be genuine and to have been signed and presented by an authorized signer of the proper Party or Parties.  Concurrent with the execution of this Agreement, the Parties shall deliver to the Escrow Agent authorized signers' forms in the form of <u>Exhibit A-1</u> and <u>Exhibit A-2</u> attached hereto.  The Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document, notice,

3

instruction or request.  The Escrow Agent shall have no duty to solicit any payments which may be due it or the Escrow Funds.  In the event that the Escrow Agent shall be uncertain as to its duties or rights hereunder or shall receive instructions, claims or demands from any Party hereto which, in its opinion, conflict with any of the provisions of this Agreement, it shall be entitled to refrain from taking any action and its sole obligation shall be to keep safely all property held in escrow until it shall be directed otherwise in a Joint Release Instruction.  The Escrow Agent may interplead all of the assets held hereunder into a court of competent jurisdiction or may seek a declaratory judgment with respect to certain circumstances, and thereafter be fully relieved from any and all liability or obligation with respect to such interpleaded assets or any action or nonaction based on such declaratory judgment.  The Escrow Agent may consult with legal counsel of its selection in the event of any dispute or question as to the meaning or construction of any of the provisions hereof or its duties hereunder.  The Escrow Agent will not be liable for any action taken, suffered or omitted to be taken by it in good faith except to the extent that the Escrow Agent's gross negligence or willful misconduct was the cause of any direct loss to either Party.   To the extent practicable, the Parties agree to pursue any redress or recourse in connection with any dispute without making the Escrow Agent a party to the same.  Anything in this Agreement to the contrary notwithstanding, in no event shall the Escrow Agent be liable for any special, indirect, punitive, incidental or consequential losses or damages of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such losses or damages and regardless of the form of action.

6.     <u>Resignation and Removal of Escrow Agent</u>.  The Escrow Agent (a) may resign and be discharged from its duties or obligations hereunder by giving thirty (30) calendar days advance notice in writing of such resignation to the Parties specifying a date when such resignation shall take effect or (b) may be removed, with or without cause, by the Buyer and VOI HoldCo acting jointly at any time by providing written notice to the Escrow Agent.  Any corporation or association into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any corporation or association to which all or substantially all of the escrow business of the Escrow Agent's line of business may be transferred, shall be the Escrow Agent under this Agreement without further act.  The Escrow Agent's sole responsibility after such thirty (30) day notice period expires or after receipt of written notice of removal shall be to hold and safeguard the Escrow Funds (without any obligation to reinvest the same) and to deliver the same (i) to a substitute or successor escrow agent pursuant to a joint written designation from the Parties or (ii) as set forth in a Joint Release Instruction, and, at the time of such delivery, the Escrow Agent's obligations hereunder shall cease and terminate.  In the event the Escrow Agent resigns, if the Parties have failed to appoint a successor escrow agent prior to the expiration of thirty (30) calendar days following receipt of the notice of resignation, the Escrow Agent may petition any court of competent jurisdiction for the appointment of such a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon all of the parties hereto.

7.     <u>Fees and Expenses</u>.  All fees and expenses of the Escrow Agent are described in <u>Schedule 1</u> attached hereto and shall be paid by the Buyer. The fees agreed upon for the services to be rendered hereunder are intended as full compensation for the Escrow Agent services as contemplated by this Agreement.

