# UNITED STATED DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

| | |
|---|---|
| DEPUY SYNTHES PRODUCTS, INC. and DEPUY SYNTHES SALES, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> VETERINARY ORTHOPEDIC IMPLANTS, INC., FIDELIO CAPITAL AB, and SYNTEC SCIENTIFIC CORPORATION. <br><br> Defendants. | Case No. 3:18-cv-01342-HES-PDB |

## PLAINTIFFS' RENEWED MOTION FOR ENTRY OF PERMANENT INJUNCTION

**I.  INTRODUCTION**

Defendants Veterinary Orthopedic Implants, Inc. ("VOI") and Fidelio Capital AB ("Fidelio") opposed the earlier entry of an injunction against defaulting Defendant Syntec Scientific Corporation ("Syntec") because the injunction would have swept in the activity of all three defendants, even though a jury may have subsequently returned a finding of non-infringement or invalidity. Dkt. 312 (Defendants' Opp.) at 1 ("[I]t is improper to enter a default judgment against one defendant before the other defendants have the opportunity to argue the merits of the claims."). This risk has now passed.

Pursuant to 35 U.S.C. § 283, Plaintiffs DePuy Synthes Products, Inc. and DePuy Synthes Sales, Inc. (collectively, "Plaintiffs" or "Synthes") respectfully move the Court to enter a permanent injunction that permanently enjoins Syntec, its officers, agents, servants, and employees, and those in active concert or participation with any of them, which includes Defendants VOI and Fidelio, from infringing Plaintiffs'

1

United States Patent Nos. 8,523,921 (the '921 patent") and 11,026,728 (the "'728 patent"). A proposed injunction order is attached as Exhibit A.[1]

## II. FACTUAL BACKGROUND

The substance of this motion has been fully briefed and heard by the Court. *See* Dkt. 314 (Plaintiffs' Motion for Entry of Default Judgment and Permanent Injunction); Dkt. 312 (Defendant VOI's Response in Opposition); Dkt. 341 (Plaintiffs' Reply). Syntec did not respond.

After Syntec failed to respond to Plaintiffs' Third Amended Complaint, a Clerk's default was duly entered on September 17, 2021. Dkt. 291. The basis for the answering Defendants' opposition to Plaintiffs' prior injunction motion was that entering default judgment and a permanent injunction against Syntec before the dispute was adjudicated as to VOI and Fidelio could result in inconsistent judgments. Dkt. 312; *see also Frow v. De la Vega*, 82 U.S. 552 (1872). On May 25, 2022, the Court denied Defendants' motion without prejudice based on *Frow*. Dkt. 370. Specifically, the Court held that at that time, there was a risk of "this Court issuing two inconsistent final judgments against Defendant Syntec and Defendant VOI," given "the possibility that Defendant VOI prevails at trial." Dkt. 370 at 6.

Following a 6-day jury trial, on January 13, 2023, a verdict was returned finding clams 1, 12, and 20 of the '921 patent and claim 1 of the '728 patent valid and infringed, unanimously rejecting each of VOI and Fidelio's noninfringement and invalidity defenses. Dkt. 555 (Verdict Form); Day 7 Tr. at 1480:3-19. Accordingly, the risk of inconsistent judgments upon which Defendants' opposition and the Court's prior ruling were based no longer exists. The Court should now enter a permanent judgment without further delay.

---

[1] Plaintiffs have prepared a Microsoft Word version of Exhibit A that will be emailed to the Court's clerk.

## III. A PERMANENT INJUNCTION SHOULD BE ENTERED

Plaintiffs respectfully request that this Court permanently enjoin Syntec, its officers, agents, and employees, and those in active concert or participation with any of them, including VOI and Fidelio, from infringing the '921 patent and the '728 patent.

