# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

DEPUY SYNTHES PRODUCTS, INC. )   Case No. 3:18-cv-01342-HES-PDB
and DEPUY SYNTHES SALES, INC., )
)
      Plaintiffs, )
)
      vs. )
)
VETERINARY ORTHOPEDIC )
IMPLANTS, INC., SYNTEC )
SCIENTIFIC CORPORATION, and )
FIDELIO CAPITAL AB, )
)
      Defendants. )
)

## PLAINTIFFS' MOTION FOR ENHANCEMENT OF DAMAGES DUE TO WILLFUL INFRINGEMENT

11182742

# TABLE OF CONTENTS

**Page**

I.  Introduction and Relief Requested ............................................................... 1

II.  Legal Standard ......................................................................................... 1

III.  Argument.................................................................................................. 2

    A.  *Read* Factor 1: Defendants Deliberately Copied Synthes' Patented Designs .............................................................. 3

    B.  *Read* Factor 2: Defendants Had No Good Faith Belief the Patent Was Invalid or Not Infringed.............................. 10

    C.  *Read* Factor 3: Defendants' Behavior Continued in this Litigation ..................................................... 12

    D.  *Read* Factor 4: Defendants' Size and Financial Condition............... 16

    E.  *Read* Factor 5: This Case Was Not Close ........................................ 18

    F.  *Read* Factor 6: Defendants' Misconduct Continued For Over a Decade......................................................... 19

    G.  *Read* Factor 7: Defendants Took No Remedial Action ................... 20

    H.  *Read* Factor 8: Defendants Intended to Harm Synthes.................... 21

    I.  *Read* Factor 9: Defendants Repeatedly Attempted to Conceal Their Misconduct ....................................... 23

IV.  CONCLUSION ....................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*800 Adept, Inc. v. Murex Sec., Ltd.*,
  505 F. Supp. 2d 1327 (M.D. Fla. 2007) ........................................................ 19

*Affinity Labs of Texas, LLC v. BMW N. Am., LLC*,
  783 F. Supp. 2d 891 (E.D. Tex. 2011) ......................................................... 16

*Alps South, LLC v. Ohio Willow Wood Co.*,
  No. 8:08-cv-1893, 2013 WL 12164769 (M.D. Fla. May 10, 2013)...................... 1

*Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*,
  876 F.3d 1350 (Fed. Cir. 2017) ................................................................... 9

*EagleView Techs., Inc. v. Xactware Sols., Inc.*,
  522 F. Supp. 3d 40 (D.N.J. 2021) ................................................................ 2

*Georgetown Rail Equip. Co. v. Holland L.P.*,
  6:13-cv-366, 2016 WL 3346084 (E.D. Tex. Jun. 16, 2016)............................. 18

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
  579 U.S. 93 (2016) .................................................................................... 1

*Innovention Toys, LLC v. MGA Ent.*,
  No. CV 07-6510, 2017 WL 3206687 (E.D. La. Mar. 8, 2017) ......................... 22

*KAIST IP US LLC v. Samsung Electronics Co., Ltd.*,
  439 F. Supp. 3d 860 (E.D. Tex. 2020) ......................................................... 25

*Minks v. Polaris Indus., Inc.*,
  No. 6:05-cv-1894, 2007 WL 788418 (M.D. Fla. Mar. 14, 2007)........................ 9

*nCube Corp. v. SeaChange Int'l, Inc.*,
  313 F.Supp.2d 361 (D. Del. 2004) .............................................................. 23

*nCube Corp. v. Seachange Int'l, Inc.*,
  436 F.3d 1317 (Fed. Cir. 2006)..................................................................... 9

*Omega Pats., LLC v. CalAmp Corp.*,
  No. 6:13-cv-1950, 2017 WL 11711880 (M.D. Fla. Apr. 5, 2017).......... 2, 9, 12, 25

**Page(s)**

*Omega Pats., LLC v. Fortin Auto Radio, Inc.,*
   No. 6:05-cv-1113, 2007 WL 9719177 (M.D. Fla. Apr. 4, 2007) ....................9, 18

*Read Corp. v. Portec, Inc.,*
   970 F.2d 816 (Fed. Cir. 1992) ...................................................................*passim*

*Stryker Corp. v. Zimmer, Inc.*
   No. 1:10-cv-1223, 2017 WL 4286412 (W.D. Mich. July 12, 2017)................2, 16

*Whirlpool Corp. v. TST Water, LLC,*
   No. 2:15-cv-01528, 2018 WL 1536874 (E.D. Tex. Mar. 29, 2018) .................... 19

**Statutes**

35 U.S.C. § 284 ................................................................................. 1

**Other Authorities**

Rule 50(a) ........................................................................................ 18

## I.      Introduction and Relief Requested

Plaintiffs DePuy Synthes Products, Inc. and DePuy Synthes Sales, Inc. (together, "Synthes") respectfully request that the Court award treble damages for Defendants' willful infringement under 35 U.S.C. § 284.

## II.     Legal Standard

35 U.S.C. § 284 provides that, for patent infringement, "the court may increase the damages up to three times the amount found or assessed" by the jury. The Supreme Court has instructed that courts should "take into account the particular circumstances of each case in deciding whether to award damages, and in what amount." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 106 (2016). Enhanced damages are particularly appropriate "for egregious cases typified by willful misconduct." *Id.*

"The Federal Circuit has established nine factors to assist the district court in determining whether to award enhanced damages: (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior as a party to the litigation; (4) the defendant's size and financial condition; (5) closeness of the case; (6) duration of defendant's misconduct; (7) remedial action by the defendant; (8) defendant's motivation for harm; and (9) whether defendant attempted to conceal its misconduct." *Alps South, LLC v. Ohio Willow Wood Co.*, No. 8:08-cv-1893, 2013 WL 12164769, at *1 (M.D. Fla. May 10, 2013) (quoting *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826 (Fed. Cir. 1992)) (awarding enhanced damages).

