# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | |
|---|---|
| DEPUY SYNTHES PRODUCTS, INC. and DEPUY SYNTHES SALES, INC., )<br><br>Plaintiffs, )<br><br>vs. )<br><br>VETERINARY ORTHOPEDIC IMPLANTS, INC., SYNTEC SCIENTIFIC CORPORATION, and FIDELIO CAPITAL AB, )<br><br>Defendants. ) | Case No. 3:18-cv-01342-HES-PDB |

## PLAINTIFFS' MOTION FOR ORDER TO SHOW CAUSE AND TO FIND DEFENDANTS IN CONTEMPT OF THE COURT'S PERMANENT INJUNCTION

11197450

# TABLE OF CONTENTS

**Page**

I. Introduction and Relief Requested ............................................................. 1

II. Argument .................................................................................................. 3

    A. The Compresiv/Versiv Plates are Not Colorably Different and Are Subject to the Injunction ............................................................. 3

        1. Defendants' Testimony Regarding Compresiv/Versiv TPLO Plates Did Not Identify Any Colorable Difference .................................................................................. 4

        2. Synthes' Testimony Regarding What Features In Elite and NXT Satisfy the Disputed Element Further Evidences That Compresiv/Versiv Are Not Colorably Different .................................................................................. 9

        3. Dr. Gall Is the Only Expert Who Analyzed Actual Compresiv/Versiv Plates and Determined they Infringe ........ 11

    B. Defendants' Tactic of Having Customers "Hold" Infringing Products Violates the Injunction ...................................................... 14

    C. Defendants' Inducement of Infringement by Supporting and Training Customers to Use Infringing Products Violates the Injunction ......................................................................................... 20

III. CONCLUSION ...................................................................................... 22

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ALPS South, LLC v. Ohio Willow Wood Co.*,
    2013 WL 12161867 (M.D. Fla. Nov. 12, 2013) ................................................. 19

*Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*,
    2013 WL 1149230 (M.D. Pa. Mar. 19, 2013) ..................................................... 21

*Barry v. Medtronic, Inc.*,
    914 F.3d 1310 (Fed. Cir. 2019).......................................................................... 21

*Blackberry Limited v. Typo Products LLC*,
    2015 WL 474553 (N.D. Cal. Feb. 4, 2015) ................................................. 17, 18

*Consumer Elecs. Assn. v. Compras & Buys Magazine, Inc.*,
    2008 WL 11333082 (S.D. Fla. Oct. 29, 2008) ................................................... 19

*Graves v. Kemsco Grp., Inc.*,
    864 F.2d 754 (Fed. Cir. 1988) ........................................................................... 19

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
    831 F.3d 1369 (Fed. Cir. 2016).......................................................................... 17

*Jeneric/Pentron, Inc. v. Dillon Co., Inc.*,
    259 F. Supp. 2d 192 (D. Conn. 2003) ............................................................... 20

*Nephron Pharma. Corp. v. Hulsey*,
    2021 WL 1341879 (M.D. Fla. Jan. 12, 2021) ..................................................... 4

*Regal Knitwear Co. v. NLRB*,
    324 U.S. 9 (1945)............................................................................................... 16

*Roe v. Operation Rescue*,
    54 F.3d 133 (3d Cir. 1995) ................................................................................ 16

*Smith & Nephew, Inc. v. Arthrex, Inc.*,
    502 Fed. App'x 945 (Fed. Cir. 2013) ................................................................ 21

*Spindelfabrik Suessen-Schurr v. Schubert & Salzer*,
    903 F.2d 1568 (Fed. Cir. 1990).......................................................................... 19

*TecSec, Inc. v. Adobe, Inc.*,
    978 F.3d 1278 (Fed. Cir. 2020)............................................................... 20

*Thomas v. Blue Cross & Blue Shield Ass'n*,
    594 F.3d 823 (11th Cir. 2010)..............................................................3, 4, 5

*TiVo, Inc. v. Echostar C*orp.,
    646 F.3d 869 (Fed. Cir. 2011) (*en banc*) ............................................... 3

*Virginia Panel Corp. v. MAC Panel Co.*,
    139 F. Supp. 2d 753 (D. W. Va. 2001)..................................................... 20

**Statutes**

35 U.S.C. § 271 .............................................................................17, 20

## I.    Introduction and Relief Requested

Plaintiffs respectfully move the Court for an order finding Defendants Veterinary Orthopedic Implants, Inc. and Fidelio Capital AB (collectively, "VOI" or "Defendants") in contempt of the Permanent Injunction entered on February 22, 2023. Synthes respectfully requests the Court set a contempt hearing on this motion as soon as possible, as discussed at the February 15, 2023 hearing. Synthes does not make this request or motion lightly. Synthes has engaged in repeated correspondence with Defendants asking them to change course, but Defendants have refused.