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001276

PX0594.283

8.    <u>Indemnity</u>.  Each of the Parties shall jointly and severally indemnify, defend, and hold harmless the Escrow Agent and its affiliates and their respective successors, assigns, directors, officers, agents and employees (the "<u>Indemnitees</u>") from and against any and all losses, damages, claims, liabilities, penalties, judgments, settlements, actions, suits, proceedings, litigation, investigations, costs or expenses (including the reasonable fees and expenses of one outside counsel and experts and their staffs and all expense of document location, duplication and shipment) (collectively "<u>Escrow Agent Losses</u>") arising out of or in connection with (a) the Escrow Agent's execution and performance of this Agreement, tax reporting or withholding, the enforcement of any rights or remedies under or in connection with this Agreement, or as may arise by reason of any act, omission or error of the Indemnitee, except to the extent that such Escrow Agent Losses, as adjudicated by a court of competent jurisdiction, have been caused by the fraud, gross negligence or willful misconduct of such Indemnitee, or (b) its following any instructions or other directions from the Buyer or VOI HoldCo.  The Parties hereby grant the Escrow Agent a lien on, right of set-off against and security interest in, the Escrow Funds for the payment of any reasonable claim for indemnification, expenses and amounts due hereunder.  In furtherance of the foregoing, the Escrow Agent is expressly authorized and directed, but shall not be obligated, upon prior written notice to the Parties, to charge against and withdraw from the Escrow Funds for its own account or for the account of an indemnitee any amounts due to the Escrow Agent or to an indemnitee under this <u>Section 8</u>.  Notwithstanding anything to the contrary herein, the Buyer and VOI HoldCo agree, solely as between themselves, that any obligation for indemnification under this <u>Section 8</u> (or for reasonable fees and expenses of the Escrow Agent described in <u>Section 7</u>) shall be borne by the Party or Parties determined by a court of competent jurisdiction to be responsible for causing the loss, damage, liability, cost or expense against which the Escrow Agent is entitled to indemnification or, if no such determination is made, then one-half by the Buyer and one-half by VOI HoldCo. The Parties acknowledge that the foregoing indemnities shall survive the resignation or removal of the Escrow Agent or the termination of this Agreement.

9.    <u>Tax Matters.</u>

(a)    The Buyer shall be responsible for and the taxpayer on all taxes due on the interest or income earned, if any, on the Escrow Funds for the calendar year in which such interest or income is earned.  The Escrow Agent shall report any interest or income earned on the Escrow Funds to the IRS or other taxing authority on IRS Form 1099. Prior to the date hereof, the Parties shall provide the Escrow Agent with certified tax identification numbers by furnishing appropriate forms W-9 or W-8 as applicable and such other forms and documents that the Escrow Agent may request.

(b)    The Escrow Agent shall be responsible only for income reporting to the Internal Revenue Service with respect to income earned on the Escrow Funds.  The Escrow Agent shall withhold any taxes required to be withheld by applicable law, including but not limited to required withholding in the absence of proper tax documentation, and shall remit such taxes to the appropriate authorities.

(c)    The Escrow Agent, its affiliates, and its employees are not in the business of providing tax or legal advice to any taxpayer outside of Citigroup, Inc. and its affiliates.  This Agreement and any amendments or attachments hereto are not intended or written to be used,

5

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001277

PX0594.284

and may not be used or relied upon, by any such taxpayer or for the purpose of avoiding tax penalties. Any such taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

10. <u>Covenant of Escrow Agent</u>. The Escrow Agent hereby agrees and covenants with the Buyer and VOI HoldCo that it shall perform all of its obligations under this Agreement and shall not deliver custody or possession of any of the Escrow Funds to anyone except pursuant to the express terms of this Agreement or as otherwise required by law.

11. <u>Notices</u>. All notices, requests, demands and other communications required under this Agreement shall be in writing, in English, and shall be deemed to have been duly given if delivered (i) personally, (ii) by facsimile transmission with written confirmation of receipt, (iii) on the day of transmission if sent by electronic mail ("e-mail") with a PDF attachment executed by an authorized signer of the Party/ Parties to the e-mail address given below, and written confirmation of receipt is obtained promptly after completion of the transmission, (iv) by overnight delivery with a reputable national overnight delivery service, or (v) by mail or by certified mail, return receipt requested, and postage prepaid. If any notice is mailed, it shall be deemed given five Business Days after the date such notice is deposited with the United States Postal Service. If notice is given to a Party, it shall be given at the address for such Party set forth below. It shall be the responsibility of the Parties to notify the Escrow Agent and the other Party in writing of any name or address changes.