### A. ALL DEFENDANTS ARE LIABLE FOR PATENT INFRINGEMENT

#### 1. Syntec is liable for direct infringement of the '921 patent.

The Third Amended Complaint ("TAC") establishes Syntec's liability for direct patent infringement. As stated in the TAC and established by Syntec's default, "Syntec, without authority, has directly infringed and continues to infringe the '921 patent . . . ." Dkt 280 (TAC) ¶ 91. The TAC defines "Accused Products" as "the [TPLO] plates at issue . . . identified on the attached Exhibit B [to the TAC], and . . . the infringing kits at issue . . . identified in Exhibit I [to the TAC], as well as substantially similar designs to those in Exhibits B and I . . . ." *Id.* ¶ 33; Dkts. 280-2 & 280-9. Syntec infringed the '921 patent "by manufacturing, importing, distributing, selling, offering for sale and/or using within the United States at least the Accused Products." Dkt. 280 ¶ 91.

Indeed, even before the actions that gave rise to this litigation, Syntec had a history and practice of infringing Plaintiffs' patents. As explained in the TAC, "Syntec has a history of pirating products." Dkt. 280 ¶ 40. For example, in 2012, a Final Judgment was entered against Syntec by default forbidding it from engaging in a number of activities involving Synthes products. *Id.*; Final Judgment Pursuant to Rule 54(b) against defendant Syntec Sci. Corp., *Synthes U.S. v. Syntec Sci. U.S. Corp.*, No. ED CV 09-1875-DMG (C.D. Cal. Jul. 6, 2012) (No. 91).

#### 2. Syntec is liable for direct infringement of the '728 patent.

The TAC also establishes Syntec's liability for direct patent infringement of the '728 patent. As stated in the TAC and established by Syntec's default, "Syntec, without

authority, has directly infringed and continues to infringe the '728 patent . . . ." Dkt. 280 (TAC) ¶ 167. The TAC defines "Accused Products" for the '728 patent as "the [TPLO] plates at issue . . . identified on the attached Exhibit B [to the TAC], as well as VOI's NXT TPLO plates with locking screw holes . . . and the accused non-plate portions of the infringing kits at issue . . . identified in Exhibit I [to the TAC], as well as substantially similar designs to those in Exhibits B and I . . . ." *Id.* ¶ 33.

Syntec infringed the '728 patent "by manufacturing, importing, distributing, selling, offering for sale and/or using within the United States at least the Accused Products." *Id.* ¶¶ 167–169.

### 3. VOI and Fidelio Capital are also liable for infringement of the Patents-In-Suit.

At trial, Plaintiffs established that VOI and Fidelio are liable for infringement of claims 1, 12, and 20 of the '921 patent and claim 1 of the '728 patent. Dkt. 555 (Verdict Form); *see also* Day 7 Tr. at 1480:3-19; Dkt. 546 (Oral Order denying Defendants' Motion for Judgment as a Matter of Law).

### B. A PERMANENT INJUNCTION IS THE NECESSARY AND PROPER REMEDY.

"[T]he axiomatic remedy for trespass on property rights is removal of the trespasser." *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1362, 1364 (Fed. Cir. 2012); *see also* 35 U.S.C. § 283 (district courts "grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent"). A permanent injunction against continued patent infringement is appropriate where the plaintiff demonstrates: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange,*

4

*L.L.C.*, 547 U.S. 388, 391 (2006). "Absent adverse equitable considerations, the winner of a judgment of validity and infringement may normally expect to regain the exclusivity that was lost with the infringement." *Edwards Lifesciences AG v. CoreValve, Inc.*, 699 F.3d 1305, 1314 (Fed. Cir. 2012) (vacating district court's denial of a permanent injunction and remanding for reconsideration). A court's analysis of these factors "proceeds with an eye to the 'long tradition of equity practice' granting 'injunctive relief upon a finding of infringement in the vast majority of patent cases.'" *Presidio Components, Inc.*, 702 F.3d at 1362 (quoting *eBay*, 547 U.S. at 395 (Roberts, C.J., concurring)).

Each of the four *eBay* factors weighs in favor of the entry of a permanent injunction here.