## III.   Argument

The facts of this case merit enhancement of damages. Defendants, with knowledge of the patent, engaged in a decade-long process of copying Synthes' patented designs and attempting to conceal that infringement. Defendants undertook this scheme for their own profit and actively attempted to drive Synthes out of the animal health business.

This type of conduct warrants enhancement to the fullest extent permitted. For example, in *Omega Pats., LLC v. CalAmp Corp.*, No. 6:13-cv-1950, 2017 WL 11711880, at *5, *8 (M.D. Fla. Apr. 5, 2017), the Court awarded treble damages on similar facts, where there was "willful copying" and concealment through "misrepresen[tations]" to patent owner. As another example, in *EagleView Techs., Inc. v. Xactware Sols., Inc.*, 522 F. Supp. 3d 40, 49-56 (D.N.J. 2021), the Court trebled the damages award of $125 million where there was evidence of copying, Defendants had no good faith belief "that they somehow did not infringe," Defendant took no remedial actions, and undertook these actions "with the express goal of luring away EagleView's customers and decreasing EagleView's market share." Similarly, in *Stryker Corp. v. Zimmer, Inc.*, No. 1:10-cv-1223, 2017 WL 4286412, at *4-6 (W.D. Mich. July 12, 2017), *aff'd*, 745 F. App'x 167 (Fed. Cir. 2018), the Court trebled the initial damages award of $70 million where (as here), "witnesses consistently testified that Zimmer deliberately copied Stryker's patented inventions," the copying spanned over a decade, there was no evidence of good faith belief or remedial action, and Defendant "attempt[ed] to prevent Stryker from discovering certain aspects of its infringement."

Further, as discussed below, all of the *Read* factors favor significant enhancement of damages in this case.

### A.   *Read* Factor 1: Defendants Deliberately Copied Synthes' Patented Designs

The evidence at trial showed that Defendants' business model was to copy Synthes' patented designs, and that Defendants persisted in copying for over a decade. For example, internal documents from Defendants showed that dating back as far as 2012, Defendants sent samples of Synthes' TPLO plates to its manufacturer and asked it to produce copies that were "Synthes identical":



| Veterinary Orthopedic Implants | | Purchase Order # | | 14215* |
| PO Date | 12/4/2012 | Need By: 1/15/2013 | For: | |

| 7 Swiss 2.7 L3 | 2.7 Locking, DCP, Low contact, Left | 75 | 27.00 | 2,025.00 |
| 7 Swiss 2.7 R3 | 2.7 Locking, DCP, Low contact, Right | 75 | 27.00 | 2,025.00 |

Locking version to be made to fit SLH 270.XX screws currently being produced. Use sample we sent and please send drawings to steve@vetimplants.com for approval. All locking versions of above plates to be Synthes identical.

PX32 (excerpt). In 2013, Steve McQueen, VOI's Director of Product Development, emailed the manufacturer: "I have attached a list of all TPLO plates that need to have their hole angles verified as matching Synthes samples" and asking the manufacturer to "match Synthes same design":



| Message | |
| From: | Steve McQueen [steve@vetimplants.com] |
| Sent: | 8/19/2013 10:06:23 AM |
| To: | Jennifer Sung-new e-mail [jennifer.s@eagleseye.com.tw] |
| CC: | Patrick Gendreau [patrick@vetimplants.com]; Charles Chang-Syntec [synchang@ms71.hinet.net]; peter@eagleseye.com.tw |
| Subject: | Swiss TPLO plate production |
| Attachments: | Swiss TPLO Plates.xlsx |

I have attached a list of all TPLO plates that need to have the hole angles verified as matching Synthes samples

Below please kindly find the update status of the Swiss TPLO plates to change the angles of top 3 or 4 holes to match Synthes same design:

PX36 (excerpt); *see also* Trial Tr. 588:6-20.

This copying persisted throughout the entire period of infringement. For example, in 2015, VOI asked a veterinarian (Dr. Mayo) to obtain samples of additional Synthes products:

> On Nov 20, 2015, at 2:36 PM, Tim VanHorssen <tim@vetimplants.com> wrote:
>
> Dr. Mayo,
> Are you able to order from Synthes? If you can, can you get the below items for me?
>
> DPO/TPO: (2 EA)
>
> V4601.L7
> V4601.R7
> V4602.L7
> V4602.R7
> V4603.L7
> V4603.R7
>
> DRILL BIT: (2EA)
>
> 310.431  4.3 QCK

PX66 (excerpt). Defendants repeatedly used this same veterinarian to obtain samples so that they could "knock off each item" (PX64) (excerpt):

> Message
>
> | From: | Veterinary Orthopedic Implants [patrick@vetimplants.com] |
> | Sent: | 2/15/2016 3:39:16 PM |
> | To: | Steve McQueen [steve@vetimplants.com] |
> | CC: | Tim VanHorssen [tim@vetimplants.com] |
> | Subject: | Re: Nick Gardener |

> I would like you to use the VID and Everost catalogs and go line by line to see how we can knock off each item. If you feel our manufacturers have the ability to make items X, Y, Z and we need samples in order to manufacture the items ourselves, please get an item list and ask Dr. Mayo to order.