On February 22, 2023, the Court entered an order that "permanently enjoined" Defendants "from making, using, selling, offering for sale, and importing into the United States any Infringing Implants or variations thereof that are not colorably different." Dkt. 593 at 12-13 (the "Permanent Injunction").

There are three elements to this contempt motion:

(a) In December 2022, just before trial, the Defendants first started selling very small amounts (less than 1,800) of what they refer to as "Compresiv" and "Versiv" plates. At the trial in January, the Defendants argued that Compresiv/Versiv were non-infringing alternatives, while Plaintiffs argued they were still infringing. The jury returned the exact amount requested by Plaintiffs, and Plaintiffs' damages calculation was premised in part on Compresiv/Versiv being infringing and therefore not acceptable alternatives. On January 17, one business day after the verdict and after Plaintiffs re-urged their motion for a permanent injunction, Defendants sent 30,000 of these plates to customers who did not request them, in a transparent attempt to evade

this Court's authority to enjoin the sale of these plates as not colorably different from those found to infringe. The manufacture, use, sale, offer to sale or importation of Compresiv/Versiv violates the injunction because they are not colorably different and are infringing.

(b) Defendants' tactic of sending plates to customers to "hold" with right to "return" them if unused is an improper attempt to evade the injunctive authority of the Court. These customers who are holding the plates for the Defendants are in active concert with the Defendants and therefore these plates are within the scope of the injunction. Further, "sale" of these plates will only occur when the customers actually pay for them, and there is no question the injunction prohibits all such sales by Defendants.

(c) An injunction forbidding infringement also forbids inducing infringement. Defendants are actively inducing their customers who are holding the infringing plates to infringe the patent by, for example, continuing to provide trainings and tutorials in how to use the infringing products. These activities should cease immediately, as they also violate the injunction.

Plaintiffs now move for an order requiring Defendants to show cause why they should not be adjudged in contempt, and for a Contempt Order against Defendants to enforce the Permanent Injunction and to remedy Defendants' violations by (i) ordering that the Permanent Injunction applies to the Compresiv/Versiv plates; (ii) ordering Defendants to recall all infringing inventory currently in the possession of third parties; and (iii) ordering an accounting so damages and other monetary remedies for

Compresiv/Versiv or other plates sold or used in violation of the Injunction can be calculated.

## II.   Argument

### A.   The Compresiv/Versiv Plates are Not Colorably Different and Are Subject to the Injunction

*TiVo, Inc. v. Echostar C*orp., 646 F.3d 869 (Fed. Cir. 2011) (*en banc*) sets out the standard for determining whether a product is within the scope of an injunction. The decision first notes that contempt proceedings are "left to the broad discretion of the trial court to be answered based on the facts presented." *Id.* at 881.

There are two parts to the contempt analysis. "The party seeking to enforce the injunction must prove both that [1] the newly accused product is not more than colorably different from the product found to infringe and [2] that the newly accused product actually infringes." *Id.* at 882. As to the "colorably different" question:

> [O]ne should focus on those elements of the adjudged infringing products that the patentee previously contended, and proved, satisfy specific limitations of the asserted claims. Where one or more of those elements previously found to infringe has been modified, or removed, the court must make an inquiry into whether that modification is significant. If those differences between the old and new elements are significant, the newly accused product as a whole shall be deemed more than colorably different from the adjudged infringing one[.]

*Id.* As to the second question:

> [W]hen a court concludes that there are no more than colorable differences between the adjudged infringing product and modified product, a finding that the newly accused product continues to infringe the relevant claims is additionally essential for a violation of an injunction against infringement.

*Id.* at 883. Plaintiffs must prove both elements by clear and convincing evidence.

"[I]njunctions are enforced through the district court's civil contempt power."