    <u>if to the Buyer, then to</u>:

        c/o Fidelio Capital AB
        Birger Jarlsgatan 13
        111 45 Stockholm
        Sweden
        Attention:    Theodor Bonnier  and Gabriel Fitzgerald
        E-mail:    Theodor.Bonnier@fideliocapital.se and
        Gabriel.Fitzgerald@fideliocapital.se

        <u>with copies (which shall not constitute notice) to</u>:

        Advokatfirman Vinge
        Stureplan 8, Box 1703 SE-111 87
        Stockholm, Sweden
        Attention:    Jonas Bergström
        E-mail:    jonas.Bergstrom@vinge.se

        <u>and</u>

        Morrison & Foerster LLP
        250 West 55th Street
        New York, NY 10019
        Attention:    Spencer Klein and Jeff Bell
        E-mail:    spencerklein@mofo.com and jbell@mofo.com

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001278

PX0594.285

or, if to VOI HoldCo, then to:

       c/o Sellers' Representative

       Patrick Gendreau
       2061 Crown Drive, St. Augustine, Florida 32092
       E-mail:  patrick@vetimplants.com

       with a copy (which shall not constitute notice) to:

       Wells & Wells, P.A.
       901 Ponce de Leon Boulevard, Suite 200
       Coral Gables, Florida 33134
       Attention: Thomas O. Wells, Esq.
       E-mail:  tom@twellslaw.com

or, if to the Escrow Agent, then to:

       Citibank, N.A.
       Citi Private Bank
       388 Greenwich Street, 29th Floor
       New York, NY  10013
       Attn: William T. Lynch
       Telephone No.: 212-783-7108
       Facsimile No.:  212-783-7131
       E-mail: william.lynch@citi.com

Notwithstanding the above, in the case of communications delivered to the Escrow Agent pursuant to the foregoing clause (i) through (iv) of this Section 11, such communications shall be deemed to have been given on the date received by the Escrow Agent.  In the event that the Escrow Agent, in its sole discretion, shall determine that an emergency exists, the Escrow Agent may use such other means of communication as the Escrow Agent deems appropriate.

    12.   Termination.  This Agreement shall terminate on the first to occur of (a) the distribution of all of the amounts in the Escrow Funds in accordance with this Agreement or (b) delivery to the Escrow Agent of a written notice of termination executed jointly by the Buyer and VOI HoldCo after which this Agreement shall be of no further force and effect except that the provisions of Section 8 hereof shall survive termination.

    13.   Miscellaneous.  The provisions of this Agreement may be waived, altered, amended or supplemented, in whole or in part, only by a writing signed by all of the parties hereto.  Neither this Agreement nor any right or interest hereunder may be assigned in whole or in part by any party without the prior consent of the other parties.  This Agreement shall be governed by and construed under the laws of the State of Delaware. Each party irrevocably waives any objection on the grounds of venue, forum non-conveniens or any similar grounds and irrevocably consents to service of process by mail or in any other manner permitted by

7

applicable law and consents to the jurisdiction of the courts located in the State of Delaware. The parties hereby waive any right to a trial by jury with respect to any lawsuit or judicial proceeding arising from or relating to this Agreement.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  All signatures of the parties to this Agreement may be transmitted by facsimile or electronic transmission in portable document format (.pdf), and such facsimile or .pdf will, for all purposes, be deemed to be the original signature of such party whose signature it reproduces, and will be binding upon such party.  If any provision of this Agreement is determined to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction.  The Parties represent, warrant and covenant that each document, notice, instruction or request provided by such Party to the Escrow Agent shall comply with applicable laws and regulations.  Where, however, the conflicting provisions of any such applicable law may be waived, they are hereby irrevocably waived by the parties hereto to the fullest extent permitted by law, to the end that this Agreement shall be enforced as written.  Except as expressly provided in <u>Sections 7 and 8</u>, nothing in this Agreement, whether express or implied, shall be construed to give to any person or entity other than the Escrow Agent and the Parties any legal or equitable right, remedy, interest or claim under or in respect of this Agreement or any funds escrowed hereunder.

14.   <u>Compliance with Court Orders</u>.  In the event that any escrow property shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered by any court order affecting the property deposited under this Agreement, the Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all writs, orders or decrees so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, and in the event that the Escrow Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the Parties or to any other Person, by reason of such compliance notwithstanding such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

15.   <u>Further Assurances</u>.  Following the date hereof, each party shall deliver to the other parties such further information and documents and shall execute and deliver to the other parties such further instruments and agreements as any other party shall reasonably request to consummate or confirm the transactions provided for herein, to accomplish the purpose hereof or to assure to any other party the benefits hereof.