***First***, Plaintiffs have been irreparably harmed by Defendants' infringement, because Plaintiffs' loss of TPLO business to Defendants causes the loss of the entire veterinarian relationship. For example, as Ms. Cunningham summarized: "It is DePuy's position that we have and continue to be irreparably harmed by VOI for all of these products as well as sort of the broader relationship. [T]he clinician relationship is very, very strong, and we – and we have actually lost relationships because of this, historically, and these plates as well, and – and everything that goes along with it, so absolutely." Day 4 Tr. (Cunningham) at 913:13-19. *See also* Day 4 Tr. (Cunningham) at 914:20-23 ("[I]f you lose the TPLO business, which is typically probably more than half of a – of a practice's, you know, revenue, everything else sort of follows suit as well. So, absolutely, if you lose your TPLO portfolio – it's an ecosystem, you lose the relationships or the regularity of talking to those sort of – as they change, and – and there's a – there's a – a trust that's been lost because they – they believe there's another product there that is just as good as yours, which is not the case."); Day 1 Tr. (Horan) at 187:12-15 ("[W]hen you lose a customer on TPLO, you

pretty much lose it all because they're going to convert the business so that, again, they can focus on a single supply chain.").

Defendant VOI's past director of business development Mr. Haas confirmed that a loss of a customer to VOI's TPLO system would cause the customer to switch all business:

> Q. Was that something that you observed, that when a doc would switch over to the VOI copies for TPLO, that that doc would be prepared to switch over for his or her other procedures as well?
>
> A. Yes, that was my experience.

Day 3 Tr. (Haas) at 602:16-20.

There was also significant evidence adduced at trial confirming that the products manufactured by Defendants are copies of Plaintiffs' patented products. *See, e.g.,* Day 1 Tr. (Horan) at 202:10-12 ("This – this showed the breadth of copying that had been going on. It was basically every plate in our product line had been copied and was available in this catalog."); Day 2 Tr. (Gall) at 322:13-16 ("[T]here's also clear evidence of copying of the Synthes products."); 350:1-21 (discussing evidence that Syntec successfully "match[ed] the Synthes same design."); 392:19-393:20 ("This is about as direct of copying as you can get. They're saying: Take that key feature, make it the same as something that's on the marketplace. And that key feature happened to be a patented feature."); Day 3 Tr. (Haas) at 600:2-4 ("Q. Within the company was there an understanding that VOI's TPLO plates were copies of DePuy Synthes plates? A. Yes.").

Moreover, the evidence at trial confirmed that Defendants' copying of Plaintiffs' patented designs was not limited to the Swiss TPLO plates; it extended to the Elite and NXT designs as well. Day 2 Tr. (Gall) at 397:22-398:7 ("So that – the presentation of Dr. Beale came out around 2017, and they were calling them the Fixin plates. Often

6

in product development, myself included, you have a certain name for a product while it's being developed and you may change that name. But what's interesting is they then launch Elite and the NXT plates in 2018 and '20, and those plates contained all the features we're talking about in this Fixin Style plate."); Day 4 Tr. (Gendreau) at 790:15-17 ("Q. No testimony or declaration or explanation from Brian Beale disputing that you copied Synthes' designs, correct? A. Not that I'm aware of, no."). Additionally, Defendants' expert Mr. Drewry did not address this issue. Day 5 Tr. (Drewry) at 1147:17-19 ("Q. 'Question: But you didn't investigate copying of DePuy Synthes products by VOI, correct?' 'Answer: That is correct.' Did I read your testimony correctly, Mr. Drewry? A. Yes, sir, you did.").

Defendants' copying is significant because it is the features claimed by the Asserted Patents and copied by the infringing products that drive demand for the such products:

> Q. Are you able to answer the question of whether for the surgeons who are purchasing the infringing product – there's anything causing them to purchase other than the features that are recited in the claims of the Synthes patents; yes or no?
>
> A. We'd have to ask them. I don't know.
>
> Q. You certainly didn't identify any evidence of other features driving demand in your report, correct?
>
> A. Not from the surgeons' perspective, no.
>
> Q. And not from the veterinary centers' purchasing department either, correct?
>
> A. Correct.