As another example, in 2017, Defendants' Director of Business Development Tim VanHorssen wrote that Defendants were developing a TPLO plate that was "100% Synthes identical" (PX38) (excerpt):

| Message | |
|---|---|
| **From:** | Veterinary Orthopedic Implants [patrick@vetimplants.com] |
| **Sent:** | 3/28/2017 11:57:13 AM |
| **To:** | Steve McQueen [steve@vetimplants.com] |
| **CC:** | Tim VanHorssen [tim@vetimplants.com] |
| **Subject:** | Re: Locking 1.5 TPLO Plate |

It will be a scaled down version of the Synthes 2.0 TPLO and will complement the new 1.5 system that we are developing that is 100% Synthes identical.

Defendants' copying of Synthes' patented designs was not limited to the Swiss/DT TPLO plates that their own counsel acknowledged were copies of Synthes designs. Trial Tr. at 1372:14-16 ("Do VOI Swiss-style plates look like the Synthes plates? Of course. I'm not going to insult you by saying they didn't look like them. They were intended to be like them."). For example, in 2017 Defendants received feedback on a design concept from Dr. Brian Beale (who had previously worked with Synthes and had access to Synthes' design), proposing that Defendants again copy Synthes' design and directing VOI to update certain design features through side-by-side comparisons to Synthes' products. Defendants ultimately used this as the basis for the "Elite" and "NXT" TPLO plates found to infringe in this case:



PX53 (excerpt); *see also* PX52 (email from Dr. Beale), Trial Tr. at 398:5-7 ("But what's interesting is they then launch Elite and the NXT plates in 2018 and '20, and those plates contained all the features they were talking about in this Fixin Style plate.").

Testimony from Defendants' own witnesses confirmed that Defendants copied Synthes' patented designs. For example, Mr. Haas, a former business development manager at VOI, testified:

> Q. Within the company was there an understanding that the -- that
> VOI's TPLO plates were copies of DePuy Synthes plates?
> A. Yes.

Trial Tr. 600:2-4.

> Q. Did VOI ever have discussions with physicians in which it claimed
> that its plates were interchangeable with or copies of DePuy Synthes
> plates?
> A. Yes.

Q. Did this occur through the time you were employed by VOI?
A. Yes.

Trial Tr. 600:20-25.

Q. Do you know who directed the strategy of creating copies of DePuy Synthes' designs and marketing VOI plates as compatible or interchangeable with DePuy Synthes?
A. Patrick Gendreau.

Trial Tr. 604:2-5.

Q. Now, in your declaration you testified that during your time at VOI, approximately 90 percent of the materials that VOI sold were knockoffs of DePuy Synthes products, fair?
A. That's fair.

Trial Tr. 616:3-6.

Mr. Gendreau, VOI's CEO, ultimately admitted on cross-examination to knocking off Synthes products (Trial Tr. 816:20-21):

Q. Did you or did you not knock off Synthes' products?
A. Absolutely.

Further testimony confirmed that Defendants engaged in no independent design efforts but rather had a business model of simply copying products developed by others. For example, Mr. McQueen, VOI's Director of Product Development, testified that VOI employs no engineers or product designers (Trial Tr. 587:19-587:25):

Q. Does VOI have engineers who are employed by it?
A. No.

Q. Does VOI have product designers who are employed by it?
A. No.

Q. Since 2014, have there been any significant investments in capital made by VOI?
A. I have no knowledge of that.

Dr. Gall, a professor of mechanical engineering with extensive design experience in medical devices, examined the evidence and determined that Defendants copied Synthes' designs:

> Q. Can you just summarize your conclusions, Dr. Gall?
> A. Yes. I do believe that VOI infringes the Synthes patents, the things I discussed. I think there's very clear evidence that they also copied the plates, the Synthes plates.

Trial Tr. 399:9-12; *see also id*. 392:14-399:12. Dr. Gall further testified that the extent of Defendants' copying was like nothing he had ever seen before in his 25 years of experience in the medical device industry (Trial Tr. 398:8-399:7 (emphases added)):

> Q. And how does VOI's product development process compare to what you've seen in your experience in the field?
> A. ***It's really not like anything I've seen before***. Normally what happens in product development is you have -- start with an engineering team, usually a quite substantial amount of the company. That engineering team builds a product. You might benchmark other products and, you know, look at other competitors and decide what things and what features are in there. You then are very careful to see what's patented. So you find out, all right, if those features are the patented features, then which things should we be looking at and avoiding. Then you're looking -- you're trying to think of how to make the product better. That's what you're almost always doing is: Okay, this is the existing product, let's make something that's better than this product. ***And in this case, it's like I've never seen something like this to this extent, which is looking at the features, copying them directly, making direct replicates of them, infringing the patents. It's to an extreme level of something I've ever seen***.

In contrast, Defendants' technical expert first claimed to the jury that he did investigate copying and then ultimately admitted under cross-examination that he had failed to investigate the issue:

> Q. So you told the ladies and gentlemen of the jury that one of the steps you took as an expert was to investigate these four -- four issues: Industry

praise, commercial success, failure of others, and alleged copying, correct?

A. I said I rebutted Mr. Ledet's analysis of these steps.

Q. You considered these factors, correct?

A. Yes, sir, I did.

Trial Tr. 1145:12-18.

Q. "Question: But you didn't investigate copying of DePuy Synthes products by VOI, correct? "Answer: That is correct." Did I read your testimony accurately, Mr. Drewry?

A. Yes, sir, you did.

Trial Tr. 1147:17-21.