*Thomas v. Blue Cross & Blue Shield Ass'n*, 594 F.3d 823, 829 (11th Cir. 2010). "If a party

contends that another party is violating an injunction, the aggrieved party should move

the court for an order to show cause why the other party should not be held in civil

contempt." *Id.* "If satisfied that the plaintiff's motion states a case of non-compliance,

the court orders the defendant to show cause why he should not be held in contempt

and schedules a hearing for that purpose." *Nephron Pharma. Corp. v. Hulsey*, 2021 WL

1341879, at *4 (M.D. Fla. Jan. 12, 2021). "At the end of the day, the court determines

whether the defendant has complied with the injunctive provision at issue and, if not,

the sanction(s) necessary to ensure compliance." *Id.*

### 1. Defendants' Testimony Regarding Compresiv/Versiv TPLO Plates Did Not Identify Any Colorable Difference

The Compresiv/Versiv TPLO plates played a central role in the trial, because

Defendants argued that they were non-infringing alternatives, and Plaintiffs argued

they were still infringing. The only clinician to testify regarding these plates for

Defendants was Dr. Peck. He testified that these plates are "pre-contoured," "are very

similar to the Elite VOI plates" found by the jury to infringe, and because of

"similarities with the previous plates," "there's nothing you have to do differently,

really, during the surgery." The only differences he identified, the presence of a K wire,

and the finish on the plate, have nothing to do with the elements of the Synthes patents.

Q. First of all, what is the Compresiv and Versiv plates?

A. ***They are precontoured TPLO*** plates that have locking screws as well.
***They are very similar to the Elite VOI plates***, but there are some

modifications that have been made, you know, a couple of nice changes that are useful.

Q. What do you like about the Compresiv and Versiv plates?

A. The first one may sound a little bit silly, but ***they have a matte finish***, so it's not shiny. And, believe it or not, sometimes the lights in the OR will glare off of the shiny metal plates. And it can be annoying sometimes when you're trying to look -- you just -- you know, you have to keep shifting the light so it's not glaring off the plate. So the matte finish gets rid of that. There's a few other things. ***They have holes for K-wires, so very small pins that we can use that*** – especially if you're doing it single-handedly, which I typically historically have done without an assistant. It helps hold the plate in place as well.

Dkt. 566, Vol. 4, at 881:13-882:5 (emphasis added).

Q.  So how did you determine that the Compresiv and Versiv plates were acceptable alternatives after only using them a handful of times?

A. Well, again, ***the similarities between previous plates,*** you know, there's not -- there's not a lot that you have to -- ***there's nothing that you have to do differently, really, during the surgery***. So the -- the intraoperative performance of the plates is very straightforward. They work just fine.

*Id*. at 883:2-9 (emphasis added).

Q. So you said that the Versiv and Compresiv were very much like the Elite and the NXT, correct?

A. I said they was -- quite similar.

*Id*. at 889:16-18 (emphasis added).

Defendants also called an expert, Mr. Drewry, who testified that "the Compresiv/Versiv plates that have been discussed" are "non-infringing alternatives." Dkt. 567, Vol. 5, at 1006:3-7. As to claim 1 of the '728 patent, Mr. Drewry only identified one limitation that was purportedly not met: "the proximal portion having a bone-contacting surface configured and dimensioned to conform to the cut-away

portion of the tibia":



Q. And then, turning to Claim 1 of the '728 patent –
Q. So we're looking at around lines 8 to 10.

A. Yes. Again, this is the -- as we talked about, the bone-contacting surface conventioned -- I mean, dimensioned to conform to the shaft of the tibia. And the -- not only did the bottom shape of the V change, but they ran that V the full length of the plate again. So they were able to maintain that V orientation the whole length of the contour.

Dkt. 567, Vol. 5, at 1101:22-1102:7.

Q. Why doesn't a V-shaped undersurface meet -- why doesn't that conform to the shape of the tibia?

A. Again, as I mentioned, it's not based on the arc of a cylinder. And because it's elevated in the middle, you have two lines of contact, basically, on the length of the plate, and under that V, there's no contact between the bone and the plate.

Dkt. 567, Vol. 5, at 1102:8-1103:14.

On cross-examination, Mr. Drewry admitted that he did not examine actual

Compresiv/Versiv plates in rendering his opinion.

Q. And you actually didn't analyze the VOI Compresiv and Versiv plates as they're actually manufactured, correct?

A. Yes, sir, that's correct.

Dkt. 567, Vol. 5, at 1172:20-22.

Not only did Mr. Drewry not examine the actual Compresiv/Versiv plates, when confronted with them he admitted that he did not opine that the actual plates had the V shape he spoke about on direct.



**Defendants Provide Inaccurate Information To Their Expert**

| Materials Provided to Mr. Drewery | Actual Compresiv/Versiv Shape |
|---|---|

PDX10.175

Q. And the right-hand plates are the plates that are actually produced and are sold to customers, correct?

A. Yes, sir, they are.

Q. And you didn't testify on direct that those plates have a V under the bone-contacting surface in the proximal plates, the actual plates, correct?

A. That's correct.

Dkt. 567, Vol. 5, at 1173:4-10.