16.   <u>Assignment</u>.  No assignment of the interest of any of the Parties shall be binding upon the Escrow Agent unless and until written notice of such assignment shall be filed with and consented to by the Escrow Agent (such consent not to be unreasonably withheld).  Any transfer or assignment of the rights, interests or obligations hereunder in violation of the terms hereof shall be void and of no force or effect.

17.   <u>Force Majeure</u>.  The Escrow Agent shall not incur any liability for not performing any act or fulfilling any obligation hereunder by reason of any occurrence beyond its control

8

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

(including, but not limited to, any provision of any present or future law or regulation or any act of any governmental authority, any act of God or war or terrorism, or the unavailability of the Federal Reserve Bank wire services or any electronic communication facility), it being understood that the Escrow Agent shall use commercially reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as reasonably practicable under the circumstances.

18.    <u>Compliance with Federal Law</u>. To help the U.S. Government fight the funding of terrorism and money laundering activities and to comply with Federal law requiring financial institutions to obtain, verify and record information on the source of funds deposited to an account, the Parties agree to provide the Escrow Agent with the name, address, taxpayer identification number, and remitting bank for all Parties depositing funds at Citibank pursuant to the terms and conditions of this Agreement.  For a non-individual person such as a business entity, a charity, a trust or other legal entity, the Escrow Agent will ask for documentation to verify its formation and existence as a legal entity.  The Escrow Agent may also ask to see financial statements, licenses, and identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.

19.    <u>Use of Citibank Name.</u>  No publicly distributed printed or other material in any language, including prospectuses, notices, reports, and promotional material which mentions "Citibank" by name or the rights, powers, or duties of the Escrow Agent under this Agreement shall be issued by any other parties hereto, or on such party's behalf, without the prior written consent of the Escrow Agent.

20.    <u>Attorneys' Fees</u>. If any party brings an action against another party to enforce its rights under this Agreement, the prevailing party shall be entitled to recover its reasonable costs and expenses, including reasonable attorneys' fees and costs, incurred in connection with such action and any appeal thereof.

*    *    *    *    *

9

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER

Fidelio_0001281

PX0594.288

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date set forth above.

BUYER:

**OSSIUM BIDCO, LLC**

By: _____
Name:   Theodor Bonnier
Its:       Authorized Person

VOI HOLDCO:

**VOI HOLDINGS, LLC**

By: _____
Name:
Its:

ESCROW AGENT:

**CITIBANK, N.A.**

By: _____
Name:
Its:

*Signature Page to Escrow Agreement*

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001282

PX0594.289

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date set forth above.

BUYER:

**OSSIUM BIDCO, LLC**

By: _____
Name:
Its:    Authorized Person

VOI HOLDCO:

**VOI HOLDINGS, LLC**

By: _____
Name: _____ Patrick    Gendreau
Its: _____ President

ESCROW AGENT:

**CITIBANK, N.A.**

By: _____
Name: _____
Its: _____

*Signature Page to Escrow Agreement*

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date set forth above.

BUYER:

**OSSIUM BIDCO, LLC**

By: _____
Name:
Its:    Authorized Person

VOI HOLDCO:

**VOI HOLDINGS, LLC**

By: _____
Name:
Its:

ESCROW AGENT:

**CITIBANK, N.A.**

By: _____
Name: Debra DeMarco, Senior Vice President
       Citi Private Bank
Its:   388 Greenwich Street, 29th Floor
       New York, NY 10013
       212-783-7092

*Signature Page to Escrow Agreement*

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

## Schedule 1

**ESCROW AGENT FEE SCHEDULE**
**Citibank, N.A., Escrow Agent**

**Acceptance Fee**
To cover the acceptance of the Escrow Agency appointment, the study of the Agreement, and supporting documents submitted in connection with the execution and delivery thereof, and communication with other members of the working group:

   **Fee:  Waived**

**Administration Fee**
The annual administration fee covers maintenance of the Escrow Account including safekeeping of assets in the escrow account, normal administrative functions of the Escrow Agent, including maintenance of the Escrow Agent's records, follow-up of the Agreement's provisions, and any other safekeeping duties required by the Escrow Agent under the terms of the Agreement. Fee is based on Escrow Amount being deposited in a non-interest bearing deposit account, FDIC insured to the applicable limits.