Day 6 Tr. (Riley) at 1283:5-13. Mr. Horan confirmed that the features recited in the patent claims – the orientation and placement of the screw holes in the proximal portion, the two-axis rotation of the proximal portion over the central mass of the tibia, the use of an arc of a cylinder pre-contoured shape, and a superior screw hole angled distally, less than 90 degrees – are what drives the clinical performance of the TPLO

system, and is present in both the Synthes and VOI plates. Day 1 Tr. (Horan) at 171:17-172:2; 173:4-8 ("And the VOI plate also is located right over that central mass that we had defined."); 175:7-16 ("[W]hen we refer to targeted locking screws, it's a precontoured plate with a well-designed screw hole to go into the central mass."); 176:25-178:19 (discussing VOI plates that target the central mass: "Q. Where does VOI place the screws, these targeted locking screws relative to the Synthes designs? A. Yeah, they place the screws in the same location."); *See also* Day 2 Tr. (Gall) at 349:6-15 (discussing VOI marketing literature: "the doctor says: I could use this, and its nice because I don't have to worry about where the screws will end up. What he's referring to is the fact that the screws all converge and you don't have to worry about them ending up in the joint or out the side.").

Defendants' ex-employee Mr. Haas confirmed the existence of a nexus between the features in VOI's infringing products that drive demand and the Synthes patents:

> Q. VOI intentionally priced its DePuy Synthes copies significantly below the cost of the DePuy Synthes plates; is that correct?
>
> A. That is correct.
>
> Q. It did that intentionally to attempt to take market share away from DePuy Synthes?
>
> A. That is correct.

Day 3 Tr. (Haas) at 602:21-603:2. *See also* Day 6 Tr. (Haas) at 1301:6-12 ("Q. Are you aware of any major VOI customer who transitioned away from DePuy Synthes to – from DePuy Synthes to VOI for a reason other than the claimed interchangability of VOI's products with DePuy Synthes and the price? A. No. I don't necessarily see what the motivation would be, given that Synthes is a well-known, quality product in the market.").

The presence of unlicensed copies of Plaintiffs' patented products in the marketplace therefore causes Synthes to lose market share and erodes prices. *See, e.g.,* Day 3 Tr. (Weinstein) at 539:16-18 ("When you copy someone else's design,

8

instead of doing R&D yourself, and sell knockoffs in the market at much lower prices, you're going to lose market share."); Day 3 Tr. (Haas) at 602:21-24 ("VOI intentionally priced its DePuy Synthes copies significantly below the cost of the DePuy Synthes plates."). The evidence shows that Defendants had a clear strategy to use those copies to target and take customers from Plaintiffs. Day 4 Tr. (Gendreau) at 837:18-838:8 (discussing PX247) ("Synthes set up a search tool that allows us to see what surgeons use their TPLO plates' locking screws. Please always use this tool . . . when you prospect for new blood."); Day 3 Tr. (Haas) at 601:21-602:2 ("Q. Were there any instructions by VOI managers to target DePuy Synthes Customers? A. Yes. Q. And to target those customers who were using Synthes' TPLO system? A. Yes.").

Additionally, Syntec's infringing acts irreparably harm Plaintiffs given that Defendants market their products as interchangeable with Plaintiffs' products, causing consumer confusion:

> Q. Did VOI ever have discussions with physicians in which it claimed that its plates were interchangeable with or copies of DePuy Synthes plates?
>
> A. Yes.
>
> Q. Did this occur through the time you were employed by VOI?
>
> A. Yes.

Day 3 Tr. (Haas) at 600:20-25. Consumer confusion caused by these claims is magnified because it is extremely difficult to distinguish between Synthes plates and VOI plates. (Haas) at 603:10-14 ("[T]hey're pretty much carbon copies of each other through x-ray."). As a result, doctors who have to perform revisions after a failed procedure with an Accused Product made by Syntec and distributed by VOI and Fidelio can mistake it for Plaintiffs' products. *See, e.g.,* Day 5 Tr. (Kowaleski) at 979:8-

9

12 ("When I've revised cases and surgeons have used mixed-and-matched implants, the implants got loose, the entire procedure exploded, and it needed a revision, and we went back and asked which screws you're using, and they were VOI screws in a Synthes plate."). In fact, Defendants' decision to manufacture products without branding was intentional. Day 3 Tr. (Haas) at 603:3-9 ("Q. VOI at some point ceased branding its TPLO plates with VOI; is that correct? . . . A. That is correct. Q. It did that so that those plates could not be traced back to it; is that correct? . . . A. Without knowing the specifics of the strategy, that was my understanding."). Indeed, Defendants' expert Dr. Peck could not tell whether the TPLO plate depicted in his own demonstratives was a Synthes plate or an accused Syntec/VOI/Fidelio plate. Day 4 Tr. (Peck) at 897:23-898:17 (discussing DDX3.4) (attached in Ex. B).