Courts in this district have repeatedly held that willful copying warrants significant enhancement of damages. *See Omega Pats.*, 2017 WL 11711880, at *5 (trebling damages award where there was "willful copying of Omega's invention"); *Omega Pats., LLC v. Fortin Auto Radio, Inc.*, No. 6:05-cv-1113, 2007 WL 9719177, at *3 (M.D. Fla. Apr. 4, 2007) (trebling damages award where defendant "deliberately copied Omega's inventions"); *Minks v. Polaris Indus., Inc.*, No. 6:05-cv-1894, 2007 WL 788418, at *1 (M.D. Fla. Mar. 14, 2007) (doubling damages award where "it is fairly clear that the copying was deliberate and the case was not close").

The Federal Circuit has likewise affirmed significant enhancement where there is deliberate copying. *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1371-72 (Fed. Cir. 2017) (affirming order trebling damages where district court found "strong evidence of copying," *see* 198 F.Supp.3d 1343, 1350); *nCube Corp. v. Seachange Int'l, Inc.*, 436 F.3d 1317, 1323–25 (Fed. Cir. 2006) (affirming order doubling damages where defendant "deliberately copied the invention in its products").

**B.** *Read* **Factor 2: Defendants Had No Good Faith Belief the Patent Was Invalid or Not Infringed**

Defendants presented no evidence that they had a good faith belief the patent was invalid or not infringed. To the contrary, the evidence showed that Defendants' explanations regarding alleged non-infringement were actually misdirection meant to conceal their infringing conduct. For example, during discovery, VOI's CEO Mr. Gendreau first tried to claim that VOI was not willful because it was not aware of the patent. However, Mr. Gendreau was immediately reminded (and admitted) that he was aware of the patent when it issued in 2013:

> Q. Why does VOI believe its infringement is not willful?
> A. We weren't aware there was a patent.
>
> Q. Does this refresh your recollection that you became aware of the '921 patent in 2013, sir?
> A. It does.

Trial Tr. 597:22-598:1. Fidelio director Mr. Bonnier likewise testified that he was aware of the patent and the alleged infringement. Trial Tr. 635:11-13 ("Q. Was Fidelio aware of the Synthes patents that are part of this lawsuit before its acquisition of VOI? A. I was aware of the alleged infringement.").

Mr. Gendreau tried to claim that VOI had a good faith belief it was not infringing because it allegedly removed a feature called the "combi-hole." Trial Tr. 748:13-25. The evidence showed, however, that this was simply another misdirection. The claims of the Asserted Patents do not relate to the so-called "combi-hole", and in any event, VOI's actual designs retained the "combi-hole" (Trial Tr. 177:14-24):

Q. Were you here in opening when counsel for VOI and Fidelio
claimed that they don't use combi-holes in their design anymore?
A. Yes, I heard that.

Q. I think you have in front of you Exhibits 652 and 667; is that correct?
A. Yes.

Q. And those should be the Elite and NXT TPLO plates. In the
proximal portion of those plates, do they have a combi-hole?
A. They have what's called a stacked combi-hole.

Defendants also pointed to a letter sent by their counsel in 2013 that claimed

the VOI products were not infringing because the screw paths were "parallel."

However, on cross examination, Mr. Gendreau admitted he had "no idea" where his

counsel got this information and disclaimed any argument that the accused products

have "parallel" screw paths.

Q. You don't remember what design documents you gave to your
counsel when they wrote a letter to us in 2013 and represented that they
weren't going to use our patent, correct?
A. I don't know that I -- I don't remember what I provided to the
attorneys.

Q. So at least one of the pieces of information you provided to counsel
was information that the screw holes in the VOI plates were parallel,
correct?
A. I have no idea.

Trial Tr. 780:18-781:4.

Q. Well, you were here in the court when each of the plates that are
accused of infringement or at issue in this case were discussed, correct?
A. Yes.

Q. There's the Swiss dual-threaded plates, correct?
A. Correct.

Q. Elite, correct?
A. Correct.

Q. NXT, correct?
A. Correct.

Q. And you didn't tell the ladies and gentlemen of the jury that any of those have parallel axes, correct
A. I didn't?

Q. Yes.
A. I don't -- I don't recall saying that, no.

Trial Tr. 781:14-782:3.

Further, Dr. Gall testified that he examined the accused TPLO plates and determined that they have non-parallel screw paths targeted into the central mass of the tibia. Trial Tr. 396:16-20 ("Q. And do any of the other VOI plates angle the caudal screw to avoid this edge in the same way? A. Yes. Q. And which ones are those? A. They all do."); 397:3-8 ("And then you can see on there, it says: Move that to a slightly distal direction for that screw. Q. And do the VOI plates you analyzed for infringement also have this feature? A. Yes, they do."). Further, as discussed below with respect to Factor 5, the limited non-infringement and invalidity arguments Defendants presented at trial fared no better. The absence of good faith belief, combined with the attempt to present baseless defenses at trial, warrants significant enhancement. *See Omega Patents*, 2017 WL 11711880, at *5 (trebling damages award where "[i]t is difficult to ascribe a good faith basis" to defendants' conduct).

## C.   *Read* Factor 3: Defendants' Behavior Continued in this Litigation

Defendants' behavior of copying, and then attempting to conceal the copied designs, continued in this litigation. As discussed below for Factor 9, the evidence

showed that Defendants actively concealed their knock-off designs from Synthes, including sending Synthes fake designs to "ke[ep] them off our back." PX70.