As to the CAD drawings he did analyze, Mr. Drewry agreed they "are not of the actual plate." Dkt. 567, Vol 5, at 1171:24-1172:5 ("Q. Now what's interesting about these CAD drawings is these are not of the actual plate, correct? A. No. As I explained, they were the CAD drawings of the parts that were designed on the computer."). Mr. Drewry further confirmed that he "didn't speak to any VOI employee who created these CAD drawings to determine if they were accurate or not," despite agreeing that there is evidence that "VOI had a practice of creating inaccurate information to provide Synthes to, quote, keep them off our back." *Id.* at 1172:6-19.

Notably, however, even the Compresiv/Versiv design drawings that VOI showed to the jury and cited in Mr. Drewry's report show the presence of a radius on the bone contacting surface of the plate. In particular, the slide defendants showed in opening depicted a radius of R8.00 which is a curve on the back surface. Mr. Drewry referred to this as "blend radii":



Q. Does that refresh your recollection that in your report you disclosed that the -- *the actual was a blend radii on the bone-contacting surface*?

A. *Yes, sir, I do*.

Dkt. 567, Vol. 5., at 1176:24-1177:2 (emphasis added).

On re-direct, Mr. Drewry then provided the following testimony about the blend radii, stating that "the bone will ride on that radius."

Q. What's the effect of -- of the blend radii, and -- and why are the CAD drawings with the V shape and the manufacturing ones not?

A. Well, again, the plate -- the plate is V-shaped like this, and the blend radius kind of takes out this sharp corner, so it makes that little turn there, and then they put blends on the bottom there so there's no sharp edges against the bone. But, again, the bone will ride on that radius, that radius, and you'll still have remnants of the V shape on the bottom of the plate.

Dkt. 567, Vol. 5, at 1186:3-12. These admissions by Dr. Peck and Mr. Drewry (including that Compresiv/Versiv are "very similar" to the Elite and NXT plates found to infringe and are configured with a radius to "ride on" the bone) confirm that Compresiv/Versiv are not colorably different.

**2.      Synthes' Testimony Regarding What Features In Elite and NXT Satisfy the Disputed Element Further Evidences That Compresiv/Versiv Are Not Colorably Different**

As discussed above, element 1(c) of the '728 patent is the only element that VOI argued Compresiv/Versiv did not meet, and the only element that Mr. Drewry addressed. For the infringing Elite plates, Synthes' expert Dr. Gall testified that the claim was met, as confirmed by images of the Elite plates on the bone, and the fact that Elite fits on the cut and re-positioned portion of the tibia:



[A.] . . . And so it talks about a proximal portion configured for attachment to a cutaway and repositioned portion of the tibia. So the proximal portion is that top of the plate there. It says it has a bone-contacting surface that's configured and dimensioned to conform, and then that that cutaway portion of the tibia has been repositioned. And you kind of think of this as the TPLO procedure, right. You cut this portion away, you reposition it, and then the plate fits on there. And it does meet those elements.

Dkt. 564, Vol. 2, at 350:24-351:7. VOI and Dr. Drewry did not contest that this

evidence satisfied element 1(c) for the Elite plates. Dkt. 567, Vol 5, at 1169:22-

1170:10. Simply put, infringement indisputably did not turn on anything about the

exact amount of space between the plate and the bone (much less the other alleged

differences that VOI identified, such as a matte finish or k-hole).

Dr. Gall's analysis was consistent with the testimony of the inventor, Mr.

Horan, who testified that the shape Synthes patented would not be a perfect fit for

any animal: "So the idea that we are proposing of here's an implant, it's not a perfect fit but it's okay, everything's cool, was kind of – kind of odd for them to hear." Dkt. 563, Vol. 1, at 171:3-5; Plaintiffs' Exhibit 3 at 4 ("Without requiring precise anatomical contouring").

### 3. Dr. Gall Is the Only Expert Who Analyzed Actual Compresiv/Versiv Plates and Determined they Infringe

Dr. Gall analyzed the physical Versiv and Compresiv plates, including the physical samples and 3D scans of those samples, and specifically found that they infringe. Dkt. 564, Vol. 2, at 386:20-387:17; 391:14-392:12.

Indeed, his analysis of the Compresiv/Versiv plates established that they did not have the only allegedly relevant difference identified by Mr. Drewry:  the "v-shape" surface depicted in Defendants' CAD drawings:



Q.  What did you find about the proximal portion contour of the Versiv

and Compresiv plates?

A. ***I found that that proximal portion was configured and dimensioned to conform to the tibia***, but they're saying it's not.