   **Fee: Waived**

**Tax Preparation Fee**
To cover preparation and mailing of Forms 1099-INT, if applicable for the escrow parties for each calendar year:

   **Fee:  Waived**

**Transaction Fees**
To oversee all required disbursements or release of property from the escrow account to any escrow party, including cash disbursements made via check and/or wire transfer, fees associated with postage and overnight delivery charges incurred by the Escrow Agent as required under the terms and conditions of the Agreement:

   **Fee:  Waived**

**Other Fees**
Material amendments to the Agreement: additional fee(s), if any, to be discussed at time of amendment.

---

**TERMS AND CONDITIONS**: The above schedule of fees does not include charges for out-of-pocket expenses or for any services of an extraordinary nature that Citibank or its legal counsel may be called upon from time to time to perform. Fees are also subject to satisfactory review of the documentation, and Citibank reserves the right to modify them should the characteristics of the transaction change. Citibank's participation in this program is subject to internal approval of the third party depositing monies into the escrow account to be established hereunder. The Acceptance Fee, if any, is payable upon execution of the Agreement. Should this schedule of fees be accepted and agreed upon and work commenced on this program but subsequently halted and the program is not brought to market, the Acceptance Fee and legal fees incurred, if any, will still be payable in full.

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001285

PX0594.292

EXHIBIT A-1

Certificate as to Buyer's Authorized Signatures

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of the Buyer and are authorized to initiate and approve transactions of all types for the escrow account or accounts established under this Agreement, on behalf of the Buyer.  The below listed persons (must list at least two individuals, if applicable) have also been designated Call Back Authorized Individuals and will be notified by Citibank N.A. upon the release of Escrow Funds from the escrow account(s).

Name / Title / Telephone                          Specimen Signature


___Theodor Bonnier_____          _____
Name                                              Signature

___Authorized signatory_____
Title

___n.a._____          ┌─────────────────────────────────┐
Phone                                            │  Redacted - Other (Nonresponsive) │
                                                 └─────────────────────────────────┘

___Jacob Wiström_____          _____
Name                                              Signature

___Authorized signatory_____
Title

___n.a._____          ┌─────────────────────────────────┐
Phone                                            │  Redacted - Other (Nonresponsive) │
                                                 └─────────────────────────────────┘

_____          _____
Name                                              Signature

_____
Title

_____          _____
Telephone                                         Mobile Phone

NOTE: Actual signatures are required above.  Electronic signatures, "Docusigned" signatures and/or signature fonts are not acceptable.

*Exhibit to Escrow Agreement*

HIGHLY CONFIDENTIAL - ATTORNEY
EYES ONLY, SUBJECT TO
PROTECTIVE ORDER

Fidelio_0001286

PX0594.293

## EXHIBIT A-2

### Certificate as to VOI HoldCo's Authorized Signatures

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of VOI HoldCo and are authorized to initiate and approve transactions of all types for the escrow account or accounts established under this Agreement, on behalf of VOI HoldCo. The below listed persons (must list at least two individuals, if applicable) have also been designated Call Back Authorized Individuals and will be notified by Citibank N.A. upon the release of Escrow Funds from the escrow account(s).

Name / Title / Telephone                          Specimen Signature

_Patrick Gondron_

Name                                              Signature

_Manager_

Title

_904   436-6540_

Phone                                             **Redacted - Other (Nonresponsive)**

_Tim Van Norssen_

Name                                              Signature

_VP Business Development_

Title

_909-815-4826_

Phone                                             **Redacted - Other (Nonresponsive)**

Name                                              Signature

Title

Telephone                                         Mobile Phone

NOTE: Actual signatures are required above.   Electronic signatures, "Docusigned" signatures and/or signature fonts are not acceptable.

_Exhibit to Escrow Agreement_

HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY, SUBJECT TO PROTECTIVE ORDER