The consumer confusion is not just limited to the infringing Swiss/DT plates, but extends to the Elite and NXT plates as well. For example, Mr. Horan testified at trial that, when installed in a TPLO procedure, the Elite and NXT plates are located over the identical location of the bone as the Synthes plates, and have indistinguishable screw locations within the bone. Day 1 Tr. (Horan) at 178:12-19 ("So you can see under the Synthes column that our screws are engaging into the central mass that we had defined. And VOI – you could see that the head of the plate is exactly over the central mass that we discovered. And by virtue of the fact that their screws – none of those screws are sort of evidenced on x-ray tells you that all of those screws are directly behind the head of that plate, or into the central mass.").

Finally, VOI witnesses admit that the infringing products compete directly with Synthes, Day 3 Tr. (Gendreau) at 589:3-7 ("Q. Is Synthes a competitor of VOI? A. Yes. Q. Does VOI attempt to compete with Synthes in the sale of TPLO plates? A. Yes.").

Under these circumstances, the fact that the infringing products are in direct competition with Plaintiffs' products, including when distributed and sold by or

on behalf of Defendants' VOI and Fidelio, strongly favors a finding of irreparable harm. *See Presidio Components, Inc.*, 702 F.3d 1351 at 1363 (noting that "competition in the same market is certainly one factor suggesting strongly the potential for irreparable harm without enforcement of the right to exclude"); *Saint-Gobain Tech. Fabrics Am., Inc.*, 2010 WL 11507575, at *9 (finding irreparable harm where plaintiff suffered potential price erosion, loss of market share, and loss of profits).

**Second**, monetary remedies are inadequate to compensate for Plaintiffs' injuries, including because of the loss of ecosystem sales, price erosion, and reputational harm caused by Defendants' infringing activities. Plaintiffs have a demonstrated policy of not licensing their patents to competitors. Day 4 Tr. (Cunningham) at 899:22-900:5 ("Q. Has the '921 patent ever been licensed to another person or company? A. We do not license our IP. We are in the business of selling, manufacturing, and actually positioning our products into the market ourselves. Q. Okay. So have – has DePuy Synthes ever licensed any patent? A. I cannot speak to that outside of my jurisdiction. I do not know – but for animal health, we have not.").

There is substantial evidence that this policy is driven by the fact that the value of the TPLO system extends beyond the system itself, and that loss of a customer relationship as to the TPLO system can result in the loss of the entire customer relationship as to other products as well. Day 4 Tr. (Cunningham) at 914:20-23 ("[I]f you lose the TPLO business, which is typically probably more than half of a – of a practice's, you know, revenue, everything else sort of follows suit as well. So, absolutely, if you lose your TPLO portfolio – it's an ecosystem, you lose the relationships or the regularity of talking to those sort of – as they change, and – and there's a – there's a – a trust that's been lost because they – they believe there's another product there that is just as good as yours, which is not the case.").

As established at trial, Syntec's attempts, in concert with Defendants VOI and Fidelio, to flood the market with the Accused Products drives down pricing across the industry:

> Q. VOI intentionally priced its DePuy Synthes copies significantly below the cost of the DePuy Synthes plates; is that correct?
>
> A. That is correct.
>
> Q. It did that intentionally to attempt to take market share away from DePuy Synthes?
>
> A. That is correct.

Day 3 Tr. (Haas) at 602:11-603:2; *see also* Day 3 Tr. at 503:21-504:3 (Weinstein) ("[D]octors would be prepared to switch over for his or her other procedures once they had – had purchased what we're calling the accused products and convoyed sales products. And that makes – that makes perfect sense to me as an – as an economist."). Moreover, as discussed in the preceding section, the difficulty of distinguishing the infringing plates and Synthes plates on bone, and Defendants' claims of interchangeability result in reputational harms that cannot be cured by money, but can be cured by removing the infringing products from the market. *See* Day 6 Tr. (Haas) at 1299:6-15 ("Q. Did you tell OSU that the VOI plates were copies of the DePuy Synthes plates? A. I didn't have to. It was obvious. Q. Did you tell OSU that the —that the VOI plates were interchangeable with the DePuy Synthes systems? A. Yes, I did. Q. Is it your understanding that OSU made the switch because of the significant pricing difference? A. I would say that the price contributed to that switch among, you know, relationships as well."); *see also id.* at 1300:2-12 ("Q. Did University of Florida, in your mind, believe that was the case? A. I believe so. They were excited that the locking screws were compatible with Synthes plates. Q. Are you aware of any major VOI customer who transitioned away from DePuy Synthes to – from DePuy Synthes to