Upon the return of the jury verdict, Synthes requested the entry of a permanent injunction that had been briefed for over 13 months. The Defendants opposed, claiming they needed time for additional briefing. Trial Tr. 1485:15-18 ("that would have to be briefed as to whether the factors for an injunction have been met"). After this briefing was filed on Tuesday, January 20, Defendants again requested briefing. Dkt. 560 (Defendants "request leave to file a response to Plaintiffs' renewed motion for entry of a permanent injunction"). Counsel for Synthes expressed its concerns to counsel for Defendants: "I am concerned that you are using the request for additional briefing as a tool to delay the injunction." Ex. 1 (Jan. 18 Email). Counsel for Defendants was emphatic that the purpose was not delay: "of course this is not being done for delay – I would not countenance that." *Id.* Synthes has no doubt that Defendants' counsel was being honest as to counsel's beliefs when these statements were being made. But the executives who run the Defendants had other plans. They were shipping large quantities of infringing products, including plates and screws, to customers who did not ask for the materials, in an obvious attempt to avoid the impact of the injunction when it issues. Dkt. 571 (Synthes' motion for TRO). Mr. Haas testtified that this is exactly what happened when Defendants had an injunction entered against them on the design patent earlier in the case (Haas Dep. 24:24-25:13):

> Q. At some point in time did VOI make the decision to dispose of the plates it was marketing as Swiss plates after the lawsuit by DePuy Synthes was filed?

A. Yes, they did.

Q. What was the instruction that was given to you regarding that step?
A. We were instructed to sell the plates to our current customers and offer them in bulk?

Q. Approximately how many plates were sold?
A. Thousands, if not over 10,000.

In addition, during this case Defendants released "new" Versiv and Compresiv TPLO plates that they claimed were non-infringing alternatives. For example, Defendants' expert testified at trial that these plates allegedly did not infringe because they have "parallel screw paths" and use a "v-shaped" "bone contacting surface." Trial Tr. 1098:25-1099:17. However, on cross-examination, Defendants' expert admitted that he had not analyzed the actual as-sold Versiv and Compresiv plates, but rather only drawings provided by Defendants (Trial Tr. 1171:24-1172:22):

Q. So you showed the ladies and gentlemen of the jury these CAD drawings, correct?
A. Yes, sir, I did.

Q. Now, what's interesting about these CAD drawings is these are not of the actual plate, correct?
A. No. As I explained, they were the CAD drawings of the parts that were designed on the computer.

Q. And you did -- you didn't speak to any VOI employee who created these CAD drawings to determine if they were accurate or not, correct?
A. No, sir, I did not.

Q. And you didn't investigate whether VOI had a practice of creating inaccurate information to provide Synthes to, quote, keep them off our back, correct?
A. Yes, sir, that's correct.

Q. [ ] There's some evidence of VOI doing that in this case, correct?
A. Yes, sir, there is.

Q. And you actually didn't analyze the VOI Compresiv and Versiv
plates as they're actually manufactured, correct?
A. Yes, sir, that's correct.

Defendants' expert then admitted that the information he was provided was not

consistent with the actual design of the Versiv and Compresiv plates as sold:

MR. SHEASBY: And if we go to my Slide 175, the left-hand side is the
materials that were provided to you; is that correct?
A. Yes, sir.

Q. And they show that distinct V, correct?
A. Yes, sir, they do.

Q. And the right-hand plates are the plates that are actually produced
and are sold to customers, correct?
A. Yes, sir, they are.

Q. And you didn't testify on direct that those plates have a V under the
bone-contacting surface in the proximal plates, the actual plates,
correct?
A. That's correct.

Trial Tr. 1172:23-1173:10.

Dr. Gall, Plaintiffs' expert, testified that he examined the actual Versiv and

Compresiv plates as-sold and determined that they do not have parallel screw paths or

a v-shape design:

Q. What did you find about the proximal portion contour of the Versiv
and Compresiv plates?
A. I found that that proximal portion was configured and dimensioned
to conform to the tibia, but they're saying it's not.

Q. Did you find a V shape in the proximal portion?
A. I did not.

Trial Tr. 387:11-17.

Q. What did you determine about the screw hole path in the Versiv and Compresiv plates?
A. So if you look at this claim, it talks about the screw hole paths for at least two of the three screw holes of the proximal portion, that they're predetermined and angled – and they are, they're predetermined and angled, they're locking screws -- to direct screws through when the bone plate is positioned on the tibia in the desired position into a central mass. And you can kind of see that they are directing both of those screws into the central mass in this image, both the superior and caudal screws.

Q. And Dr. Gall, are the blue line and the yellow line showing the path of the superior screw hole and the caudal screw hole parallel.
A. They are not parallel.

Trial Tr. 391:16-392:6.

The behavior of Defendants' witnesses during the litigation also weighs in favor of enhancement. Mr. Gendreau testified on direct examination that VOI's infringement occurred because Synthes "baited me, you know, they set me up." Trial Tr. at 759:5-8. After repeatedly conceding he was not set up on cross examination, Defendants' counsel, who elicited this testimony in his direct questioning of Mr. Gendreau, conceded in closing: "I'm not going to argue that he [Dr. Fischer/Synthes] set up VOI." Trial Tr. at 1374:11-17.

**D.    *Read* Factor 4: Defendants' Size and Financial Condition**

The fourth *Read* factor supports enhancement where a Defendant is a large company and enhanced damages are needed to act as a deterrent. *See, e.g.*, *Affinity Labs of Texas, LLC v. BMW N. Am., LLC*, 783 F. Supp. 2d 891, 903 (E.D. Tex. 2011) (finding fourth *Read* factor "supports a higher enhancement amount" because "Large profitable companies like the Hyundai/Kia Defendants are not likely to be deterred by a per unit enhancement amount that is low"); *Stryker*, 2017 WL 4286412, at *5 (trebling damages

where Defendant was a multi-billion dollar company because "a $70 million verdict may sound large in the abstract, but in context it may not be enough, without enhancement, to deter infringing conduct").