Q. Did you ***find a V shape*** in the proximal portion?

A. ***I did not***.

Dkt. 564, Vol 2, at 387:11-17 (emphasis added).

Dr. Gall testified without dispute that the other limitations of claim 1 of the '728 patent were met for Compresiv/Versiv. Dkt. 564, Vol. 2, at 391:16-392:12 ("And so would the Versiv and Compresiv plates be a non-infringing alternative to the accused products?  A.  They would not.").

| | | '728 Patent, Claim 1 | | |
|---|---|---|---|---|

– VOI Versiv/Compresiv TPLO Plates          **VOI / FIDELIO**

| | | | Present? |
|---|---|---|---|
| [A] | A bone plate for securing two tibial bone segments as part of a tibial leveling osteotomy procedure for an animal, the bone plate comprising: | | ✓ |
| [B] | a distal portion comprising an elongated shaft having disposed therein a plurality of distal portion screw holes each designed to accept a screw; and | | ✓ |
| [C] | a proximal portion configured for attachment to a cutaway and repositioned portion of the tibia, the cut-away portion of the tibia comprising an articular surface at which the tibia interacts with a femur, the proximal portion having a bone-contacting surface configured and dimensioned to conform to the cut-away portion of the tibia when the distal portion is coupled to the shaft of the tibia in a desired orientation and when the cut-away portion of the tibia has been re-positioned as desired, | | ✓ |
| [D] | the proximal portion comprising at least three proximal portion screw holes each designed to accept a screw, wherein a first proximal portion screw hole is a superior screw hole, a second proximal portion screw hole is a cranial screw hole located distally and cranially from the superior screw hole, and a third proximal portion screw hole is a caudal screw hole located distally and caudally from the superior screw hole, | | ✓ |
| [E] | wherein screw hole paths for at least two of the three screw holes of the proximal portion are predetermined and angled to direct screws inserted therethrough, when the bone plate is positioned on the tibia in a desired position, into a central mass of the tibia, wherein the elongated shaft extends along a longitudinal shaft axis and the plate defines a base plane parallel to the shaft axis, the screw hole path of the superior screw hole being angled no more than 90 degrees relative to the base plane. | | ✓ |

PLAINTIFFS' **PX2**

PDX5.251

Dr. Gall's testimony was consistent with his supplemental expert report served in the case. Dkt. 500-1 at ¶ 9 ("The Versiv and Compresiv TPLO plates meet each limitation of claim 1, as explained in detail below."), ¶ 21 ("the Versiv and Compresiv

TPLO plates are not a non-infringing alternative to the plates accused of infringement in this case"). Defendants were offered the opportunity to depose Dr. Gall on this supplemental report. Dkt. 502 at 9 ("if VOI has questions about Dr. Gall's report, Synthes is willing to produce Dr. Gall for a supplemental deposition."). Defendants declined. At trial, Defendants identified no credible basis to contest Dr. Gall's testimony or the physical and documentary evidence establishing that there is no colorable difference as to the disputed element:



In sum, Synthes has proven both that the Compresiv/Versiv product is not more than colorably different from the product found to infringe, and that Compresiv/Versiv actually infringes. Therefore, Synthes respectfully submits that the Court should order that Compresiv/Versiv are subject to the injunction.

**B.    Defendants' Tactic of Having Customers "Hold" Infringing Products Violates the Injunction**

The jury handed down its verdict on January 13, 2023. Dkt. 555. On January 17, the next business day, Defendants sent unsolicited letters to its customers announcing it was shipping without being requested large amounts of the Compresiv/Versiv plates:

> Due to continued supply chain inconsistencies and uncertainties, we have shipped a significant portion of your annual needs as it pertains to TPLO plates and locking screws. Please note this shipment does not reflect COD but rather a payment plan invoice.
>
> Should you choose not to accept this shipment please feel free to work with your district manager to process a no charge return.

Dkt. 578-2 at 154.

The size of these shipments was, to put it mildly, extraordinary. In all of 2021, Defendants sold 59,786 TPLO plates. Between December 2022 and January 2023, Defendants shipped 11,400 Elite/NXT/CBLO plates and 32,907 Compresiv/Versiv plates. Defendants have tried to excuse this behavior as being standard operating procedure associated with the "Annual Order Program." But that program requires the customer to "Place one order to fit your needs & make equal month payments." Dkt. 578-2 at 11. Customers who received these plates made clear that they had not pre-ordered them and were surprised by their shipment:

> "Wonder if this has anything to do with the recent sudden unauthorized shipping of tens of thousands of dollars of VOI TPLO plates and locking screws to current veterinary surgeon customers."
>
> "Timing of lawsuit 1/13/23 publication and **recent unauthorized shipment of product (plates and screws) 1-2 days ago is extremely suspicious**. Especially for VOI (Movora) money/cash flow and revenue/income."