VOI for a reason other than the claimed interchangability of VOI's products with DePuy Synthes and the price? A. No. I don't necessarily see what the motivation would be, given that Synthes is a well-known, quality product in the market.").

Finally, monetary remedies may not be collectible from Syntec in this action. For example, because Syntec has not appeared and defaulted, Dkt. S-182, Dkt. 296, adequate discovery cannot be conducted as to the full extent of Syntec's liability for damages. Moreover, it is unclear whether Syntec even has any assets in the United States, making it particularly infeasible to remedy the harm to Plaintiffs through monetary damages alone. *Correct Craft IP Holdings, LLC*, 2013 WL 6086455, at *1, 4 (entering a permanent injunction upon a finding that even if the plaintiff might have been able to collect some monetary judgment for future infringement, "it is doubtful at best that Plaintiff will be able to collect any monetary judgment from Defendant"); *Jaguar Imports, LLC*, 2013 WL 3491160, at *4 (noting that "[the defendant's] failure to appear in these proceedings also lends some support to a finding that monetary damages would be inadequate here."). "Even if money damages could be properly assessed [against Syntec], the prospect of collecting money damages from [a foreign] defendant with no known assets in the United States favors a finding of inadequate remedies at law." *Saint-Gobain Tech. Fabrics Am., Inc.*, 2010 WL 11507575, at *8.

***Third***, the balance of harm weighs heavily in favor of the remedy of an injunction. Where, as here, defendants acting in concert intentionally copy a patented product, equity requires that the burden associated with ceasing infringement be borne by the infringers. *Saint-Gobain Tech. Fabrics Am., Inc.*, 2010 WL 11507575, at *9 (finding that the balance of hardships favors the plaintiff, as "[o]ne who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected" (internal quotation marks and citations omitted)); *see also Jaguar Imports, LLC*, 2013 WL 3491160, at *4 (finding that the balance of hardships weighs in favor of a permanent injunction

because any harm to the defendant is harm of the defendant's own making). On the other hand, Plaintiffs will continue to be harmed unless Defendants' infringing conduct is restrained and enjoined.

Defendants repeatedly emphasized at trial that there are alternative TPLO plates allegedly available to them, or that TPLO makes up only a small portion of their business. *See, e.g.,* Day 6 Tr. (Riley) at 1224:9-11 (asserting that the market for Synthes TPLO plates and the infringing products is a "very small niche market"); *see also* Day 4 Tr. (Gendreau) at 744:14-18 (Q. Mr. Gendreau, over the years how much of VOI's product sales has been TPLO plates? A. So we've been selling TPLO plates for roughly 20 years now, and anywhere between 10 to 15 percent of our sales are TPLO.). Mr. Gendreau showed to the jury a number of plate designs, such as the "O-style," "L-style," "Y-style," and "B-style" plates that are not accused of infringement, which he claims could be used for TPLO procedures, and which he testified "all are" "still offered by VOI today." Day 4 Tr. (Gendreau) at 732:22-734:15 (discussing DDX1-6) (attached in Ex. B).[2]

***Finally***, the public interest would be served by a permanent injunction. Defendants claim that there are large number of historical TPLO plates that they sell that are alternatives to its infringing plates. *See id*. Defendants also claim that there are a large number of third parties that sell TPLO plates. Day 6 Tr. (Riley) at 1227:12-17. And there is evidence that Plaintiffs have substantial capacity to meet demand. *See also* Day 1 Tr. (Horan) at 203:3-6 (Q. If Synthes would know that VOI would stop

---

[2] These non-accused TPLO plates do not include the Compresiv and Versiv plates. At trial, Dr. Gall established that Compresiv and Versiv plates continue to use Synthes' patents. *See* Day 2 Tr. (Gall) at 392:10-12 (Q. And so would the Versiv and Compresiv plates be a non-infringing alternative to the accused products? A. They would not.). In contrast, VOI's expert Mr. Drewry admitted that he failed to analyze the actual Compresiv and Versiv plates. Day 5 Tr. (Drewry) at 1172:20-22 (Q. And you actually didn't analyze the VOI Compresiv and Versiv plates as they're actually manufactured, correct? A. Yes, sir, that's correct.).