Defendants have significant size and financial assets, and enhanced damages are necessary to deter further misconduct. In 2020, Fidelio Capital purchased VOI and merged it into a new entity called Vimian, with an operating company called Movora. Trial Tr. 809:1-11. Fidelio is owned and controlled by the richest families in Sweden. Bonnier Depo. at 50:11-14 (owners of Fidelio include "the wealthiest families of Sweden"). Fidelio had full knowledge of the lawsuit in advance of the acquisition. Trial Tr. 635:8-13 ("Q. Was Fidelio aware of the Synthes patents that are part of this lawsuit before its acquisition of VOI? A. I was aware of the alleged infringement.").

Fidelio then repeatedly emphasized the need for VOI to create "organic" growth, which is increased sales from pre-existing customers. PX82 at 4-7, 11-13. The record showed that taking TPLO business is exactly what allowed for this organic growth. Mr. Gendreau admitted that 50% of orthopedic device revenue comes from treatment of the cranial cruciate ligament. Trial Tr. 833:23-25 ("Q. This reports that in 2021, 50 percent of the Movora revenue was cranial cruciate ligament revenue, correct? A. I think that's what it says, yes."). Fidelio then launched an IPO that combined VOI and its other vet businesses -- Vimian. At the time of this IPO, the value of Vimian was over 3 billion Euros (equating to over $3.2 billion dollars). PX82 at 6. The VOI veterinary unit – including specifically sales of the infringing TPLO products for the CCL segment – contributed a significant portion of this revenue. Trial Tr.

833:12-15 ("Q. Movora, which is the orthopedic vet part of the Vimian business, contributed 36 percent of the revenue, correct? A. Yes. At that moment in time it was 36 percent of the total revenue, that's my understanding.").

### E.   *Read* Factor 5: This Case Was Not Close

This was not a close case. The jury deliberated for just over one hour and rendered a verdict for Synthes on every issue:  (1) VOI infringed all asserted claims, (2) Fidelio was liable for the infringement, (3) the infringement by both Defendants was willful, (4) the asserted claims are not invalid, and (5) Synthes is entitled to all of its claimed damages to the penny. Dkt. 555. *See Omega Patents*, 2007 WL 9719177, at *4 (holding "this was not a 'close' case" where "the Jury overwhelmingly concluded that the final patents-in-suit were willfully infringed by DEI"); *Georgetown Rail Equip. Co. v. Holland L.P.*, 6:13-cv-366, 2016 WL 3346084, at *19 (E.D. Tex. Jun. 16, 2016) (case not close where "jury deliberated for just over an hour and returned a verdict in Georgetown's favor on all counts for the exact amount Georgetown requested").

As discussed above, Defendants admitted copying and did not present any evidence of good faith. The substantive defenses presented by Defendants were not close either. As to invalidity, Defendants' obviousness theories were rejected by both the Patent Trial and Appeal Board and the jury, and (as explained in Plaintiffs' Rule 50(a) motion) Defendants' expert presented a legally deficient obviousness analysis that failed to discuss motivation to combine or reasonable expectation of success, as well as a written description analysis that contradicted the claims and the Court's constructions. Dkt. 548 at 4-6. And as to non-infringement, Defendants contested only

a single limitation of each Asserted Claim, and their non-infringement arguments regarding these limitations were merely re-hashes of claim construction arguments that the Court had already rejected at the *Markman* phase. Trial Tr. 1148:24-1149:11, 1169:22-1170:10; Dkt. 548 at 1-4. The mere fact that Defendants put on some defenses, which the jury quickly rejected, does not make the case close. *Whirlpool Corp. v. TST Water, LLC*, No. 2:15-cv-01528, 2018 WL 1536874, at *7 (E.D. Tex. Mar. 29, 2018) ("That a defendant's position on various defenses 'may have required resolution at trial ... does not dictate that the case was close.'").

    **F.**   *Read* **Factor 6: Defendants' Misconduct Continued For Over a Decade**

    Defendants' willful infringement continued for over a decade, from when the '921 patent issued in 2013 through (and after) trial, and Defendants attempted to conceal their infringement throughout this entire period. Defendants' misconduct has not ceased even through the present day. Defendants continue to sell plates that use Synthes' patented designs (including the infringing Elite and NXT models, and "new" Versiv and Compresiv plates), and after the jury verdict began dumping infringing products onto the market as addressed in Synthes' motion for TRO. Dkt. 571.

    All of this was done with full knowledge of the patents, as Mr. Gendreau admitted. Trial Tr. 779:22-25, 780:4-7 ("Q. So December in 2013, VOI was put on formal notice of the ['921] patent by Synthes, correct? Correct? A. Yes. . . . Q. Synthes asked you to stop using its patented technology in 2013, correct? A. Sure."). *See 800 Adept, Inc. v. Murex Sec., Ltd.*, 505 F. Supp. 2d 1327, 1340 (M.D. Fla. 2007) (enhancing damages where defendants "provided the infringing services for years prior to the entry

of the jury verdict and after notice of the infringement"), *aff'd in part and rev'd in part on other grounds*, 539 F.3d 1354 (Fed. Cir. 2008).

### G.    *Read* Factor 7: Defendants Took No Remedial Action

From the day they were put on notice of the patent in 2013 through closing arguments at trial, Defendants took no remedial action to stop their infringement. Instead, as discussed above (and below as to Factor 9), Defendants expanded and refined their copying enterprise, while concealing their infringement from Synthes.