"I got the letter, apparently shipped out today. Everyone should check their email and junk mail. It was from Pierre D'Amours. I've never heard of him... So I'm glad I read my email stating that someone is **sending me a huge package probably in the 30-50k range**, oh I didn't get an invoice to say how much was being sent... **I did not order**. But says that if I don't want it, to send it back... Yes, I'm probably going to keep it but just don't like being told what to do."

"I received an email today from an executive at Movora stating that they were **shipping me a chunk of inventory that I hadn't ordered**. I asked my rep who replied with a formulaic email stating she "**had to act quickly**" to send out stock due to backorder issues. The shipment appears to be $33000 worth of screws and they've already set up a monthly payment plan. I'm not against a preorder but this seems really odd to me. Anyone else get this?"

"I got an email from Pierre, my rep and a VM. Sounded like I needed to agree to it though. **My order was $100,000 but only TPLO stuff because of anticipated supply chain issues**."

"Received all the things today. I talked to my rep about it and **asked if it was truly due to anticipated backorders and supply issues and she basically said there may be more to it than that but wouldn't expand**. Definitely set off some alarm bells."

Dkt. 575 (emphasis added).

This Court has already found that Defendants' "fire sale" tactic "sought to evade the effect of the requested permanent injunction" by sending "large shipments of TPLO plates and screws" "to surgeons who never ordered the product." Dkt. 593 (Order Granting Injunction) at 7. The Court rejected Defendants' explanations for this behavior, stating "this Court does not find Defendants explanation credible." *Id.*

Following this Court's order issuing the injunction, Synthes immediately wrote to Defendants informing them that having the customers continue to hold these plates was a violation of the injunction:

> The possession of Elite, NXT, CBLO, Swiss/DT, Compresiv, and Versiv plates by your customers is a violation of the terms of the injunction. This is especially the case as to plates for which the customers retain a right of return. We request that you as well as any Vimian officer, employee and agent confirm that the return of all of these plates, as well as the locking screws and other TPLO equipment sold with these plates, will be immediately effected. Given the speed at which a substantial amount of these materials were shipped out immediately before and after the jury verdict, we believe these process of return should take no more than a week to complete.

Ex. 1 (2/22 Email). Defendants refused, stating "We do not agree that possession of any plates by VOI's customers violates the injunction. VOI will, therefore, not be effectuating any returns of plates, screws, or other equipment." *Id.* (2/24 Email). VOI cited no case law authority supporting its position, and did not dispute the factual predicates relating to the fire sale shipment of the plates.

Defendants' assertion that they can evade the injunction by having their customers hold inventory is wrong. As an initial matter, the injunction is not limited to Defendants themselves, but expressly prohibits "those ***in active concert or participation with any of them*** . . . from making, using, selling, offering for sale, and importing into the United States any Infringing Implants or variations thereof that are not colorably different." Dkt. 593 at 13 (emphasis added). Defendants cannot evade the injunction or a contempt finding by acting in concert with their customers. *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945) ("defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding"); *Roe v. Operation Rescue*, 54 F.3d 133, 139 (3d Cir. 1995) ("an instigator of contemptuous conduct may not 'absolve himself of contempt

liability by leaving the physical performance of the forbidden conduct to others'").

Further, Defendants cannot evade the injunction by shipping the products to customers before the injunction, and then actually selling them to the customers after. Defendants admitted that the Compresiv/Versiv shipments were not completed sales in which the customer placed an order, paid for it, and title passed to the customer. Rather, Defendants confessed they shipped the plates without receiving any order *at all*. Dkt. 578-2 at ¶ 11 ("Although these customers *were not currently part of the Annual Order Program*, Movora decided to ship 4 to 6 months-worth of plates and screws to these repeat, high-volume customers . . .") (emphasis added). Further, while the Court already found Defendants' explanation regarding its "annual order program" not credible, even under that alleged program there was no sale to customers. Defendants concede those customers receive an "entire annual inventory in one shipment" without making any payment, and then "make[] monthly payments on its entire annual inventory throughout the year." Dkt. 578-2 at ¶ 6. Critically, however, a customer "can return any unused and unopened inventory." *Id.* at ¶ 6.