14

infringing its patents, would Synthes be able to expand its capacity to meet the additional demand of VOI plates? A. Yes, certainly.). In fact, Defendants claimed that TPLO plate sales reflect less than 1% of Plaintiffs capacity.

In addition, the Federal Circuit has repeatedly held that the public interest is best served by strong patent protection, and it would be served here by protecting Plaintiffs' patents. *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 809 F.3d 633, 647 (Fed. Cir. 2015) ("We base this conclusion not only on the Patent Act's statutory right to exclude, which derives from the Constitution, but also on the importance of the patent system in encouraging innovation. Injunctions are vital to this system. As a result, the public interest nearly always weighs in favor of protecting property rights in the absence of countervailing factors, especially when the patentee practices his inventions."); *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383 (Fed. Cir. 2006) (affirming district court's grant of preliminary injunction and stating that "[w]e have long acknowledged the importance of the patent system in encouraging innovation"); *Jaguar Imports, LLC*, 2013 WL 3491160 at *5 ("the record contains no evidence demonstrating that [defendant's] product is of unusual social benefit or otherwise establishing that the public interest would be disserved by an injunction").

Dr. Kowaleski testified that the willingness of companies to invest in animal health research is limited. Day 5 Tr. (Kowaleski) at 959:11-21 (Q. Has there historically been more funding for human orthopedic research than veterinary orthopedic research? A. Oh, absolutely.). And there is corroborating evidence adduced at trial from independent veterinary surgeons that VOI's behavior harms the industry: "[W]hat would happen if all the companies who are doing R&D stopped. Who would VOI copy now?" PX473 at 2.

Because each of the four *eBay* factors favors granting a permanent injunction, this Court should enter an order permanently enjoining Syntec, its officers, agents,

servants, and employees, and those in active concert or participation with them, which includes VOI and Fidelio, from manufacturing, importing, selling, or offering for sale any product that infringes the '921 and '728 patents. *See Presidio Components, Inc.*, 702 F.3d at 1362 (vacating district court's denial of a permanent injunction); *see also Saint-Gobain Tech. Fabrics Am., Inc.*, 2010 WL 11507575, at *7–9 (entering default judgment and a permanent injunction against the defendant).

## IV. CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that this Court enter default judgment of willful patent infringement against Syntec and enter a permanent injunction enjoining Syntec, its officers, agents, and employees, and those in active concert or participation with any of them, including VOI and Fidelio, from manufacturing, importing, selling, offering for sale, and/or using in the United States any good infringing the '921 patent and/or the '728 patent. *See* Exhibit A (Proposed Injunction Order).

Dated this 17th Day of January, 2023.

GRAYROBINSON, P.A.

By: ___/s/ *Troy Smith*___
R. Troy Smith
Florida Bar No. 485519
50 N. Laura Street, Suite 1100
Jacksonville, FL 32202
Phone: (904) 598-9929
Facsimile: (904) 598-9109
troy.smith@gray-robinson.com
maria.daniels@gray-robinson.com

-and-

Jason G. Sheasby (admitted *pro hac vice*)
California Bar No.: 205455
Andrew E. Krause (admitted *pro hac vice*)
California Bar No.: 294850
Irell & Manella, LLP
1800 Avenue of the Stars, Ste. 900
Los Angeles, CA 90067-4276

Phone:        (310) 203-7096
Facsimile: (310) 203-7199
*jsheasby@irell.com*
*akrause@irell.com*

***Attorneys for Plaintiffs DePuy Synthes Products, Inc. and DePuy Synthes Sales, Inc.***

## CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that on January 17, 2023, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all CM/ECF participants, and I properly effectuated service to Syntec in Taiwan by FedEx .

                                                                        /s/ *Troy Smith*