The remedial actions Defendants claimed to have undertaken were all proven false at trial. For example:

- As discussed above, Mr. Gendreau claimed that VOI removed the "combi-hole" feature after being put on notice of the infringement. Trial Tr. 748:13-25. The evidence at trial showed that this claim was false and that VOI's accused plates *still* contain this feature. Trial Tr. 177:14-24 ("Q. And those should be the Elite and NXT TPLO plates. In the proximal portion of those plates, do they have a combi-hole? A. They have what's called a stacked combi-hole.").

- Mr. Gendreau claimed that after being put on notice, Defendants stopped selling the "clover leaf" plates, and replaced them with new models of plates (the Elite and NXT designs) that were not copies. Trial Tr. 734:19-735:4. However, the evidence showed that VOI did not actually stop selling the "swiss-style" plates, but instead concealed its sales by removing them from catalogues. Trial Tr. 600:11-19; Trial Tr. 752:19-25. The evidence also showed that the alleged "replacement" plates were also direct copies of the Synthes plates, and the jury found that the Elite and NXT designs infringe. *See* PX53 (2017 VOI design document with Synthes diagrams); Trial Tr. 172:3-173:8 (VOI technique guide for "Elite" plates "copied the kind of contour" of Synthes designs), Trial Tr. 397:22-398:7 (Elite and NXT contain all features in 2017 VOI design guide with Synthes diagrams). VOI continues to sell the copied Elite and NXT designs. Trial Tr. 839:7-9.

- Mr. Gendreau also claimed that Defendants' "new" Versiv and Compresiv designs do not infringe. However, as discussed above, Defendants' non-infringement argument was based on inaccurate drawings that do not show the real-world design of these plates. Dr. Gall analyzed the physical Versiv and

Compresiv plates as they are actually manufactured and determined they are not non-infringing alternatives. Trial Tr. 392:10-12 ("Q. And so would the Versiv and Compresiv plates be a non-infringing alternative to the accused products? A. They would not."). Defendants were given the opportunity to have Mr. Drewry analyze and testify to the physical Versiv and Compresiv plates that Defendants produced in November 2022, but declined to do so. 1/3/23 Hearing Tr. at 19:23-20:1. If the drawings Mr. Drewry was provided were accurate, why did Defendants fail to take advantage of this opportunity?

## H.    *Read* Factor 8: Defendants Intended to Harm Synthes

The evidence at trial also showed that Defendants' undertook their infringement with the motivation to steal Synthes' customers and (ultimately) drive Synthes out of the veterinary business. For example, Mr. Haas testified (Trial Tr. 601:21-602:4):

> Q. Were there any instructions by VOI managers to target
> DePuy Synthes customers?
> A. Yes.
>
> Q. And to target those customers who were using DePuy Synthes'
> TPLO system?
> A. Yes.
>
> Q. And was the instructions by management to tell the customers that
> the VOI plates and screws were interchangeable?
> A. Yes.

This was confirmed by VOI's internal documents, in which Mr. Gendreau instructed VOI salespeople to "capture all of" Synthes' business:

> Q. This is a document from Patrick Gendreau to a group of sales folks
> at VOI; is that correct?
> A. That is correct.
>
> Q. And Patrick Gendreau is instructing VOI sales folks to, quote,
> 'prospect for new blood' using the list of surgeons that DePuy Synthes
> publishes who use their plates; is that correct?
> A. That is correct.

> Q. And it's stating that the goal of this is to, quote, 'capture all of the customer's business so they don't use any DePuy Synthes products in the future'; is that correct?
> A. Yes, that is correct.

Trial Tr. 605:8-21; PX48.

This strategy continued with the acquisition by Fidelio. In particular, Mr. Gendreau wrote (and admitted on cross examination) that the goal of Fidelio's acquisition was to create an illegal monopoly and drive Synthes out of business:

> Q. [T]his is you on October 5, 2018. "Hi, Eric. Kyon and BioMedtrix for 10 million joined by VOI equals game, set, match. Johnson & Johnson would realize immediate defeat. Can't see them sticking around for more than 36 months." Do you see that?
> A. I do.
>
> Q. And by "Johnson & Johnson," you're referring to DePuy Synthes; is that correct?
> A. That's correct.
>
> Q. And below that you say: "KBV" -- Kyon, BioMedtrix, VOI -- "would control 100 percent of the veterinary surgery centers and teaching facilities in the world." Is that correct?
> A. That's right. That's what I wrote.

Trial Tr. 821:16-822:12 (discussing PX260). Testimony confirmed that this conduct was harmful to Synthes' business. For example, Ms. Cunningham testified that "when we received more information and we were better able to understand the scope, the severity, and the new, evolved plate design and we were able to sort of assess that, it became very clear that this [lawsuit] was an action we needed to take to – for the survivability of our business, that was increasingly under attack." Trial Tr. 920:10-19.

This type of malicious motive supports enhancement. *See Innovention Toys, LLC v. MGA Ent.*, No. CV 07-6510, 2017 WL 3206687, at *3 (E.D. La. Mar. 8, 2017)

(trebling damages where "MGA and Innovention were direct business competitors, which gave MGA motivation to harm Innovention"); *nCube Corp. v. SeaChange Int'l, Inc.*, 313 F.Supp.2d 361, 390 (D. Del. 2004) (finding "this factor also militates in favor of enhanced damages" where "nCUBE and SeaChange are direct competitors").