The Patent Act defines infringement as including "whoever without authority . . . sells any patented invention." 35 U.S.C. § 271(a). It is black letter Federal Circuit law that a "sale" under section 271(a) of the Patent Act "consists in the passing of title from the seller to the buyer for a price." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 831 F.3d 1369, 1378 (Fed. Cir. 2016). Here, as discussed above, Defendants' customers have not paid for the anticipatory shipments and did not order them, and therefore have no contractual obligation to purchase or pay for them. Thus,

11197450

Defendants' ploy did not succeed in taking these infringing units outside the scope of the injunction, as the sales will occur as payments are made.

*Blackberry Limited v. Typo Products LLC*, 2015 WL 474553 (N.D. Cal. Feb. 4, 2015) is instructive. There, Defendant engaged in a virtually identical scheme to VOI – agreeing with a third party that it would "transfer around 4,000 keyboards to Yergensen before the injunction took effect, and Yergensen would only pay Typo for the keyboards when Yergensen sold them to third parties." *Id.* at *2. The third party subsequently "sold approximately 1,900 keyboards, for which he paid Typo approximately $75,000 after the preliminary injunction took effect." *Id*. Defendant argued it did not violate the injunction because the shipment "occurred before the injunction took effect and Yergensen's sales to third parties were outside of Typo's control." *Id.* at *2. The Court disagreed, holding Defendant in contempt because the mere shipment of products "before the injunction took effect did not transfer title of the enjoined keyboards from Typo to Yergensen." *Id*. Rather, "Typo did not sell the enjoined keyboards to Yergensen until Yergensen paid Typo for the keyboards, which was after the preliminary injunction took effect." *Id.* The Court further found the absence of a sale before the injunction because "Typo reclaimed 1,800 keyboards which Yergensen had been unable to sell, confirming that ownership of those keyboards never transferred to Yergensen. Typo's sales of 1,908 keyboards to Yergensen therefore violated the preliminary injunction." *Id.*

Just as in *Blackberry*, Compresiv/Versiv plates are sold when Defendants are actually paid and title is transferred. All these sales are expressly prohibited by the

injunction and the Court should order Defendants to recall all inventory in the possession of customers. *See ALPS South, LLC v. Ohio Willow Wood Co.*, 2013 WL 12161867, at *11 (M.D. Fla. Nov. 12, 2013) (finding contempt of injunction and ordering Defendant to sequester all infringing products not colorably different).

For Compresiv/Versiv plates that the customers have already used and cannot be recalled, Synthes is entitled to a monetary remedy. This Court has "discretion to determine the basis for setting the amount of civil contempt damages." *Graves v. Kemsco Grp., Inc.*, 864 F.2d 754, 756 (Fed. Cir. 1988); *Spindelfabrik Suessen-Schurr v. Schubert & Salzer*, 903 F.2d 1568, 1578 (Fed. Cir. 1990) (affirming district court's award of damages in contempt proceeding "for the additional infringements upon which the finding of contempt rested"). Synthes requested that Defendants "provide an accounting within 7 days of all units of Elite, NXT, CBLO, Swiss/DT, Compresiv and Versiv plates made, sold, offered for sale, used, and/or imported between December 5, 2023 and today (including without limitation by identifying each unit, the dates of manufacture, sale, offer for sale, use, and/or importation, the current location of each unit, and all revenue associated with each unit)." Ex. 1 (2-22 Email). To date, Defendants have not provided this information. *Id.* (2-24 Email).

Because an accounting is necessary to calculate any monetary remedy, Synthes requests that the Court order Defendants to provide the requested accounting so that an appropriate monetary remedy can be calculated and determined in further proceedings. *See, e.g.*, *Consumer Elecs. Assn. v. Compras & Buys Magazine, Inc.*, 2008 WL 11333082, at *12 (S.D. Fla. Oct. 29, 2008) (ordering that "within three (3) days from

11197450

- 19 -

the date of the entry of the Contempt Order that Justin Finocchiaro be required to render an accounting to Plaintiff of all business conducted by Defendants under any of the infringing trade names").

### C. Defendants' Inducement of Infringement by Supporting and Training Customers to Use Infringing Products Violates the Injunction

An injunction forbidding infringement also forbids inducing infringement. *See, e.g., Virginia Panel Corp. v. MAC Panel Co.*, 139 F. Supp. 2d 753, 755-56 (D. W. Va. 2001) (holding that injunction on "manufacturing, using, or selling for commercial, non-government, purposes the adjudged infringing receivers" "proscribes all types of infringement, including direct infringement, inducement of infringement, and contributory infringement"); *Jeneric/Pentron, Inc. v. Dillon Co., Inc.*, 259 F. Supp. 2d 192, 198 (D. Conn. 2003) (after trial on direct infringement, holding injunction also applied to inducement because "The Court knows of no reason why it should distinguish among the different forms of infringement covered by the statute. The focus of the injunction is to protect against future infringement, no matter how it is manifested.").