### I.   *Read* Factor 9: Defendants Repeatedly Attempted to Conceal Their Misconduct

The evidence at trial also showed that Defendants went to extraordinary lengths to conceal their misconduct from Synthes. For example, as discussed above, after being put on notice of the infringement, VOI sent Synthes fake plate designs using old angles to conceal their infringement. PX70 (2016 McQueen email) ("We sent Synthes a sample of a plate some time back and we sent a single threaded locking plate with the old angles (on purpose). In ways I believe this has kept them off our back."). At trial, Mr. Gendreau remarkably claimed that "We found that the plate had not been sent," and that VOI would "have a record if it had been sent to Synthes." Trial Tr. at 753:20-754:3. Yet VOI provided no corroborating records or testimony regarding this new justification that Mr. Gendreau suddenly remembered at trial.

VOI engaged in other falsehoods as well. For example, after being put on notice of the infringement, Mr. Gendreau falsely told Synthes that VOI would stop selling the copied designs. Trial Tr. 748:13-25. But rather than actually stop, VOI expanded its copying and took steps to conceal it, including hiding the copies under the table at trade shows and omitting them from public catalogues (Trial Tr. 600:11-19):

> Q. At trade shows, did VOI keep its copies of DePuy Synthes plates underneath the counter so that they would not be publicly available?

A. Yes.

Q. At -- and who instructed you to take that step?
A. I was instructed by my superior, Tim Van Horssen.

Q. Did VOI take steps to hide the designs of its TPLO plates by not including them in public catalogs?
A. Yes.

*See also* PX96 (2018 VOI email urging "discretion" in "distributing photos" of copied plates); Trial Tr. 593:6-594:1 (VOI marketing email regarding public catalogue stating "we cannot use the Synthes-like TPLO plate for obvious reasons").

Mr. Gendreau admitted in his direct testimony to omitting the designs from catalogues, testifying this was done to conceal the plates from Synthes. Trial Tr. 752:19-25 ("Q. Now, after 2008 -- that was the first contact with Synthes' attorney -- VOI didn't list the Cloverleaf plates, the redesigned ones in its catalog; isn't that right? A. That's correct. Q. Were you trying to hide the fact that VOI was selling Cloverleaf plates from Synthes? A. I didn't want to get on their radar again.").

These concealment efforts were effective. As Mr. Horan testified, Synthes did not learn the true extent of Defendants' copying until obtaining a copy of VOI's "secret" catalogue from a surgeon. Trial Tr. 202:1-12 ("Q. Was there something special about this catalog that the surgeon forwarded you? A. Yes. This was a secret catalog, or secret pages of catalog that was not available on their website. It was not provided or shown at any of the trade shows. It's the first evidence we had seen of these pages. Q. And what did these pages show in terms of the amount of products that they -- that VOI was marketing in relation to your patent? A. This -- this showed

the breadth of copying that had been going on. It was basically every plate in our product line had been copied and was available in this catalog.") (discussing PX586).

Defendants' concealment has not stopped even to this day. At trial, Defendants tried once again to present through their expert Mr. Drewry divorced-from-reality "CAD" files for the Versiv and Compresiv plates (which no VOI witness compared to an actual product) that do not reflect the actual Versiv and Compresiv plates as produced. This was done to paint the Versiv and Compresiv plates as non-infringing alternatives when in reality they continue to contain the patented features. This type of deliberate, ongoing concealment and misrepresentation supports enhancement. *See, e.g.*, *Omega Patents*, 2017 WL 11711880, at *8 (trebling damages award where defendant "attempted to conceal its infringement by misrepresenting to Omega that it only sold black boxes which were programmed by customers and by removing information from the CalAmp website to make discovery of infringement more difficult"); *KAIST IP US LLC v. Samsung Electronics Co., Ltd.*, 439 F. Supp. 3d 860, 886 (E.D. Tex. 2020) (doubling damages award where defendant concealed infringement through "repeated statements to Prof. Lee that they could not commercialize his invention while simultaneously developing the accused product").

## IV.   CONCLUSION

Synthes respectfully requests the Court award enhanced, treble damages in this case, or such other amount that the Court finds appropriate.

Dated this 20th day of January, 2023.

GRAYROBINSON, P.A.

By: */s/ Stephen Payne*
Jason G. Sheasby (admitted *pro hac vice*)
California Bar No.: 205455
Lisa S. Glasser (admitted *pro hac vice*)
California Bar No.: 223406
Andrew E. Krause (admitted *pro hac vice*)
California Bar No.: 294850
Stephen Payne (admitted *pro hac vice*)
California Bar No.: 310567
Irell & Manella, LLP
1800 Avenue of the Stars, Ste. 900
Los Angeles, CA 90067-4276
Phone:        (310) 203-7096
Facsimile: (310) 203-7199
*jsheasby@irell.com*
*akrause@irell.com*

-and-

R. Troy Smith
Florida Bar No. 485519
50 N. Laura Street, Suite 1100
Jacksonville, FL 32202
Phone: (904) 598-9929
Facsimile: (904) 598-9109
*troy.smith@gray-robinson.com*
*maria.daniels@gray-robinson.com*
*jessica.gonzalez@gray-robinson.com*

***Attorneys for Plaintiffs DePuy Synthes***
***Products, Inc. and DePuy Synthes Sales, Inc.***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 20, 2023, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all CM/ECF participants.

By: */s/ Stephen Payne*

## <u>LOCAL RULE 3.01(g) CERTIFICATION</u>

Pursuant to Local Rule 3.01(g), I hereby certify that the Parties discussed this motion on the record on January 13, 2023, following the entry of the jury verdict, and a briefing and hearing schedule was set. Defendants oppose the motion.

By: <u>/s/ *Stephen Payne*</u>