"A defendant is liable for 'induced infringement under § 271(b)' if the defendant took certain affirmative acts to bring about the commission by others of acts of infringement and had 'knowledge that the induced acts constitute patent infringement.'" *TecSec, Inc. v. Adobe, Inc.*, 978 F.3d 1278, 1286 (Fed. Cir. 2020). Here, there is no question that following this lawsuit and the jury verdict Defendants are aware of the Synthes patents and that Compresiv/Versiv and the other TPLO plates

addressed at trial infringe.

Despite this, Defendants continue to undertake affirmative acts to bring about infringement by their customers. For example, Defendants continue to provide their customers with tutorials, trainings, and workshops teaching and encouraging customers to use the infringing Compresiv/Versiv plates. Ex. 2 (Movora Education Website offering numerous VOI TPLO workshops); Ex. 3 (VOI website offering "a lab or educational session at your university or practice"). Defendants also continue to provide marketing and teaching materials that induce customers to infringe. Ex. 4 (VOI YouTube page with videos touting infringing NXT and Elite plates). The Federal Circuit has repeatedly held that training and instruction of customers to use infringing devices constitutes inducement. *See, e.g.*, *Barry v. Medtronic, Inc.*, 914 F.3d 1310, 1336 (Fed. Cir. 2019) (affirming verdict of inducement based on "the training materials provided by Medtronic and its sales representatives" and "teaching surgeons the nuances of and techniques for using the devices"); *Smith & Nephew, Inc. v. Arthrex, Inc.*, 502 Fed. App'x 945, 950 (Fed. Cir. 2013) (reversing district court and re-instating jury verdict of inducement where defendant provided "instructions for use of the accused Bio–SutureTak anchor [to surgeons]"). Engaging in this type of inducement violates the injunction. *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 2013 WL 1149230, at *15-16 (M.D. Pa. Mar. 19, 2013) (finding Defendant in contempt by inducing infringement in violation of injunction, where it provided "online promotional videos, which demonstrate how the Whipper–Snap connectors work and instruct end users on how to use them").

Following entry of the injunction, Synthes informed Defendants that "The support of any customers who were sold Elite, NXT, CBLO, Swiss/DT, Compresiv, and Versiv plates to use these plates also violates the terms of the injunctions. We request that you as well as any Vimian officer, employee and agent confirm immediate cessation of such acts." Ex. 1 (2-22 Email). Defendants refused. *Id.* ("VOI will not be ceasing 'support' of customers"). Synthes therefore respectfully requests that the Court hold Defendants in contempt and order Defendants to cease inducing use of the infringing plates by having the plates returned to VOI.

## III.   CONCLUSION

As discussed at the February 15, 2023 hearing, Plaintiffs request a hearing on the issues raised in this motion. Plaintiffs believe one hour per side would be adequate to address the issues raised.


Dated this 2nd day of March, 2023.

GRAYROBINSON, P.A.

By:    */s/ R. Troy Smith*
R. Troy Smith
Florida Bar No. 485519
50 N. Laura Street, Suite 1100
Jacksonville, FL 32202
Phone: (904) 598-9929
Facsimile: (904) 598-9109
*troy.smith@gray-robinson.com*
*maria.daniels@gray-robinson.com*
*jessica.gonzalez@gray-robinson.com*

-and-

Jason G. Sheasby (admitted *pro hac vice*)
California Bar No.: 205455
Andrew E. Krause (admitted *pro hac vice*)
California Bar No.: 294850

Irell & Manella, LLP
1800 Avenue of the Stars, Ste. 900
Los Angeles, CA 90067-4276
Phone: (310) 277-1010
Facsimile: (310) 203-7199
jsheasby@irell.com
akrause@irell.com

Lisa S. Glasser (admitted *nro hac vice*)
California Bar No.: 223406
Stephen M. Payne (admitted *pro hac vice*)
California Bar No.: 310567
Irell & Manella LLP
840 Newport Center Drive, Ste. 400
Newport Beach, CA 92660-6396
Phone: (949) 760-0991
Facsimile: (949) 760-5200

***Attorneys for Plaintiffs DePuy Synthes***
***Products, Inc. and DePuy Synthes Sales, Inc.***

### Local Rule 3.01(g) Certification

I hereby certify that the Parties discussed the motion at the February 15, 2023

hearing and further met and conferred on February 22, 24, and 28, 2023. Defendants

oppose the motion.

By: /*s/ R. Troy Smith*